NITIN GAMBHIR (SBN 259906)
ngambhir@polsinelli.com
Polsinelli LLP
1661 Page Mill Road, Suite A
Palo Alto, CA 94304
T: 650-461-7700
F: 650-461-7701

DANIEL D. OWEN (*PHV FORTHCOMING*)
dowen@polsinelli.com
G. GABRIEL ZOROGASTUA (*PHV FORTHCOMING*)
gzorogastua@polsinelli.com
Polsinelli PC
900 w. 48TH Place, Ste. 900
Kansas City, MO 64112
T: 816-753-1000
F: 816-753-1536

Attorneys for Plaintiff
Tevra Brands, LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEVRA BRANDS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>BAYER HEALTHCARE LLC, BAYER ANIMAL HEALTH GmbH, and BAYER AG,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR ANTITRUST VIOLATIONS OF THE CLAYTON ACT §3 (EXCLUSIVE DEALING AND TYING) AND THE SHERMAN ACT §2 (MAINTENANCE OF A MONOPOLY)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Tevra Brands, LLC ("Tevra") brings this lawsuit against Defendants Bayer Healthcare LLC, Bayer Animal Health GmbH, and Bayer AG (collectively, "Defendants") for antitrust violations of the Clayton Act §3 (exclusive dealing and tying) and the Sherman Act §2 (maintenance of a monopoly) as follows:

## NATURE OF ACTION

1.      Plaintiff Tevra Brands, LLC ("Tevra") was damaged by a reduction in competition caused by Defendants' violations of antitrust law, including Defendants' two separate schemes of illegal exclusive dealing and illegal tying involving "squeeze-on" Imidacloprid topical flea and tick treatments ("Imidacloprid topicals"), which are purchased by retailers throughout the United States.

2.      Tevra makes generic "squeeze-on" Imidacloprid topicals that are less expensive, and just as effective, as the name brand Advantix flea and tick treatments made by Defendants. Despite this, Defendants' anticompetitive conduct has maintained its monopoly in the Over-The-Counter ("OTC") market for Imidacloprid topicals, excluded generics like Tevra's products from the market, and ensured that both retailers and consumers pay supra-competitive prices.

3.      Defendants made approximately 85% of all sales in the relevant market during 2018 and, upon information and belief, received patent royalties for most of the other 15%. To maintain its monopoly, and to stop Tevra and other makers of generic flea and tick treatments from competing against their Advantix brand, Defendants entered into "Secret Bundled Loyalty Rebate"[1] agreements with retailers and distributors. Through these illegal exclusive dealing and tying agreements, Defendants forced retailers and distributors to agree to not carry generic Imidacloprid topicals in competition with Advantix.

---

[1] The phrase "Secret Bundled Loyalty Rebate" is used to describe the agreements that Defendants entered into with retailers and distributors for the sale of Imidacloprid topicals, the Seresto flea collar, and other products manufactured by Defendants, which Defendants used to foreclose competition from generic manufacturers of Imidacloprid topicals. These agreements include, but are not limited to, agreements requiring retailers and distributors to not carry generic Imidacloprid topicals, agreements requiring sales of certain amounts of Bayer products to receive rebates, and agreements tying the purchases of and rebates on the Seresto flea collar to purchases of Defendants' Imidacloprid topicals.

COMPLAINT FOR ANTITRUST VIOLATIONS

4.      Defendants also coerced retailers into buying its more expensive products by illegally tying the purchase of Advantix to Defendants' patented, "must have," Seresto flea collar.  Generic manufacturers like Tevra cannot compete with this illegal tying agreement because Defendants obtained the "exclusive use" of the formulation used in the Seresto flea collar when it registered that formulation with the U.S. Environmental Protection Agency pursuant to the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136a, *et seq*.

5.      Defendants have used their Secret Bundled Loyalty Rebate, which includes both the illegal exclusive dealing scheme described above in ¶3, and the illegal tying scheme described above in ¶4, to maintain their monopoly.  As a result of Defendants' conduct, Tevra and other generic manufacturers were substantially foreclosed from entering the OTC retail market and its pet specialty retail and online retail sub-markets with their generic Imidacloprid topical flea and tick treatments.  The exclusion of Tevra and other generic manufacturers from the market has resulted in substantially less competition, higher prices, and fewer product choices for retailers, distributors, and consumers.

## PARTIES

6.      Plaintiff Tevra is a Nebraska limited liability company, with its headquarters in Omaha, Nebraska.  Tevra was founded in 2015 by a group of five veterans of the pet products industry.  Prior to founding Tevra, they had acquired a tremendous depth and breadth of experience with flea and tick treatments, having worked at Sergeant's Pet Care Products, Perrigo, Bayer Animal Health, and other leading companies in the industry.

7.      Defendant Bayer AG is a corporation organized and existing under the laws of Germany, with a place of business at Kaiser-Wilhelm-Allee 1, 51368 Leverkusen, Germany.  Defendant Bayer AG is a German company founded in 1863.  It is composed of over 400 consolidated companies, including Defendant Bayer Healthcare, LLC and Defendant Bayer Animal Health GmbH.  The Bayer conglomerate operates in over 90 countries, employs over 115,000 people, and had over $44 billion in sales in 2018.

8.      Defendant Bayer HealthCare LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 100 Bayer

-2-

Blvd., Whippany, NJ 07981. Bayer HealthCare LLC is also a wholly owned subsidiary of Bayer AG. Bayer Animal Health is <u>a division</u> of Bayer HealthCare LLC with its principal place of business at 12809 Shawnee Mission Parkway, Shawnee, Kansas. The business of Bayer HealthCare LLC relevant to this action is operated by its division Bayer Animal Health.  This division should not be confused with Defendant Bayer Animal Health GmbH, described below.

9.     Defendant Bayer Animal Health GmbH is a corporation organized and existing under the laws of Germany, with a place of business at Kaiser-Wilhelm-Allee 50, 51373 Leverkusen, Germany. Bayer Animal Health GmbH is also a wholly owned subsidiary of Bayer AG.  Defendant Bayer Animal Health GmbH should not be confused with the Bayer Animal Health division of Defendant Bayer HealthCare LLC, described above.

10.     Bayer Animal Health GmbH, Bayer HealthCare LLC and Bayer AG are affiliated companies under common control and are collectively referred to, for the purposes of this Complaint, as "BAH."  Bayer HealthCare LLC licenses a patent described in this Complaint from Bayer Animal Health GmbH, and these two companies, under the common control of Bayer AG, are jointly engaged in research, development and marketing of BAH products described in this complaint.

## <u>JURISDICTION AND VENUE</u>

11.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), because this action arises under Sections 3, 4 and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15 and 26, as well as Section 2 of the Sherman Act, 15 U.S.C. § 2.

12.     This Court has personal jurisdiction over each of the defendants, pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants may be found and transact business in the State of California.  This Court also has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in California; (b) researched, developed, sold, shipped, and/or delivered substantial quantities of Imidacloprid products and the Seresto flea collar throughout the United States, including in California; (c) had substantial contacts with the United States, including in California; (d) engaged in anticompetitive agreements with companies in the United States,

including in California, that were directed and had a direct, foreseeable, and intended effect of causing injury to the business or property of companies and consumers residing in, located in, or doing business throughout California and the United States; and/or (e) sold and directed their sale of Imidacloprid products and the Seresto flea collar to retailers throughout the United States, including in California.

13.     This Court also has personal jurisdiction over BAH because the BAH knew, or should have known, that their anticompetitive agreements outlined in this Complaint with nationwide retailers would have the effect of preventing manufacturers of generic Imidacloprid topicals from competing with BAH and of increasing prices for both retailers and consumers. BAH knew, or should have known, that their anticompetitive agreements had an impact in California, and throughout the United States.

14.     Venue is proper in this District because each of the defendants transacts business in this District and may be found in this District, as defined by 15 U.S.C. § 22.   Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant Bayer Health Care LLC maintains a facility in which it transacts business at 455 Mission Bay Blvd. South in San Francisco, California, and claims to be third largest biotech employer in the Bay Area. Defendant Bayer Health Care LLC also resides in this District, as it is subject to the Court's personal jurisdiction with respect to this action for the reasons stated above.

## FACTS COMMON TO ALL COUNTS

### A.     The Relevant Market

15.     The relevant market for analyzing the antitrust violations committed by BAH is:

> Topical flea and tick products containing Imidacloprid sold at wholesale by manufacturers to Over-The-Counter ("OTC") retailers in the U.S., including the sub-markets of sales to Pet Specialty Retailers, Online Retailers, and General Retailers, and to distributors who re-sell these products to OTC retailers.

1.     **The Product Market**

16.     The relevant product market in this case is topical flea and tick products containing Imidacloprid sold at wholesale by manufacturers to OTC retailers and to the distributors that supply OTC retailers.  For the reasons explained below, the relevant product market does not include topical products containing Fipronil and non-topical products like flea collars.

17.     The relevant product market includes sales to OTC retailers, specifically Pet Specialty Retailers, Online Retailers, and General Retailers, but excludes sales to veterinarians, for the reasons explained below.

a.     **Imidacloprid topicals are distinct and non-interchangeable with Fipronil topicals.**

18.     The active ingredients in flea and tick treatments are insecticides that kill and/or repel fleas and ticks.  Some of these insecticides are common agricultural insecticides that are manufactured in enormous quantities and used worldwide.  Two common insecticides used for flea and tick protection are Fipronil (which is the active ingredient in the topical treatment Frontline, and generics that compete with Frontline), and Imidacloprid (which is the active ingredient in BAH's Advantix, and generics that have attempted to compete against Advantix).

19.     Because common agricultural insecticides like Fipronil and Imidacloprid are widely available, inexpensive commodities, they usually constitute a small percentage of the cost of flea and tick treatments.  Instead, the major costs for most flea and tick treatments are the delivery systems for these active ingredients (such as a collar or a "squeeze-on" topical solution), together with the very substantial costs of obtaining regulatory approval by the U.S. Environmental Protection Agency for the use of the particular formulation of active ingredients in each flea and tick treatment.

20.     Flea and tick medications containing Fipronil are not included in the relevant market because such products serve different purposes from Imidacloprid products and are otherwise not interchangeable.  Specifically, Imidacloprid formulations sold today are more effective than Fipronil formulations, because they repel fleas and ticks, whereas Fipronil only

COMPLAINT FOR ANTITRUST VIOLATIONS

kills them.  In addition, unlike Fipronil, Imidacloprid kills and repels mosquitoes and repels biting flies.  Thus, many consumers perceive the higher value of Imidacloprid topical formulations, do not consider them interchangeable with Fipronil topical formulations. Manufacturers and retailers therefore charge a small but significant and non-transitory increase in price for Imidacloprid formulations, as compared to Fipronil formulations, and retailers and consumers do not switch from Imidacloprid to Fipronil formulations in response to that price difference in numbers sufficient to make the price difference unprofitable.

21.     BAH has extensively advertised the greater effectiveness of its name brand Imidacloprid topicals, as compared to Fipronil topicals, and contends that its Imidacloprid topicals are superior to Fipronil topicals.  BAH specifically states that its Imidacloprid topical repels and kills fleas and ticks, instead of simply killing them.  *See, e.g.*, K9 Advantix II protects against more types of ectoparasites than Frontline Plus, *available at* https://www.bayerdvm.com/static/media/images/pop-up/KPI-PopUp-Modal-k9AdvII.png (last accessed July 22, 2019).

22.     Because of the perceived superiority of Imidacloprid formulations over Fipronil formulations, consumers are willing to pay a small but significant non-transitory increase in the price of Imidacloprid formulations, as compared to Fipronil formulations.  For example, on July 16, 2019, a leading online pet retailer, Chewy.com, advertised a 6 dose package of K9 Advantix II Imidacloprid formulation for $64.59, which is $10.76 per dose.  On the same day, the same website advertised a 6 dose package of the Frontline Plus Fipronil formulation for $56.93, which is $9.48 per dose (a 13.5% price difference).  Also on July 16, 2019, a leading "brick and mortar" retailer, PetCo, advertised a 2 dose package of the K9 Advantix Imidacloprid formulation on its website for $26.09, which is $13.04 per dose.  On the same day the same retailer carried an advertisement on the same website for a 3-dose package of the Frontline Fipronil formulation for $36.49, which is $12.17 per dose (a 7.1% price difference).  These prices are summarized in Table 1 below:

| OTC Sub-Market | Retailer | Fipronil Price Per Dose | Imidacloprid Price Per Dose | Price % Difference |
|---|---|---|---|---|
| Online | Chewy.com | $9.48 | $10.76 | 13.5% |
| Pet Specialty | PetCo | $12.17 | $13.04 | 7.1% |

**Table 1 – Difference in Advertised per Dose Prices Between Fipronil and Imidacloprin Topicals – July 2019**

23.     These price differences are "significant" under the DOJ/FTC Horizontal Merger Guidelines, which generally consider a 5% price increase to be "small but significant."  (Merger Guidelines § 4.1.2, available at https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf).  Despite the significant price difference, Imidacloprid formulations do not lose enough sales to Frontline formulations to make the price difference unprofitable.  Because a hypothetical monopolist of Imidacloprid topicals could profitably impose a small but significant and non-transitory increase in price without losing enough sales to other products to make the price increase unprofitable (and, in fact, BAH did so as an actual monopolist), Imidacloprid topicals are a relevant product market under Merger Guidelines § 4.1.1.

24.     In addition to having distinct formulations, distinct purposes, and distinct pricing structures, the industry recognizes the two types of products as separate from one another.  Nielsen, a global measurement and data analytics company in the industry for pet products, tracks data for Fipronil and Imidacloprid separately.  Retailers also do not switch products in response to price changes between Fipronil and Imidacloprid because consumers expect retailers to carry both products.

25.     Imidacloprid and Fipronil are not interchangeable to Pet Specialty Retailers, Online Retailers, and General Retailers.  To remain competitive and to offer the products that customers expect to find, retailers must carry both formulations.

### b.     Topical flea and tick medications and delivery systems

26.     Distinct, non-interchangeable, products deliver flea and tick treatment to pets in different ways.  In 2018, the fastest growing type of flea and tick product was the flea and tick collar, led by BAH's Seresto flea collar.  The Seresto flea collar was a comparatively expensive product, typically offered by retailers in different markets at $40 to $69 per collar, depending on

the market.  BAH claims that the Seresto flea collar has a major advantage over other flea and tick treatment products, because it provides eight months of protection from a single application.

27.     "Topical" liquid treatments that are applied directly to a pet's skin or fur are distinct from flea collars.  In 2018, topicals accounted for the largest dollar amount of OTC flea and tick treatment sales.

28.     Flea and tick treatments may also be given to pets orally, but oral treatments must be obtained from a veterinarian, rather than from a retailer.  Other products that contain flea and tick treatments include shampoos and sprays.  Those products account for a small percentage of total flea and tick treatment sales.

29.     The relevant product market in this case does not include non-topical flea and tick medications.  Flea collars and topical flea and tick treatments are not interchangeable for most consumers.  Some consumers prefer the convenience and ease of using a single flea collar for up to 8 months, but will not accept the frequency and difficulty of applying a topical treatment to their pet.  Other consumers prefer the lower per-dose price of topicals and the control they have over when to apply them, but dislike the higher initial cost, smell, and appearance of flea collars. In addition, some consumers do not purchase flea collars due to safety concerns.

30.     Similarly, from the perspective of Pet Specialty Retailers and Online Retailers topical products do not represent interchangeable demand with other delivery systems for flea and tick medications like flea collars, shampoos, and baths.  Rather, these retailers must carry and sell each of these types of products to remain competitive.

### 2.      The Geographic Market

31.     The geographic market for analyzing the antitrust violations committed by BAH is the entire United States.  Manufacturers of Imidacloprid topicals sell those products to retailers with locations throughout the United States, and those retailers subsequently sell the products to consumers in all fifty states.

COMPLAINT FOR ANTITRUST VIOLATIONS

### 3. The relevant market includes sub-markets of Pet Specialty Retailers, Online Retailers, and General Retailers.

32. Within a broad product market, well defined sub-markets may exist which, in themselves, constitute product markets for antitrust purposes.

33. Almost half of the approximately $270,000,000 in Imidacloprid topicals sold at wholesale in 2018 were sold to OTC retailers, with the rest purchased by veterinarians.

34. OTC wholesale sub-markets include Pet Specialty Retailers, such as PetSmart, PetCo and Pet Sense, Online Retailers like Chewy.com, as well as General Retailers like grocers, drug stores, and discount stores.

35. In 2018, Pet Specialty Retailers purchased approximately 54% of Imidacloprid topicals sold at OTC wholesale, for about $71,000,000.

36. In 2018, Online Retailers purchased approximately 21% of Imidacloprid topicals sold at OTC wholesale, for about $28,000,000.

37. In 2018, General Retailers purchased approximately 25% of Imidacloprid topicals sold at OTC wholesale, for about $32,000,000.

38. Imidacloprid topical products sold directly or through distributors to Pet Specialty Retailers, Online Retailers, and General Retailers are appropriate relevant sub-markets of the OTC market. These distinct types of retailers re-sell the products to different types of consumers and have different markups from wholesale to retail prices. As set forth below, the same products can be sold at significantly different prices in different sub-markets.

39. Pet Specialty Retailers, Online Retailers, and General Retailers operate in all 50 states, and the sale of Imidacloprid topicals to these retailers involves hundreds of millions of dollars in U.S. interstate commerce.

#### a. Pet Specialty Retailers

40. The first OTC sub-market for flea and tick treatments is Pet Specialty Retailers, such as PetSmart, PetCo and Pet Sense. Sales to Pet Specialty Retailers accounted for about 54% of OTC Imidacloprid topical sales in 2018, or about $71,000,000. Pet Specialty Retailers can often charge higher prices for Imidacloprid topicals than Online Retailers and General

COMPLAINT FOR ANTITRUST VIOLATIONS

Retailers, because some consumers are attracted to their expertise, selection and perceived quality.

41.     Pet Specialty Retailers typically demand "vet quality" Imidacloprid topicals that are not readily available in lower priced distribution channels, such as General Retailers and Online Retailers.

42.     Pet Specialty Retailers are a lower-margin market for Imidacloprid topicals than veterinarians, but a higher-margin market compared to General Retailers and Online Retailers. Pet Specialty Retailers have higher overhead cost than General Retailers that sell many more items in the same store.  Pet Specialty Retailers are also expected to have staff that is trained to give advice on pet products.  Pet Specialty Retailers typically need to make a higher margin on their sales, and often mark-up wholesale prices by 75% to set their retail prices.

### b.     Online Retailers

43.     The second OTC sub-market for flea and tick treatments is Online Retailers (also called "e-commerce," "internet," or "web").  Sales to Online Retailers accounted for about 21% of OTC Imidacloprid topical sales in 2018, or about $28,000,000.  These retailers charge the lowest prices, but cannot offer face-to-face advice, or the opportunity to examine the products before purchasing them.  These retailers are generally chosen by consumers who are most price-sensitive, and who are willing to forgo the advantages of other markets for flea and tick treatments.

44.     Online Retailers are the lowest-margin market for Imidacloprid topicals.  They have no "brick and mortar" costs, but must appeal to the most price-conscious consumers. Online retailers often mark up wholesale prices 30% to 35% to set their retail prices.

45.     To meet the demands of different types of retailers, manufacturers like Tevra typically produce multiple brands of the same formulations, but restrict those brands to different sub-markets of retailers.  For example, Tevra produces Vetality, a "vet quality" Imidacloprid topical brand that it restricts to the Pet Specialty Retailer sub-market.  Tevra also produces the same formulation under its "TevraPet" brand, which it sells to General Retailers and to Online Retailers.

COMPLAINT FOR ANTITRUST VIOLATIONS

### c.    General Retailers

46.    Another OTC sub-market for flea and tick treatments is General Retailers, such as discount chains (ex. Walmart), grocery chains (ex. Kroger) and pharmacy chains (ex. Walgreens) that do not advertise any particular expertise in pet products, but include them with a wide variety of other consumer products.  Sales to General Retailers accounted for about 25% of OTC Imidacloprid sales in 2018, or about $32,000,000.  General Retailers can still charge higher prices for Imidacloprid topicals than online retailers, because some consumers want to examine the products before purchasing them, or like the convenience of having the products available when they are shopping for other items.

47.    General Retailers are a lower-margin market than Pet Specialty Retailers, but a higher-margin market compared to Online Retailers.  Because General Retailers operate on a greater scale than Pet Specialty Retailers, they can spread their overhead costs among many more products, and concentrate more on volume and less on margin.  General Retailers often mark up wholesale prices 50% to set their retail prices.

### 4.    The relevant market does not include sales to veterinarians.

48.    Veterinarians are an entirely separate market from the OTC retail market.  Sales to veterinarians accounted for about 51% of all Imidacloprid topical sales in 2018, or about $136,000,000.  Veterinarians are the highest-margin market for Imidacloprid topicals.

49.    Because veterinarians have a professional relationship with most of their customers for Imidacloprid topicals, and because of the perceived value of their advice on these treatments, they often mark up the wholesale prices by 100% (doubling or "key-stoning" the wholesale price) to set their retail prices.

50.    That veterinarians are outside of the relevant market in this case is particularly evident by the fact that veterinarians typically demand a "vet-only" brand from manufacturers, or even a private label brand that is unique to the specific veterinarian.  Indeed, veterinarians generally refuse to buy brands of Imidacloprid topicals that are available in lower-priced sub-markets such as Pet Specialty Retailers, General Retailers, and Online Retailers.  Veterinarians generally insist on some type of "exclusivity" in the Imidacloprid topicals they buy to enhance

the perceived value of those treatments and the veterinarian's advice on their use, in the minds of consumers to whom the products are resold.

51.    Consumer preferences are relevant here to the extent they drive the retailers' demand for products.  Veterinarians resell Imidacloprid topicals to consumers with whom they have a professional relationship, and who rely on their professional advice.  Veterinarians can charge a higher price for Imidacloprid topicals, which are ancillary to their professional practice.

52.    Approximately 49% of all Imidacloprid topicals in the U.S. were not sold by veterinarians, but through the separate and distinct OTC market, and its well-defined sub-markets of Pet Specialty Retailers, General Retailers, and Online Retailers.

53.    Pet Specialty Retailers, General Retailers, and Online Retailers are distinct sub-markets for Imidacloprid topicals, and veterinarians are part of an entirely separate market.  They do not represent interchangeable demand, from the perspective of Tevra and other manufacturers of generic flea and tick medications. These four different types of retailers serve four different groups of core customers, each with different price sensitivities and buying habits.  Evidence of this can be seen in the four different prices points offered by sellers in the four different markets for the same product – BAH's Seresto flea collar.  Table 2 below summarizes data collected in July 2019:

| Market | Advertised Price of Seresto Flea Collar | Source of Advertised Price |
|---|---|---|
| Veterinarian | $62 | https://www.plazaanimalclinic.com |
| Pet Specialty | $58 | https://www.petsmart.com |
| General Retail | $52 (2 pack) | https://www.walmart.com |
| Online | $40 | https://www.petcaresupplies.com |

**Table 2 – Advertised Prices of Seresto Flea Collar in Different Markets**

54.    The products sold to veterinarians, Pet Specialty Retailers, General Retailers, and Online Retailers are not interchangeable from a supply standpoint either.  As explained above, the same manufacturers sell different brands of products to veterinarians, Pet Specialty Retailers, General Retailers, and Online Retailers.  Veterinarians will often purchase the "vet only" brands

and refuse to purchase the "vet quality" brands sold at Pet Specialty Retailers.  In turn, General Retailers and Online Retailers do not typically have the same restrictions, but they, like Pet Specialty Retailers, cannot access "vet only" brands.

55.     For example, Tevra carries two separate Imidacloprid topicals.  One is Vetality's Avantect II, which is exclusively marketed to Pet Specialty Retailers. The other is TevraPet's Activate II, which is exclusively marketed to Online Retailers and General Retailers.  Tevra does not manufacture Imidacloprid products sold to veterinarians.  Tevra and many other manufacturers of Imidacloprid topicals do not market their products to veterinarians because large veterinarian chains often carry their own private label brands or refuse to purchase generic Imidacloprid, and sales to smaller veterinary practices increase the transaction costs to manufacturers.

56.     BAH acknowledges that it sells its products into different markets.  On its official website https://jobs.bayer.com, Bayer advertised for an executive to work with "the different customer segments (types of producers, veterinarians, retailers etc.)."

**B.     Generics lowered prices of Fipronil flea and tick medications.**

57.     In 1997, Merial (later purchased by Boehringer-Ingelheim) introduced its Frontline topical formulation of Fipronil to the U.S. market.  Frontline has remained the single best-selling brand of Fipronil topical since that time.

58.     Beginning in 2011, generic Fipronil topicals, which compete directly with Frontline, entered the U.S. marketplace.  By 2018, generic Fipronil topicals accounted for approximately 52% of Fipronil topical sales, with Frontline still accounting for about 48%. Unlike Fipronil, as of today 85% of the relevant market is controlled by BAH.

59.     The results of generic Fipronil topicals entering the separate market for Fipronil topicals have been more competition, lower prices, and more choices for retailers and consumers in that market.

COMPLAINT FOR ANTITRUST VIOLATIONS

**C.     BAH has prevented generics from entering the relevant market.**

**1.     Imidacloprid products, including Advantix**

60.     In 2002, BAH introduced its Advantage line of Imidacloprid topicals, which now includes Advantage II, K9 Advantix-II, and other similar brand names sold by BAH.

61.     BAH filed a lawsuit against the first manufacturer of generic Imidacloprid topicals that attempted to enter the OTC market, and its sub-markets.  On September 26, 2016, the generic manufacturer CAP IM Supply, Inc. was granted conditional registration by EPA for its generic Imidacloprid topical.

62.     On May 22, 2017, three Bayer entities, including Defendant Bayer Health Care, LLC and Defendant Bayer Animal Health GmbH filed a patent infringement lawsuit against CAP IM Supply, Inc. in U.S. District Court for the District of Delaware.  This lawsuit was shortly settled and, upon information and belief, CAP IM began paying BAH royalties for the use of its patented formula.

63.     Imidacloprid topicals produced by CAP IM have been sold in the U.S. by several companies including TruRx and PetIQ, under various brand names including Advecta, PetLock and ParaDefense.  Upon information or belief, these sales do not represent true generic competition against BAH, but rather are licensed products, for which BAH profits through its receipt of royalties.

64.     As set forth below, BAH has illegally maintained its monopoly and prevented the entry of true generic Imidacloprid topicals into the pet specialty and online markets by forcing retailers to agree not to carry generic Imidacloprid topicals and by tying the purchase of its Advantix topicals to its extremely successful Seresto flea collar.

65.     The results of BAH's illegal, anticompetitive, and exclusionary actions have been less competition, higher prices, and fewer choices for retailers and consumers.

**2.     Flea and tick collars, including Seresto**

66.     Another market is flea collars, including the Seresto flea collar manufactured by BAH, sold at wholesale by manufacturers to OTC Retailers and the distributors that supply OTC Retailers.  As set forth below, the Seresto flea collar has, upon information and belief, been used

COMPLAINT FOR ANTITRUST VIOLATIONS

1  by BAH as part of an illegal tying scheme, designed to maintain its monopoly in sales of

2  Imidacloprid topicals to OTC retailers.

3       67.    BAH began manufacturing the Seresto flea collar in 2011-2012.  The active

4  ingredients in the Seresto flea collar are imidacloprid (10%) and flumethrin (4.5%).

5       68.    The Seresto flea collar claims to be an "odorless, non-greasy collars" that kills

6  and repels fleas and ticks on dogs for eight months.  *See* BayerDVM for U.S. Veterinary

7  Professionals, *available at* https://www.bayerdvm.com/products/seresto-for-dogs/ (last visited

8  July 22, 2019).

9       69.    The Seresto flea collar is protected by U.S. Patent No. 7,910,122B2.

10      70.    Last year, Seresto became the "largest brand in the history of Animal Health at

11  Bayer," according to the Head of Marketing at Bayer Animal Health.  In 2018, Seresto achieved

12  270,000,000€ in sales with a production record of 13 million collars.  It is registered in 78

13  countries, and Seresto recently became available in China.

14      71.    In its 2018 Annual Report, Bayer reported that the Seresto flea collar was one of

15  four best-selling BAH products.  According to the Annual Report, sales of its Seresto flea collar

16  "achieved continued strong growth" from "higher volumes in the United States and Europe."

17      72.    According to a study posted on the Bayer DVM website, 97% of veterinarians

18  were satisfied or very satisfied with the Seresto flea collar for dogs or cats after 8 months.

19  Similarly, 94% of veterinarians were likely or very likely to recommend the Seresto flea collar

20  for their dog or cat patients.  According to the study, clients also had similar satisfaction rates.

21      73.    Given the strong sales of the Seresto flea collar, Seresto is a "must have" product

22  for Pet Specialty Retailers and Online Retailers.

23          **3.    Registration of insecticides with EPA and "exclusive use"**

24      74.    The insecticides used as active ingredients in flea and tick treatments are

25  regulated by the U.S. Environmental Protection Agency, under the Federal Insecticide, Fungicide

26  and Rodenticide Act (FIFRA), 7 U.S.C. § 136a, *et seq.*  This statute requires that manufacturers

27  of insecticides register each formulation before offering it for sale in the U.S.

28      75.    To obtain EPA registration under FIFRA for the use of an insecticide formulation,

COMPLAINT FOR ANTITRUST VIOLATIONS

a company must submit detailed scientific data demonstrating the safety and effectiveness of that use of the insecticide formulation.

76.    If the EPA agrees to register the use of an insecticide formulation, the registering company has an "exclusive use" of the data used to register that formulation for a period of 10 years after registration, pursuant to FIFRA, 7 U.S.C. § 136a, *et seq.*

77.    The 10-year "exclusive use" period created by FIFRA registration effectively gives the owner a monopoly for products produced by the registering company.

78.    The 10-year exclusive use period under FIFRA has expired for both Fipronil and Imidacloprid topicals, which effectively means that generics of those products can be manufactured by competitors of the brand name manufacturers.

79.    However, BAH registered the formulation of the Seresto flea collar with the U.S. Environmental Protection Agency, and it currently has an exclusive use of the formulation used in the Seresto flea collar for several more years.  In effect, this means that BAH has a monopoly over the Seresto flea collar and that generic manufacturers like Tevra cannot produce a product with the same formulation.

**4.    BAH's market power in the Seresto flea collar**

80.    BAH has substantial market power in its Seresto flea collar product, which is sold to OTC retailers in a separate market for flea collars, for at least five reasons.

a.    First, the Seresto flea collar is protected by U.S. Patent No. 7,910,122B2.

b.    Second, by registering the formulation of its Seresto collar with the Environmental Protection Agency, pursuant to the Federal Insecticide, Fungicide and Rodenticide Act, (FIFRA) 7 U.S.C. §136a, BAH has exclusive use of the data used to register the formulation for a period of ten years following the registration, which effectively gives BAH a monopoly on the use of the formulation.

c.    Third, BAH dominated the market for flea collars, with an extraordinary 62% share of total flea collar sales for its Seresto flea collar.

d.    Fourth, BAH's Seresto flea collar enjoyed a substantial price differential over

-16-

1    other flea collars, selling for at least double, and up to ten times more, than other

2    flea collars.

3    e.    Fifth, multiple retailers told Tevra that they could not carry its generic

4    Imidacloprid topical because they needed to comply with BAH's rebate program

5    which, upon information and belief, includes the Seresto flea collar.

6    81.    As a result of its Seresto flea collar, BAH has at least 62% of flea collar sales to

7    OTC Retailers.  This share continues to grow every year.

8    **D.    Tevra's attempts to enter the OTC market for Imidacloprid topicals**

9    82.    In 2016, Tevra created detailed sales forecasts for both its generic Fipronil

10    topicals, and its generic Imidacloprid topicals. Tevra recognized that it could sell several times

11    more generic Imidacloprid topicals than generic Fipronil topicals, due to several factors.

12    a.    First, by 2016, the market for Imidacloprid topicals was expanding, while the

13    market for Fipronil topicals was shrinking.

14    b.    Second, the Fipronil topical market was already crowded with generic

15    competition.  Velcera's "Pet Armor" generic Fipronil topical entered the market

16    to compete with the name brand Frontline in 2011.  Since that time at least four

17    other manufacturers had entered the market for Fipronil topicals.  This crowded

18    market for Fipronil topicals made it difficult for another entrant, like Tevra, to

19    obtain sales and market share.

20    c.    Third, when Tevra was formed in 2015, there were no generic Imidacloprid

21    topicals being sold in either the pet specialty market or the online market.  No

22    generic Imidacloprid topicals had been patented, or registered by the EPA, at that

23    time.

24    d.    Fourth, generic Imidacloprid topicals could be sold at higher prices than generic

25    Fipronil topicals, because BAH had acquired a monopoly with its Advantix name

26    brand due to its patents and its prior "exclusive use" from its EPA registration.

27    e.    Fifth, as set forth in ¶22 and Table 1, above, consumers were willing to pay more

28    for Imidacloprid topicals than for Fipronil topicals.

-17-

COMPLAINT FOR ANTITRUST VIOLATIONS

83.   Tevra immediately went to work licensing a generic Fipronil topical to compete against Boehringer's name brand Frontline, as well as registering a generic Imidacloprid topical to compete against BAH's name brand Advantix.

84.   Tevra applied for EPA registration of its generic Imidacloprid topical.  The EPA granted the registration of Tevra's generic Imidacloprid topical in 2017.

85.   Even before EPA registration was complete, Tevra hired a sales team of professionals with experience in the industry, and aggressively pursued sales in the pet specialty sub-market and online sub-market to begin promoting Tevra's generic flea and tick treatments. Beginning in 2016, Tevra's salespersons met with representatives of numerous pet specialty and online retailers, including those identified below as Retailer A, Retailer B, Retailer C, Retailer D, and Retailer E.

### 1.   Tevra's successful entry into separate Fipronil topical market

86.   In 2017, Tevra made its first sales of its generic Fipronil topical.  Because Tevra's product was a less expensive, equally effective alternative to Frontline, Tevra was able to demonstrate to retailers that carrying Tevra's generic Fipronil topical would increase sales and profits for the retailers.

87.   Attracted by the price and profitability advantages of Tevra's generic Fipronil topical, retailers began buying it in large quantities.  Tevra made a profit of over $2.4 Million from online and pet specialty sales of its generic Fipronil topical in 2018.

### 2.   Tevra was foreclosed from entering the Imidacloprid topical market

88.   Tevra's attempts to sell its less expensive, equally effective, generic Imidacloprid topical in the OTC market, including the Pet Specialty sub-market and Online sub-market, have been foreclosed by BAH's illegal exclusive dealing and tying schemes used to maintain its monopoly, as described below.

89.   Tevra attempted to sell its generic Imidacloprid topical to some of the same Pet Specialty Retailers and the same Online Retailers that were already carrying Tevra's generic Fipronil topical.  However, as set forth in ¶91 to ¶109, below, numerous retailers refused to carry Tevra's generic Imidacloprid topical, and five of those retailers, or their distributors, explicitly

cited BAH's rebate program that, upon information and belief, includes the Seresto flea collar, as the reason for their refusal.  These retailers have refused to carry generic Imidacloprid topicals from Tevra, even though several of them sell generic Fipronil.

90.     In 2018, Tevra sold almost none of its generic Imidacloprid topical into the Pet Specialty sub-market, or the Online sub-market, and made a total profit of only $402,000 in those markets.

**E.      BAH's Secret Bundled Loyalty Rebate Illegally Foreclosed Entry into the OTC Retail Market for Imidacloprid Topicals**

**1.      Statements by Retailers Describing the Secret Bundled Loyalty Rebate**

91.     None of the OTC Retailers to whom Tevra attempted to sell its generic Imidacloprid topical provided Tevra with a copy of the BAH rebate program, presumably because BAH has imposed a condition of secrecy.  The exact details of the rebate program are in the possession and control of the Defendant BAH, and Tevra can only describe BAH's Secret Bundled Loyalty Rebate upon information and belief, based on the facts that it has learned from retailers, as set forth below.

92.     To protect the identities of the retailers that described BAH's Secret Bundled Loyalty Rebate to Tevra, they will be referred to as "Retailer A, Retailer B, etc."  A key showing the identity of each retailer will be filed under seal with the Court, if required.  Retailers A, B, and C are part of the Online sub-market, while Retailers D, E and F are part of the Pet Specialty sub-market.

93.     Tevra began discussions to sell generic Imidacloprid topicals with Retailer A in the fall of 2016.  In 2017, a representative of Retailer A told a Tevra salesperson that Retailer A "had a contract with Bayer and could not offer a generic to K9 Advantix II," or words to that effect.  Retailer A also told another Tevra salesperson "that they had an agreement with Bayer that prevented them from offering a generic to Bayer's K9 Advantix," or words to that effect.

94.     In July 2018, Tevra salespersons again met with representatives from Retailer A and discussed the possibility of Retailer A carrying Tevra's generic Imidacloprid topical in competition with BAH's K9 Advantix II.  A representative of Retailer A told a Tevra salesperson

1    that "they understand the opportunity but need to be able to make up potential lost marketing

2    dollars from Bayer," or words to that effect.

3        95.    In October 2018, a Tevra salesperson spoke with a representative of Retailer A

4    who told the Tevra salesperson that Retailer A "is trying to work with Bayer on the contract.

5    There was some old language in the old agreement that either prevented [Retailer A] from

6    offering a generic or featuring 'Compares to' or contains the same active ingredient," or words to

7    that effect.

8        96.    In 2019, Retailer A told a representative from Tevra that "they would lose $3

9    million dollars in net margin taking into account the reduced Bayer rebate vs. what they thought

10   they would make in margin selling [Tevra's] product," or words to that effect.

11       97.    Retailer A ultimately refused to purchase and stock Tevra's generic Imidacloprid

12   topical.

13       98.    In 2018, Tevra salespersons were attempting to convince Retailer B to carry

14   Tevra's generic Imidacloprid topical.  A representative of Retailer B told one of Tevra's

15   salespersons that Retailer B would not carry Tevra's generic Imidacloprid topical because "it

16   was a conflict of interest given the recent Bayer 'no generic' as to pulling advertising funding

17   and lucrative rebates," or words to that effect.

18       99.    Retailer B ultimately refused to purchase and stock Tevra's generic Imidacloprid

19   topical.

20       100.   In 2018, salespersons for Tevra made an initial presentation to Retailer C.  During

21   that initial presentation, a representative of Retailer C stated that "they had an agreement with

22   Bayer."  Retailer C did not carry any generics that compete directly against Bayer flea and tick

23   treatments as of December 2018.

24       101.   In 2019, a sales person for Tevra had a discussion with a representative of

25   Retailer C in which the representative described Retailer C's "program with Bayer and not

26   allowing any generic equivalents," or words to that effect.

27       102.   Retailer C ultimately refused to purchase and stock Tevra's generic Imidacloprid

28   topical.

COMPLAINT FOR ANTITRUST VIOLATIONS

103.   In the summer of 2018, Tevra salespersons made presentations to Retailer D showing the sales and profitability advantage of Tevra's generic Imidacloprid topical.  A representative of Retailer D later told a Tevra salesperson that Retailer D had "no interest in Own Brands or generic compromise as the Bayer rebates are HUGE," or words to that effect.

104.   Retailer D ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.

105.   In February 2017, a salesperson for Tevra informed Retailer E that Tevra had just received EPA registration for its generic Imidacloprid topical.  In March 2017, Tevra made an offer to Retailer E with significant incentives to encourage Retailer E to carry Tevra's generic Imidacloprid topical.  Retailer E directed Tevra to discuss the sale of Tevra's product through the distributor to Retailer E.  In discussions with the distributor, Tevra salespersons were told of the existence of a "Bayer agreement," and were told that "they were going to let us know if the agreement prohibits them from adding another Imidacloprid product."

106.   Retailer E ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.

107.   An affiliate of Retailer F also told Tevra Bayer was trying to "bundle" its rebate program for both Retailer F and the affiliate.  The affiliate then stopped negotiating with Tevra, because of the Bayer rebate program.  Retailer F and its affiliate ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.

108.   Together, Retailers A, B, and C represent over 75% of the Online Retailer sub-market.

109.   Together, Retailers D, E, and F represent over 70% of the Pet Specialty Retailer sub-market.

2.      **"Bundled Loyalty Rebates"**

110.    "Bundled loyalty rebates" like the ones imposed by BAH penalize retailers for purchasing from competitors.

111.    "Bundled loyalty rebate" schemes explicitly measure a retailer's purchases from competitors, and penalize a retailer for purchasing too much from competitors, which can injure competition, coerce retailers into buying unwanted products at higher prices, and decrease consumer choice in the market.

112.    To foreclose competition from Tevra and other generic Imidacloprid topical producers, BAH created its "Secret Bundled Loyalty Rebate" scheme that contains an illegal "no generics" condition, agreement or understanding, and that illegally ties its patented, EPA-registered "exclusive-use" Seresto flea collar (in which it has tremendous market power as set forth in ¶80 to ¶81) to the purchase of its name brand Advantix Imidacloprid topicals.

113.    When Tevra offered its lower-priced generic Imidacloprid topical to retailers, some of whom had already bought Tevra's generic Fipronil topical, it ran into the insurmountable barrier of BAH's Secret Bundled Loyalty Rebate.  As set forth at ¶91 to ¶109, multiple retailers told Tevra that they could not carry its generic Imidacloprid topical because of BAH's rebates.

F.      **Reasonable inferences about BAH's Secret Bundled Loyalty Rebate**

114.    BAH forced retailers to keep the details of its bundled loyalty rebate scheme secret, so that no competitor could bid against BAH on a head-to-head basis.

115.    In their attempts to overcome the barrier created by BAH's Secret Bundled Loyalty Rebate, Tevra and other generic makers are in the difficult position of having to infer the terms and conditions of the BAH rebate scheme from the limited information they can glean from retailers.

116.    As set forth in ¶96, Retailer A told Tevra that it would lose a net $3 million from the BAH Secret Bundled Loyalty Rebate if it purchased Tevra's generic Imidacloprid topical. This shows the magnitude of the barrier to entry erected by the BAH Secret Bundled Loyalty Rebate.

117.     The statements of the retailers to Tevra set forth in ¶91 through ¶106, above allow one to draw the following two reasonable inferences about the BAH rebate program.

118.     First, it is reasonable to infer that the rebate must cover a "bundle" of BAH products, not just BAH's Advantix Imidacloprid topicals.  The threat of a $3 million net loss in rebates that Retailer A described in ¶96, above could not possibly have involved a single product line like Imidacloprid topicals, but would need to include other products, like BAH's best-selling, "must-have" Seresto flea collar.

119.     Second, the statements of the retailers create a reasonable inference that the BAH rebates are based on "loyalty" to BAH and explicitly rewards retailers for refusing to do business with BAH's competitors.  Multiple retailers each separately told Tevra that they had a contract with BAH that prohibited them from carrying generic alternatives to BAH's products.

120.     BAH acknowledges that it operates loyalty rebate programs.  It advertised a job on its official website https://jobs.bayer.com for an executive whose duties included "loyalty rebates."

**G.     BAH required exclusive dealing using the Secret Bundled Loyalty Rebate.**

121.     BAH used its Secret Bundled Loyalty Rebate to force retailers into an illegal exclusive dealing scheme, under which they agree not to purchase or carry generic alternatives to BAH's name brand Imidacloprid topicals.

122.     Upon information and belief, and drawing reasonable inferences from the facts set forth in this complaint, the Secret Bundled Loyalty Rebate contained a "no generics" condition, agreement or understanding that prevented retailers from purchasing or carrying lower-cost generic alternatives to BAH's name brand Imidacloprid topicals.

123.     In addition to the "no generics" condition, the Secret Bundled Loyalty Rebate also forced retailers into an illegal exclusive dealing scheme by conditioning the size of the rebate on the purchase of the entire bundle of BAH products, thereby excluding the products of competitors.

-23-

COMPLAINT FOR ANTITRUST VIOLATIONS

**H.     BAH tied Advantix to the Seresto flea collar using the Secret Bundled Loyalty Rebate.**

124.     BAH also used its Secret Bundled Loyalty Rebate to "tie" purchases of its name brand Advantix Imidacloprid topicals to purchases of its "must-have" Seresto Flea Collar.

125.     Upon information and belief, and drawing reasonable inferences from the facts set forth in this Complaint, the Secret Bundled Loyalty Rebate was structured so that a retailer (such as Retailer A, described in ¶93 to ¶97, above) would lose a "HUGE" amount of rebates (to quote Retailer D in ¶103, above) if the retailer did not demonstrate loyalty by purchasing all of the bundled BAH products, including BAH's higher-cost Advantix Imidacloprid topicals.  Retailer A calculated that it would lose a net $3 Million in BAH rebates by purchasing Tevra's generic Imidacloprid topical, even though Tevra's product was less expensive and could be re-sold at a higher profit margin.

126.     Tevra and other generic manufacturers cannot offer a generic version of the Seresto flea collar.  As explained above in ¶79, BAH has "exclusive use" under FIFRA over the formulation for the Seresto flea collar for several more years, so generic manufacturers of flea and tick medication cannot compete with BAH's illegal bundling and tying agreement.

127.     Given the popularity of the Seresto flea collar with consumers and the fact that no other manufacturer can make a generic version of that product, retailers need to carry the Seresto flea collar to compete with other retailers in their selection of products.  And they also need to obtain the BAH rebate on the entire bundle of BAH products, to offset the high price of the Seresto Flea Collar and enable them to compete with other retailers on the price of the Seresto flea collar.

128.     Because of the Secret Bundled Loyalty Rebate, the only viable economic option for retailers was to purchase the bundled Advantix products (the tied products) together with the Seresto Flea Collar (the tying product).

129.     BAH structured its Secret Bundled Loyalty Rebate such that the purchase of the tied product (BAH's name brand Imidacloprid topicals) with the tying product (BAH's "must have" Seresto flea collar) is the only viable economic option for retailers.  Even if BAH were

COMPLAINT FOR ANTITRUST VIOLATIONS

willing to sell its Seresto flea collar without the concomitant purchase of its Imidacloprid topicals, this would not be a viable economic option for retailers because they could not resell the Seresto flea collar at a competitive price if they did not receive the rebate on that collar. If other similarly situated retailers are receiving a rebate on the Seresto flea collar, and can resell that collar at a price that reflects the rebate, the only viable economic option for a retailer is to comply with BAH's Secret Bundled Loyalty Rebate, in order to be able to sell the Seresto flea collar at a competitive price.

### I.     Anti-Competitive Effects of BAH's Conduct

130.     BAH's illegal Secret Bundled Loyalty Rebate substantially lessened competition and tended to create and maintain a monopoly in the relevant market for Imidacloprid topicals sold at wholesale to OTC Retailers and the sub-markets for Imidacloprid topicals sold to Online Retailers and Pet Specialty Retailers. It also had the following anti-competitive effects:

a.     Tevra, and other sellers of generic Imidacloprid topicals, were substantially foreclosed from entering the market for Imidacloprid topicals.

b.     Retailers were prevented from purchasing lower-cost, equally-effective, generic Imidacloprid topicals, causing them to pay higher prices and make less profit.

c.     Retailers were prevented from offering consumers a wider selection of Imidacloprid topicals.

d.     Retailers were coerced into buying unwanted quantities of BAH's name brand Imidacloprid topicals, causing them to pay higher prices and make less profit.

e.     Consumers were prevented from purchasing lower-cost, equally effective, Imidacloprid topicals, causing them to pay higher prices, and

f.     Consumers were denied choices of competing Imidacloprid topicals.

### J.     Lack of Pro-Competitive Justification for BAH's Actions

131.     There are no pro-competitive justifications for the Secret Bundled Loyalty Rebate. The Secret Bundled Loyalty Rebate: (1) contains an illegal condition, agreement or understanding that "no generics" would compete against Advantix, and also (2) leverages BAH's market power in the Seresto flea collar to prevent retailers from carrying lower-cost, equally

1   effective generics and coerce them into buying unwanted quantities of BAH's name brand

2   topicals.  The Secret Bundled Loyalty Rebate damages competition, raises prices, and diminishes

3   choices for retailers, distributors, and consumers.

4         **K.**     **Antitrust Injury**

5        132.    Tevra has suffered injuries of the type that U.S. antitrust laws were intended to

6   prevent, and those injuries flow directly and proximately from BAH's illegal Secret Bundled

7   Loyalty Rebate.  The Secret Bundled Loyalty Rebate reduced competition, and Tevra was

8   injured by the reduction in competition.

9        133.    BAH's illegal Secret Bundled Loyalty Rebate substantially foreclosed Tevra from

10   entering the pet specialty market and the online market for Imidacloprid topicals, thereby causing

11   Tevra to lose prospective profits on the sale of its generic Imidacloprid topical.

12        134.    Tevra was nearly 100% foreclosed from the Pet Specialty and Online sub-markets

13   of the OTC market for Imidacloprid topicals, which prevented it from competing for nearly

14   $100,000,000 in sales to Pet Specialty and online retailers.

15        135.    Even using the broader measure of all OTC market for Imidacloprid topicals

16   (including General Retail), Tevra was still foreclosed from about 75% of possible sales to OTC

17   Retailers.

18        136.    BAH's illegal Secret Bundled Loyalty Rebate substantially lessened competition

19   and tended to create and maintain a monopoly, by keeping generic Imidacloprid topicals out of

20   the pet specialty market and the online market, thereby causing Tevra to lose prospective profits

21   on the sale of its generic Imidacloprid topical.

22
23        **L.**     **Tevra has attempted to mitigate its damages, but has been unable to obtain interchangeable demand for its products.**

24        137.    Tevra has made numerous attempts to mitigate its damages by selling its generic

25   Imidacloprid topicals wherever, and to whomever, it can.  Tevra has sold small quantities of its

26   products to small independent pet stores, and has sold to general retailers wherever possible.

27   Tevra has also sold its products direct to consumers, through its own website and through

28   Amazon.  However, as set forth below, these direct-to-consumer sales are in a completely

COMPLAINT FOR ANTITRUST VIOLATIONS

different market than the OTC Retailer market and sub-markets where Tevra was foreclosed by BAH's illegal acts, and do not represent interchangeable demand with the OTC Retail market.

138.    Direct sales to consumers do not represent interchangeable demand for Tevra and other manufacturers that have been foreclosed from selling into the OTC Retail market and its sub-markets.  This is because direct sales to consumers involve a completely different cost structure, profit margin, and risk structure, in the following respects.

a.    Direct-to-consumer sales require manufacturers to create and implement their own marketing strategies, rather than relying on retailers for this marketing.

b.    Direct-to-consumer sales require manufacturers to create and implement their own advertising strategies, to drive consumers to themselves, rather than to retailers who would be reselling their products.

c.    Direct-to-consumer sales require manufacturers to create websites, with attractive user interfaces, for consumers to use.

d.    Direct-to-consumer sales require manufacturers to develop and implement search engine optimization procedures, and other techniques to drive consumer traffic to their websites.

e.    Direct-to-consumer sales require manufacturers to set up payment processing procedures with credit card processors and other forms of payment, such as PayPal.

f.    Direct-to-consumer sales require manufacturers to build and operate order fulfillment structures, including warehouses in which consumer orders are assembled and packed.

g.    Direct-to-consumer sales require manufacturers to set up and operate delivery structures, including contracts with carriers, delivery services, and postal services.

h.    Direct-to-consumer sales require manufacturers to have a customer service operation that can help consumers and resolve their problems.

i.    Direct-to-consumer sales require manufacturers to process returns, redeliveries,

COMPLAINT FOR ANTITRUST VIOLATIONS

and credits for thousands of consumers, as opposed to just a few retailers.

    j.    Direct-to-consumer sales require manufacturers to have contracts with online market places, such as Amazon, and to comply with their numerous rules and procedures.

    k.    Direct-to-consumer sales subject manufacturers to the additional risks of complying with consumer protection laws in all 50 states.

**M.    Tevra Has Been Damaged and Continues to be Damaged by BAH's Anti-Competitive Conduct.**

139.    Tevra was damaged by BAH's Secret Bundled Loyalty Rebate, which was used to carry out both an illegal exclusive dealing scheme, and an illegal tying scheme.  These schemes foreclosed Tevra from entering the Pet Specialty sub-market and the Online sub-market with its generic Imidacloprid topical, and caused it to lose the prospective profits it would have earned, as described in ¶140 to ¶143, below.

140.    One way to estimate Tevra's lost profits caused by BAH's Secret Bundled Loyalty Rebate is to compare Tevra's 2016 projections of its future sales of its generic Fipronil products and its generic Imidacloprid products to its actual sales of these products.

141.    Tevra's 2016 projections of its future sales of its generic Fipronil products were reasonably accurate, and Tevra actually sold more generic Fipronil products than it projected, as shown in Table 3, below.

| Year | Projected Online Fipronil Sales | Actual Online Fipronil Sales | Projected Pet Specialty Fipronil Sales | Actual Pet Specialty Fipronil Sales |
|---|---|---|---|---|
| 2017 | $85,179 | $61,322 | $133,093 | $190,505 |
| 2018 | $689,947 | $1,986,219 | $1,078,052 | $2,319,479 |
| 2019 | $1,294.716 | Est. $2M | $2,023,011 | Est. $3M |
| TOTALS | $2,069,841 | $4,047,541 | $3,234,156 | $5,448,662 |

**Table 3 – Projected and Actual Sales of Fipronil by Tevra**

142.    In 2016, Tevra also made projections for the future sales of its generic Imidacloprid products.  However, BAH's Secret Bundled Loyalty Rebate foreclosed Tevra from

entering the online sub-market and pet specialty sub-market with its generic Imidacloprid topicals.  Tevra's projections, which should have been as accurate as its Fipronil projections, and the actual sales into the foreclosed markets, are set forth in Table 4, below.

| Year | Projected Online Imidacloprid Sales | Actual Online Imidacloprid Sales | Projected Pet Specialty Imidacloprid Sales | Actual Pet Specialty Imidacloprid Sales |
|---|---|---|---|---|
| 2017 | $5,016,213 | $119,040 | $4,859,458 | $413,979 |
| 2018 | $9,278,240 | $17,267 | $8,988,295 | $549,652 |
| 2019 | $13,823,310 | Est. $13,500 | $13,391,380 | Est. $506,925 |
| TOTALS | $28,117,813 | $149,807 | $27,239,131 | $1,470,556 |

**Table 4 – Projected and Actual Sales of Imidacloprid by Tevra.**

143.    If Tevra had actually sold the projected amount of Imidacloprid in 2017, 2018, and 2019, it would have made a total net profit, after the cost of goods sold and other expenses are deducted, of at least $38,152,973.

144.    Tevra is entitled to treble damages, for at least $114,458,918 in lost profits, plus its attorney fees and the costs of this action.

145.    Tevra's damages will continue to accrue until BAH's anti-competitive conduct is enjoined.

## CLAIMS FOR RELIEF

### COUNT I
### EXCLUSIVE DEALING IN VIOLATION OF § 3 CLAYTON ACT, 15 U.S.C. § 14

146.    Tevra incorporates all other allegations in this Complaint into Count I.

147.    BAH has engaged in substantial U.S. interstate commerce by selling goods, including flea and tick collars and flea and tick topicals, to distributors and retailers.

148.    BAH's Secret Bundled Loyalty Rebates fixed rebates upon the price of goods it sold on the condition, agreement or understanding that the purchaser thereof shall not deal in the goods of a competitor, in violation of § 3 of the Clayton Act, 15 U.S.C. § 14.

149.    Because of the Secret Bundled Loyalty Rebate, the only viable economic alternative for retailers is to not carry generics that compete with BAH's Imidacloprid topicals.

150.    One effect of the condition, agreement or understanding described in ¶148, above is to substantially lessen competition in a line of commerce and tend to create and maintain a monopoly in the relevant market.

151.    Another effect of the condition, agreement or understanding described in ¶148, above was to foreclose Tevra from a substantial share of the pet specialty market for Imidacloprid topicals.

152.    If not enjoined, BAH's anticompetitive conduct will continue to cause immediate and irreparable injury, loss, or damage to Tevra.

**WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards against each BAH defendant:

a.    A declaration that BAH has violated the Clayton Act § 3, 15 U.S.C. § 14;

b.    A permanent injunction against BAH and its agents, restraining them from using the Secret Bundled Loyalty Rebate to carry out any exclusive dealing scheme or tying scheme;

c.    Damages in the amount of at least $38,152,973, for lost profits and lost value of the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15 to a total of at least $114,458,918;

d.    The costs of this action, including reasonable attorney fees; and

e.    Such other relief as the Court finds just and equitable.

COMPLAINT FOR ANTITRUST VIOLATIONS

## COUNT II
## TYING ARRANGEMENT IN VIOLATION OF § 3 CLAYTON ACT, 15 U.S.C. § 14

153.   Tevra incorporates all other allegations in this Complaint into Count II.

154.   BAH engaged in substantial U.S. interstate commerce, including the sale of two separate products sold in separate markets:  (1) its Seresto flea collar, and (2) its brand name Imidacloprid topicals including K-9 Advantix II.

155.   BAH tied the sale of its brand named Imidacloprid topicals (the tied goods) to the sale of its Seresto flea collar (the tying good) by means of its Secret Bundled Loyalty Rebate, described in ¶124 to ¶129, above, in violation of § 3 of the Clayton Act, 15 U.S.C. § 14.

156.   Because of the Secret Bundled Loyalty Rebate, the only viable economic alternative for retailers was to purchase unwanted quantities of the tied product, instead of the less expensive generic alternatives offered by Tevra, and other manufacturers of generics.

157.   BAH has substantial market power in the tying good – its Seresto flea collar – as described in ¶80 to ¶81, above, and used that market power to condition the sale of its Seresto flea collar on the purchase of its name brand Imidacloprid topicals.

158.   The effect of the tying scheme described above is to substantially lessen competition and to create and maintain a monopoly in the market for Imidacloprid topicals.

159.   If not enjoined, BAH's anticompetitive conduct will continue to cause immediate and irreparable injury, loss, or damage to Tevra.

**WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards against each BAH defendant:

a.   A declaration that BAH has violated the Clayton Act § 3, 15 U.S.C. § 14;

b.   A permanent injunction against BAH and its agents, restraining them from using the Secret Bundled Loyalty Rebate to carry out any exclusive dealing scheme or tying scheme;

c.   Damages in the amount of at least $38,152,973, for lost profits and lost value of the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15 to a total of at least $114,458,918;

COMPLAINT FOR ANTITRUST VIOLATIONS

d.   The costs of this action, including reasonable attorney fees; and

e.   Such other relief as the Court finds just and equitable.

COMPLAINT FOR ANTITRUST VIOLATIONS

## COUNT III
## UNLAWFUL MAINTENANCE OF A MONOPOLY, IN VIOLATION OF § 2 SHERMAN ACT, 15 U.S.C. §2

160.    Tevra incorporates all other allegations in this Complaint into Count III.

161.    BAH has a monopoly on the sale of Imidacloprid topicals to OTC retailers in the U.S., and made approximately 85% of all sales of that product into the relevant market in 2018.

162.    BAH has willfully maintained its monopoly with a specific intent to monopolize by means of the unlawful and anticompetitive exclusive dealing arrangement described in Count I and the unlawful tying arrangement described in Count II.

163.    The effects of BAH's monopoly have been to raise prices for both retailers and consumers, prevent the sale of lower cost, equally effective, competing products in the relevant market, to substantially foreclose competitors from access to the relevant market, to substantially lessen competition, and to create and maintain a monopoly in the relevant market.

164.    Tevra has been damaged by BAH's maintenance of its monopoly by being substantially foreclosed from selling its products in the relevant market and by losing profits it would have made, but for BAH's unlawful maintenance of its monopoly.

165.    If not enjoined, BAH's anticompetitive conduct will continue to cause immediate and irreparable injury, loss, or damage to Tevra.

## JURY DEMAND

Tevra hereby demands a trial by jury on all issues so triable.

COMPLAINT FOR ANTITRUST VIOLATIONS

Dated:  July 26, 2019

Respectfully Submitted,

POLSINELLI LLP


*/s/ Nitin Gambhir*

By:     NITIN GAMBHIR (SBN 259906)
         ngambhir@polsinelli.com
         Polsinelli LLP
         1661 Page Mill Road, Suite A
         Palo Alto, CA 94304
         T:  650-461-7700
         F:  650-461-7701

         DANIEL D. OWEN (*PHV FORTHCOMING*)
         dowen@polsinelli.com
         G. GABRIEL ZOROGASTUA (*PHV FORTHCOMING*)
         gzorogastua@polsinelli.com
         Polsinelli PC
         900 w. 48TH Place, Ste. 900
         Kansas City, MO 64112
         T:  816-753-1000
         F:  816-753-1536

         ***Attorneys for Plaintiff Tevra Brands, LLC***

COMPLAINT FOR ANTITRUST VIOLATIONS