DANIEL B. ASIMOW (Bar No. 165661)
daniel.asimow@arnoldporter.com
ANDREW S. HANNEMANN (Bar No. 322400)
andrew.hannemann@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone:     415.471.3100
Facsimile:     415.471.3400

SONIA K. PFAFFENROTH (Bar No. 223984)
sonia.pfaffenroth@arnoldporter.com
LAURA S. SHORES (appearance *pro hac vice*)
laura.shores@arnoldporter.com
KATHERINE E. CLEMONS (appearance *pro hac vice*)
katherine.clemons@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone:     202.942.5000
Facsimile:     202.942.5999

Attorneys for Defendant BAYER HEALTHCARE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TEVRA BRANDS, LLC,<br><br>                    *Plaintiff*,<br><br>          v.<br><br>BAYER HEALTHCARE LLC, BAYER ANIMAL HEALTH GmbH, and BAYER AG,<br><br>                    *Defendants*. | Case No. 5:19-cv-04312-BLF<br><br>**BAYER HEALTHCARE LLC'S MOTION UNDER RULE 12 TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**<br><br>Date:          February 27, 2020<br>Time:          9:00 a.m.<br>Courtroom:     3, 5th Floor<br>Judge:          Hon. Beth Labson Freeman |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Please take notice that on February 27, 2020 at 9:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Beth Labson Freeman, Courtroom 3, 5th Floor, Robert F. Peckham Federal Building and United States Courthouse, 280 South 1st Street, San Jose, California, Defendant Bayer HealthCare LLC will and hereby does move the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing with prejudice Plaintiff's Complaint in its entirety.  The motion to dismiss is brought on the grounds that the Complaint fails to state a claim upon which relief can be granted.

The motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the complete files and records in this action, Defendant's forthcoming Request for Judicial Notice, oral arguments of counsel, and such and other and further matters as this Court may consider.

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

INTRODUCTION .................................................................................................................. 1

BACKGROUND ..................................................................................................................... 2

    A.    Plaintiff's Allegations Regarding the Relevant Market **Error! Bookmark not defined.**

    B.    Plaintiff's Allegations Regarding Bayer's Agreements ................................... 3

    C.    Bayer's Actual Agreements with Retailers and Distributors .......................... 4

ARGUMENT ........................................................................................................................... 5

    I.    THE COMPLAINT FAILS TO ALLEGE A LEGALLY COGNIZABLE AND FACTUALLY SUPPORTED RELEVANT MARKET FOR ANTITRUST ANALYSIS ................................................................................ 5

        A.    The SSNIP Test Does Not Provide A Legal Basis for Market Definition as Applied in the Complaint ........................................... 7

        B.    Plaintiff's Allegations Concerning Price, Quality, and Features Are Insufficient to Support a Market Limited to Topical Imidacloprid Products ........................................................................ 8

        C.    The Complaint Allegations Do Not Support Excluding Veterinarian Sales and Direct Sales from the Relevant Market ............................ 9

    II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR EXCLUSIVE DEALING IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14 ............................................................................................ 10

        A.    Plaintiff Fails to Plausibly Allege That Bayer's Allegedly Exclusive Dealing Arrangements Foreclose Competition in the Alleged Market or Any Market ................................................................................ 11

            1.    Plaintiff Fails to Allege that Bayer's Agreements Are of a Duration Sufficient to Foreclose Competition ................................. 12

            2.    The Complaint Expressly Acknowledges Alternative Distribution Channels Other Than The Pet Specialty and Online Retailers .............................................................................. 13

        B.    Bayer's Agreements Cannot Foreclose Competition As a Matter of Law Because They Are Short-Term and Easily Terminable ........................ 14

III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR TYING IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14 ............. 15

IV.   THE COMPLAINT FAILS TO ALLEGE ANY VIOLATION OF THE ANTITRUST LAWS ARISING FROM USE OF BUNDLED DISCOUNTS ......... 18

V.   THE COMPLAINT FAILS TO STATE A CLAIM FOR MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 .............................................................................. 18

   A.   Plaintiff Fails to Adequately Plead That Bayer Possesses Monopoly Power .......................................................................................................... 19

   B.   Plaintiff Fails to Plead That Bayer Has Willfully Maintained Monopoly Power Through Anticompetitive Conduct ................................... 19

CONCLUSION .............................................................................................................. 20

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

### <u>Cases</u>

4

5

*Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*,
  No C 08-01035 JSW, 2008 WL 4830740 (N.D. Cal. Nov. 6, 2008) ......................................... 13

6

*Abid v. Google LLC*,
  No. 18-cv-00981-MEJ, 2018 WL 3458546 (N.D. Cal. July 18, 2018)....................................... 20

7

8

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016).................................................................................................... 18

9

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010)...................................................................................................... 10

10

*Apple, Inc. v. Psystar Corp.*,
  586 F. Supp. 2d 1190 (N.D. Cal. 2008) .............................................................................. 5, 6, 7

11

12

*Arista Networks, Inc. v. Cisco Sys., Inc.*,
  No. 16–cv–00923–BLF, 2017 WL 6102804 (N.D. Cal. Oct. 10, 2017)................................. 5, 18

13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................................................... 5

14

15

*Balaklaw v. Lovell*,
  14 F.3d 793 (2d Cir. 1994).......................................................................................................... 12

16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................................. 5, 19

17

18

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
  182 F.3d 1096 (9th Cir. 1999)...................................................................................................... 6

19

20

*Brignac v. Yelp Inc.*,
  No. 19-cv-01188-EMC, 2019 WL 2372251 (N.D. Cal. June 5, 2019)....................................... 19

21

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)..................................................................................................................... 10

22

23

*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008)....................................................................................................... 18

24

25

*CDC Techs., Inc. v. IDEXX Labs.*,
  186 F.3d 74 (2d Cir. 1999)........................................................................................................... 13

26

*Colonial Med. Grp, Inc. v. Catholic Healthcare W.*,
  No. C-09-2192 MMC, 2010 WL 2108123 (N.D. Cal. May 25, 2010) .................................... 6, 8

27

28

*DeHoog v. Anheuser-Busch InBev SA/NV*,
    899 F.3d 758 (9th Cir. 2018) ...................................................................................... 16

*Eastman v. Quest Diagnostics Inc.*,
    724 F. App'x 556 (9th Cir. 2018) ............................................................................... 17

*Gen. Bus. Sys. v. N. Am. Philips Corp.*,
    699 F.2d 965 (9th Cir. 1983) ....................................................................................... 14

*Genus Lifesciences Inc. v. Lannett Co.*,
    378 F. Supp. 3d 823 (N.D. Cal. 2019) ...................................................................... 19

*Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*,
    960 F. Supp. 701 (S.D.N.Y. 1997) ........................................................................... 8, 9

*Havensight Capital LLC v. Nike, Inc.*,
    No. CV 14–8985–R, 2015 WL 993334 (C.D. Cal. Feb. 18, 2015) ............................ 19

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ..................................................................................... 19

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) ......................................................................................................... 5

*Indeck Energy Servs., Inc. v. Consumers Energy Co.*,
    250 F.3d 972 (6th Cir. 2000) ....................................................................................... 12

*John Doe 1 v. Abbott Labs.*,
    571 F.3d 930 (9th Cir. 2009) ....................................................................................... 18

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ....................................................................................... 5

*Ky. Speedway, LLC v. NASCAR*,
    588 F.3d 908 (6th Cir. 2009) ......................................................................................... 6

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
    No. 18-cv-02054-MMC, 2019 WL 1767335 (N.D. Cal. Apr. 22, 2019) .................... 10

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ..................................................................................... 19

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ................................................................................... 5, 9

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*,
    795 F.3d 1124 (9th Cir. 2015) ..................................................................................... 19

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ....................................................................... 6, 8, 10, 13

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997)...............................................................5, 10, 11, 12, 13, 14, 15

*Paddock Publ'ns, Inc v. Chi. Tribune Co.*,
103 F.3d 42 (7th Cir. 1996)....................................................................................... 12

*Paladin Assocs., Inc. v. Mont. Power Co.*,
328 F.3d 1145 (9th Cir. 2003).............................................................................. 16, 17

*PNY Techs., Inc. v. SanDisk Corp.*,
2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ....................................................... 5, 15

*PNY Techs., Inc. v. SanDisk Corp.*,
2014 WL 2987322 (N.D. Cal. July 2, 2014)..............................................11, 12, 13, 14

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
No. SACV 12-2102-JST, 2013 WL 3936394 (C.D. Cal. July 30, 2013).................... 15

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)........................................................................................ 6

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995)....................................................................................... 6

*Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*,
732 F.2d 1403 (9th Cir. 1984)................................................................................... 16

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984)..................................................................................... 12

*Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*,
No. C93 20613 RMW, 1995 WL 853037 (N.D. Cal. Sept. 7, 2015)......................... 16

*Sidibe v. Sutter Health*,
4 F. Supp. 3d 1160 (N.D. Cal. 2013) ........................................................................ 16

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993)..................................................................................................... 5

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001), *amended on other grounds*, 275 F.3d 1187 (9th
Cir. 2001) ..................................................................................................................... 5

*SPX Corp. v. Mastercool U.S.A., Inc.*,
No. 3:10 CV 1266, 2011 WL 2532889 (N.D. Ohio June 24, 2011) .......................... 15

*Synopsys, Inc. v. ATopTech, Inc.*,
No. C 13–2965 MMC, 2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) ........................ 17

*Tanaka v. USC*,
252 F.3d 1059 (9th Cir. 2001)................................................................................. 6, 8

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
   546 F.3d 991 (9th Cir. 2008) ................................................................................. 7

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) ............................................................................................... 8

*W. Parcel Exp. v. UPS*,
   190 F.3d 974 (9th Cir. 1999) ............................................................................... 11

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ................................................................................ 11

## Statutes

15 U.S.C. § 2 .............................................................................................................. 2, 18

15 U.S.C. § 14 ........................................................................................... 2, 10, 11, 12, 15

## Other Authorities

U.S. Dep't of Justice, Antitrust Div., *Horizontal Merger Guidelines* § 4.1.1 .................................... 7

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiff Tevra Brands, LLC ("Tevra" or "Plaintiff") complains that it has been unsuccessful in introducing its topical imidacloprid products at certain retailers.  It alleges that its lack of success is attributable to agreements between these retailers and Defendant Bayer HealthCare LLC ("Bayer")[1] that purportedly preclude the retailers from carrying Plaintiff's products or incentivize the retailers not to do so.  But courts have long recognized that exclusive dealing arrangements (or discounts in exchange for exclusivity) are generally pro-competitive and result in lower prices for consumers.  Such arrangements are problematic only if they are imposed by a firm with market power, result in substantial foreclosure that effectively prevents a competitor from reaching its ultimate customers, and are long-term.  Plaintiff fails adequately to plead any of these elements.  Plaintiff's market definition—on the basis of which it asserts Bayer has market power—is implausible, particularly in light of other allegations in the Complaint.  Plaintiff's assertion of substantial foreclosure is premised on an impermissible segmentation of distribution channels and undercut by Plaintiff's admission that it can and does reach consumers through direct sales and through Amazon.  And the Complaint nowhere alleges the duration of Bayer's agreements, even though exclusive dealing arrangements of moderate duration are permissible as a matter of law.

Plaintiff further alleges that Bayer's arrangements constitute impermissible tying or bundled rebates.  This claim also fails because of the inadequate allegation of market power.  In addition, Plaintiff fails to allege other necessary elements.  Plaintiff does not claim that any retailer was forced to accept an unwanted product (a "tied product") as a condition of purchasing another product (a "tying product").  And it does not claim that the purported bundled rebates, if applied solely to the competitive product, resulted in a below-cost price for that product.

---

[1] The Complaint makes little effort to distinguish between the alleged actions of the three defendants, defining them jointly as "BAH" and then proceeding to reference the conduct of "BAH" throughout. Compl. ¶ 10.  Defendants Bayer Animal Health GmbH and Bayer AG have not been served, and this motion is brought only on behalf of Bayer HealthCare LLC.

*(cont'd)*

BAYER HEALTHCARE LLC'S MOTION TO DISMISS                                    No. 5:19-cv-04312-BLF

These pleading deficiencies require dismissal of the Complaint.  Ordinarily a court in granting an initial motion would allow leave to amend.  But the Court may also take judicial notice of Bayer's actual agreements with retailers and distributors.  These agreements will be provided to the Court upon entry of a protective order in this case.[2]  They demonstrate that all of Bayer's relevant agreements are terminable on notice of 90 days or less.  Under these circumstances, there can be no substantial foreclosure as a matter of law and the Complaint should be dismissed with prejudice.

**BACKGROUND**

Plaintiff's Complaint contains three claims for relief: (1) exclusive dealing in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14; (2) tying arrangements in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14; and (3) unlawful maintenance of a monopoly in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**A.      Plaintiff's Allegations Regarding the Relevant Market**

Plaintiff alleges that the relevant market for analyzing Bayer's conduct is the market for "[t]opical flea and tick products containing Imidacloprid sold at wholesale by manufacturers to Over-The-Counter ("OTC") retailers in the U.S."  Compl. ¶ 15.  This market is quite narrow across three different dimensions.  It omits all other formulations used to treat flea and tick infestation, all other methods of application, and the most common form of commercial distribution of such products.

First, Plaintiff's alleged product market does not include topical flea and tick products containing fipronil or other active ingredients other than imidacloprid.  *Id.* ¶ 16.  "Two common insecticides used for flea and ticket protection are Fipronil . . . and Imidacloprid . . . ."  *Id.* ¶ 18.  Plaintiff alleges that imidacloprid formulations sold today are more effective than fipronil formulations because the former repels fleas and ticks, whereas the latter only kills fleas and ticks.  *Id.* ¶ 20.  Plaintiff also alleges that, unlike fipronil, imidacloprid kills and repels mosquitoes and repels biting flies.  *Id.*  Plaintiff alleges that "many consumers perceive the higher value of Imidacloprid

[2] As set forth in Bayer's concurrently filed motion for entry of a protective order, Plaintiff has refused to meet and confer regarding a protective order and has stated that it would publicly disseminate Bayer's confidential agreements with retailers and distributors if provided in the absence of a protective order.

topical formulations" and "do not consider them interchangeable with Fipronil topical formulations." *Id.* Plaintiff further alleges that manufacturers and retailers "charge a small but significant and non-transitory increase in price for Imidacloprid formulations, as compared to Fipronil formulations," and that "retailers and consumers do not switch from Imidacloprid to Fipronil formulations in response to that price difference in numbers sufficient to make the price difference unprofitable." *Id.*

Second, Plaintiff's alleged product market does not include non-topical flea and tick treatments such as flea collars, oral drugs, or sprays. *Id.* ¶ 16. For instance, Plaintiff excludes from the definition Bayer's Seresto® collar, which it describes as an "'odorless, non-greasy collar' that kills and repels fleas and ticks on dogs for eight months" (*id.* ¶ 68), even though the Seresto® collar contains imidacloprid (*see id.* ¶ 67). Plaintiff alleges that Bayer's Seresto® flea and tick collar was a comparatively expensive product, typically offered at $40 to $69 per collar, depending on the market. *Id.* ¶ 26. Plaintiff alleges that the Seresto® flea and tick collar provides eight months of protection from a single application and that flea collars and topical flea and tick treatments are not interchangeable for most consumers. *Id.* ¶¶ 26, 29. Plaintiff also excludes other non-topical products from its alleged product market, including oral products, shampoos, and sprays. *Id.* ¶ 28. Plaintiff alleges that oral products must be obtained from a veterinarian, rather than from a retailer. *Id.*

Third, Plaintiff excludes sales to veterinarians from its alleged market, asserting that veterinarians are an entirely separate market from the Over-The-Counter retail market. *Id.* ¶ 48. Plaintiff alleges that veterinarians accounted for 51% of all imidacloprid topical sales in 2018 and that veterinarians can charge higher prices for imidacloprid topicals due to the perceived value of their advice and their professional relationships with customers. *Id.* ¶¶ 48–49, 51. Plaintiff further alleges that veterinarians typically demand a "vet-only" brand from manufacturers or a private label brand that is unique to the specific veterinarian. *Id.* ¶ 50. Plaintiff also excludes direct sales to consumers because they allegedly "involve a completely different cost structure, profit margin, and risk structure." *Id.* ¶ 138.

**B.    Plaintiff's Allegations Regarding Bayer's Agreements**

Plaintiff alleges that it was granted registration by the Environmental Protection Agency for its generic imidacloprid topical product in 2017 and that it began promoting its product to retailers

prior to that time in 2016.  *Id.* ¶¶ 84–85.  Plaintiff alleges that while retailers purchased its generic fipronil topical product in large quantities in 2018, Plaintiff's attempts to sell its "less expensive, equally effective" generic imidacloprid topical product in the Over-The-Counter market were foreclosed due to Bayer's agreements with retailers and distributors.  Plaintiff refers to these agreements as Bayer's "Secret Bundled Loyalty Rebate."  *Id.* ¶¶ 86–88; *id.* at 1 n.1.  Plaintiff alleges that Bayer used its agreements or rebate program "to carry out both an illegal exclusive dealing scheme, and an illegal tying scheme."  *Id.* ¶ 139.

Plaintiff acknowledges that the "exact details of the rebate program are in the possession and control of [Bayer]" and that Plaintiff can only describe the rebate program "upon information and belief, based on the facts it has learned from retailers."  *Id.* ¶ 91.  According to Plaintiff, one retailer indicated it would lose $3 million dollars in net margin without the Bayer rebates.  *Id.* ¶ 96.  Another retailer allegedly stated that it would be a "conflict of interest" to carry Plaintiff's generic imidacloprid topical products due to Bayer's "lucrative rebates."  *Id.* ¶ 98.  A third retailer allegedly described its "program with Bayer and [sic] not allowing any generic equivalents."  *Id.* ¶ 101.  A fourth retailer allegedly stated that it had "no interest" in Plaintiff's generic Imidacloprid topical products because "the Bayer rebates are HUGE."  *Id.* ¶ 103.  A fifth retailer noted the existence of a "Bayer agreement," and an affiliate of a sixth retailer allegedly indicated that Bayer was trying to "bundle" its rebate program.  *Id.* ¶ 107.  Plaintiff states that it is reasonable to infer from these retailer comments that Bayer's "rebate must cover a 'bundle' of BAH products, not just BAH's Advantix Imidacloprid topicals."  *Id.* ¶ 118.  Plaintiff omits the names of these retailers in its Complaint "[t]o protect the identities of the retailers."  *Id.* ¶ 92.

## C.  Bayer's Actual Agreements with Retailers and Distributors

Given the deficiencies in Plaintiff's Complaint, the Court does not need to review the terms of Bayer's actual agreements with retailers and distributors in order to grant this motion.  However, because the Complaint relies on them, it is proper for the Court to take judicial notice of the agreements.  Bayer is prepared to file a request for judicial notice, with all relevant agreements attached, as soon as a protective order is entered in this case.  The Court's review will confirm that all of Bayer's agreements governing distribution of the products at issue have a term of two years or

1   less and are terminable at will by the customer with notice of 90 days or less.

2   **ARGUMENT**

3   To survive a motion to dismiss, a complaint alleging violation of the antitrust laws must plead

4   "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550

5   U.S. 544, 570 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Factual allegations must

6   be enough to raise a right to relief above the speculative level" (*Twombly*, 550 U.S. at 555), and courts

7   "are not bound to accept as true a legal conclusion couched as a factual allegation,'" *Iqbal*, 556 U.S.

8   at 678 (internal quotation marks and citation omitted). *See also Kendall v. Visa U.S.A., Inc.*, 518 F.3d

9   1042, 1047–48 (9th Cir. 2008) (holding that plaintiff who alleged "only ultimate facts" and "legal

10   conclusions," rather than "evidentiary facts," failed to state claim under Sherman Act). Courts

11   generally disregard facts that are not alleged on the face of the complaint and need not indulge in

12   unwarranted inferences. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064–65 (9th

13   Cir. 2008); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on other*

14   *grounds*, 275 F.3d 1187 (9th Cir. 2001). On a motion to dismiss, "[t]he Court may generally consider

15   exhibits attached to or incorporated by reference into the complaint and matters properly subject to

16   judicial notice." *Arista Networks, Inc. v. Cisco Sys., Inc.*, No. 16–cv–00923–BLF, 2017 WL 6102804,

17   at *4 (N.D. Cal. Oct. 10, 2017); *see also PNY Techs., Inc. v. SanDisk Corp.* ("PNY I"), 2014 WL

18   1677521, at *2 (N.D. Cal. Apr. 25, 2014) (taking judicial notice of retailer agreements on motion to

19   dismiss exclusive dealing claim). In such cases, "[t]he court need not . . . accept as true allegations

20   that contradict matters properly subject to judicial notice or by exhibit." *Sprewell*, 266 F.3d at 988.

21
22   **I.   THE COMPLAINT FAILS TO ALLEGE A LEGALLY COGNIZABLE AND FACTUALLY SUPPORTED RELEVANT MARKET FOR ANTITRUST ANALYSIS**

23   Exclusive dealing, tying, and monopolization claims each require a showing that the defendant

24   has market power in a "relevant market." *See Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157,

25   1169 (9th Cir. 1997) (exclusive dealing); *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 42–43

26   (2006) (tying); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (monopolization). The

27   market definition inquiry "does not differ for the three claims in any material respect." *Apple, Inc. v.*

28   *Psystar Corp.*, 586 F. Supp. 2d 1190, 1195–99 (N.D. Cal. 2008) (comparing cases). "Failure to

1    identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka v. USC*,

2    252 F.3d 1059, 1063 (9th Cir. 2001) (citation omitted).  Plaintiff's failure to allege a properly

3    supported relevant market warrants dismissal of all claims in the Complaint.

4         "Whether products are part of the same or different markets under antitrust law depends on

5    whether consumers view those products as reasonable substitutes for each other and would switch

6    among them in response to changes in relative prices." *Apple*, 586 F. Supp. 2d at 1196 (citing *Newcal*

7    *Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)).  A "market" for antitrust

8    purposes is "the group of sellers or producers who have the actual or potential ability to deprive each

9    other of significant levels of business."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th

10   Cir. 1995) (internal quotation marks omitted).  Courts consistently reject market definitions that fail

11   to include all reasonably interchangeable products or services.  *See, e.g.*, *Ky. Speedway, LLC v.*

12   *NASCAR*, 588 F.3d 908, 917 (6th Cir. 2009); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d

13   1096, 1105 (9th Cir. 1999); *Apple*, 586 F. Supp. 2d at 1195–96 (dismissing antitrust claims where

14   parties alleged a relevant product market limited to a single product).  Claims that are predicated on

15   an unreasonably narrow market are "legally insufficient[,] and a motion to dismiss may be granted."

16   *Colonial Med. Grp, Inc. v. Catholic Healthcare W.*, No. C-09-2192 MMC, 2010 WL 2108123, at *3

17   (N.D. Cal. May 25, 2010) (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436

18   (3d Cir. 1997)); *see also Tanaka*, 252 F.3d at 1062–63 (affirming dismissal where plaintiff failed to

19   allege any facts other than plaintiff's personal preference to support "conclusory" assertion that

20   market existed); *Queen City Pizza*, 124 F.3d at 436 (dismissing antitrust claims "[w]here the plaintiff

21   fail[ed] to define its proposed relevant market with reference to the rule of reasonable

22   interchangeability and cross-elasticity of demand, [and] allege[d] a proposed relevant market that

23   clearly does not encompass all interchangeable substitute products even when all factual inferences

24   are granted in plaintiff's favor").

25        To support its antitrust claims, Plaintiff seeks to define a narrow topical-only, imidacloprid-

26   only product market (excluding all other chemicals and all other modes of applying flea and tick

27   treatment) and a distribution market that excludes one of the largest channels—sales by

28   veterinarians—as well as direct-to-consumer sales in an effort to establish that Bayer has the

BAYER HEALTHCARE LLC'S MOTION TO DISMISS                                No. 5:19-cv-04312-BLF

1    necessary market power and has foreclosed a sufficiently significant portion of the potential

2    distribution channels for Plaintiff's product.  The facts as alleged, even when taken in the light most

3    favorable to Plaintiff, do not support Plaintiff's desired exclusions from the relevant market.

4          **A.**      **The SSNIP Test Does Not Provide A Legal Basis for Market Definition as**
                         **Applied in the Complaint**

5

6          Plaintiff purports to use the "SSNIP" test, also known as the hypothetical monopolist test and

7    typically used by the antitrust agencies to evaluate mergers, to exclude fipronil-based products from

8    the relevant product market.  Plaintiff fundamentally misunderstands how the test is applied.  *See* U.S.

9    Dep't of Justice, Antitrust Div., *Horizontal Merger Guidelines* § 4.1.1 (Aug. 19, 2010), available at

10   https://www.justice.gov/atr/horizontal-merger-guidelines-08192010#4c (describing the test as a

11   means to define a "set of products that are reasonably interchangeable with a product sold by one of

12   the merging firms").  The test asks whether a hypothetical "monopolist in the proposed market could

13   profitably impose a small but significant and nontransitory [increase in] price" ("SSNIP"; typically

14   5-10%), or whether, when faced with such a price increase, consumers would switch to a product

15   outside of the proposed market at a rate that would make the price increase unsustainable.  *Theme*

16   *Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008).  "If a monopolist could

17   not profitably impose a SSNIP, the market definition should be expanded to include those substitute

18   products that constrain the monopolist's pricing."  *Id.*  The test concerns a response to a *change* in

19   price, not the difference between the absolute level of prices.

20         Plaintiff contends that fipronil products should be excluded from the relevant market because

21   "consumers are willing to pay a small but significant non-transitory increase in the price of

22   Imidacloprid formulations, as compared to Fipronil formulations."  Compl. ¶ 22.  But in fact all the

23   Complaint alleges is that the prices of certain imidacloprid and fipronil products are more than 5%

24   apart.  Compl. ¶¶ 22–23.  This allegation is of no moment.  As this Court has held, price differences

25   have little bearing on whether two products are in the same relevant market:  "Although the

26   *responsiveness* of one product to the price of another is at the heart of the market definition analysis,

27   a mere price differential alone does not necessarily signal a distinct market . . . [or] mean that a

28   product is unconstrained by competition."  *Apple*, 586 F. Supp. 2d at 1198 (emphasis in original).

-7-

What matters is what would happen if the price of imidacloprid topical products increased by 5-10% while the prices of other potentially competitive products remained constant.[3]  If consumers would switch to fipronil products—or any other flea and tick product—then those other products are in the same market as imidacloprid topical products.  On this issue the Complaint is silent, rendering the Complaint's allegations with respect to the SSNIP test meaningless.

> ### B.   Plaintiff's Allegations Concerning Price, Quality, and Features Are Insufficient to Support a Market Limited to Topical Imidacloprid Products

Plaintiff's remaining allegations seeking to differentiate fipronil from imidacloprid products, as well as topical from non-topical products, do not support a legal conclusion that they are in separate markets.

The fact that fipronil products are priced differently from imidacloprid products, and topicals are priced differently from non-topicals, is insufficient as a matter of law to support the conclusion that the products are in different product markets.  In *United States v. E.I. du Pont de Nemours & Co.*, the Supreme Court affirmed that cellophane was part of a broader market for flexible packaging materials, despite a price difference of over 200% between cellophane and competing flexible wrapping materials.  351 U.S. 377, 400–01 (1956).  Here, the price difference is only alleged to be 7.1% to 13.5%.  Compl. ¶ 22.

It is well settled that products are in the same market if they have "reasonable interchangeability for the purpose for which they are produced—*price, use and qualities considered*." *E.I. du Pont*, 351 U.S. at 404 (emphasis added); *see id.* at 393–94 ("But where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others.  If it were not so, only physically identical products would be a part of the market.").  Courts recognize that defining markets by reference to the consumers of a product and not the use or purpose of a product itself renders the market definition "facially unsustainable."  *Newcal*, 513 F.3d at 1045; *see also Colonial Med. Grp.*, 2010 WL 2108123, at *3 (granting motion to dismiss where plaintiff "defined the market by reference

---

[3] *See Horizontal Merger Guidelines*, *supra*, § 4.1.1 ("For the purpose of analyzing this issue, the terms of sale of products outside the candidate market are held constant.").

to a consumer"). "[S]trictly personal preference . . . is irrelevant to the antitrust inquiry." *Tanaka*, 252 F.3d at 1063. The fact that a consumer "might choose to purchase a certain product because the manufacturer has spent time and energy differentiating his or her creation from the panoply of products in the market" does not mean that product should be excluded from the relevant market. *Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) ("[A]t base, Pepsi is one of many sodas, and NBC is just another television network."). Similarly, the conclusory allegation that "[d]istinct, non-interchangeable, products deliver flea and tick treatment to pets in different ways" is unsupported by specific facts that would explain why or how products used to address the exact same problem (treating fleas and ticks on pets) with the exact same active ingredient are rendered non-interchangeable by virtue of having different delivery mechanisms. *See* Compl. ¶ 26. For oral treatments in particular, the single fact put forth in the Complaint to justify excluding them from the market is that they "must be obtained from a veterinarian," and there are no allegations whatsoever as to why shampoos and sprays would not be reasonable substitutes. *See id.* ¶ 28.

Finally, Plaintiff's contention that fipronil-containing products, such as Frontline, "serve different purposes from Imidacloprid products and are otherwise not interchangeable" is both conclusory and belied by other allegations in the Complaint: "The active ingredients in flea and tick treatments are insecticides that kill *and/or* repel fleas and ticks. . . . Two common insecticides used for flea and tick protection are Fipronil . . . and Imidacloprid . . . ." Compl. ¶¶ 18, 20 (emphasis added). Allegations in the Complaint regarding Bayer's practice of "extensively advertis[ing]" imidacloprid products in direct comparison to fipronil products only underscore that at least Bayer views the products as competitive. *See* Compl. ¶ 21. A court "is not required to indulge unwarranted inferences in order to save a complaint from dismissal." *Metzler Inv.*, 540 F.3d at 1064–65.

C.   **The Complaint Allegations Do Not Support Excluding Veterinarian Sales and Direct Sales from the Relevant Market**

The allegations in the Complaint purporting to justify excluding veterinarian and direct sales from the relevant distribution market suffer from the same inadequacies as the product market allegations. While acknowledging that half of imidacloprid topical product sales are through

-9-

veterinarians (Compl. ¶ 33), Plaintiff proposes to carve out the majority of imidacloprid topical sales from the market based primarily on the allegation that veterinarians charge higher prices (which as discussed above is not sufficient to justify excluding sales from a relevant market) and a conclusory allegation that veterinarians (and each of the alleged OTC retailers) serve a "different group[] of core customers" (Compl. ¶ 53).  Even taken as true, these allegations cannot support a legally cognizable market because "[t]he consumers do not define the boundaries of the market; the products or producers do." *Newcal*, 513 F.3d at 1045 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).  Plaintiff has not alleged any facts that would place the products sold by veterinarians and those sold by other retailers into fundamentally distinct markets.  Given that, according to the Complaint, sales through veterinarians are sales of the same products sold for the same use (flea and tick treatment) to pet owners in need of flea and tick treatment, it is not reasonable to exclude those sales from the relevant market absent some additional specific allegations.  *See Med Vets Inc. v. VIP Petcare Holdings, Inc.*, No. 18-cv-02054-MMC, 2019 WL 1767335, at *5 (N.D. Cal. Apr. 22, 2019) (dismissing claims for failure to allege a "facially sustainable" relevant market where plaintiffs attempted to exclude certain distribution channels from market definition and finding that "plaintiffs' exclusion of veterinarians and manufacturers conflict[ed] with various allegations in their [complaint]").  Similarly, the Complaint's basis for excluding direct sales (including sales through Amazon) is inadequate.  Plaintiff alleges that such sales may involve different commercial arrangements (Compl. ¶ 138), but that does not preclude such sales from being in the same market. The relevant question is whether sales in one channel are responsive to price changes in another.  On this question, the Complaint is once again silent.

## II.     THE COMPLAINT FAILS TO STATE A CLAIM FOR EXCLUSIVE DEALING IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14

Count I of the Complaint asserts that Bayer's agreements with retailers constitute unlawful exclusive dealing in violation of Section 3 of the Clayton Act. "Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010).  Because of the "well-recognized economic benefits to exclusive dealing

arrangements, including the enhancement of interbrand competition," courts "analyze challenges to exclusive dealing arrangements under the antitrust rule of reason."  *Omega*, 127 F.3d at 1162; *see also PNY Techs., Inc. v. SanDisk Corp.* ("PNY II"), 2014 WL 2987322, at *4 (N.D. Cal. July 2, 2014) (noting that "[e]xclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition") (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012)).  Exclusive dealing only runs afoul of the law "where [its] effect . . . may be to substantially lessen competition or tend to create a monopoly."  15 U.S.C. § 14.  As a threshold matter, it is unclear that Plaintiff has alleged a relationship between Bayer and retailers that could be defined as exclusive dealing, which involves "a commitment by a buyer to deal only with a particular seller," as opposed to a rebate or sales incentive program.  *See W. Parcel Exp. v. UPS*, 190 F.3d 974, 975–76 (9th Cir. 1999) ("Because the contracts do not preclude consumers from using other delivery services, they are not exclusive dealings contracts that preclude competition . . . .").  As discussed below, the allegations in the Complaint concerning the mechanism by which Bayer is alleged to have engaged in exclusive dealing are vague and conclusory.  But even assuming, *arguendo*, that Bayer's agreements could constitute exclusive dealing, the Complaint fails to allege the requisite foreclosure necessary to state a claim for exclusive dealing in violation of the Clayton Act.

### A.   Plaintiff Fails to Plausibly Allege That Bayer's Allegedly Exclusive Dealing Arrangements Foreclose Competition in the Alleged Market or Any Market

Exclusive dealing arrangements do not violate Section 3 of the Clayton Act unless they foreclose a substantial share of competition in a relevant market.  *See Omega*, 127 F.3d at 1162 ("Only those arrangements whose 'probable' effect is to 'foreclose competition in a substantial share of the line of commerce affected' violate Section 3 [of the Clayton Act]." (citation omitted)).  As discussed above, not only has Plaintiff failed to adequately allege a product market in which Bayer has sufficient market power to support a claim of exclusive dealing, Plaintiff also has failed to adequately allege either that (a) Bayer's agreements are sufficiently long term to foreclose competition as a matter of law or (b) Bayer has foreclosed Plaintiff's access to a substantial share of the potential market for distribution of its imidacloprid product.

BAYER HEALTHCARE LLC'S MOTION TO DISMISS                                      No. 5:19-cv-04312-BLF

1

2

        **1.**      **Plaintiff Fails to Allege that Bayer's Agreements Are of a Duration Sufficient to Foreclose Competition**

3

      Plaintiff's Complaint fails to plausibly allege that Bayer's agreements with retailers foreclose

4

competition in any relevant market containing Bayer's imidacloprid flea and tick products.  It is well-

5

established that "short duration and easy terminability . . . negate substantially [exclusive

6

agreements'] potential to foreclose competition." *Id.* at 1163 (citing *Roland Mach. Co. v. Dresser*

7

*Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) (holding that "contracts terminable in less than a year

8

are presumptively lawful")).   Exclusive arrangements that are easily terminable "may actually

9

encourage, rather than discourage, competition, because the incumbent and [its competitors] have a

10

strong incentive continually to improve the [service] and prices they offer in order to secure the

11

exclusive positions." *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (discussing three-year

12

exclusive agreement that could be terminated for any reason on six months' notice).  Short duration

13

contracts therefore cannot form the basis of exclusive dealing claims, as they lack the inherent power

14

to foreclose competition as a matter of law.  *See PNY II*, 2014 WL 2987322, at \*4; *Omega*, 127 F.3d

15

at 1164 ("Because all of [defendant's] distributors are available within one year, and most . . . are

16

available on 60 days['] notice, a competing manufacturer need only offer a better product or a better

17

deal to acquire their services."); *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972,

18

977–78 (6th Cir. 2000) (affirming dismissal of claims brought under Sherman Act Section 2 and

19

Clayton Act Section 3 "in light of the fact that the exclusive contracts were of limited duration, and

20

in light of the fact that the customers were free to seek other [suppliers] at the conclusion of the

21

contracts"); *Paddock Publ'ns, Inc v. Chi. Tribune Co.*, 103 F.3d 42, 44 (7th Cir. 1996) (affirming

22

dismissal of Sherman Act Section 1 claim challenging exclusive contracts "terminable at will or on

23

short notice" of thirty days to one year).

24

      Here, while the Complaint contains conclusory allegations of substantial foreclosure, it is

25

silent on the duration of Bayer's agreements with retailers.  Plaintiff's recitation of conversations with

26

unidentified retailers contains no suggestion that Bayer's contracts are long term or difficult to

27

terminate.  The Complaint's allegations are equally consistent with a scenario in which Plaintiff could

28

offer a superior or less expensive product, wait a reasonably short period of time, and convince

-12-

      

1    retailers to carry its product instead of (or perhaps in addition to) Bayer's product.  Bayer's success

2    in these circumstances reflects the quality of its products, not any improper exclusionary conduct.

3    The lack of any specific allegation that the terms of any Bayer program are of sufficient duration to

4    substantially foreclose competition is fatal to Plaintiff's claims.[4]

5
              **2.      The Complaint Expressly Acknowledges Alternative Distribution
6                       Channels Other Than The Pet Specialty and Online Retailers**

7              Exclusive dealing agreements do not foreclose competition when there are existing and

8    potential alternative channels of distribution besides those allegedly affected by the exclusive

9    agreements.  *See, e.g.*, *Omega*, 127 F.3d at 1163; *CDC Techs., Inc. v. IDEXX Labs.*, 186 F.3d 74, 80

10   (2d Cir. 1999) (finding that plaintiff failed to establish foreclosure because it had "successfully

11   reached customers by a variety of marketing techniques").  The Complaint expressly acknowledges

12   that there are alternative channels of distribution other than Pet Specialty and Online OTC Retailers

13   and then conveniently requests that the Court not consider them.  The Complaint does not allege that

14   Bayer has foreclosed a substantial percentage of all distribution channels for Plaintiff's product—

15   merely the two channels in which Plaintiff alleges Bayer's share is highest.  *See Newcal*, 513 F.3d at

16   1045 (holding relevant market "must include the group or groups of sellers or producers who have

17   actual or potential ability to deprive each other of significant levels of business" (internal quotation

18   marks omitted)).  Where a competitor has alternative means of reaching consumers "it is unclear

19   whether such restrictions foreclose from competition *any* part of the relevant market."  *See Omega*,

20   127 F.3d at 1163 (referencing "existing or potential alternative channels of distribution"); *Abbyy USA*

21   *Software House, Inc. v. Nuance Commc'ns Inc.*, No C 08-01035 JSW, 2008 WL 4830740, at *2, *6

22   (N.D. Cal. Nov. 6, 2008) (finding that plaintiff did not state a claim for exclusive dealing based on

---

23   [4] Moreover, as Judge Orrick noted in dismissing a remarkably similar complaint alleging exclusive
24   dealing based on inferences from conversations with retailers, "it is unclear that the retailers meant
25   they are actually prevented from considering [defendant's] competitors or that their deal with
26   [defendant] is simply too good to forego, not something more nefarious.  [Plaintiff] does not allege . . .
27   that it offered better terms to those retailers than [defendant] . . . .  [Plaintiff] fails to allege why
28   competition has been substantially foreclosed."  *PNY II*, 2014 WL 2987322, at *6.

1   being "foreclosed from 'certain retail outlets'" where the plaintiff also "alleged that direct sales and

2   licensing agreements [we]re alternative distribution channels for the same [relevant] products").

3         The Complaint acknowledges that sales through veterinarians account for over 50% of

4   imidacloprid topical product distribution and yet, as discussed above, omits veterinarians from its

5   foreclosure analysis.  *See* Compl. ¶ 48.  In addition, the Complaint defines a General Retailer

6   distribution channel, but contains no specific allegations of foreclosure in the General Retailer

7   channel, and in fact admits that it "has sold to general retailers wherever possible."  *See* Compl. ¶ 137.

8   The Complaint further acknowledges that Plaintiff can sell "direct to consumers, through its own

9   website and through Amazon" (*id.*), thereby conceding alternative distribution channels are available.

10  *See Omega*, 127 F.3d at 1163.  The antitrust laws only require that "[c]ompetitors [be] free to sell

11  directly, to develop alternative distributors, or to compete for the services of the existing distributors."

12  *Id.* (rejecting plaintiff's arguments that available distribution channels were inadequate substitutes for

13  the "existing distributors—who have proven finances, abilities and customer relationships [that were]

14  restricted by exclusive dealing").  The fact that a defendant has succeeded in "legitimately controlling

15  the best, most efficient and cheapest source of supply" does not mean that it then has to "share the

16  fruits of its superior acumen and industry."  *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965,

17  979 (9th Cir. 1983) (internal quotation marks omitted).

18        These concessions are fatal to Plaintiff's exclusive dealing claim.  Even if Plaintiff had

19  adequately alleged that it could not sell through certain specified retailers in certain specified channels

20  for an extended period of time—which it has not—the existence of non-foreclosed alternative

21  channels is inconsistent with any assertion of substantial foreclosure.  *See PNY II*, 2014 WL 2987322,

22  at *8–9 (dismissing exclusive dealing claim with prejudice when direct sales constituted 19% of

23  market and noting it was irrelevant that "the vast majority of customers prefer brick-and-mortar

24  retailers").

25      **B.**    **Bayer's Agreements Cannot Foreclose Competition As a Matter of Law**

26            **Because They Are Short-Term and Easily Terminable**

27        Bayer's actual agreements with retailers and distributors demonstrate the absence of

28  substantial foreclosure as a matter of law.  Courts considering complaints similar to Plaintiff's have

1     held that the contracts in question are appropriately the subject of judicial notice on a motion to

2     dismiss and have dismissed exclusive dealing claims stemming from short-term, easily terminable

3     contracts.  *See Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. SACV 12-2102-JST (ANx), 2013

4     WL 3936394 (C.D. Cal. July 30, 2013); *PNY I*, 2014 WL 1677521, at *2.  In both *Pro Search* and

5     *PNY*, the plaintiff brought claims challenging exclusive agreements that the defendant, which

6     allegedly held a greater than 50% market share, had entered into with customers.  *See Pro Search*,

7     2013 WL 3936394, at *1; *PNY I*, 2014 WL1688521, at *1.  In granting defendants' motions to dismiss

8     claims of exclusive dealing, the courts took judicial notice of the relevant agreements on which the

9     plaintiff's complaint necessarily relied and found that the agreements were short-term (1 to 5 years)

10    and terminable by the customers with a reasonable notice period (90 days to 12 months).  *See Pro

11    Search*, 2013 WL 3936394, at *2 n.2, *4 (holding that "[b]ecause those contracts are of relatively

12    short duration and, crucially, can be terminated upon short notice, they do not—by themselves—

13    sustain the Sherman Act claims"); *PNY I*,  2014 WL 1677521, at *2, *5 (finding that the complaint

14    failed to plead adequate facts showing unlawful foreclosure because the contracts were short term

15    and their "easy terminability 'negate[s]' substantially their potential to foreclose competition'" (citing

16    *Omega*, 127 F.3d at 1163)); *see also SPX Corp. v. Mastercool U.S.A., Inc*., No. 3:10 CV 1266, 2011

17    WL 2532889, at *1 (N.D. Ohio June 24, 2011) (finding that even though the plaintiff had "exclusive

18    agreements with most of the [customers] in the [relevant] market, nothing prevents [the plaintiff] from

19    competing for those [customers] once the agreements expire, or from offering more favorable

20    terms . . . to entice [them] to exercise the early termination provisions in the agreements").

21            As Bayer's request for judicial notice will show, none of Bayer's agreements has a term longer

22    than two years and all are terminable at will by the customer with 90 or fewer days' notice.

23    Accordingly, they cannot foreclose competition as a matter of law and dismissal with prejudice is

24    warranted.

25    **III.     THE COMPLAINT FAILS TO STATE A CLAIM FOR TYING IN VIOLATION OF
26             SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14**

27            Count II of the Complaint asserts unlawful tying.  To prevail on a tying claim, a plaintiff must

28    prove: "(1) that there exist two distinct products or services in different markets whose sales are tied

-15-

1    together; (2) that the seller possesses appreciable economic power in the tying product market

2    sufficient to coerce acceptance of the tied product; and (3) that the tying arrangement affects a not

3    insubstantial volume of commerce in the tied product market." *See Paladin Assocs., Inc. v. Mont.*

4    *Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) (internal quotation marks omitted). A plaintiff must

5    present evidence that the defendant went beyond persuasion and coerced or forced its customer to

6    buy the tied product in order to obtain the tying product. *See id.* Dismissal is warranted where a

7    complaint fails to plead factual allegations showing an unlawful tying arrangement. *See, e.g.*, *Sidibe*

8    *v. Sutter Health*, 4 F. Supp. 3d 1160, 1178–79 (N.D. Cal. 2013).

9          Plaintiff's allegations regarding a "tie" between Bayer's K9 Advantix® II imidacloprid

10   products and the Seresto® flea and tick collar are pure speculation. There are no allegations in the

11   Complaint to support such a claim. "Such speculation stops short of the line between possibility and

12   plausibility of entitlement to relief." *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 765

13   (9th Cir. 2018) (internal quotation marks omitted). Plaintiff alleges that by "drawing reasonable

14   inferences from the facts set forth in this Complaint, the Secret Bundled Loyalty Rebate was

15   structured so that a retailer . . . would lose a "HUGE" amount of rebates . . . if the retailer did not

16   demonstrate loyalty by purchasing all of the bundled BAH products, including BAH's higher-cost

17   Advantix Imidacloprid topicals." Compl. ¶ 125. But none of the retailer comments highlighted by

18   Plaintiff indicates that the availability of the Seresto® flea and tick collar is contingent on the purchase

19   of any other product. Rather, Plaintiff alleges only that retailers have stated that Bayer offered

20   substantial rebates, with one retailer commenting that Bayer was "trying to 'bundle' its rebate

21   program." *See* Compl. ¶¶ 96, 98, 103, 107. The mere fact that a seller includes multiple products in

22   a rebate program does not support an inference that those products are tied. *See, e.g.*, *Santa Cruz*

23   *Med. Clinic v. Dominican Santa Cruz Hosp.*, No. C93 20613 RMW, 1995 WL 853037, at *12 (N.D.

24   Cal. Sept. 7, 2015) ("If the desirable, tying product 'is truly available without the condition that other

25   products be purchased with it, its alternative sale as part of a package cannot logically be a device to

26   force the purchase of the 'tied' products."); *Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys.,*

27   *Inc.*, 732 F.2d 1403, 1407 (9th Cir. 1984) ("[W]here the buyer is free to take either product by itself

28   there is no tying problem even though the seller may also offer the two items as a unit at a single

BAYER HEALTHCARE LLC'S MOTION TO DISMISS                                    No. 5:19-cv-04312-BLF

1    price."). Nowhere does Plaintiff suggest that retailers or distributors were prohibited from purchasing

2    the Seresto® flea and tick collar if they purchased competing generic imidacloprid topical products.

3          In the absence of any basis to allege an actual tie, Plaintiff resorts to a vague assertion,

4    unsupported by any factual allegations, that retailers' "only viable economic alternative" was to

5    purchase unwanted quantities of brand imidacloprid topicals due to the alleged Secret Bundled

6    Loyalty Rebate.  Compl. ¶ 156.  However, the Ninth Circuit "ha[s] not found evidence of coercion

7    where a defendant used a package discount to encourage buyers to take both products."  *Paladin*

8    *Assocs.*, 328 F.3d at 1160.  Mere allegations that a competitor "forced" a tie through elimination of

9    substantial discounts if a consumer purchased the tied good from a competitor are insufficient to make

10   out a tying claim. *See Synopsys, Inc. v. ATopTech, Inc.*, No. C 13–2965 MMC, 2015 WL 4719048, at

11   *7–8 (N.D. Cal. Aug. 7, 2015).  In *Synopsys*, for example, the court dismissed plaintiff's claim that a

12   company's discount pricing practice "render[ed] it economically unviable" to purchase from a

13   competitor due to plaintiff's failure to allege facts showing how the alleged discounting practice was

14   coercive, including failure to allege relevant price information. *See id.* at *7; *see also Eastman v.*

15   *Quest Diagnostics Inc.*, 724 F. App'x 556, 560 (9th Cir. 2018) ("Although plaintiffs alleged medical

16   providers' 'only viable economic option' was to accept the alleged Quest tying, plaintiffs did not

17   allege facts to make this conclusion plausible.").  Plaintiff's Complaint alleges that retailers were

18   offered substantial rebates from Bayer and that retailers found these rebates sufficiently attractive not

19   to purchase from competitors, but it provides no facts in support of this conclusion. *See* Compl. ¶ 103

20   ("Retailer D had 'no interest in Own Brands or generic compromise as the Bayer rebates are

21   HUGE'").  Plaintiff does not say what its prices were or what Bayer's prices were.

22         Even taken in the light most favorable to Plaintiff, the allegations support a conclusion only

23   that some retailers found some ill-defined rebate program attractive and offered this as a reason to

24   Plaintiff for declining to purchase Plaintiff's products.  In the absence of any facts showing that Bayer

25   coerced the purchase of a tied product, Plaintiff cannot show that Bayer's conduct was impermissible

26   under the antitrust laws.

27

28

      

1
2

**IV.    THE COMPLAINT FAILS TO ALLEGE ANY VIOLATION OF THE ANTITRUST
LAWS ARISING FROM USE OF BUNDLED DISCOUNTS**

3         Plaintiff does not make an express claim regarding bundled loyalty discounts.  However, it

4    refers throughout its Complaint to Bayer's agreements as constituting a "Secret Bundled Loyalty

5    Rebate."  *See* Compl. ¶¶ 110–113.  On the possibility that Plaintiff intended to assert a claim based

6    on bundled discounts, we address it briefly.  In the Ninth Circuit, in order to proceed with a bundled

7    discount claim, "the plaintiff must establish that, after allocating the discount given by the defendant

8    on the entire bundle of products to the competitive product or products, the defendant sold the

9    competitive product or products below its average variable cost of producing them."  *Cascade Health*

10   *Sols. v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2008).  This "discount attribution" screen ensures

11   that the law only condemns bundled discounts that would exclude an equally efficient producer of the

12   competitive product or products.  *See id.* at 909.

13         The Complaint contains no allegations that any loyalty rebates offered by Bayer resulted in

14   prices that were below an appropriate measure of Bayer's costs.  Loyalty rebates—"secret" or

15   otherwise—are not unlawful in such circumstances.  Without the "clearest showing" that a pricing

16   practice will injure competition, the Supreme Court has shown "a measured concern to leave

17   unhampered pricing practices that might benefit consumers."  *See Cascade Health Sols.*, 515 F.3d at

18   902.  This is because bundling practices "generally benefit the buyers because the discounts allow the

19   buyer to get more for less."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1185 (9th Cir.

20   2016); *see also Arista Networks*, 2017 WL 6102804, at *13–14 (dismissing bundling claims for

21   failure to adequately plead facts under the discount attribution standard).

22
23

**V.     THE COMPLAINT FAILS TO STATE A CLAIM FOR MONOPOLIZATION IN
VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**

24         In Count III, Plaintiff asserts unlawful monopolization in violation of Section 2 of the

25   Sherman Act, 15 U.S.C. § 2.  To establish monopolization, a plaintiff must show "(1) the possession

26   of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power

27   as distinguished from growth or development as a consequence of a superior product, business

28   acquisition, or historic accident."  *John Doe 1 v. Abbott Labs.*, 571 F.3d 930, 933 n.3 (9th Cir. 2009);

*see also Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*, 795 F.3d 1124, 1131–32 (9th Cir. 2015) (affirming dismissal of a complaint for failure to state a monopolization claim). Plaintiff's Complaint fails to allege either element sufficiently.

### A.    Plaintiff Fails to Adequately Plead That Bayer Possesses Monopoly Power

Plaintiff's monopolization claim must be dismissed because Plaintiff has failed to allege a properly supported relevant market within which Plaintiff has monopoly power.  Plaintiff alleges that Bayer has a monopoly on the sale of imidacloprid topicals to over-the-counter retailers in the U.S. Compl. ¶ 161.  As previously discussed, Plaintiff's market definition analysis is deeply flawed and the purported relevant market is not supported by the factual allegations in the Complaint.  Plaintiff has not alleged any alternative product market in its Complaint.  Plaintiff thus cannot show that Bayer has monopoly power in any relevant market.  *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th Cir. 2018) (dismissal is warranted where proposed product market is facially unsustainable); *see also Brignac v. Yelp Inc.*, No. 19-cv-01188-EMC, 2019 WL 2372251, at *4 (N.D. Cal. June 5, 2019) (dismissing a Sherman Act monopolization claim for failure to identify a relevant product market).

### B.    Plaintiff Fails to Plead That Bayer Has Willfully Maintained Monopoly Power Through Anticompetitive Conduct

The Complaint also fails to adequately allege that Bayer willfully maintained its alleged monopoly power through exclusionary conduct.  *See Genus Lifesciences Inc. v. Lannett Co.*, 378 F. Supp. 3d 823, 841 (N.D. Cal. 2019) ("[T]o be actionable under Section 2 a monopolist's conduct must have an anticompetitive effect." (internal quotation marks omitted)); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004) (requiring a showing of exclusionary conduct to prevail on a monopolization claim).  Plaintiff's monopolization claim is premised on the argument that Bayer willfully maintained its monopoly "by means of the unlawful and anticompetitive exclusive dealing arrangement . . . and the unlawful tying arrangement."  Compl. ¶ 162.  However, as discussed above, Plaintiff has not adequately alleged under *Twombly* that any such anticompetitive arrangements existed.  Where, as here, a "[p]laintiff has failed to plead sufficient facts supporting a claim of monopolization, and instead relies on legal conclusions and threadbare recitals of the elements of th[e] cause of action," dismissal should be granted.  *Havensight Capital LLC v. Nike,*

1  *Inc.*, No. CV 14–8985–R, 2015 WL 993334, at *4 (C.D. Cal. Feb. 18, 2015); *see also Abid v. Google*

2  *LLC*, No. 18-cv-00981-MEJ, 2018 WL 3458546, at *4–5 (N.D. Cal. July 18, 2018) (dismissing

3  monopolization claims under the Sherman Act as conclusory).

4  **CONCLUSION**

5  For the above reasons, Bayer HealthCare LLC respectfully requests the Court dismiss with

6  prejudice all claims against Bayer HealthCare LLC.

7  Dated:  September 27, 2019.  Respectfully submitted,

8  **ARNOLD & PORTER KAYE SCHOLER LLP**
DANIEL B. ASIMOW

9  ANDREW S. HANNEMANN
Three Embarcadero Center, 10th Floor

10  San Francisco, CA  94111-4024

11  SONIA K. PFAFFENROTH
LAURA S. SHORES (*pro hac vice*)

12  KATHERINE E. CLEMONS (*pro hac vice*)
601 Massachusetts Ave. NW

13  Washington, D.C.  20001-3743

14

15  By:  /s/ *Daniel B. Asimow*
DANIEL B. ASIMOW

16

17  *Attorneys for Defendant*
BAYER HEALTHCARE LLC

18

19

20

21

22

23

24

25

26

27

28