NITIN GAMBHIR (SBN 259906)
ngambhir@polsinelli.com
POLSINELLI LLP
1661 Page Mill Road, Suite A
Palo Alto, CA 94304
T: 650-461-7700
F: 650-461-7701

DANIEL D. OWEN (*Admitted Pro Hac Vice*)
dowen@polsinelli.com
POLSINELLI PC
900 w. 48TH Place, Ste. 900
Kansas City, MO 64112
T: 816-753-1000
F: 816-753-1536

HERBERT F. ALLEN (*Pro Hac Vice Admission Pending*)
hallen@polsinelli.com
ALEXA R. DICUNZOLO (*Admitted Pro Hac Vice*)
adicunzolo@polsinelli.com
POLSINELLI PC
1401 I ("Eye") St. NW, Ste. 800
Washington DC, 20005
T: 202-783-3300
F: 202-783-3535

Attorneys for Plaintiff
TEVRA BRANDS, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| TEVRA BRANDS, LLC, | Case No. 5:19-cv-04312-BLF |
| Plaintiff, | **PLAINTIFF TEVRA BRANDS, LLC'S OPPOSITION TO DEFENDANT BAYER HEALTHCARE, LLC'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM** |
| v. | |
| BAYER HEALTHCARE LLC, and BAYER ANIMAL HEALTH GmbH, and BAYER AG, | Date:   February 27, 2020 |
| Defendants. | Time:   9:00 a.m.<br>Ctrm:  3, 5th Floor<br>Judge:  Honorable Beth Labson Freeman |

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     DEFENDANTS' MOTION TO DISMISS RAISES A THRESHOLD PROCEDURAL ISSUE THAT MUST BE DECIDED BY THIS COURT .................................................................................................................... 1

III.    THE COMPLAINT SUFFICIENTLY ALLEGES THE RELEVANT MARKETS FOR ANTITRUST ANALYSIS ........................................................... 2

        A.      Legal Standard:  Motions to Dismiss on Product-Market Grounds Are Disfavored Because Market Definition Is "Deeply Fact-Intensive." ................................................................................................ 3

        B.      The Complaint Properly Invokes the Rule of "Reasonable Interchangeability" in Explaining Why the Product Market Does Not Include Medicated Collars, Oral Dosage Forms, and Products Containing an Entirely Different Active Ingredient (Fipronil). ..................... 4

        C.      The Defendant Misconstrues the Pricing Allegations in the Complaint ......................................................................................... 8

        D.      The Complaint Sufficiently Alleges a Sub-Market for Topical Imidacloprid that Excludes Sales by Veterinarians and Direct-to-Consumer Sales ................................................................................ 9

IV.     THE COMPLAINT STATES A CLAIM FOR EXCLUSIVE DEALING IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14. .................................................................................................................. 11

        A.      Tevra has Sufficiently Alleged Bayer's Illegal Exclusive Dealing Scheme and Its Substantial Foreclosure of Competition in the Relevant Market ....................................................................................... 11

                1.      Tevra's Complaint Plausibly Alleges that Bayer's Exclusive-Dealing Agreements Were of Sufficient Duration to Foreclose Competition and Substantially Lessen Competition. .................................................................. 12

                2.      Tevra's Complaint Clearly Explains Why Alternative Distribution Channels Do Not Represent Interchangeable Demand for Tevra's Products and that, Despite Tevra's Efforts to Mitigate its Damages, It Remains Foreclosed from a Substantial Share of the Relevant Market. ............................ 14

     B.     The Court Should Treat Bayer's Motion to Dismiss as a Motion
for Summary Judgment or, Alternatively, the Court Should
Exclude the Extrinsic Documents Presented by Bayer with Its
Motion to Dismiss ........................................................................................... 15

V.     THE COMPLAINT STATES A CLAIM FOR TYING IN VIOLATION
OF SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14 .................................. 20

VI.    THE COMPLAINT DOES NOT ASSERT A SEPARATE CAUSE OF
ACTION BASED ON BUNDLED DISCOUNTS ..................................................... 22

VII.   THE COMPLAINT STATES A CLAIM FOR MONOPOLIZATION IN
VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. §
2. ......................................................................................................................... 23

     A.     The Complaint Adequately Pleads that Bayer Possesses
Monopoly Power ............................................................................................. 24

     B.     The Complaint Adequately Pleads that Bayer Has Willfully
Maintained Monopoly Power Through Anticompetitive Conduct. ................. 24

VIII.  CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Teva,*
   432 F. Supp. 2d 408 (D. Del. 2006)........................................................................11, 15

*Abid v. Google LLC,*
   2018 WL 3458546 (N.D. Cal. July 18, 2018)..................................................................25

*Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.,*
   2004 WL 2075445 (N.D. Cal. Sept. 15, 2004) ...........................................................19, 22

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
   836 F.3d 1171 (9th Cir. 2016) ......................................................................................20

*Airweld, Inc. v. Airco, Inc.,*
   742 F.2d 1184 (9th Cir. 1984) ......................................................................................22

*Applied Med. Res. Corp. v. Ethicon, Inc.,*
   2006 WL 1381697 (C.D. Cal. Feb. 3, 2006).................................................................24

*Auburn News Co. v. Providence Journal Co.,*
   504 F. Supp. 292 (D.R.I. 1980)......................................................................................4

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.,*
   2019 WL 633008 (N.D. Cal. Feb. 14, 2019) ..................................................................20

*Branch v. Tunnell,*
   14 F.3d 449 (9th Cir. 1994) *overruled on other grounds by Galbraith v.*
   *County of Santa Clara,* 307 F.3d 1119 (9th Cir. 2002) ...............................................16, 17

*In re Brand Name Prescription Drugs Antitrust Litigation,*
   186 F.3d 781 (7th Cir. 1999) .........................................................................................6

*Brignac v. Yelp Inc.,*
   2019 WL 2372251 (N.D. Cal. June 5, 2019) ...................................................................8

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962)...............................................................................................4, 6, 9

*In re Cardizem CD Antitrust Litig.,*
   105 F. Supp. 2d 618 (E.D. Mich. 2000), *aff'd,* 332 F.3d 896 (6th Cir. 2003) ..........................7

*Carefusion Corp. v. Medtronic, Inc.,*
   2010 WL 4509821 (N.D. Cal. Nov. 1, 2010) ..................................................................23

*Church & Dwight Co. v. Mayer Labs., Inc.*,
  2011 WL 1225912 (N.D. Cal. Apr. 1, 2011) ........................................................................23

*CollegeNet, Inc. v. Common Application, Inc.*,
  355 F. Supp. 3d 926 (D. Or. 2018) ......................................................................................23

*Cooper v. Pickett*,
  137 F.3d 616 (9th Cir. 1997) .........................................................................................16, 17

*Datel Holdings Ltd. v. Microsoft Corp.*,
  712 F. Supp. 2d 974 (N.D. Cal. 2010) ........................................................................9, 10, 20

*Eastman v. Quest Diagnostics, Inc.*,
  724 F. App'x 556, 560 (9th Cir. 2018)……………………………………………………21

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)..............................................................................................................20

*In re eBay Seller Antitrust Litigation*,
  545 F. Supp. 2d 1027 (N.D. Cal. 2008) .............................................................................4, 6

*Foundation for Int. Design v. Savannah College*,
  244 F.3d 521 (6th Cir. 2001) ................................................................................................3

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
  852 F. Supp. 2d 1171 (N.D. Cal. 2012) .........................................................................22, 25

*FTC v. Qualcomm Inc.*,
  2017 WL 2774406 (N.D. Cal. June 26, 2017) .....................................................................22

*FTC v. Qualcomm, Inc.*,
  2019 WL 2206013 (N.D. Cal. May 21, 2019) ......................................................................13

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
  386 F.3d 485 (2d Cir. 2004).................................................................................................7

*Havensight Capital LLC v. Nike, Inc.*,
  2015 WL 993334 (C.D. Cal. Feb. 18, 2015).................................................................24, 25

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) .............................................................................................8

*In re High–Tech Employee Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...............................................................................5

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) .................................……………………………………. 24

*Kaplan v. Burroughs Corp.*,
  611 F.2d 286 (9th Cir. 1979) ................................................................................................8

-iv-

*LePage's Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003)..............................................................................23, 24

*In re Loestrin 24 FE Antitrust Litig.,*
    261 F. Supp. 3d 307 (D.R.I. 2017)..........................................................................7

*In re Nexium I Antitrust Litig.,*
    968 F. Supp. 2d 367 (D. Mass. 2013) ...................................................................3, 7

*Marder v. Lopez,*
    450 F.3d 445 (9th Cir. 2006) ...............................................................................17, 18

*Masimo Corp. v. Tyco Healthcare Grp., L.P.,*
    2006 WL 1236666 (C.D. Cal. 2006), *aff'd,* 350 F. App'x 95 (9th Cir. 2009)............14, 22, 25

*McKenzie-Willamette Hosp. v. PeaceHealth,*
    2004 WL 7338329 (D. Or. Sept. 30, 2004) ...........................................................24

*Newcal Indus., Inc. v. Ikon Office Sol.,*
    513 F.3d 1038 (9th Cir. 2008) ..............................................................................3, 24

*Oltz v. St. Peter's Community Hosp.,*
    861 F.2d 1440 (9th Cir. 1988) ..............................................................................4

*Omega Environmental, Inc. vs. Gilbarco, Inc.,*
    127 F.3d 1157 (9th Cir. 1997) ..............................................................................12, 13

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.,*
    268 F. Supp. 3d 1071 (C.D. Cal. 2017) ................................................................21

*Paladin Assocs., Inc. v. Montana Power Co.,*
    328 F.3d 1145 (9th Cir. 2003) ..............................................................................21

*Parrino v. FHP, Inc.,*
    146 F.3d 699 (9th Cir. 1998) ...............................................................................16, 17

*PNY Techs., Inc. v. SanDisk Corp.,*
    Case No. 11–cv–04689–WHO, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) .....................18

*Pro Search Plus, LLC v. VFM Leonardo, Inc.,*
    2013 WL 6229141 (C.D. Cal. Dec. 2, 2013) .........................................................19

*RealPage, Inc. v. Yardi Sys., Inc.,*
    852 F. Supp. 2d 1215 (C.D. Cal. 2012) ................................................................4, 5, 6

*Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.,*
    732 F.2d 1403 (9th Cir. 1984) ..............................................................................21

*Synopsys, Inc. v. ATopTech, Inc.,*
    2015 WL 4719048 (N.D. Cal. Aug. 7, 2015) ........................................................21

-v-

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ..................................................................................................19

*Tele Atlas N.V. v. NAVTEQ Corp.*,
  2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) ........................................................24

*In re Terazosin Hydrochloride Antitrust Litig.*,
  352 F. Supp. 2d 1279 (S.D. Fla. 2005) ......................................................................7

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) (Sotomayor, J.)..............................................................3

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
  676 F.2d 1291 (9th Cir. 1982) ..................................................................................19

*United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA*,
  296 F. Supp. 3d 1142 (N.D. Cal. 2017) ......................................................................7

*United Shoe Mach. Corp. v. United States*,
  258 U.S. 451 (1922) ..................................................................................................19

*United States v. Aluminum Co. of America*,
  377 U.S. 271 (1964) ....................................................................................................8

*United States v. Archer-Daniels-Midland Co.*,
  866 F. 2d 242 (8th Cir. 1988) ............................................................................5, 8, 10

*United States v. Continental Can Co.*,
  378 US 441 (1964) ......................................................................................................8

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d. Cir. 2005)................................................................................19, 24

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ..................................................................................................24

*United States v. Microsoft*,
  253 F.3d 34 (D.C. Cir. 2001) ..............................................................................11, 15

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ....................................................................................17

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)................................................................................13, 19

**Statutes**

Clayton Act Section 3, 15 U.S.C. § 14 ..............................................................11, 19, 20, 24

Sherman Act Section 2, 15 U.S.C. § 2..........................................................................23, 24, 25

Sherman Act Section 1, 15 U.S.C. § 1 ...........................................................................24

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. 2013–2018) ......................................7, 13

Federal Rule of Civil Procedure 12 ....................................................2, 3, 16, 18, 25

Federal Rule of Civil Procedure 56 ................................................................2, 18

Federal Rule of Evidence 201 ............................................................................16

*Wright & Miller*, 5B Fed. Prac. & Proc. Civ. ¶ 1357 (3d Ed.) ......................................18

## I.     INTRODUCTION

Plaintiff Tevra's Complaint documents the injury to competition from Defendant Bayer's exclusionary conduct, which damaged competitors like Tevra that attempted to enter the market and break up Bayer's monopoly.  Bayer is a monopolist in the market for the leading topical ("squeeze-on") flea and tick treatment, but its monopoly is threatened by makers of generic flea and tick treatments that contain the same active ingredient.  The "exclusive use" period created by EPA registration of Bayer's topical flea and tick treatment has expired, and the door is open to generic competition.

To protect its monopoly and exclude generic competition, Bayer operates at least two illegal schemes.  First, Bayer has created and enforced exclusive dealing agreements that prevent competing generic products from being purchased by retailers.  Second, Bayer has "tied" the purchase of its topical flea and tick treatment to the purchase of its patented, market-dominating flea collar, which retailers must purchase to remain competitive.  Unlike Bayer's topical flea and tick treatment, Bayer's flea collar is not threatened by generic competition, because it is still protected by patent and the "exclusive use" period created by EPA registration.

Both of Bayer's illegal schemes to protect its monopoly are apparently carried out through its Secret Bundled Loyalty Rebate, which is described in the Complaint.  The Secret Bundled Loyalty Rebate appears to measure each retailer's purchase of competing products, and penalize any retailer purchasing from Bayer's competitors by withholding rebates across an entire bundle of Bayer products, including its market-dominating flea collar.  The Secret Bundled Loyalty Rebate forces retailers to keep out generic competition and to purchase unwanted quantities of Bayer's topical flea and tick treatments at higher prices.

## II.    DEFENDANTS' MOTION TO DISMISS RAISES A THRESHOLD PROCEDURAL ISSUE THAT MUST BE DECIDED BY THIS COURT

This case involves an unusual procedural issue because Bayer's Motion to Dismiss ("MTD") presents matters outside the pleadings, consisting of confidential documents that were unavailable to Tevra when it was drafting its Complaint, and which neither the Court nor Tevra has seen.  Bayer described these documents in its publicly filed MTD, but did not attach them,

apparently because of their secret nature.  Tevra has had no discovery regarding Bayer's secret documents, or any of the issues they raise. This procedural issue is controlled by Rule 12(d), which states:

> If, on motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion ***must*** be treated as one for summary judgment under Rule 56.  All parties ***must*** be given a reasonable opportunity to present ***all the material that is pertinent*** to the motion.

*Id.* (emphasis added).

Bayer's motion must be treated as on for summary judgment under Rule 56, if the Court does not exclude Bayer's proffered documents. Tevra should then be entitled to discovery under Rule 56(d), provides:

> If a non-movant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1)   defer considering the motion or deny it;
> (2)   allow time to obtain affidavits or declarations or to take discovery; or
> (3)   issue any other appropriate order.

Tevra attaches the declaration of its counsel, Daniel D. Owen, hereto, as Exhibit A, stating the reasons that it cannot "justify its opposition" to Bayer's MTD.  Tevra requests relief under Rule 56(d)(1), (2) or (3), as this Court deems appropriate.  Bayer's tactic of describing its secret documents to the Court, in a publicly filed MTD, actually supports Tevra's position that discovery is needed, and that this Court should revisit the issues in the MTD after that discovery has been conducted and a motion for summary judgment has been filed.

## III.   THE COMPLAINT SUFFICIENTLY ALLEGES THE RELEVANT MARKETS FOR ANTITRUST ANALYSIS

Defendant argues that the Complaint should be dismissed on the pleadings, before Plaintiff has had *any* opportunity to conduct fact and expert discovery into the economics of the secret conduct and secret agreements at the heart of this case.  Defendant argues that Plaintiff's product market is "deeply flawed," not "legally cognizable," and "not supported by the factual allegations in the Complaint."  Mot. at 5, 19.

Defendant's attempts to forestall discovery should be rejected for the following reasons.  *First*, Defendant ignores the controlling legal standard for assessing market definition at the

-2-

pleading stage, under which market definition is recognized as "deeply fact-intensive" and "generally requiring discovery."  *Second*, Defendant ignores the detailed allegations about the lack of "reasonable substitutes" for the topical Imidacloprid products alleged to comprise the relevant product market.  *Third*, Defendant misconstrues Plaintiff's arguments about pricing, which are clearly relevant to market definition.  *Fourth*, Defendant considers the allegations on market definition in isolation, rather than holistically.  And, *Fifth*, Defendant ignores evidence of a distribution submarket.  As set forth below, the allegations in Complaint, when taken together, provide more than sufficient support for Plaintiff's proposed market definition, requiring denial of Defendant's Motion.

### A.   Legal Standard:  Motions to Dismiss on Product-Market Grounds Are Disfavored Because Market Definition Is "Deeply Fact-Intensive."

It is well established that "courts hesitate to grant motions to dismiss for failure to plead a relevant product market," because "market definition is a deeply fact-intensive inquiry."  *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (Sotomayor, J.).  In the Ninth Circuit, dismissal of an antitrust complaint on market definition grounds is reserved for cases where a plaintiff's allegations about the relevant market rise to the level of being "facially unsustainable." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

Because market definition is "deeply fact-intensive," resolving market definition questions "generally requires discovery."  *Foundation for Int. Design v. Savannah College*, 244 F.3d 521, 531 (6th Cir. 2001); *see also Newcal*, 513 F.3d at 1045 ("Since the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial.").  The same is true when assessing the sufficiency of market-definition allegations in a pharmaceutical antitrust complaint.  *See In Re Nexium I Antitrust Litig.*, 968 F. Supp. 2d 367, 388 (D. Mass. 2013) (determining the economic interchangeability of one drug with other drugs is "such a factually intensive determination [it] is better left for resolution by a jury").

With this in mind, claims will survive "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect."  *Newcal*, 513 F.3d at 1045.  A

1    legal defect occurs "[w]here the plaintiff fails to define its proposed relevant market with

2    reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a

3    proposed relevant market that ***clearly*** does not encompass all interchangeable substitute products

4    even when all factual inferences are granted in plaintiffs favor."  *In re eBay Seller Antitrust*

5    *Litigation*, 545 F. Supp. 2d 1027, 1031 (N.D. Cal. 2008) (emphasis added) (internal quotations

6    omitted).

7        **B.    The Complaint Properly Invokes the Rule of "Reasonable**
         **Interchangeability" in Explaining Why the Product Market Does Not**
8        **Include Medicated Collars, Oral Dosage Forms, and Products Containing an**
         **Entirely Different Active Ingredient (Fipronil).**
9

10       The standard for deciding what products belong in a relevant product market in an

11   antitrust case is their "reasonable interchangeability."  *Oltz v. St. Peter's Community Hosp.*, 861

12   F.2d 1440, 1446 (9th Cir. 1988).  But products are not "reasonably interchangeable" simply

13   because they have similar uses.  Reasonable interchangeability depends on whether the products

14   are economic substitutes for one another—whether relative changes in the price of one product

15   cause substantial shifts in the quantities demanded for another—commonly referred to as "cross-

16   elasticity of demand."[1]

17       The Supreme Court has emphasized that certain factors are especially relevant to defining

18   an appropriate product market, including "industry or public recognition of the submarket as a

19   separate economic entity, the product's peculiar characteristics and uses, unique production

20   facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized

21   vendors."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

22       A plaintiff need not rule out all conceivable substitutes for a product at the pleading stage

23   so long as the complaint "conscientiously considers and rejects multiple interchangeable

24   substitute products."  *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1225 (C.D. Cal.

25

26   [1] *See Auburn News Co. v. Providence Journal Co.*, 504 F. Supp. 292, 302 (D.R.I. 1980) ("When
     one gets down to brass tacks, or any other specific product, almost all products have substitutes:
27   even buses, skywriters and road signs compete with newspapers for advertising. Antitrust law,
     however, is only concerned with products reasonably interchangeable with one another, in other
28   words, products for which there is some cross elasticity of demand") (citing *Brown Shoe Co.*).

-4-

2012) (denying motion to dismiss complaint on basis of market definition).  Finally, the Court should consider the facts underlying Plaintiff's alleged product market "as a whole."  *In re High–Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) (explaining that courts should not permit antitrust defendants to obtain dismissal by "tightly compartmentalizing the various factual elements and wiping the slate clean after scrutiny of each").

In the present case, Tevra's Complaint "conscientiously considers and rejects multiple interchangeable substitute products," as shown by the following:

- **Allegations Regarding the Lack of "Reasonable Interchangeability" with Fipronil** – The Complaint alleges that Fipronil-based treatments are not "reasonably interchangeable" with topical Imidacloprid-based products, because "Imidacloprid formulations sold today are more effective than Fipronil formulations."  Compl. ¶ 20.  Specifically, Imidacloprid "repel[s] fleas and ticks, whereas Fipronil only kills them."  *Id.*  "In addition, unlike Fipronil, Imidacloprid kills and repels mosquitoes and repels biting flies."  *Id.*  Bayer specifically advertises that its Imidacloprid-based brand drug, K9 Advantix II, "protects against more types of ecoparasites" than its Fipronil-based brand competitor, Frontline Plus.  *Id.* ¶ 21.  For these reasons, "many consumers perceive the higher value of Imidacloprid topical formulations, [and] do not consider them interchangeable with Fipronil topical formulations."  *Id.* ¶ 20.  Finally, retailers do not view the products as interchangeable, because "[t]o remain competitive and to offer the products that customers expect to find, retailers must carry both formulations."  *Id.* ¶ 25.

- **Allegations Regarding the Lack of "Reasonable Interchangeability" with Flea and Tick Collars** – The Complaint explains that flea and tick collars are not "reasonably interchangeable" with topical Imidacloprid treatments, because many consumers dislike the "smell" and "appearance" of flea and tick collars, and prefer the "control they have over when to apply [topical treatments]."  *Id.* ¶ 26.  In addition, flea and tick collars are much more expensive than topical Imidacloprid treatments.  For example, Bayer's Seresto flea collar is "typically offered by retailers in different markets at $40 to $69 per collar, depending on the market."  *Id.* ¶ 26.  Meanwhile, a dose of a topical Imidacloprid-based treatment can be obtained online for $10.76 and at a pet specialty store for $13.04.  *Id.* ¶ 22.  Because flea and collars are significantly more expensive than topical Imidacloprid treatments, they would not constrain an increase in the price of topical Imidacloprid, suggesting the products are in different markets.  *United States v. Archer-Daniels-Midland Co.*, 866 F. 2d 242, 246 (8th Cir. 1988).  Finally, retailers do not view medicated collars, shampoos, and baths designed to

kill fleas and ticks as substitutes for topical Imidacloprid, because "retailers must carry and sell each of these types of products to remain competitive."  Compl. ¶ 30.

- **Allegations Regarding the Lack of "Reasonable Interchangeability" with Oral Dosage Forms** – The complaint explains that oral treatments are not "reasonably interchangeable" with topical Imidacloprid treatments because oral treatments "must be obtained from a veterinarian," unlike Imidacloprid topical treatments, which can be obtained over-the-counter, without having to make a costly visit to a veterinarian.  *Id.* ¶ 28.  The fact that oral dosage forms can only be obtained through a "specialized vendor"—*i.e.,* a visit to a veterinarian—suggests that they do not compete with topical treatments.  *Brown Shoe*, 370 U.S. at 325.  The significant cost of a visit to a veterinarian also suggests that oral dosage forms would not constrain an increase in the price of topical Imidacloprid.

Taken together, these allegations demonstrate that topical Imidacloprid has numerous characteristics that differentiate it from other treatment options:  Price, method of administration, convenience, availability (*i.e.,* sold over the counter, rather than by veterinary prescription), and clinical effectiveness (*i.e.,* only Imidacloprid repels fleas and ticks, kills and repels mosquitoes, and repels biting flies).  Thus, this is not a case where the relevant product market "***clearly*** does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiffs favor."  *In re eBay Seller Antitrust Litigation*, 545 F. Supp. 2d at 1031 (emphasis added).  To the contrary, Plaintiff has "conscientiously consider[ed] and reject[ed] multiple interchangeable substitute products," requiring denial of Defendant's Motion.  *RealPage*, 852 F. Supp. 2d at 1225.

This approach is consistent with market definition in drug antitrust cases where courts have endorsed a relevant market composed of a single active ingredient, and refused to dismiss the complaint, recognizing that discovery is necessary to determine whether two similar drugs really are "economically interchangeable."  As Judge Posner noted in the *Brand Name* case, "[e]veryone knows" that manufacturers of brand-name drugs "have market power."  *In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 786 (7th Cir. 1999).

In one recent case a court found that the plaintiff sufficiently alleged a relevant market consisting of a brand oral contraceptive and its generic alternative based solely on pricing

-6-

1    evidence that the defendant charged high prices without losing sales, much like Bayer's strategy

2    of charging a premium for its topical Imidacloprid brand product without losing sales to generic

3    competitors.  *In re Loestrin 24 FE Antitrust Litig.*, 261 F. Supp. 3d 307, 329 (D.R.I. 2017).  The

4    court concluded:  "[I]t may very well turn out, after discovery, that the Loestrin drugs are in fact

5    reasonably economically interchangeable with other oral contraceptives, or some subset of oral

6    contraceptives,"  but, "***this is a fact-sensitive issue that is not appropriately decided on a motion***

7    ***to dismiss***."  *Id.* (emphasis added).

8        Many other courts have reached the same conclusion, endorsing a relevant market

9    composed of a single active ingredient.  *United Food & Commercial Workers Local 1776 v.*

10   *Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1176 (N.D. Cal. 2017) (market limited to "5%

11   lidocaine patches, Lidoderm and its generic equivalents"); *Geneva Pharms. Tech. Corp. v. Barr*

12   *Labs., Inc.*, 386 F.3d 485, 496–500 (2d Cir. 2004) (relevant market limited to generic versions of

13   a particular drug); *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1319

14   n.40 (S.D. Fla. 2005) (defining a relevant market as a branded drug and its generic counterpart);

15   *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 680–81 (E.D. Mich. 2000), *aff'd*, 332

16   F.3d 896 (6th Cir. 2003) (holding a branded drug and its generic version to be a plausible

17   relevant market); *In re Nexium I Antitrust Litig.*, 968 F. Supp. 2d at 388 (holding a single

18   branded drug and its generic to be a plausible relevant market, and stating that the

19   interchangeability of one drug with other drugs is "such a factually intensive determination [it] is

20   better left for resolution by a jury").

21       A leading antitrust treatise similarly endorses product-market definitions comprising only

22   of drugs containing the same active pharmaceutical ingredient, which are thus "chemically

23   identical," explaining that "[o]ther drugs may perform similar functions but are different in both

24   effectiveness and side effects."  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An*

25   *Analysis of Antitrust Principles and Their Application* ¶ 561b2 (4th ed. 2013–2018).  Exactly the

26   same is true here.  As alleged in the Complaint, there are important functional differences

27   between the active ingredients Imidacloprid and Fipronil:  Only Imidacloprid ***repels*** fleas and

28   ticks, kills and repels mosquitoes, and repels biting flies.  Compl. ¶ 20.  These functional

1  differences make Imidacloprid effective against additional pests and may prevent animals from

2  reacquiring the pests after they have been killed.  *Id*.

3       Finally, even Defendants' own case law does not support dismissal in this case.

4  Defendants cite *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th Cir. 2018) as supporting

5  dismissal but the *Hicks* plaintiff failed either (1) to include reasonably interchangeable products,

6  or  (2) to plausibly explain why those products were distinguishable from the distinct sub-market

7  alleged.  Defendants also cite *Brignac v. Yelp Inc.*, 2019 WL 2372251, at *4 (N.D. Cal. June 5,

8  2019), even though the Court dismissed an amended complaint that said ***nothing*** about economic

9  substitutes for the alleged product market.

10      **C.**    **The Defendant Misconstrues the Pricing Allegations in the Complaint**

11       Defendant devotes a significant portion of its Motion to arguing that price differences

12  between topical Imidacloprid and other treatments for fleas and ticks have "little bearing" on

13  whether the products are in the same relevant market.  Mot. at 7.  Defendant further argues that

14  the hypothetical monopolist test doesn't apply, since the hypothetical monopolist test only

15  applies to a "***change*** in price, not the difference between the absolute level of prices."  *Id.*

16       In fact, the Supreme Court has recognized that "price differentials between two products"

17  can be "relevant" to defining the appropriate product market, even if "not determinative of the

18  product market issue."  *United States v. Continental Can Co.*, 378 U.S. 441, 455 (1964).  The

19  Ninth Circuit has specifically endorsed the use of price differentials as a "relevant factor to

20  consider" in defining an appropriate relevant market, "though price differential ***alone*** does not

21  govern the scope of the relevant market."  *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th

22  Cir. 1979) (emphasis added).  Price differences can be especially relevant when competing

23  products are so much more expensive that they would not constrain an increase in the price of a

24  lower-priced one.  *See Archer-Daniels-Midland*, 866 F.2d at 246 (finding that the market for

25  high-fructose corn syrup does not include sugar, because sugar is 10-30% more expensive and

26  therefore will not constrain an increase in the price of high-fructose corn syrup).  Indeed, "to

27  ignore price in determining the relevant line of commerce is to ignore the single, most important,

28  practical factor in the business."  *United States v. Aluminum Co. of America*, 377 U.S. 271, 276

1   (1964).

2       Here, Plaintiff has not alleged that price differences "alone" demonstrate a product

3   market limited to topical Imidacloprid products.  Instead, Plaintiff asks the court to consider

4   price differences as one factor **among many** that is "relevant" to the question of whether topical

5   Imidacloprid competes with other treatments for fleas and ticks.  At the motion-to-dismiss stage,

6   this "relevant" pricing evidence, combined with other evidence that other flea and tick treatments

7   are not "reasonable substitutes" for topical Imidacloprid, is more than sufficient to avoid

8   dismissal, especially when Plaintiff has had no opportunity to conduct discovery.

9       **D.    The Complaint Sufficiently Alleges a Sub-Market for Topical Imidacloprid
            that Excludes Sales by Veterinarians and Direct-to-Consumer Sales.**

10      Defendant complains that Plaintiff has improperly alleged a narrow distribution market

11  for topical Imidacloprid that excludes two modes of distribution:  (1) sales by veterinarians and

12  (2) direct-to-consumer sales.  Defendant argues that "Plaintiff has not alleged any facts that

13  would place the products sold by veterinarians and those sold by other retailers into

14  fundamentally distinct markets."  Mot. at 10.

15      In fact, the Complaint gives a detailed explanation of why certain alternative channels of

16  distribution do not represent interchangeable demand, beginning with the well-settled rule that

17  "within a broad product market, well defined sub-markets may exist, which, in themselves,

18  constitute product markets for antitrust purposes."  Compl. ¶ 32.  (quoting *Brown Shoe Co. vs.*

19  *United States*, 370 U.S. 294, 325 (1962)).  The Complaint then explains that topical Imidacloprid

20  sold via veterinarians and by direct-to-consumer sales has "distinct perceptions by consumers,"

21  "distinct customer targeting by manufacturers," and distinct "pricing and pricing patterns," all of

22  which support finding that these sales occur in a separate market—*i.e.,* a distribution submarket

23  that does not constrain over-the-counter sales of topical Imidacloprid.  *Datel Holdings Ltd. v.*

24  *Microsoft Corp.*, 712 F. Supp. 2d 974, 997 (N.D. Cal. 2010).

25      **Allegations Regarding the Lack of "Reasonable Interchangeability" with Topical**

26  **Imidacloprid Sold Via Veterinarians –** Sales to veterinarians inherently constitute sales to a

27  distinct category of customers, *i.e.*, sales to professionals licensed to practice veterinary

28

-9-

medicine.  As explained in the Complaint, veterinarians also have distinct preferences when it comes to the topical Imidacloprid they purchase:  "veterinarians typically demand a 'vet-only' brand from manufacturers, or even a private label brand that is unique to the specific veterinarian. Indeed, veterinarians generally refuse to buy brands of Imidacloprid topicals that are available in lower-priced submarkets such as Pet Specialty Retailers, General Retailers, and Online Retailers."  Compl. ¶ 50.  Additionally, "Veterinarians generally insist on some type of 'exclusivity' in the Imidacloprid topicals they buy to enhance the perceived value of those treatments and the veterinarian's advice on their use, in the minds of consumers to whom the products are resold."  *Id.* There are also different companies that compete to sell topical Imidacloprid to veterinarians:  "Tevra and many other manufacturers of Imidacloprid topicals do not market their products to veterinarians because large veterinarian chains often carry their own private label brands or refuse to purchase generic Imidacloprid, and sales to smaller veterinary practices increase the transaction costs to manufacturers."  *Id.* ¶ 55.

The Complaint further explains that sales to veterinarians involve distinct "pricing and pricing patterns."  *Datel Holdings*, 712 F. Supp. 2d at 997.  "Because veterinarians have a professional relationship with most of their customers for Imidacloprid topicals, and because of the perceived value of their advice on these treatments, they often mark up the wholesale prices by 100% (doubling or 'key-stoning' the wholesale price) to set their retail prices."  Compl. ¶ 49.  By comparison, the topical Imidacloprid sold over-the-counter is only marked up by between 30% and 75%.  *Id.* ¶¶ 42, 44.  Because veterinarians impose significantly higher prices, there is no way sales by veterinarians could constrain an increase in the price topical Imidacloprid sold via OTC retailers.  Sales by veterinarians therefore occur in a different relevant market.  *See Archer-Daniels-Midland Co.*, 866 F.2d at 246 (the market for high-fructose corn syrup does not include sugar, because a monopolist of corn syrup would have to raise prices 10-30% "before being constrained by the competitive forces of sugar").

**Allegations Regarding the Lack of "Reasonable Interchangeability" with Topical Imidacloprid Sold Via "Direct to Consumer" Sales for the Purpose of Measuring Foreclosure -** In order to market topical Imidacloprid directly to consumers, manufacturers must

-10-

1  make costly investments, to include purchasing direct-to-consumer advertising, building a

2  delivery and returns infrastructure, and setting up a customer-service operation.  Compl.

3  ¶¶ 138.a-j.  For these reasons, "direct sales to consumers involve a completely different cost

4  structure, profit margin, and risk structure"—one that is much less "cost-efficient" than selling to

5  OTC retailers.  *Id.* ¶ 138.

6        For the purpose of assessing the degree to which Bayer's conduct has foreclosed Tevra

7  from selling into the relevant market, the Complaint explains that direct-to-consumer sales

8  should not be included, because they "do not represent interchangeable demand for Tevra and

9  other manufacturers that have been foreclosed from selling into the OTC Retail market and its

10  sub-markets."  This approach is consistent with cases where Courts has found sufficient

11  foreclosure to sustain an antitrust claim where a plaintiff was foreclosed from the most "cost-

12  efficient" means of distribution.  *See United States v. Microsoft*, 253 F.3d 34, 64 (D.C. Cir. 2001)

13  (competitors need not be barred "from all means of distribution," if they are barred "from the

14  cost-efficient ones"); *Abbott Labs. v. Teva*, 432 F. Supp. 2d 408, 423 (D. Del. 2006) (foreclosure

15  established in pharmaceutical case where generic drug companies are prevented from a selling

16  generic substitute, "which is alleged to be cost-efficient means of competing in the

17  pharmaceutical drug market").  The same is true in this case.  For purposes of assessing whether

18  Tevra has been foreclosed from the topical Imidacloprid market, the Court should not consider

19  direct-to-consumer sales, which is a much less "cost-effecient" means of distributing topical

20  Imidacloprid than sales via OTC retailers.

21  **IV.    THE COMPLAINT STATES A CLAIM FOR EXCLUSIVE DEALING IN**
        **VIOLATION OF SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14.**
22

23        **A.    Tevra has Sufficiently Alleged Bayer's Illegal Exclusive Dealing Scheme and**
              **Its Substantial Foreclosure of Competition in the Relevant Market.**

24        Bayer also contends that Tevra's Complaint "fails to allege the requisite foreclosure

25  necessary to state a claim for exclusive dealing in violation of the Clayton Act," but this

26  argument is defeated by even a casual reading of the Complaint, and controlling case law.

27

28

-11-

1

### 1. Tevra's Complaint Plausibly Alleges that Bayer's Exclusive-Dealing Agreements Were of Sufficient Duration to Foreclose Competition and Substantially Lessen Competition.

2

3 Bayer ignores and mischaracterizes the allegations in Tevra's Complaint as relying on

4 contracts of "short duration and easy terminability" that it says have less potential to foreclose

5 competition. Bayer cites no authority for the proposition that a plaintiff is required to anticipate

6 and negate this defense at the pleading stage. The timeline pleaded in Tevra's Complaint

7 establishes foreclosure across a two- to three-year period. Tevra began discussions with Retailer

8 A in 2016, and those discussions continued through 2017, 2018, and 2019. Compl. ¶¶ 93–95.

9 By 2019, in the third year after discussions began, "Retailer A told a representative from Tevra

10 that 'they would lose $3 million in net margin taking into account the reduced Bayer rebate vs.

11 what they thought they would make in margins selling [Tevra's product].'"  *Id.* ¶ 96.  Tevra's

12 Complaint also details its contact with Retailer B, Retailer C, Retailer D, Retailer E and Retailer

13 F over the same extended time period and specifically states that none of those six retailers ever

14 purchased any of Tevra's products. *Id.* ¶¶ 97, 99, 102, 104, 106, and 107. Tevra's well-pleaded

15 allegations thus cannot be characterized as complaining about contracts with "short duration and

16 easy terminability,"  and the threatened loss of $3 million in rebates by Retailer A contradicts the

17 idea of an "easily terminable" rebate program. Whatever language might appear in a document

18 allegedly describing a rebate program, the economic reality, as disclosed by Tevra's Complaint,

19 is that none of the three online retailers (representing over 75% of that sub-market, Compl.

20 ¶ 108) or the three pet-specialty retailers (representing over 70% of that sub-market, Compl.

21 ¶ 109) withdrew from Bayer's rebate program during the three years that Tevra has been trying

22 to enter the market.  The Complaint also shows that the duration of the rebate program is not the

23 result of better pricing and quality from Bayer, whose products are actually more expensive and

24 no more effective than Tevra's generic alternatives.

25 Bayer cites *Omega Environmental, Inc. vs. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir.

26 1997), where summary judgment was granted in favor of a defendant that was not alleged to be a

27 monopolist and whose Domestic Distributor Agreement, produced during discovery, was

28 terminable on 60 days' notice.  The *Omega* court stated, "the short duration and easy

-12-

terminability of these agreements negate *substantially* their potential to foreclose competition." *Id.* at 1163 (emphasis added).  In *Omega*, plaintiffs did not contend that Gilbarco had acquired a monopoly and, after discovery and summary judgment briefing, the plaintiffs failed to "produce credible evidence to support their contention that Gilbarco's policy actually deterred entry into this market." *Id.* at 1164.

In the present case, in contrast, Tevra has alleged that Bayer is a monopolist with at least an 85% market share (and effectively 100% if it is, as alleged upon information and belief, receiving royalties on the remaining 15% of sales).  Compl. ¶¶ 3, 61–63, 161.  Tevra has also described the barriers to entry into the relevant market in its Complaint, including the substantial cost of obtaining EPA approval and the 10 year "exclusive use" provided by EPA registration. *Id.* ¶¶ 19, 74–79.  Exclusive dealing arrangements have been subjected to heightened scrutiny, when they are employed by a monopolist like Bayer.  In the very recent case of *FTC v. Qualcomm, Inc.*, 2019 WL 2206013 (N.D. Cal. May 21, 2019), a Court in this district applied this heightened scrutiny in finding that a monopolist's exclusive dealing contracts were anticompetitive, The *Qualcomm* court stated:

> The Third Circuit explained that "[e]xclusive dealing arrangements are a special concern when imposed by a monopolist," *Id*. at 271, and gave the following example:  "[S]uppose an established manufacturer has long held a dominant position but is starting to lose market share to an aggressive young rival.  A set of strategically planned exclusive-dealing contracts may slow the rival's expansion by requiring its alternative outlets for its product, or at least rely temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth." *Id.* (quoting Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1802c, at 64 (2d ed. 2002)).

*Id.* at *87 (citing *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012)).

The example described by professors Areeda and Hovenkamp, and quoted by the court in *Qualcomm*, is virtually identical to the situation here:  Threatened with the loss of its dominant position to the aggressive new rival Tevra, Bayer has engaged in anticompetitive conduct, including both exclusive dealing and tying.

2.    **Tevra's Complaint Clearly Explains Why Alternative Distribution Channels Do Not Represent Interchangeable Demand for Tevra's Products and that, Despite Tevra's Efforts to Mitigate its Damages, It Remains Foreclosed from a Substantial Share of the Relevant Market.**

Bayer further mischaracterizes Tevra's Complaint with respect to alternative distribution channels, saying "the Complaint expressly acknowledges that there are alternative channels of distribution, other than Pet Specialty and Online OTC Retailers and then conveniently requests that the court not consider them."  Mot. at 13.  To the contrary, as detailed in Section I.B. above, the Complaint gives a detailed explanation of why certain alternative channels of distribution do not represent interchangeable demand.

Bayer may disagree with Tevra's assertion of facts in its Complaint.  Perhaps it will eventually proffer evidence or expert testimony opposing Tevra's factual contentions, and will put this material before the Court when seeking summary judgment.  However, at the pleading stage, Tevra cannot be credibly accused of failing to define the relevant markets for antitrust purposes, and supporting those definitions with facts.

Bayer next asserts that "the Complaint does not allege that Bayer has foreclosed a substantial percentage of all distribution channels for Plaintiff's product—merely the two channels in which plaintiff alleges Bayer's share is highest."  Mot. at 13.  Bayer is correct that Tevra alleged its foreclosure in the Pet Specialty sub-market and the Online sub-market.  All of Tevra's claimed damages flow from its nearly 100% foreclosure in these two sub-markets. Compl. ¶¶ 88–90, 142–143, Table 4.  But, even if the Court ultimately rejects Tevra's sub-market definitions and treats all OTC sales as a single market, Tevra would still have been foreclosed from approximately 75% of that market.  *Id.* ¶¶ 35–37.  Even if the Court were to include purchases by veterinarians in a single market for Imidacloprid topicals, Tevra would have been foreclosed from over 30% of the market, which has been held to constitute substantial foreclosure.  *Id.* ¶ 33.  In *Masimo Corp. v. Tyco Healthcare Grp., L.P.,* 2006 WL 1236666, at *6 (C.D. Cal. 2006), *aff'd,* 350 F. App'x 95 (9th Cir. 2009), the court found that although "[a]mple evidence was introduced at trial showing that Masimo was not foreclosed from all hospitals, and that Masimo did in fact convince hospitals to use their technology and grew their revenues, the

-14-

1   jury could reasonably conclude from the evidence presented at trial that competitors were

2   *foreclosed from greater than 24% of the market and that the foreclosure was substantial*." *Id.*

3   (emphasis added).

4          Bayer is correct that Tevra's foreclosure analysis "omits veterinarians," but it ignores

5   Tevra's lengthy factual allegations as to why veterinarians constitute a separate market.  Bayer is

6   correct that Tevra claims no foreclosure in the General Retailer OTC sub-market and that it has

7   attempted to mitigate its damages by selling "to general retailers whenever possible."  Compl. ¶

8   137.  Tevra does not claim either foreclosure or damages relating to the General Retailer OTC

9   sub-market and is, in fact, selling everything it can into that sub-market.  But, the General

10  Retailer OTC sub-market accounts for only 25% of sales to OTC retailers. *Id.* ¶ 37.  Even if

11  Tevra's sub-market analysis is rejected, Tevra is still foreclosed from a substantial share of the

12  wholesale market by any reasonable measure.

13         Finally, the Complaint contains facts showing that sales via veterinarians and direct-to-

14  consumer sales are not "cost-efficient" means of distributing topical Imidacloprid. *See* Section

15  II. D.  A court can discount a distribution channel that is not "cost-efficient" when measuring

16  foreclosure. *See Microsoft*, 253 F.3d at 64; *Abbott Labs.*, 432 F. Supp. 2d at 423.

> **B.**     **The Court Should Treat Bayer's Motion to Dismiss as a Motion for Summary Judgment or, Alternatively, the Court Should Exclude the Extrinsic Documents Presented by Bayer with Its Motion to Dismiss.**

19         Bayer describes the contents of formerly confidential documents in its Motion to

20  Dismiss, and then states that it will be asking the Court to take "judicial notice" of these

21  documents, as soon as a Protective Order can be entered to maintain their secrecy.  Tevra should

22  be entitled to comprehensive discovery on the issues created by these documents, which Tevra

23  has never seen.  Alternatively, the Court should exclude these documents from consideration of

24  the Motion to Dismiss.

25         The Ninth Circuit has developed a robust and consistent line of case law over the past 25

26  years that clearly explains when documents are, and are not, "incorporated by reference" into a

27  complaint.  None of this Ninth Circuit law is cited by Bayer.  Bayer also conflates two distinct

28

legal doctrines enunciated by the Ninth Circuit.  The first is "judicial notice" under Federal Rule of Evidence 201, which applies only to facts "not subject to reasonable dispute."  The secret documents proffered by Bayer obviously do not fit this description.  The second doctrine, which is actually at issue in this case, is "incorporation by reference" of extrinsic documents into a plaintiff's complaint.  In *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002), the Ninth Circuit explicitly adopted a new rule on "incorporation by reference," as follows:

> The leading commentators state that "when [the] plaintiff *fails to introduce a pertinent document* as part of his pleading, [the] defendant may introduce the exhibit as part of his motion attacking the pleading."  5 *Charles Alan Wright and Arthur R. Miller, FPP §1327, at 726-63 (2d Ed. 1990)*. . .  We have previously indicated approval of this rule, but have not explicitly adopted it . . . as it makes sense and comports with existing practice, we hold the documents *whose contents are alleged in a complaint* and whose authenticity no party questions, but which are not physically attached to the pleading may be considered on a Rule 12(b)(6) motion to dismiss.  Such consideration does "not convert the motion to dismiss into a motion for summary judgment."

*Id.* (emphasis added).

Branch explains that the doctrine of incorporation by reference is based on a plaintiff's failure "to introduce a pertinent document" that it could have introduced.  This rationale, therefore, can apply only where the plaintiff had access to a document while drafting his or her complaint.  In *Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997), the Ninth Circuit held that documents could not be incorporated by reference when the plaintiff did not have them before the complaint was filed.

In *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–706 (9th Cir. 1998), the Ninth Circuit extended the rule announced in *Branch* to prevent "plaintiffs from surviving a Rule 12(b)(6) Motion by deliberately omitting references to documents upon which their claims are based." The *Parrino* court also noted that where "an attached document is integral to the plaintiff's claims and its authenticity is not disputed, the plaintiff 'obviously is on notice of the contents of the document and the need for a chance to refute evidence is greatly diminished.'"  *Id.* at 706 n.4.

1   Even after the rule announced in *Branch* was extended by *Parrino*, it still only applies to

2   documents to which a plaintiff actually had access during the time he or she was drafting the

3   complaint.  In *United States  v. Ritchie*, 342 F.3d 903, 907–908 (9th Cir. 2003), the Ninth Court

4   reversed the District Court, finding that neither the doctrine of incorporation by reference or the

5   doctrine of judicial notice allowed the district court to consider documents extrinsic to the civil

6   complaint.  Although *Ritchie* involved a motion for return of personal property at the conclusion

7   of a criminal case, the Ninth Circuit noted that such motions must be treated as civil complaints,

8   and that the rules of civil procedure apply.  *Id.* at 906–907.  The *Ritchie* court then restated the

9   *Branch/Parrino* doctrine as follows:

> Even if a document is not attached to a complaint, it may be
> incorporated by reference into a complaint if the plaintiff refers
> extensively to the document or the document forms the basis of the
> plaintiff's claim . . .  The doctrine of incorporation by reference
> may apply, for example, when a plaintiff's claim about insurance
> coverage is based on the contents of the coverage plan, *See
> Parrino*, 146 F.3d at 705-06, or when a plaintiff's claim about
> stock fraud is based on the contents of SEC filings, *See In Re
> Silicon Graphics Secs. Litg.* 183 F.3d 907, 986 (9th Cir. 1999).
>
> The government's contention that the district court could have
> considered some or all of the attachments under the incorporation
> by reference doctrine is unpersuasive.  The [witness] declaration
> prepared in response to [the] civil complainant's motion, was
> obviously not mentioned in the motion . . .  Indeed, none of the
> attached documents formed the basis of [the civil complainant's]
> complaint, and she did not refer extensively to any of them.

*Id.* at 908.

It is a tautology that a plaintiff cannot "fail to introduce" or "deliberately omit" a

document that it has never seen, possessed, or had access to.  *Cooper* and *Ritchie* both support

this conclusion.  In *Marder v. Lopez*, 450 F.3d 445, 448–449 (9th Cir. 2006), the court found that

a document referred to in plaintiff's complaint and which was "central to her claim," was

properly considered by the district court.  However, the court refused to consider another

document stating "that letter was created after Marder's complaint was filed and therefore could

not possibly have been a document upon which her complaint 'necessarily relie[d].'"  *Id.* at 448–

1    449.

2          Secondary sources have collected hundreds of cases that discuss whether presenting

3    documents outside the pleadings requires a Rule 12 motion to be treated as one for summary

4    judgment under Rule 56.  *See Wright & Miller*, 5B Fed. Prac. & Proc. Civ. ¶ 1357 (3d Ed.) n.1;

5    138 A.L.R. Fed. 393, "What Matters not Contained in Pleadings may be Considered in Ruling on

6    a Motion to Dismiss under Rule 12(b)(6) . . . Without Conversion to Motion for Summary

7    Judgment."  Diligent research has disclosed ***no reported case*** in which a plaintiff was held to

8    have incorporated a document by reference into its complaint, where that plaintiff had no access

9    to the document prior to the filing of the complaint.  Bayer is asking this Court to do something

10   "unprecedented," in the strictest sense of the word.

11         Bayer repeatedly cites to unreported, un-appealed orders in *PNY Techs., Inc. v. SanDisk*

12   *Corp.,* Case No. 11–cv–04689–WHO (N.D. Cal.), in which counsel for Bayer in the present case

13   served as plaintiff's counsel.  *PNY* had a long history, with over a year of discovery.  The

14   original complaint was filed in 2011.  *Id.* at Dkt. 1.  As noted in a later court order, by the end of

15   2013, both parties had completed document production.  *PNY,* 2014 WL 1677521 (N.D. Cal.

16   Apr. 25, 2014) at *2 n.4.  In January 2014, the plaintiff obtained leave to amend and add two

17   new causes of action, based on the discovery it had completed: (1) attempted monopolization and

18   (2) exclusive dealing.  *PNY* at Dkt. 189.  In February, 2014 the defendant moved to dismiss the

19   new fifth and sixth causes of action in the Second Amended Complaint ("SAC").  *Id.* at Dkt.

20   195.  The defendant also asked the Court to apply "incorporation by reference" doctrine, citing

21   *Branch*, to consider contracts produced during discovery.  The Court explicitly found that PNY

22   had access to the contracts in question before it filed its SAC.  The Court further found that "the

23   agreements and their effect are the foundation for PNY's claims and PNY has not questioned

24   then [sic] authenticity."  *PNY,* 2014 WL 1677521 at *2 n.4.  The procedural rulings of *PNY* have

25   no application in the present case, since Tevra has had no discovery, had no access to the Bayer

26   documents when it was drafting its Complaint, and obviously cannot admit to their authenticity.

27         In the present case neither Tevra nor the Court have ever possessed, or even seen, the

28   documents that Bayer is asking the Court to consider.  It is axiomatic that Tevra could not have

-18-

1    "relied" on those documents in the preparation of its complaint.  It is equally important to note

2    that a cause of action under the Sherman Act and Clayton Act does not "necessarily rely" on the

3    existence of any particular document or other written material.  Anti-competitive behavior could

4    be carried out entirely by verbal agreement, tacit agreement, or conduct of the parties.  *See* 15

5    U.S.C. § 14 (illegal action could be by "condition, agreement, or understanding"); *Advanced*

6    *Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, 2004 WL 2075445, at *5 (N.D. Cal.

7    Sept. 15, 2004) ("Under the Sherman Act, concerted action does not require an express

8    agreement; tacit or informal agreements are sufficient.").

9            Even if this Court chooses to consider the contracts being proffered by Bayer, the

10   provisions of those contracts cannot be determinative of Tevra's claims at the pleading stage.

11   Contracts that state that they are of "short duration and easily terminability," may still constitute

12   unlawful exclusive dealing if their "practical effect" is to suppress competition.  *See Tampa Elec.*

13   *Co. v. Nashville Coal Co.*, 365 U.S. 320, 324, 326–37 (1961); *United Shoe Mach. Corp. v.*

14   *United States*, 258 U.S. 451, 457 (1922) (emphasizing that "the practical effect" of exclusive

15   contracts must be considered, rather than just their specific language).  The Ninth Circuit has

16   held that actual exclusivity is not a prerequisite to finding unlawful exclusive dealing under the

17   rule of reason, and that the issue is whether the restraint in question "is one that promotes

18   competition or one that suppresses competition."  *Twin City Sportservice, Inc. v. Charles O.*

19   *Finley & Co., Inc.*, 676 F.2d 1291, 1302 (9th Cir. 1982).  In *Pro Search Plus, LLC v. VFM*

20   *Leonardo, Inc.*, 2013 WL 6229141, at *5 (C.D. Cal. Dec. 2, 2013), the court explained: "an

21   express exclusivity requirement, however, is not necessary because we look past the terms of the

22   contract to ascertain the relationship between the parties and the effect of the agreement in the

23   real world."  *Id.* (citing *ZF Meritor*, 696 F.3d at 270); *see also United States v. Dentsply Int'l,*

24   *Inc.*, 399 F.3d 181, 189 (3d. Cir. 2005) ("economic realities rather than a formalistic approach

25   must govern review of antitrust activity").  "Thus, de facto exclusive dealing claims are

26   cognizable under the antitrust laws." *ZF Meritor*, 696 F.3d at 270.  In the present case, the

27   statements of retailers over nearly three years, which are quoted in the Complaint, and the actual

28   foreclosure shown by the numeric data in the Complaint, show that Bayer's Secret Bundled

Loyalty Rebate Program created a "condition, agreement or understanding," within the meaning of the Clayton Act § 3, that retailers would not deal in the goods of generic competitors, regardless of the actual language of any document that Bayer might proffer with its MTD.

## V.    THE COMPLAINT STATES A CLAIM FOR TYING IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14.

Defendants separately argue that Plaintiff's tying claim must be dismissed because the allegations of an actual tie of K9 Advantix® II Imidacloprid products and the Seresto® flea and tick collar are "pure speculation." Mot. at 16.   To the contrary, the Complaint alleges numerous facts that, taken as true, could lead a jury to find that Bayer tied products in violation of Section 3 of the Clayton Act.  Compl. ¶ 4 ("Defendants also coerced retailers into buying its more expensive products by illegally tying the purchase of Advantix to Defendants' patented, 'must have,' Seresto flea collar."); *Id.* ¶ 112 ("BAH created its 'Secret Bundled Loyalty Rebate' scheme that contains an illegal 'no generics' condition, agreement or understanding, and that illegally ties its patented, EPA- registered 'exclusive-use' Seresto flea collar . . .  to the purchase of its name brand Advantix Imidacloprid topicals."); *Id.* ¶ 113 ("[M]ultiple retailers told Tevra that they could not carry its generic Imidacloprid topical because of BAH's rebates."); *Id.* ¶¶ 124–129, 152–159.[2]  These allegations negate Defendants' claim that "Plaintiff alleges only that retailers have stated that Bayer offered substantial rebates . . ."  and refute Defendants' claim that "[n]owhere does Plaintiff suggest that retailers or distributors were prohibited from purchasing the Seresto® flea and tick collar if they purchased competing generic Imidacloprid topical products."   Mot. at 17.   To state a viable tying claim Plaintiff does not need to plead, or even prove, that Bayer's Secret Bundled Loyalty Rebate agreements expressly tie the purchase of its Imidacloprid topicals to the purchase of its flea collars.  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1179 (9th Cir. 2016) ("[T]ying conditions need not be spelled out in express

---

[2] Tying can be found when the buyer "agrees that he will not purchase that product from any other supplier." *Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, 2019 WL 633008, at *3 (N.D. Cal. Feb. 14, 2019); *Datel Holdings*, 712 F. Supp. 2d at 995; *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992).

1    contractual terms to fall within the Sherman Act's prohibitions[.]");  *Packaging Sys., Inc. v. PRC-*

2    *Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1085 (C.D. Cal. 2017).

3          Defendants liken Plaintiff's tying pleadings to those dismissed in *Synopsys, Inc. v.*

4    *ATopTech, Inc.*, 2015 WL 4719048, at *7 (N.D. Cal. Aug. 7, 2015).  There, however, *Synopsys*,

5    the plaintiff acknowledged that the two products were offered separately, and did "not include

6    facts that would show how the alleged discounting practice was coercive."  *Id.*  Here, though,

7    Tevra clearly explains how the discounting practice was coercive: "[retailers] could not resell the

8    Seresto flea collar at a competitive price if they did not receive the rebate on that collar" and that

9    rebate was conditioned on the purchase of BAH's Imidacloprid topicals at the exclusion of

10   others.  Compl. ¶ 129.  Tevra also pleaded that every Retailer approached by Tevra has

11   uniformly refused to buy generic Imidacloprid topicals because of the threat of losing "lucrative"

12   rebates from BAH.  *Id.* ¶¶ 124–129.

13         Defendants suggest that Plaintiff has not alleged "facts showing how the alleged

14   discounting practice was coercive," and that there is a requirement to plead "relevant price

15   information" to show that a discount program was coercion.  Mot. at 17.  But there is no such

16   requirement.  *Synopsys*, 2015 WL 4719048 at *7 (pricing differential between tied discount price

17   and separate price is an ***example*** of how plaintiff could have pleaded coercive discounting);

18   *Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 560 (9th Cir. 2018) (same).  The

19   Complaint makes numerous allegations that, taken as true, amount to coercion.  First, "forcing

20   (or coercion) is likely if the seller has power in the tying product market."  *Robert's Waikiki U-*

21   *Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*, 732 F.2d 1403, 1407 (9th Cir. 1984).  The Complaint

22   alleges in detail that Bayer has market power in the market for flea collars.  Compl. ¶¶ 80–81.

23         Second, "[t]he Supreme Court has found evidence of coercion when a plaintiff introduced

24   evidence the defendant possessed a patent or similar monopoly over a product—and therefore,

25   market power—which it used to force customers to buy an undesirable product."  *Paladin*

26   *Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1160 (9th Cir. 2003) (citing *United States v.*

27   *Loew's Inc.,* 371 U.S. 38, 45–47 (1962)).  The Complaint alleges that Bayer has a patent on the

28   Seresto flea collar, as well as EPA-registered "exclusive-use" of the Seresto flea collar, and

-21-

1  alleges that Bayer uses this market power to force Retailers to buy their branded Imidacloprid

2  topicals exclusively.  Compl. ¶ 112.

3      Third, coercion can be shown indirectly "from a showing that an appreciable number of

4  buyers have accepted burdensome terms, such as a tie-in, and there exists sufficient economic

5  power in the tying product market." *Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1189 (9th Cir.

6  1984) (citation omitted).   75% of retailers in the Online Retailer sub-market have agreed to

7  Bayer's tie-ins, along with 70% of retailers in the Pet Speciality Retailer sub-market.  Compl.

8  ¶¶ 108–109.  Surely that is an appreciable portion of retailers.

9      In sum, Defendants have identified allegations that will require discovery.  "For now, it is

10  sufficient to note that Plaintiffs' complaint adequately notifies Defendants as to the incidents for

11  which they are being sued under the Clayton Act. Moreover, it does not appear beyond doubt

12  that Plaintiffs can prove no set of facts in support of their claim." *Advanced Microtherm, Inc.*,

13  2004 WL 2075445, at *7 (refusing to dismiss plaintiff's tying claims).

14  **VI.   THE COMPLAINT DOES NOT ASSERT A SEPARATE CAUSE OF ACTION BASED ON BUNDLED DISCOUNTS**

15

16  Defendants are correct that Plaintiff does not, at this time, allege a price-based claim

17  regarding Bayer's Secret Bundled Loyalty Rebate agreements alone.  Mot. at 18.  Plaintiff also

18  agrees that to bring a claim based on a theory of predatory pricing through bundled discounts

19  would require allegations that Bayer was priced below-cost through its program.  But, Plaintiff

20  does not bring such a claim.

21  Instead, Plaintiff alleges that these rebates were a key tactic employed by Bayer to carry

22  out a scheme of illegal tying and exclusive dealing, and to maintain its monopoly.  This Court,

23  and many others, have recognized that conditional discount or rebate programs can support

24  tying, exclusive dealing, and maintenance of monopoly claims.  *See Free FreeHand Corp. v.*

25  *Adobe Sys. Inc.,* 852 F. Supp. 2d 1171, 1185 (N.D. Cal. 2012) (sustaining claim that bundled

26  discounting was a means to maintaining a monopoly); *FTC v. Qualcomm Inc.*, 2017 WL

27  2774406, at *16, 25 (N.D. Cal. June 26, 2017) (sustaining de facto exclusive dealing claims

28  based on conditional rebate program); *Masimo Corp.*, 2004 WL 5907538, at *9–10 (sustaining

-22-

1   claim that bundled rebates were part of a scheme to maintain defendant's monopoly);

2   *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 956 (D. Or. 2018)

3   (sustaining claim that bundled discounting was a means for illegal tying); *LePage's Inc. v. 3M*,

4   324 F.3d 141, 181–82 (3d Cir. 2003) (affirming jury award against defendant for exclusive

5   dealing claims based on discount and rebate program).

6         When plaintiffs do not allege a "price-based claim," there is no need to show pricing

7   below cost.  In *Church & Dwight Co. v. Mayer Labs., Inc.*, 2011 WL 1225912, at *10 (N.D. Cal.

8   Apr. 1, 2011), the plaintiff brought claims based on a bundled discount program employed by the

9   defendants, which was conditioned on excluding competitors from "the vast majority of crucial

10   display space in crucial retailers' stores."  *Id.*  Defendants argued that the claims should be

11   dismissed because plaintiff did not show below-cost pricing.  *Id.*  The court disagreed, and found

12   that the plaintiff "asserts the same kind of harm that occurs in exclusive dealing cases—the

13   foreclosure of a substantial share of competition."  *Id.*  Here, as in *Church & Dwight*, Plaintiff

14   does not claim that Bayer substantially foreclosed competition by pricing below cost.  Plaintiff

15   claims that the conditions on Bayer's bundled discount program resulted in the substantial

16   foreclosure of competitors from the market for Imidacloprid topicals and therefore no showing of

17   below-cost pricing is required.

18   **VII.    THE COMPLAINT STATES A CLAIM FOR MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2.**

19         Plaintiff adequately asserts unlawful maintenance of monopolization in violation of

20   Section 2 of the Sherman Act, 15 U.S.C. § 2.  "To succeed in establishing a claim of

21   monopolization under Section 2, a plaintiff must adequately plead that: '(1) the defendant

22   possesses monopoly power in the relevant market; (2) the defendant has willfully acquired or

23   maintained that power; and (3) the defendant's conduct has caused antitrust injury.'"  *Carefusion*

24   *Corp. v. Medtronic, Inc.*, 2010 WL 4509821, at *3 (N.D. Cal. Nov. 1, 2010) (quoting *Cost Mgmt.*

25   *Servs., Inc. v. Washington Nat. Gas Co.*, 99 F.3d 937, 949–50 (9th Cir. 1996)).  Defendant

26   contends that Count III should be dismissed because Tevra has not adequately pleaded that Bayer

27   possesses monopoly power, or that this power was willfully maintained.

28

-23-

**A.    The Complaint Adequately Pleads that Bayer Possesses Monopoly Power.**

Tevra alleges that Bayer "has a monopoly on the sale of Imidacloprid topicals to OTC retailers in the U.S., and made approximately 85% of all sales of that product into the relevant market in 2018."  Compl. ¶ 161; *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) ("[O]ver 80% [market share] constituted 'a substantial monopoly.") (citations omitted).

Defendants argue that this claim must be dismissed because Plaintiff's market definition is "deeply flawed" and "not supported by the factual allegations in the Complaint."  Mot. at 19. But the Complaint may only be dismissed if Defendants show that the relevant market definition is "facially unsustainable."  *Newcal Indus.,* 513 F.3d at 1045. As described in Section I.B. Plaintiff's Complaint contains more than enough facts to support the alleged product market at the pleading stage of the case.

**B.    The Complaint Adequately Pleads that Bayer Has Willfully Maintained Monopoly Power Through Anticompetitive Conduct.**

Defendant argues that Tevra's monopolization claim should be dismissed because it fails to adequately plead tying and exclusive dealing claims and instead "'relies on legal conclusions and threadbare recitals of the elements of th[e] cause of action[.]'"  Mot. at 19 (quoting *Havensight Capital LLC v. Nike, Inc.*, 2015 WL 993334, at *4 (C.D. Cal. Feb. 18, 2015).

First, plaintiffs are not even required to plead other antitrust violations as a prerequisite to adequately pleading a monopolization claim.  *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1217 (9th Cir. 1997) ("[B]ehavior that might otherwise not be of concern to the antitrust laws—or that might even be viewed as procompetitive—can take on exclusionary connotations when practiced by a monopolist.").   Courts consistently emphasize that what may not constitute illegal tying or exclusive dealing under Section 1 of the Sherman Act, or Section 3 of the Clayton Act, may still constitute unlawful maintenance of a monopoly under Section 2.  *See Tele Atlas N.V. v. NAVTEQ Corp.,* 2008 WL 4911230, at *1 (N.D. Cal. Nov. 13, 2008); *LePage's Inc. v. 3M*, 324 F.3d 141, n.10 (3d Cir. 2003); *Dentsply Int'l, Inc.*, 399 F.3d at 197; *Applied Med. Res. Corp. v. Ethicon, Inc.*, 2006 WL 1381697, at *5 (C.D. Cal. Feb. 3, 2006);  *McKenzie-Willamette Hosp. v. PeaceHealth*, 2004 WL 7338329, at *8 (D. Or. Sept.

-24-

30, 2004).

Second, Defendants ignore detailed allegations of Bayer's exclusionary conduct aimed at maintaining its monopoly throughout the Complaint.  Compl. ¶¶ 3, 64, 88, 162.  Defendants liken the Complaint to that dismissed in *Havensight*, which comprised bald assertions that defendant "'engage[d] in aggressive anti-competitive behavior,'" without "any supporting facts showing plausible anticompetitive conduct."  2015 WL 993334, at *4.  Defendants also cite *Abid v. Google LLC*, 2018 WL 3458546, at *4–5 (N.D. Cal. July 18, 2018), which dismissed a *pro se* complaint that was internally inconsistent and only contained conclusory statements about the legal effect of the defendant's actions.  Again, Plaintiff's pleadings are easily distinguished.

Tevra alleges that "to maintain its monopoly . . . Defendants entered into 'Secret Bundled Loyalty Rebate' agreements with retailers and distributors [and] [t]hrough these illegal exclusive dealing and tying agreements, Defendants forced retailers and distributors to agree to not carry generic Imidacloprid topicals in competition with Advantix."  Compl. ¶ 64.  The Complaint details facts gathered during Tevra's failed attempts to sell its generic Imidacloprid topical to a handful of major retailers.  Compl. ¶¶ 88–129.  These facts make it "plausible to infer that this conduct tended to impair the opportunities of rivals and did not further competition on the merits."  *Free FreeHand Corp*, 852 F. Supp. 2d at 1184 (internal citations and quotations omitted) (sustaining maintenance of monopoly claim based on combined allegations of exclusive dealing and tying); *Masimo Corp.*, 2004 WL 5907538, at *12 (sustaining maintenance of monopoly claim based on a combination of allegations including exclusive dealing, bundled rebates, and volume discounts).  Unlike the complaints dismissed in *Havensight* and *Abid*, Tevra's Complaint goes far beyond mere recitation of the elements of a Section 2 claim and alleges anticompetitive conduct, including exclusive dealing and tying, which has allowed Bayer to maintain its monopoly in the market for Imidacloprid topicals.

## VIII.   CONCLUSION

For the reasons set forth above, the Motion to Dismiss should be rejected as it fails to show that the Complaint is deficient as a matter of law under Rule 12(b)(6).

1

2

3   Dated:  October 25, 2019                    Respectfully Submitted,

4

5                                              **POLSINELLI LLP**
                                               NITIN GAMBHIR (SBN 259906)
6                                              ngambhir@polsinelli.com
                                               POLSINELLI LLP
7                                              1661 Page Mill Road, Suite A
                                               Palo Alto, CA 94304
8                                              T:  650-461-7700
                                               F:  650-461-7701
9
                                               DANIEL D. OWEN (*Admitted Pro Hac*
10                                             *Vice*)
                                               dowen@polsinelli.com
11                                             POLSINELLI PC
                                               900 w. 48TH Place, Ste. 900
12                                             Kansas City, MO 64112
                                               T:  816-753-1000
13                                             F:  816-753-1536

14                                             HERBERT F. ALLEN (*Pro Hac Vice*
                                               *Admission Pending*)
15                                             hallen@polsinelli.com
                                               ALEXA R. DICUNZOLO (*Admitted Pro*
16                                             *Hac Vice*)
                                               adicunzolo@polsinelli.com
17                                             POLSINELLI PC
                                               1401 I ("Eye") St. NW, Ste. 800
18                                             Washington DC, 20005
                                               T:  202-783-3300
19                                             F:  202-783-3535

20

21

22                                                  */s/ DANIEL D. OWEN*
                                               _____
                                         By:   Daniel D. Owen
23
                                               *Attorneys for Defendant*
24                                             TEVRA BRANDS, LLC

25

26

27

28