NITIN GAMBHIR (SBN 259906)
ngambhir@polsinelli.com
POLSINELLI LLP
1661 Page Mill Road, Suite A
Palo Alto, CA 94304
T:  650-461-7700
F:  650-461-7701

DANIEL D. OWEN (*Admitted Pro Hac Vice*)
dowen@polsinelli.com
G. Gabriel Zorogastua (*Admitted Pro Hac Vice*)
gzorogastua@polsinelli.com
POLSINELLI PC
900 w. 48TH Place, Ste. 900
Kansas City, MO 64112
T:  816-753-1000
F:  816-753-1536

ALEXA RAE DICUNZOLO (*Admitted Pro Hac Vice*)
adicunzolo@polsinelli.com
POLSINELLI PC
1401 I Street N.W.
Washington, DC 20005
T:  202-783-3300
F:  202-783-3535

Attorneys for Plaintiff
TEVRA BRANDS, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TEVRA BRANDS, LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>BAYER HEALTHCARE LLC, and<br>BAYER ANIMAL HEALTH GmbH, and<br>BAYER AG,<br><br>                    Defendants. | Case No. 3:19-cv-04312-BLF<br><br>**FIRST AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS OF THE CLAYTON ACT §3 (EXCLUSIVE DEALING AND TYING) AND THE SHERMAN ACT §§ 1 AND 2 (RESTRAINT OF TRADE AND MAINTENANCE OF A MONOPOLY)**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge:  Honorable Beth Labson Freeman |

**[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

NATURE OF ACTION ...............................................................................................1

PARTIES .................................................................................................................3

JURISDICTION AND VENUE ...............................................................................4

FACTS COMMON TO ALL COUNTS....................................................................5

    A.    THE RELEVANT MARKET ..............................................................5

        1.    The Product Market .................................................................5

            a.    Imidacloprid topicals are distinct and non-interchangeable with Fipronil topicals. .................................................6

            b.    Topical flea and tick medications and delivery systems.................9

        2.    The Geographic Market ........................................................11

        3.    The relevant market includes sub-markets of wholesale sales to Pet Specialty Retailers, Online Retailers, and General Retailers....................11

            a.    Pet Specialty Retailers ................................................11

            b.    Online Retailers ........................................................12

            c.    General Retailers........................................................13

        4.    The relevant market does not include sales to veterinarians.....................13

        5.    The relevant market does not include direct-to-consumer sales. ...............17

    B.    GENERICS LOWERED PRICES OF FIPRONIL FLEA AND TICK MEDICATIONS. ..................................................................19

    C.    BAH HAS PREVENTED GENERICS FROM ENTERING THE RELEVANT MARKET...........................................................19

        1.    Imidacloprid products, including Advantix .............................................19

        2.    Flea and tick collars, including Seresto ...................................................20

        3.    Registration of insecticides with EPA and "exclusive use".......................21

        4.    BAH's market power in the Seresto flea collar ........................................22

    D.    TEVRA'S ATTEMPTS TO ENTER THE OTC MARKET FOR IMIDACLOPRID TOPICALS ..........................................................22

        1.    Tevra's successful entry into separate Fipronil topical market .................24

        2.    Tevra was foreclosed from entering the Imidacloprid topical market .......................................................................24

E.   BAH'S EXCLUSION SCHEME ILLEGALLY FORECLOSED ENTRY INTO THE OTC RETAIL MARKET FOR IMIDACLOPRID TOPICALS ........25

   1.   Key Terms of BAH's Purchase Agreements ...............................26

   2.   Statements by Retailers Evidencing their Understanding of BAH's Exclusion Scheme ..................................................................33

F.   BAH REQUIRED EXCLUSIVE DEALING USING BAH'S EXCLUSION SCHEME .................................................................37

G.   BAH TIED ADVANTIX TO THE SERESTO FLEA COLLAR USING ITS EXCLUSION SCHEME .....................................................37

H.   FTC STAFF REPORT ON COMPETITION IN THE PET MEDICATIONS INDUSTRY FOUND THAT EXCLUSIVE DEALING HAS ANTICOMPETITIVE EFFECTS ...........................................40

I.   BAH POSSESSES MONOPOLY POWER IN THE RELEVANT MARKET ..........................................................................41

J.   ANTI-COMPETITIVE EFFECTS OF BAH'S CONDUCT ..............................42

K.   LACK OF PRO-COMPETITIVE JUSTIFICATION FOR BAH'S ACTIONS ............................................................................42

L.   ANTITRUST INJURY .....................................................................43

M.   TEVRA HAS ATTEMPTED TO MITIGATE ITS DAMAGES, BUT HAS BEEN UNABLE TO OBTAIN OTHER CUSTOMERS FOR ITS PRODUCTS .....................................................................44

N.   TEVRA HAS BEEN DAMAGED AND CONTINUES TO BE DAMAGED BY BAH'S ANTI-COMPETITIVE CONDUCT ..........................44

CLAIMS FOR RELIEF ..............................................................................46

JURY DEMAND .........................................................................................53

-ii-

Plaintiff Tevra Brands, LLC ("Tevra"), by its undersigned counsel, complains against Defendants Bayer Healthcare LLC, Bayer Animal Health GmbH, and Bayer AG (collectively, "Defendants") for violations of the Clayton Act § 3 (exclusive dealing and tying) and Sherman Act §§ 1 and 2 (agreements in restraint of trade and maintenance of a monopoly) as follows:

## NATURE OF ACTION

1.      Plaintiff Tevra Brands, LLC ("Tevra") competes with Defendants by producing more effective generic alternatives to Defendants' products, which it offers for sales at a much lower cost.  However, as set forth below, Defendants' illegal restraints of trade and maintenance of their monopoly have substantially foreclosed competition, resulting in higher prices and fewer choices for buyers in the relevant market.

2.      Tevra was damaged by a reduction in competition caused by Defendants' violations of antitrust law, including Defendants' schemes of illegal exclusive dealing and tying involving wholesale sales of "squeeze-on" Imidacloprid topical flea and tick treatments for dogs and cats ("Imidacloprid topicals"), which are purchased by retailers and distributors throughout the United States.

3.      Tevra makes generic Imidacloprid topicals that are less expensive and more effective as the name brand Advantage and Advantix flea and tick treatments made by Defendants.  For example, in 2017, Bayer sold 6-dose Advantix II to Retailer A[1] for ███ per unit, before applying discounts and rebates.  After applying the maximum discounts and rebates of ███ under the agreement between Bayer and Retailer A, Retailer A still paid approximately ███ per unit in 2017.  That same year, Tevra offered to sell a 6-dose generic of Advantix II to Retailer A for ███, which is approximately ███ less expensive than Bayer's brand-name product, and approximately ███ less expensive after applying all of Bayer's discounts and rebates.  Despite the fact that Tevra's generic Imidacloprid topicals are significantly less expensive and more effective than Bayer's Imidacloprid topicals, Retailer A

---

[1] Certain retailers discussed in this Complaint are referred to as "Retailer A, Retailer B, etc."  A key showing the identity of each retailer will be filed under seal with the Court, if required.

and various other retailers did not purchase Tevra's generic Imidacloprid topicals.  This is due to Defendants' anti-competitive conduct, through which Defendants have maintained their monopoly in the market for wholesale sales of Imidacloprid topical to Over-The-Counter ("OTC") retailers, excluded generics like Tevra's from the market, and ensured that both retailers and consumers pay supra-competitive prices.

4.    Defendants made approximately 85% of all sales in the relevant market during 2018 and, upon information and belief, received patent license royalties for most of the other 15%.  To maintain its monopoly, and to stop Tevra and other makers of generic flea and tick treatments from competing against their Advantage and Advantix brands, Defendants entered into BAH's "Exclusion Scheme"[2] with retailers and distributors.  Through their Exclusion Scheme, Defendants forced retailers and distributors not to carry generic Imidacloprid topicals in competition with Advantix.  Retailers have told Tevra that they have a "no generics" agreement with Bayer, and that selling Tevra's products would violate that agreement.

5.    Defendants also coerced retailers and distributors into buying its more expensive Imidacloprid topicals by illegally tying the purchase of Advantage and Advantix to Defendants' patented, "must have," Seresto flea collar.  Defendants' agreements with retailers ████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████  Generic manufacturers like Tevra cannot compete with this illegal tying agreement because Defendants obtained the "exclusive

---

[2] The phrase "Exclusion Scheme" is used to describe the agreements and/or understandings that Defendants entered into with retailers and distributors for the sale of Imidacloprid topicals, the Seresto flea collar, and other products manufactured by Defendants, which Defendants used to foreclose competition from generic manufacturers of Imidacloprid topicals.  These agreements are reflected in and reached through written contracts, understandings, verbally, course of dealing, tacit agreements, or otherwise.

use" of the formulation used in the Seresto flea collar when it registered that formulation with the U.S. Environmental Protection Agency pursuant to the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136a, *et seq*.

6.      Defendants have used their Exclusion Scheme, which includes the illegal exclusive dealing scheme described in ¶4, and the illegal tying scheme described in ¶5, to maintain their monopoly.  As a result of Defendants' conduct, generic Imidacloprid topical manufacturers were, and continue to be, substantially foreclosed from entering the market for wholesale sales to OTC retailers (and the submarkets for wholesale sales to Pet Specialty Retailers and Online Retailers).  The exclusion of generic Imidacloprid topicals from the market has resulted in substantially less competition, higher prices, and fewer product choices for retailers, distributors, and consumers.

## PARTIES

7.      Plaintiff Tevra is a Nebraska limited liability company, with its headquarters in Omaha, Nebraska.  Tevra was founded in 2015 by a group of six veterans of the pet products industry.  Prior to founding Tevra, they had acquired a tremendous depth and breadth of experience with flea and tick treatments, having worked at Sergeant's Pet Care Products, Perrigo, Bayer Animal Health, and other leading companies in the industry.

8.      Defendant Bayer AG is a corporation organized and existing under the laws of Germany, with a place of business at Kaiser-Wilhelm-Allee 1, 51368 Leverkusen, Germany. Defendant Bayer AG is a German company founded in 1863.  It is composed of over 400 consolidated companies, including Defendant Bayer Healthcare, LLC and Defendant Bayer Animal Health GmbH.  The Bayer conglomerate operates in over 90 countries, employs over 115,000 people, and had over $44 billion in sales in 2018.

9.      Defendant Bayer HealthCare LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 100 Bayer Blvd., Whippany, NJ 07981.  Bayer HealthCare LLC is also a wholly owned subsidiary of Bayer AG. Bayer Animal Health is a division of Bayer HealthCare LLC with its principal place of business at 12809 Shawnee Mission Parkway, Shawnee, Kansas.  The business of Bayer

-3-

HealthCare LLC relevant to this action is operated by its division Bayer Animal Health.  This division should not be confused with Defendant Bayer Animal Health GmbH, described below.

10.     Defendant Bayer Animal Health GmbH is a corporation organized and existing under the laws of Germany, with a place of business at Kaiser-Wilhelm-Allee 50, 51373 Leverkusen, Germany.  Bayer Animal Health GmbH is also a wholly owned subsidiary of Bayer AG.  Defendant Bayer Animal Health GmbH should not be confused with the Bayer Animal Health division of Defendant Bayer HealthCare LLC, described above.

11.     Bayer Animal Health GmbH, Bayer HealthCare LLC and Bayer AG are affiliated companies under common control and are collectively referred to, for the purposes of this Complaint, as "BAH."  Bayer HealthCare LLC licenses a patent described in this Complaint from Bayer Animal Health GmbH, and these two companies, under the common control of Bayer AG, are jointly engaged in research, development and marketing of BAH products described in this complaint.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), because this action arises under Sections 3, 4 and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15 and 26, as well as Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

13.     This Court has personal jurisdiction over each of the defendants, pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants may be found and transact business in the State of California.  This Court also has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in California; (b) researched, developed, sold, shipped, and/or delivered substantial quantities of Imidacloprid topicals and Seresto flea collars throughout the United States, including in California; (c) had substantial contacts with the United States, including in California; (d) engaged in anticompetitive agreements with companies in the United States, including in California, that were directed and had a direct, foreseeable, and intended effect of causing injury to the business or property of companies and consumers residing in, located in, or doing business throughout California and the United States; and/or (e) sold and directed their

-4-

1  sale of Imidacloprid products and the Seresto flea collar to retailers throughout the United States,

2  including in California.

3       14.    This Court also has personal jurisdiction over BAH because BAH intended and

4  knew, or should have known, that their anticompetitive agreements outlined in this Complaint

5  with nationwide retailers would have the effect of preventing manufacturers of generic

6  Imidacloprid topicals from competing with BAH and of increasing prices for both retailers and

7  consumers.  BAH knew, or should have known, that their anticompetitive agreements had an

8  impact in California, and throughout the United States.

9       15.    Venue is proper in this District because each of the defendants transacts business

10  in this District and may be found in this District, as defined by 15 U.S.C. § 22.   Venue is also

11  proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant Bayer

12  HealthCare LLC maintains a facility in which it transacts business at 455 Mission Bay Blvd.

13  South in San Francisco, California, and claims to be third largest biotech employer in the Bay

14  Area.  Defendant Bayer Health Care LLC also resides in this District, as it is subject to the

15  Court's personal jurisdiction with respect to this action for the reasons stated above.

16                    **FACTS COMMON TO ALL COUNTS**

17       **A.    The Relevant Market**

18       16.    The relevant market for analyzing the antitrust violations committed by BAH is:

19       Topical flea and tick products containing Imidacloprid sold at wholesale by

20  manufacturers to Over-The-Counter ("OTC") retailers in the U.S., including the sub-markets of

21  sales to Pet Specialty Retailers, Online Retailers, and General Retailers, and to distributors who

22  re-sell these products to OTC retailers.

23              **1.    The Product Market**

24       17.    The relevant product market in this case is topical flea and tick products for dogs

25  and cats containing Imidacloprid sold at wholesale by manufacturers to OTC retailers and to the

26  distributors that supply OTC retailers.  For the reasons explained below, the relevant product

27  market does not include topical products containing Fipronil and non-topical products like flea

28  collars.

-5-

18.     The relevant product market includes sales to OTC retailers, specifically Pet Specialty Retailers, Online Retailers, and General Retailers, but excludes sales to veterinarians, for the reasons explained below.

a.     **Imidacloprid topicals are distinct and non-interchangeable with Fipronil topicals.**

19.     The active ingredients in flea and tick treatments are insecticides that kill and/or repel fleas and ticks.  Some of these insecticides are common agricultural insecticides that are manufactured in enormous quantities and used worldwide.  Two common insecticides used for flea and tick protection are Fipronil (which is the active ingredient in the topical treatment Frontline, and generics that compete with Frontline), and Imidacloprid (which is the active ingredient in BAH's Advantage and Advantix, and generics that compete with those products).

20.     Because common agricultural insecticides like Fipronil and Imidacloprid are widely available, inexpensive commodities, they usually constitute a small percentage of the cost of flea and tick treatments.  Instead, the major costs for most flea and tick treatments are the delivery systems for these active ingredients (such as a collar or a "squeeze-on" topical solution), together with the very substantial costs of obtaining regulatory approval by the U.S. Environmental Protection Agency for the use of the particular formulation of active ingredients in each flea and tick treatment, as well as the costs of marketing, selling and delivering the products.

21.     Flea and tick medications containing Fipronil are not in the relevant market because such products serve different purposes and function differently from Imidacloprid products and are otherwise not interchangeable.  Specifically, Imidacloprid formulations sold today are more effective than Fipronil formulations, because they repel and kill fleas and ticks, whereas Fipronil only kills them; thus, they do not serve the same purpose.  In addition, unlike Fipronil, Imidacloprid kills and repels mosquitoes and repels biting flies.  Thus, many consumers perceive the higher value of Imidacloprid topical formulations, and do not consider them interchangeable with Fipronil topical formulations.

-6-

22.     When BAH first entered the market with an Imidacloprid topical, it charged a higher price than the prevailing price for Fipronil topicals.  This created a test of whether Imidacloprid topicals and Fipronil topicals are in the same market.  If they are, BAH's small but significant and non-transitory increase in price for Imidacloprid formulations, as compared to Fipronil formulations, would have caused retailers and consumers to buy Fipronil formulations in response to that price difference in numbers sufficient to make the price difference unprofitable. In fact, retailers and consumers purchased Imidacloprid in large quantities despite the higher price.  The price increase therefore "stuck," and is evidence that Imidacloprid topicals and Fipronil topicals are not substitutes for most retailers and consumers.

23.     BAH has extensively advertised the greater effectiveness of its name brand Imidacloprid topicals, as compared to Fipronil topicals, and contends that Imidacloprid topicals are superior to Fipronil topicals.  BAH specifically states that its Imidacloprid topical repels and kills fleas and ticks, instead of simply killing them.  *See, e.g.*, Bayer Animal Health, *K9 Advantix II protects against more types of ectoparasites than Frontline Plus*, https://www.bayerdvm.com/static/media/images/pop-up/KPI-PopUp-Modal-k9AdvII.png (last visited February 10, 2020).

24.     Because of the superiority of Imidacloprid formulations over Fipronil formulations, consumers are willing to pay a small but significant non-transitory increase in the price of Imidacloprid formulations, as compared to Fipronil formulations.  For example, on July 16, 2019, a leading online pet retailer, Chewy.com, advertised a 6 dose package of K9 Advantix II Imidacloprid topical for $64.59, which is $10.76 per dose.  On the same day, the same website advertised a 6 dose package of the Frontline Plus Fipronil topical for $56.93, which is $9.48 per dose (a 13.5% price difference).  Also on July 16, 2019, a leading "brick and mortar" retailer, PetCo, advertised a 2 dose package of the K9 Advantix Imidacloprid topical on its website for $26.09, which is $13.04 per dose.  On the same day the same retailer carried an advertisement on the same website for a 3-dose package of the Frontline Fipronil topical for $36.49, which is $12.17 per dose (a 7.1% price difference).  These prices are summarized in Table 1 below:

| OTC Sub-Market | Retailer | Fipronil Price Per Dose | Imidacloprid Price Per Dose | Price % Difference |
|---|---|---|---|---|
| Online | Chewy.com | $9.48 | $10.76 | 13.5% |
| Pet Specialty | PetCo | $12.17 | $13.04 | 7.1% |

**Table 1 – Difference in Advertised per Dose Prices between Fipronil and Imidacloprid Topicals – July 2019**

25.     These price differences are "significant" under the DOJ/FTC Horizontal Merger Guidelines, which generally consider a 5% price increase to be "small but significant."  Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 4.1.2 (Aug. 19, 2010) ("Merger Guidelines"), available at https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf.  The fact that the price difference continues years after the initial price increase when Bayer's Imidacloprid topicals entered the market shows that the price increase "stuck"—i.e., that despite the significant price difference, Imidacloprid formulations do not lose enough sales to Frontline formulations to make the price difference unprofitable.  Because a hypothetical monopolist of Imidacloprid topicals could have profitably imposed a small but significant and non-transitory increase in price without losing enough sales to other products to make the price increase unprofitable (and, in fact, BAH did so as an actual monopolist, without losing enough sales to defeat the price increase), Imidacloprid topicals are a relevant product market under Merger Guidelines § 4.1.1.

26.     There is low cross-elasticity of demand between Fipronil and Imidacloprid products.  That retailers, distributors, and consumers would not switch from Imidacloprid to Fipronil in response to a small but significant non-transitory change in price is also evident from the entry of Fipronil generics into the Fipronil market, which occurred in 2011.  Although the availability of generics made Fipronil topicals less expensive, retailers, distributors, and consumers generally did not switch from Bayer's Imidacloprid topical products to Fipronil topicals.  Further, the entry of generic Fipronil topicals did not force Bayer to lower the price of Imidacloprid topicals.  Instead, the prices of Bayer's Imidacloprid topicals offered to retailers and distributors have increased.

-8-

27.     In addition to having distinct formulations, distinct purposes, and distinct pricing structures, the industry recognizes the two types of products as separate from one another. Nielsen, a global measurement and data analytics company in the industry for pet products, tracks data for Fipronil and Imidacloprid separately.

28.     From a retailer's or distributor's perspective, Imidacloprid topicals and Fipronil topicals are complements, not substitutes.  Retailers also do not substitute one for the other in response to price changes, because consumers expect retailers to carry both products. Consumers generally buy only one flea and tick treatment at a time, but retailers buy a full line of flea and tick treatments.  Imidacloprid and Fipronil are not interchangeable to Pet Specialty Retailers, Online Retailers, and General Retailers.  To remain competitive and to offer the products that customers expect to find, retailers must carry both formulations.

**b.     Topical flea and tick medications and delivery systems**

29.     Distinct, non-interchangeable, products deliver flea and tick treatment to pets in different ways.  In 2018, the fastest growing type of flea and tick product was the flea and tick collar, led by BAH's Seresto flea collar.  The Seresto flea collar is a comparatively expensive product, typically offered by retailers in different markets at $40 to $69 per collar, depending on the market.  BAH claims that the Seresto flea collar has a major advantage over other flea and tick treatment products, because it provides eight months of protection from a single application.

30.     "Topical" liquid treatments that are applied directly to a pet's skin or fur are distinct from flea collars.  In 2018, topicals accounted for the largest dollar amount of OTC flea and tick treatment sales.

31.     Flea and tick treatments may also be given to pets orally.  However, oral imidacloprid products like Bayer's Advantus kill only adult fleas, and do not prevent re-infestation unless given every day.  Additionally, many consumers think of oral treatments as inconvenient and difficult to administer, because many pets will not consume the oral treatments, or will expel them.  In some instances, consumers cannot administer such medications to their pets without using food or pill pouches to conceal the taste and smell of the medication.  Even then, pets may reject them.  The inconvenience of trying to administer oral products makes them

-9-

a poor substitute for Imidacloprid topicals.

32.     Other products that contain flea and tick treatments include sprays, wipes, and shampoos.  Those products account for a small percentage of total flea and tick treatment sales.  Sprays, wipes, and shampoos are not part of the relevant market because they are generally not used for the prevention of fleas and ticks.  Sprays, wipes, and shampoos are used for alleviating symptoms in animals that are already infested with fleas and/or ticks.  These products can kill fleas and ticks on contact, but are generally aimed at relieving infested animals from itching and pain caused by fleas and ticks and washing away dead pests.  As a result, a small but significant non-transitory price increase in the price of Imidacloprid topicals would not lead consumers to switch from Imidacloprid topicals to non-topical flea and tick products.

33.     The relevant product market in this case does not include flea collars.  Flea collars and topical flea and tick treatments are not interchangeable for most consumers.  Some consumers prefer the convenience and ease of using a single flea collar for up to 8 months, but will not accept the frequency and difficulty of applying a topical treatment to their pet.  Other consumers prefer the lower per-dose price of topicals and the control they have over when to apply them, but dislike the higher initial cost, smell, and appearance of flea collars.  In addition, some consumers do not purchase flea collars due to safety concerns.  As a result, a small but significant and non-transitory increase in the price of Imidacloprid topicals would not lead consumers to switch from Imidacloprid topicals to flea collars.

34.     Similarly, from the retailer's perspective, topical products are not substitutes for other delivery systems for flea and tick medications like oral treatments, flea collars, shampoos, and baths.  Rather, these retailers must carry and sell each of these types of products to remain competitive.  For retailers, these different categories of products are complements, not substitutes.  As a result, a small but significant and non-transitory increase in the price of Imidacloprid topicals would not lead retailers to switch from Imidacloprid topicals to non-topical flea and tick products.

### 2. The Geographic Market

35.     The geographic market for analyzing the antitrust violations committed by BAH is the entire United States.  Manufacturers of Imidacloprid topicals sell those products to retailers with locations throughout the United States, and to distributors throughout the United States who sell the products to retailers, and those retailers subsequently sell the products to consumers in all fifty states.

### 3. The relevant market includes sub-markets of wholesale sales to Pet Specialty Retailers, Online Retailers, and General Retailers.

36.     Within a broad product market, well defined sub-markets may exist which, in themselves, constitute product markets for antitrust purposes.

37.     Sub-markets within the relevant market defined above include wholesale sales to Pet Specialty Retailers, such as PetSmart, PetCo and Pet Sense; sales to Online Retailers like Chewy.com; and sales to General Retailers like grocers, drug stores, and discount stores.

38.     In 2018, Pet Specialty Retailers purchased approximately 54% of Imidacloprid topicals sold in the relevant market, for about $71,000,000.

39.     In 2018, Online Retailers purchased approximately 21% of Imidacloprid topicals sold in the relevant market, for about $28,000,000.

40.     In 2018, General Retailers purchased approximately 25% of Imidacloprid topicals sold in the relevant market, for about $32,000,000.

41.     Imidacloprid topical products sold directly or through distributors to Pet Specialty Retailers, Online Retailers, and General Retailers are appropriate relevant sub-markets.  These distinct types of retailers re-sell the products to different types of consumers and have different markups from wholesale to retail prices.

42.     Pet Specialty Retailers, Online Retailers, and General Retailers operate in all 50 states, and the sale of Imidacloprid topicals to these retailers involves over one hundred million dollars in U.S. interstate commerce.

#### a. Pet Specialty Retailers

43.     The first OTC sub-market for Imidacloprid topicals is wholesale sales to Pet

-11-

Specialty Retailers, such as PetSmart, PetCo and Pet Sense.  Sales to Pet Specialty Retailers accounted for about 54% of sales in the relevant market in 2018, or about $71,000,000.  Pet Specialty Retailers can often charge higher prices for Imidacloprid topicals than Online Retailers and General Retailers, because some consumers are attracted to their expertise, selection and perceived quality.

44.    Pet Specialty Retailers typically demand Imidacloprid topicals branded as being of "vet quality."  Manufacturers of Imidacloprid topicals branded as being of "vet quality" typically do not sell those products to lower priced distribution channels, such as General Retailers and Online Retailers.

45.    Pet Specialty Retailers are a higher-margin market compared to General Retailers and Online Retailers.  Pet Specialty Retailers have higher overhead cost than General Retailers that sell many more items in the same store.  Pet Specialty Retailers are also expected to have staff trained to give advice on pet products.  Pet Specialty Retailers typically need to make a higher margin on their sales, and often mark up wholesale prices by 75% to set their retail prices.

### b.    Online Retailers

46.    The second OTC sub-market for Imidacloprid topicals is Online Retailers (also called "e-commerce," "internet," or "web").  Sales to Online Retailers accounted for about 21% of sales in the relevant market in 2018, or about $28,000,000.  These retailers charge the lowest prices, but cannot offer face-to-face advice, or the opportunity to examine the products before purchasing them.  These retailers are generally chosen by consumers who are most price-sensitive, and who are willing to forgo the advantages of other markets for flea and tick treatments.

47.    Online Retailers are the lowest-margin market for Imidacloprid topicals.  They have no "brick and mortar" costs, but appeal to the most price-conscious consumers.  Online retailers often mark up wholesale prices 30% to 35% to set their retail prices.

48.    Most of the Imidacloprid topicals that are sold by Online Retailers are sold by online pet specialty retailers, such as Chewy.com.  Online general retailers, like Amazon.com, also sell Imidacloprid topicals, but in far smaller quantities.  Consumers tend to search for

-12-

Imidacloprid topicals online only after they have seen the product at a pet specialty retailer, and they are looking for a lower price.  Therefore, exclusion of a product from pet specialty retailers (online or brick and mortar) prevents the product from selling successfully at online general retailers, including Amazon.com.

49.     To meet the demands of different types of retailers, manufacturers like Tevra typically produce multiple brands of the same formulations, but restrict sales of those brands to different sub-markets of retailers.  For example, Tevra produces Vetality, a "vet quality" Imidacloprid topical brand that it markets specifically to the Pet Specialty Retailer sub-market. Tevra also produces the same formulation under its "TevraPet" brand, which it sells to General Retailers and to Online Retailers.

### c.     General Retailers

50.     Another OTC sub-market for Imidacloprid topicals is General Retailers, such as discount chains (like Walmart), grocery chains (like  Kroger) and pharmacy chains (like Walgreens) that do not advertise any particular expertise in pet products, but include them with a wide variety of other consumer products.  Sales to General Retailers accounted for about 25% of sales in the relevant market in 2018, or about $32,000,000.  General Retailers can charge higher prices for Imidacloprid topicals than online retailers, because some consumers want to examine the products before purchasing them, or like the convenience of having the products available when they are shopping for other items.

51.     General Retailers are a lower-margin market than Pet Specialty Retailers, but a higher-margin market compared to Online Retailers.  Because General Retailers operate on a greater scale than Pet Specialty Retailers, they can spread their overhead costs among many more products, and concentrate more on volume and less on margin.  General Retailers often mark up wholesale prices 50% to set their retail prices.

### 4.     The relevant market does not include sales to veterinarians.

52.     Veterinarians are an entirely separate market from the OTC retail market. Veterinarians purchased about $136,000,000 of Imidacloprid topicals at wholesale in 2018, or about the same amount that was sold to OTC Retailers.

-13-

53.     Because veterinarians have a professional relationship with most of their customers for Imidacloprid topicals, and because of the perceived value of their advice on these treatments, they often mark up the wholesale prices by 100% (doubling or "key-stoning" the wholesale price) to set their retail prices.

54.     That veterinarians are outside of the relevant market in this case is particularly evident by the fact that veterinarians typically demand a "vet-only" brand from manufacturers, or even a private label brand that is unique to the specific veterinarian.  Indeed, veterinarians generally refuse to buy brands of Imidacloprid topicals that are available in lower-priced sub-markets such as Pet Specialty Retailers, General Retailers, and Online Retailers.  Veterinarians generally insist on some type of "exclusivity" in the Imidacloprid topicals they buy to enhance the perceived value of those treatments and the veterinarian's advice on their use, in the minds of consumers to whom the products are resold.

55.     Consumer preferences are relevant here to the extent they drive the retailers' demand for products sold at wholesale.  Veterinarians resell Imidacloprid topicals to consumers with whom they have a professional relationship, and who rely on their professional advice. Veterinarians can charge a higher price for Imidacloprid topicals, which are ancillary to their professional practice.

56.     Approximately 49% of all Imidacloprid topicals in the U.S. were not sold by veterinarians, but through the separate and distinct OTC market, and its well-defined sub-markets of Pet Specialty Retailers, General Retailers, and Online Retailers.

57.     Pet Specialty Retailers, General Retailers, and Online Retailers are distinct sub-markets for Imidacloprid topicals, and veterinarians are part of an entirely separate market.  They do not represent interchangeable demand, from the perspective of Tevra and other manufacturers of generic flea and tick medications. These four different types of retailers serve four different groups of core customers, each with different price sensitivities and buying habits.  Evidence of this can be seen in the four different price points offered by sellers in the four different markets for the same product—BAH's Seresto flea collar.  Table 2 below summarizes data collected in July 2019:

-14-

| Market | Advertised Price of Seresto Flea Collar | Source of Advertised Price |
|--------|------------------------------------------|----------------------------|
| Veterinarian | $62 | https://www.plazaanimalclinic.com |
| Pet Specialty | $58 | https://www.petsmart.com |
| General Retail | $52 (2 pack) | https://www.walmart.com |
| Online | $40 | https://www.petcaresupplies.com |

**Table 2 – Advertised Retail Prices of Seresto Flea Collar in Different Markets**

58.     The products sold to veterinarians, Pet Specialty Retailers, General Retailers, and Online Retailers are not interchangeable from a supply standpoint either.  As explained above, the same manufacturers sell different brands of products to veterinarians, Pet Specialty Retailers, General Retailers, and Online Retailers.  Veterinarians generally do not demand and generally will not purchase generics.  Veterinarians will often purchase the "vet only" brands and refuse to purchase the "vet quality" brands typically sold at Pet Specialty Retailers.  In turn, General Retailers and Online Retailers do not typically have the same restrictions, but they, like Pet Specialty Retailers, typically cannot access "vet only" brands.

59.     For example, Tevra offers two brands of Imidacloprid topicals.  One is Vetality Avantect II, which is primarily marketed by Tevra to Pet Specialty Retailers. The other is TevraPet Activate II, which is primarily marketed by Tevra to Online Retailers and General Retailers.  Tevra does not offer Imidacloprid topicals branded specifically for veterinarians. Tevra and other manufacturers of generic Imidacloprid topicals do not market their products to veterinarians because large veterinarian chains often carry their own private label brands or refuse to purchase generic Imidacloprid, and sales to smaller veterinary practices increase the transaction costs to manufacturers.

60.     As a result of the differences between veterinarians and OTC Retailers detailed above, a small but significant and non-transitory decrease in the wholesale price to OTC retailers (or a small but significant increase in the wholesale price paid by veterinarians) would not lead manufacturers of generic Imidacloprid topicals branded as being of "vet quality," like Tevra, to switch to manufacturing "vet-only" branded Imidacloprid topicals and marketing those to veterinarians.

-15-

61.     BAH acknowledges that it sells its products into different markets.  On its official website https://jobs.bayer.com, Bayer advertised for an executive to work with "the different customer segments (types of producers, veterinarians, retailers etc.)."

62.     BAH has recognized that sales to veterinarians and sales to OTC retailers are different markets.  Until 2010, BAH sold flea and tick treatments only to veterinarians.  Then, BAH changed its policy.  As the Federal Trade Commission said in its 2015 report on competition in the pet medications industry:

> in March 2010, Bayer became the first major drug manufacturer to begin selling pet medications directly to non-veterinary retailers in an effort to address the unauthorized sale (also sometimes called "diversion") of its products outside of the veterinary channel. Bayer also pointed to ways in which the market for pet medications is changing, with pet owners increasingly shifting their purchases to the retail channel, as justification for its decision. Bayer now sells its OTC products to pet specialty retail stores.

Federal Trade Commission, *Competition in the Pet Medications Industry: Prescription Portability and Distribution Practices* at 80-81 (May 2015), available at https://www.ftc.gov/system/files/documents/reports/competition-pet-medications-industry-prescription-portability-distribution-practices/150526-pet-meds-report.pdf.

63.     Elanco, another large manufacturer of prescription and OTC pet medications, recently announced that it has signed an agreement to purchase BAH's animal health business. In a public statement to investors explaining the business rationale for the transaction, Elanco recognized that sales to veterinarians are a different "channel" from sales to pet specialty, general retail and online retailers:

> With Bayer's capabilities, launched nearly a decade ago, we will add a leading position in the alternative channels, with over-the-counter brands in pet specialty, mass retail, and e-commerce. Critically, it is estimated that 1/3 of US pet owners don't go to the vet.  So these alternative channels are the primary means for obtaining pet medications, especially OTC parasiticides like collars and topicals.  In fact, 40% of pet medications in the US are now sold in the fast-growing online and retail channels.  Bayer's sophisticated customer engagement capabilities and relationships with e-commerce and physical retailers are best in class, and would take years to replicate independently.  This acquisition will enable us to serve customers where they choose to shop, while complementing our long-standing focus on the veterinarian.

-16-

1    Elanco conference call with investors (August 20, 2019), audio available at

2    https://event.on24.com/eventRegistration/console/EventConsoleApollo.jsp?&eventid=2070596&

3    sessionid=1&username=&partnerref=&format=fhaudio&mobile=&flashsupportedmobiledevice=

4    &helpcenter&key=537AFC4137DD8FFCF17E5C299318BBC7&newConsole=false&text_lang

5    uage_id=en&playerwidth=748&playerheight=526&eventuserid=266796385&contenttype=A&m

6    ediametricsessionid=223668266&mediametricid=2920178&usercd=266796385&mode=launch.

7    Elanco thus recognized the fact that sales to veterinarians are no substitute for sales to pet

8    specialty, general retail and online retailers, "especially [for] OTC parasiticides like collars and

9    topicals." *Id.*

10            **5.      The relevant market does not include direct-to-consumer sales.**

11    64.    Direct retail sales to consumers are also an entirely separate market from

12    wholesale sales to retailers in the OTC Retail Market.  Such sales do not represent

13    interchangeable demand for Tevra and other manufacturers that have been foreclosed from

14    selling at wholesale into the OTC Retail market and its sub-markets.  Adopting a direct-to-

15    consumer sales strategy would require a new entrant like Tevra to simultaneously enter the

16    business at two levels of distribution:  manufacturing and retail sales.  Selling at retail is

17    completely different from selling at wholesale.  It has a completely different cost structure, profit

18    margin, and risk structure, in the following respects:

19        a.    Direct-to-consumer sales require manufacturers to create and implement their

20              own advertising strategies, to drive consumers to themselves, rather than to

21              retailers who would be reselling their products.

22        b.    Direct-to-consumer sales require manufacturers to create or acquire websites, with

23              attractive user interfaces, for consumers to use.

24        c.    Direct-to-consumer sales require manufacturers to develop and implement search

25              engine optimization procedures, and other techniques to drive consumer traffic to

26              their websites.

27        d.    Direct-to-consumer sales require manufacturers to set up payment processing

28              procedures with credit card processors and other forms of payment, such as

-17-

FIRST AMENDED COMPLAINT
CASE NO. 3:19-cv-04312-BLF

1          PayPal.

2    e.     Direct-to-consumer sales require manufacturers to build and operate order

3          fulfillment structures, including warehouses in which consumer orders are

4          assembled and packed.

5    f.     Direct-to-consumer sales require manufacturers to set up and operate delivery

6          structures, including contracts with carriers, delivery services, and postal services.

7    g.     Direct-to-consumer sales require manufacturers to have a customer service

8          operation that can help consumers and resolve their problems.

9    h.     Direct-to-consumer sales require manufacturers to process returns, redeliveries,

10          and credits for thousands of consumers, as opposed to just a few retailers.

11    i.     Direct-to-consumer sales require manufacturers to have contracts with online

12          market places, such as Amazon, and to comply with their numerous rules and

13          procedures.

14    j.     Direct-to-consumer sales subject manufacturers to the additional risks of

15          complying with consumer laws regulating retailers in all 50 states.

16    65.    Even though Tevra has attempted to mitigate its damages through direct-to-

17 consumer sales, such sales have proven to not be an effective or efficient channel for Tevra to

18 sell its products for the reasons outlined in this paragraph. For example, Tevra has established a

19 direct-to-consumer sales operation through Amazon.com. However, Amazon.com charges Tevra

20 up to 75% of the retail price for its commission, order fulfillment services, and onsite

21 advertising. And as discussed above in ¶48, sales on Amazon.com are sharply reduced because

22 Tevra is excluded from pet specialty retailers like PetSmart and online retailers like Chewy.com.

23 Thus, the different customer profiles, cost structures, profit margins, and risk structures discussed

24 above have prevented Tevra from effectively and meaningfully reaching consumers through

25 direct-to-consumer sales.

26    66.    Because direct-to-consumer sales are not a substitute for wholesale sales for

27 manufacturers like Tevra, Tevra cannot switch to direct-to-consumer sales to make up the sales it

28 has lost due to Bayer's antitrust violations.

**B.      Generics lowered prices of Fipronil flea and tick medications.**

67.      In 1997, Merial (later purchased by Boehringer-Ingelheim) introduced its Frontline topical formulation of Fipronil to the U.S. market.  Frontline has remained the single best-selling brand of Fipronil topical since that time.

68.      Beginning in 2011, generic Fipronil topicals, which compete directly with Frontline, entered the U.S. marketplace.  By 2018, generic Fipronil topicals accounted for approximately 52% of Fipronil topical sales, with Frontline still accounting for about 48%.

69.      The results of generic Fipronil topicals entering the separate market for Fipronil topicals have been more competition, lower prices, and more choices for retailers and consumers in that market.

70.      Unlike Fipronil, despite the attempted entry of at least two generic Imidacloprid topical manufacturers in the past few years, at least 85% of the relevant market for Imidacloprid topicals is still controlled by BAH.  Bayer has a monopoly in the relevant market and effectively controls 100% of that market, as upon information and belief, BAH receives patent license royalties for most or all of the remaining 15%.  Because of BAH's anti-competitive conduct, the relevant market has not benefitted from the entry of generics, as the Fipronil market did.

**C.      BAH has prevented generics from entering the relevant market.**

**1.      Imidacloprid products, including Advantix**

71.      In 2002, BAH introduced its Advantage line of Imidacloprid topicals, which now includes Advantage II and K9 Advantix-II.

72.      BAH filed a lawsuit against the first manufacturer of generic Imidacloprid topicals that attempted to enter the OTC market, and its sub-markets.  On September 26, 2016, the generic manufacturer CAP IM Supply, Inc. was granted conditional registration by EPA for its generic Imidacloprid topical.

73.      On May 22, 2017, three Bayer entities, including Defendant Bayer HealthCare, LLC and Defendant Bayer Animal Health GmbH filed a patent infringement lawsuit against CAP IM Supply, Inc. in U.S. District Court for the District of Delaware.  This lawsuit was shortly settled and, upon information and belief, CAP IM began paying BAH royalties for the

-19-

use of its patented formula.

74. Imidacloprid topicals produced by CAP IM have been sold in the U.S. by several companies including TruRx and PetIQ, under various brand names including Advecta, PetLock and ParaDefense. Upon information or belief, these sales do not represent true generic competition against BAH, but rather are licensed products, also known as "authorized generics," from which BAH profits through its receipt of royalties.

75. As set forth below, BAH has illegally maintained its monopoly and prevented the entry of true generic Imidacloprid topicals into the pet specialty and online markets by forcing retailers to agree not to carry generic Imidacloprid topicals, and by tying the purchase of its Advantix Imidacloprid topicals to its extremely successful Seresto flea collar, to force retailers to buy its Imidacloprid topicals.

76. The results of BAH's illegal, anticompetitive, and exclusionary actions have been less competition, higher prices, and fewer choices for retailers and consumers.

## 2. Flea and tick collars, including Seresto

77. Bayer sells the Seresto flea collar at wholesale to OTC Retailers and to distributors that supply OTC Retailers. As set forth below, the Seresto flea collar has been used by BAH as part of an illegal tying scheme, designed to maintain its monopoly in sales of Imidacloprid topicals to OTC retailers.

78. BAH began manufacturing the Seresto flea collar in 2011-2012. The active ingredients in the Seresto flea collar are imidacloprid (10%) and flumethrin (4.5%).

79. BAH claims that the Seresto flea collar is an "odorless, non-greasy collar" that kills and repels fleas and ticks on dogs for eight months. *See* BayerDVM for U.S. Veterinary Professionals, https://www.bayerdvm.com/products/seresto-for-dogs/, (last visited February 10, 2020).

80. The Seresto flea collar is protected by U.S. Patent No. 7,910,122B2.

81. Last year, Seresto became the "largest brand in the history of Animal Health at Bayer," according to the Head of Marketing at Bayer Animal Health. In 2018, Seresto achieved 270,000,000€ in sales with a production record of 13 million collars. It is registered in 78

-20-

1   countries, and recently became available in China.

2        82.    In its 2018 Annual Report, Bayer reported that the Seresto flea collar was one of

3   four best-selling BAH products.  According to the Annual Report, sales of its Seresto flea collar

4   "achieved continued strong growth" from "higher volumes in the United States and Europe."

5        83.    According to a study posted on the Bayer DVM website, 97% of veterinarians

6   were satisfied or very satisfied with the Seresto flea collar for dogs or cats after 8 months.

7   Similarly, 94% of veterinarians were likely or very likely to recommend the Seresto flea collar

8   for their dog or cat patients.  According to the study, the veterinarians' clients also had similar

9   satisfaction rates.

10       84.    Elanco, which is acquiring BAH's Animal Health Division, has described Seresto

11  as the "#2 Fastest Growing Blockbuster in [Animal Health] Industry."

12       85.    Given the strong sales of the Seresto flea collar, Seresto is a "must have" product

13  for Pet Specialty Retailers and Online Retailers.

14         **3.**      **Registration of insecticides with EPA and "exclusive use"**

15       86.    The insecticides used as active ingredients in flea and tick treatments are

16  regulated by the U.S. Environmental Protection Agency, under the Federal Insecticide, Fungicide

17  and Rodenticide Act (FIFRA), 7 U.S.C. § 136a, *et seq.*  This statute requires that manufacturers

18  of insecticides register each formulation before offering it for sale in the U.S.

19       87.    To obtain EPA registration under FIFRA for the use of an insecticide formulation,

20  a company must submit detailed scientific data demonstrating the safety and effectiveness of that

21  use of the insecticide formulation.

22       88.    If the EPA agrees to register the use of an insecticide formulation, the registering

23  company has an "exclusive use" of the data used to register that formulation for a period of 10

24  years after registration, pursuant to FIFRA, 7 U.S.C. §  136a, *et seq.*

25       89.    The 10-year "exclusive use" period created by FIFRA registration effectively

26  gives the owner a monopoly for products produced by the registering company.

27       90.    The 10-year exclusive use period under FIFRA has expired for both Fipronil and

28  Imidacloprid topicals.

91.     However, BAH registered the formulation of the Seresto flea collar with the U.S. Environmental Protection Agency, and it currently has an exclusive use of the formulation used in the Seresto flea collar for several more years.  In effect, this means that BAH has a monopoly over the Seresto flea collar and that generic manufacturers like Tevra cannot produce a product with the same formulation.

### 4.     BAH's market power in the Seresto flea collar

92.     BAH has substantial market power in its Seresto flea collar product for at least five reasons.

a.     First, the Seresto flea collar is protected by U.S. Patent No. 7,910,122B2.

b.     Second, by registering the formulation of its Seresto collar with the Environmental Protection Agency, pursuant to FIFRA, BAH has exclusive use of the data used to register the formulation for a period of ten years following the registration, which effectively gives BAH a monopoly on the use of the formulation.

c.     Third, BAH faces no real competition for sales of Seresto, because no other products are equivalent to Seresto.

d.     Fourth, BAH's Seresto flea collar enjoys a substantial price differential over other flea collars, selling for at least double, and up to ten times more than other flea collars.

e.     Fifth, multiple retailers told Tevra that they could not carry its generic Imidacloprid topical because they needed to comply with BAH's discount program, which includes the Seresto flea collar.

### D.     Tevra's attempts to enter the OTC market for Imidacloprid topicals

93.     In 2016, Tevra created detailed sales forecasts for both its generic Fipronil topicals and its generic Imidacloprid topicals. Tevra recognized that it could sell several times more generic Imidacloprid topicals than generic Fipronil topicals, due to several factors.

a.     First, by 2016, the market for Imidacloprid topicals was expanding, while the market for Fipronil topicals was shrinking.

b.      Second, the Fipronil topical market was already crowded with generic competition.  Velcera's "Pet Armor" generic Fipronil topical entered the market to compete with the name brand Frontline in 2011.  Since that time at least four other manufacturers had entered the market for Fipronil topicals.  This crowded market for Fipronil topicals made it difficult for another entrant, like Tevra, to obtain sales and market share.

c.      Third, there were no generic Imidacloprid topicals being sold.  Tevra could therefore be the first generic entrant.

d.      Fourth, generic Imidacloprid topicals could be sold at higher prices than generic Fipronil topicals, because BAH had acquired a monopoly with its Advantix name brand due to its patents and its prior "exclusive use" from its EPA registration.  The price of the first generic is lower than the price of the monopoly branded product, but a high-priced branded product generally permits a higher price for the first generic.

e.      Fifth, as set forth in ¶24 and Table 1, above, consumers are willing to pay more for Imidacloprid topicals than for Fipronil topicals.

94.     Tevra immediately went to work licensing a generic Fipronil topical to compete against Boehringer's name brand Frontline, as well as registering a generic Imidacloprid topical to compete against BAH's name brand Advantix. Tevra applied for EPA registration of its generic Imidacloprid topical.  The EPA granted the registration of Tevra's generic Imidacloprid topical in 2017.

95.     Tevra's Imidacloprid topicals are more effective than BAH's Imidacloprid topicals.  Both topicals contain the same active ingredient.  However, Tevra's method of delivering that active ingredient to the skin of the pet to which it is applied is superior to BAH's.

96.     One of the inventors of BAH's Imidacloprid topicals was Dr. Olaf Hansen, who is listed as an inventor in BAH's patent.  After leaving BAH, Dr. Hansen joined Tevra and helped invent an improved delivery system for Imidacloprid topicals that became part of Tevra's patented formulation.

-23-

97.     Controlled experiments have demonstrated that Tevra's Imidacloprid topicals kill over 99% of fleas, just as BAH's do, but Tevra's Imidacloprid topicals also kill ticks more effectively than the corresponding BAH product.  In addition, Tevra's Imidacloprid topicals are less toxic than those produced by BAH, due to their superior delivery method.

98.     Even before EPA registration was complete, Tevra hired a sales team of professionals with experience in the industry, and aggressively pursued sales to Pet Specialty Retailers and Online Retailers.  Beginning in 2016, Tevra's salespersons met with representatives of numerous pet specialty and online retailers, including those identified below as Retailer A, Retailer B, Retailer C, Retailer D, and Retailer E.

### 1.     Tevra's successful entry into separate Fipronil topical market

99.     In 2017, Tevra made its first sales of its generic Fipronil topical.  Because Tevra's product was a less expensive, equally effective alternative to Frontline, Tevra was able to demonstrate to retailers that carrying Tevra's generic Fipronil topical would increase sales and profits for the retailers.

100.    Attracted by the price and profitability advantages of Tevra's generic Fipronil topical, retailers began buying it in large quantities.  Tevra made a profit of over $2.4 Million from online and pet specialty sales of its generic Fipronil topical in 2018.

### 2.     Tevra was foreclosed from entering the Imidacloprid topical market

101.    Tevra's attempts to sell its less expensive, more effective, generic Imidacloprid topical in the OTC market, including Pet Specialty Retailers and Online Retailers, have been foreclosed by BAH's illegal exclusive dealing and tying schemes used to maintain its monopoly, as described below.

102.    Tevra attempted to sell its generic Imidacloprid topical at wholesale to some of the same Pet Specialty Retailers and the same Online Retailers that were already carrying Tevra's generic Fipronil topical.  However, as set forth in ¶135 to ¶151, below, numerous retailers refused to carry Tevra's generic Imidacloprid topical, and five of those retailers, or their distributors, explicitly cited BAH's discount program, which includes the Seresto flea collar, as the reason for their refusal.  These retailers have refused to carry generic Imidacloprid topicals

-24-

1    from Tevra, even though several of them sell generic Fipronil.

2          103.    In a competitive market, Tevra would be able to sell its products to retailers and

3    distributors.  Its generic Imidacloprid topicals are just as effective as BAH's brand-name

4    Imidacloprid topicals.  Tevra's generic Imidacloprid topicals are also significantly less expensive

5    than BAH's brand-name Imidacloprid topicals.  Indeed, Tevra has offered to sell retailers generic

6    Imidacloprid topicals for approximately 50% or less of Bayer's discounted wholesale price (as

7    stated in its written contracts) for K9 Advantix II Imidacloprid topicals.

8          104.    Despite a price that is approximately 50% lower (or even lower than that) than

9    BAH's, Pet Specialty Retailers and Online Retailers have not purchased Tevra's Imidacloprid

10   topical.

11         105.    If a retailer purchased Tevra's generic Imidacloprid topicals, the retailer could

12   charge consumers prices that are significantly lower than the retail prices of BAH's Imidacloprid

13   topicals.

14         106.    In 2018, Tevra sold almost none of its generic Imidacloprid topical into the Pet

15   Specialty sub-market, or the Online sub-market, and made a total profit of only $402,000 in

16   those markets.

17       E.    **BAH's Exclusion Scheme Illegally Foreclosed Entry into the OTC Retail
18             Market for Imidacloprid Topicals**

19         107.    To foreclose competition, BAH created its "Exclusion Scheme" scheme which (1)

20   includes an illegal "no generics" condition, agreement or understanding, and (2) illegally ties its

21   patented, EPA-registered "exclusive-use" Seresto flea collar (in which it has tremendous market

22   power as set forth in ¶92) to the purchase of its name brand Advantage and Advantix

23   Imidacloprid topicals, to force retailers and distributors to buy Advantage and Advantix

24   Imidacloprid topicals.

25         108.    When Tevra offered its lower-priced generic Imidacloprid topical to retailers,

26   some of whom had already bought Tevra's generic Fipronil topical, it ran into the

27   insurmountable barrier of BAH's Exclusion Scheme.  As set forth in ¶¶135 to 151, multiple

28   retailers told Tevra that they could not carry its generic Imidacloprid topical because of BAH's

-25-

discounts and rebates.

### 1.    Key Terms of BAH's Purchase Agreements

109.    BAH's anti-competitive Exclusion Scheme has been remarkably successful. BAH has prevented any meaningful competition, maintaining at least an 85% share in the relevant market, and, upon information and belief, effectively 100%, as BAH receives royalties for most of the other 15%.

110.    BAH designed its Purchase Agreements to ensure ███████████████████ ███████████████████████████████████████████████████████████ ███████████. With its "must have" Seresto product and its effectively 100% share in the relevant market, BAH knew that ███████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████. BAH's web of loyalty contracts prevented competitors, including Tevra, from becoming viable competitors in the relevant market.

111.    BAH forced retailers to keep the details of its Exclusion Scheme secret.  In their attempts to overcome the barrier created by BAH's Exclusion Scheme, Tevra and other generic makers are in the difficult position of having to infer the terms and conditions of the BAH rebate scheme from the limited information they can glean from retailers.

112.    BAH recently submitted a handful of their retailer and distributor agreements to the Court and designed them as Highly Confidential and Attorneys' Eyes Only under the Protective Order, revealing in this litigation the terms of BAH's Exclusion Scheme in some of their Purchase Agreements.  These written purchase agreements are one source that shows how BAH forced retailers to exclusively purchase BAH's Imidacloprid topicals in order to have access to its must-have Seresto collar.  Another source of BAH's anti-competitive agreements are BAH's "no generics" agreements or understandings with purchasers, which have been described by multiple retailers to Tevra as explained further below.  BAH has used its Purchase Agreements to enforce the exclusive dealing agreements or understandings with purchasers.

-26-

113.    BAH's Exclusion Scheme includes both a "contract, combination or conspiracy," within the meaning of the Sherman Act, and a "condition, agreement or understanding" within the meaning of the Clayton Act, that retailers and distributors will not carry generic Imidacloprid topicals that compete with BAH's product.  The written contracts with several retailers that BAH has now provided to Tevra constitute part of the "conspiracy" or "understanding," but they are clearly not the only terms of illegal agreements between BAH and retailers and distributors of Imidacloprid topicals.

114.    Indeed, more than one retailer has explicitly told Tevra that it believes it has a "no generics" agreement with Bayer provided by BAH in this litigation to date, even though the written contracts do not expressly include the verbatim phrase "no generics."  For example, Retailer A told Tevra that "they had an agreement with Bayer that prevented them from offering a generic to Bayer's K9 Advantix," or words to that effect.  Retailer B told Tevra about "the recent Bayer 'no generic'" or words to that effect.  Retailer C told Tevra about its "program with Bayer and not allowing any generic equivalence," or words to that effect.

115.    BAH's Purchase Agreements with retailers (1) expressly ███████████████████████████████████████████████████████████████████████████; (2) provide that BAH can terminate the Agreements ███████████████████████████████; and (3) ███████████████████████████ ███████████████████████.

116.    The Purchase Agreements contain a ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ A breach of this and any other provision ████████████████████████ ███████████████.

117.    BAH's written contracts with retailers and distributors, which are part of its Exclusion Scheme, require retailers ███████████████████████ ███████████████████.

-27-

118.    BAH's Exclusion Scheme includes a written contract that explicitly offers retailers a discount for ████████████████████ However, the broader conspiracy or understanding of BAH's Exclusion Scheme is that "no generics" will be permitted to compete with BAH's Imdiacloprid topicals.

119.    Nearly all of BAH's Purchase Agreements also contain ████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████.

120.    To enforce its anticompetitive agreements, the Purchase Agreements permit BAH ████████████████████████████████████████████
████████████████.

121.    To further enforce its anticompetitive agreements, and as part of BAH's ████████ retailers and distributors are required to provide BAH ████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████.

122.    Some of the written contracts that BAH has now provided to Tevra contain a naked restraint of trade that requires retailers or distributors ████████████████████
████████████████████████. This clause, which has the obvious intent and effect of foreclosing competition, reads as follows:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

123.    The Purchase Agreements are not easily terminable by retailers or distributors. BAH is a monopolist with at least 85% of sales in the relevant market—and effectively 100%,

**CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION**

as, upon information and belief, BAH receives royalties for most of the remaining 15% of sales. BAH also has monopoly power in Seresto.  A retailer who terminates or violates its Purchase Agreement with BAH risks losing the right to buy products that any pet specialty retailer must have to compete.  That the Purchase Agreements are not easily terminable is further evident from the fact that none of the three Online Retailers (discussed below as retailers A, B and C), which represent over 75% of that sub-market, or the three Pet-Specialty Retailers (discussed below as Retailers D, E and F), which represent over 70% of that sub-market, ███████████████████ █████████████████████████████████████████████████████████████████████████ ████████████. Indeed, none of those six retailers even agreed to purchase Tevra's product.

124.    The Purchase Agreements are also not easily terminable in part because retailers and distributors refuse to terminate those agreements in fear that they would lose the anti-competitive discounts and rebates on Bayer's products.

125.    Under its Purchase Agreements, Bayer effectively requires the purchase of its expensive Imidacloprid topicals in order for retailers to purchase Seresto by requiring that retailers and distributors comply with █████████████ of up to █████████, containing clauses that expressly require ███████████████████████████████████████, and threatening to terminate the agreements ███████████████████ if the retailer or distributor does not comply with ███████████████████ of the agreement.  As a result of this arrangement, Bayer expressly █████████████████████ ████████████████████████.

126.    It is economically irrational for retailers and distributors to refuse to purchase any quantity of Tevra's products, which have been demonstrated to be more effective, where those products are priced at approximately half or even less than the price of corresponding BAH products.  This apparently irrational behavior by retailers and distributors is explained by BAH's Exclusion Scheme described in this Complaint.

127.    As part of the Purchase Agreements, █████████████████████████████ ███████████████████████████████ Specifically, ████████████████████████ █████████████████████████████████████████████████████████████████████████

FIRST AMENDED COMPLAINT
CASE NO. 3:19-cv-04312-BLF

128.

BAH includes multiple "loyalty" discount provisions in contracts with retailers and distributors, some of which require

Some of these anti-competitive discounts are:

| Discount | Range | Requirements |
|---|---|---|
|  |  |  |
|  |  |  |



| Discount | Range | Requirements |
|---|---|---|

129. █████████████████████████████████,
in some instances the anti-competitive discounts and rebates amount to approximately ██████
████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
██████████████

-31-

130.    If a retailer were to not participate in Bayer's loyalty discount program, it could not compete with retailers who do participate in the discount program.  This is the case in part because ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████     ██████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████  The clause in the BAH written agreements that informs ████████████████████████████████████████████████████████████  is a clear invitation to a horizontal conspiracy.  It is also a warning to each retailer that they will be at a severe cost disadvantage if they do not participate in the Exclusion Scheme.  Each retailer or distributor can see that competitors will be getting a very substantial discount that they will not receive if they do not participate in the Exclusion Scheme.  The discounts individually and collectively permit BAH to enforce its exclusive dealing and tying agreements by preventing manufacturers of Imidacloprid topicals from entering the market.  In addition, as discussed below, retailers have told Tevra that they have entered into "no generics" agreements with Bayer.  Bayer has utilized these illegal agreements to maintain its monopoly in the relevant market and to prevent generics from entering the relevant market.

131.    Regardless of the length of the Purchase Agreements or their termination clauses, the Purchase Agreements are not easily terminable and effectively operate *de facto* exclusive long-term dealing agreements with the intent and effect to prevent generic manufacturers of Imidacloprid topicals from entering the markets.  Retailers cannot afford to cancel the Purchase Agreements in part because Bayer has market power in the relevant market, and, if they were to terminate the Purchase Agreements, they would lose millions of dollars in discounts on Seresto and other products.  Further, and as mentioned above, BAH can enforce the "no generics" agreements through the terms of the Purchase Agreements, including but not limited to terms

1   stating to BAH's customers ███████████████████████████████████
2   ██████████████████████████████   In addition, significant barriers to entry
3   into the wholesale Imidacloprid topical market exist. These barriers to entry include BAH's
4   Exclusion Scheme itself, which prevents generics from entering the market, as well as BAH's
5   monopoly of Imidacloprid topicals.  These and other barriers to entry effectively foreclose any
6   generics from entering the market.  Thus, the Purchase Agreements are effectively sufficiently
7   long term to foreclose competition, and are not easily terminable.  Through the Purchase
8   Agreements and other understandings and agreements with retailers and distributors, BAH has
9   foreclosed access to a substantial share of the relevant market by Tevra and other generic
10   manufacturers of Imidacloprid topicals.

11       132.    Thus, the Purchase Agreements and related understandings amount to long-term
12   exclusive dealing agreements between Bayer and the retailers and distributors.  Due to the terms
13   of the Purchase Agreements, BAH's market power in Imidacloprid topicals, and its monopoly in
14   Seresto, retailers and distributors cannot do business with generic manufacturers of Imidacloprid
15   topicals. As a result of BAH's ongoing anti-competitive conduct, there is no meaningful
16   competition in the relevant market.

17       **2.    Statements by Retailers Evidencing their Understanding of BAH's
18       Exclusion Scheme**

19       133.    Not only do the Purchase Agreements contain anti-competitive ██████████
20   ██████   and otherwise amount to *de facto* exclusive dealing between Bayer and the retailers
21   and distributors, but Bayer and multiple retailers have an understanding or agreement that
22   retailers will not do business with generic manufacturers of Imidacloprid topicals, as explained
23   by the retailers themselves to Tevra.

24       134.    Retailers A, B, and C are part of the Online sub-market, while Retailers D, E and
25   F are part of the Pet Specialty sub-market.  Tevra offered each of these retailers generic
26   Imidacloprid topicals at prices that are about 50% lower than the discounted prices of
27   Imidacloprid topicals offered by Bayer under its Purchase Agreements, but each retailer refused
28   to carry Tevra's product, despite Tevra's generic Imidacloprid topicals being just as effective as

-33-

CONTAINS HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION

1  Bayer's Advantix II product.

2      135.    Tevra began discussions to sell generic Imidacloprid topicals with Retailer A in

3  the fall of 2016.  In 2017, a representative of Retailer A told a Tevra salesperson that Retailer A

4  "had a contract with Bayer and could not offer a generic to K9 Advantix II," or words to that

5  effect.  Retailer A also told another Tevra salesperson "that they had an agreement with Bayer

6  that prevented them from offering a generic to Bayer's K9 Advantix," or words to that effect.

7      136.    In July 2018, Tevra salespersons again met with representatives from Retailer A

8  and discussed the possibility of Retailer A carrying Tevra's generic Imidacloprid topical in

9  competition with BAH's K9 Advantix II.  A representative of Retailer A told a Tevra salesperson

10  that "they understand the opportunity but need to be able to make up potential lost marketing

11  dollars from Bayer," or words to that effect.

12      137.    In October 2018, a Tevra salesperson spoke with a representative of Retailer A,

13  who told the Tevra salesperson that Retailer A "is trying to work with Bayer on the contract.

14  There was some old language in the old agreement that either prevented [Retailer A] from

15  offering a generic or featuring 'Compares to' or contains the same active ingredient," or words to

16  that effect.

17      138.    In 2019, Retailer A told a representative from Tevra that if Retailer A purchased

18  Tevra's product, "they would lose $3 million dollars in net margin taking into account the

19  reduced Bayer rebate vs. what they thought they would make in margin selling [Tevra's]

20  product," or words to that effect.

21      139.    At the wholesale price Tevra offered Retailer A, and if Retailer A had accepted Te

22  vra's proposal, Tevra projected that it would have sold Retailer A approximately $2 million in Im

23  idacloprid topicals during the time period covered by Retailer A's $3 million estimate

24  described in the above paragraph

25      140.    Tevra could not profitably offer a discount to match BAH's discount of at least $3

26  million because it would have had to sell to Retailer A its product at an approximate $1 million

27  loss.  In addition, Tevra could not offer a comparable bundle of products because only BAH can

28  offer Seresto.

141.    Retailer A ultimately refused to purchase Tevra's generic Imidacloprid topical.

142.    In 2018, Tevra salespersons were attempting to convince Retailer B to carry Tevra's generic Imidacloprid topical.  A representative of Retailer B told one of Tevra's salespersons that Retailer B would not carry Tevra's generic Imidacloprid topical because "it was a conflict of interest given the recent Bayer 'no generic' as to pulling advertising funding and lucrative rebates," or words to that effect.

143.    Retailer B ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.

144.    In 2018, salespersons for Tevra made an initial presentation to Retailer C.  During that initial presentation, a representative of Retailer C stated that "they had an agreement with Bayer."  Retailer C did not carry any generics that compete directly against Bayer flea and tick treatments as of December 2018.

145.    In 2019, a sales person for Tevra had a discussion with a representative of Retailer C in which the representative described Retailer C's "program with Bayer and not allowing any generic equivalents," or words to that effect.

146.    Retailer C ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.

147.    In the summer of 2018, Tevra salespersons made presentations to Retailer D showing the sales and profitability advantage of Tevra's generic Imidacloprid topical.  A representative of Retailer D later told a Tevra salesperson that Retailer D had "no interest in Own Brands or generic compromise as the Bayer rebates are HUGE," or words to that effect.

148.    Retailer D ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.

149.    In February 2017, a salesperson for Tevra informed Retailer E that Tevra had just received EPA registration for its generic Imidacloprid topical.  In March 2017, Tevra made an offer to Retailer E with significant incentives to encourage Retailer E to carry Tevra's generic Imidacloprid topical.  Retailer E directed Tevra to discuss the sale of Tevra's product through the distributor to Retailer E.  In discussions with the distributor, Tevra salespersons were told of the

-35-

1  existence of a "Bayer agreement," and were told that "they were going to let us know if the

2  agreement prohibits them from adding another Imidacloprid product."

3       150.    Retailer E ultimately refused to purchase and stock Tevra's generic Imidacloprid

4  topical.

5       151.    An affiliate of Retailer F also told Tevra that Bayer was trying to "bundle" its

6  rebate program for both Retailer F and the affiliate.  The affiliate then stopped negotiating with

7  Tevra, because of the Bayer rebate program.  Retailer F and its affiliate ultimately refused to

8  purchase and stock Tevra's generic Imidacloprid topical.

9       152.    Together, Retailers A, B, and C represent over 75% of Imidacloprid topical sales

10  to the Online Retailer sub-market. BAH's agreements with these retailers have collectively

11  foreclosed at least that share of the Online Retailer sub-market, as these retailers are unwilling or

12  unable to purchase generic Imidacloprid products, even if the prices for such products are

13  significantly lower than the prices for BAH's Imidacloprid topicals, for fear of violating BAH's

14  no-generics rule, losing BAH's anti-competitive discounts and rebates, or losing access to

15  Seresto.

16       153.    Together, Retailers D, E, and F represent over 70% of Imidacloprid topical sales

17  to the Pet Specialty Retailer sub-market.  BAH's agreements with these retailers have

18  collectively foreclosed at least that share of the Pet Specialty Retailer sub-market, as these

19  retailers are unwilling or unable to purchase generic Imidacloprid products, even if the prices for

20  such products are significantly lower than the prices for BAH's Imidacloprid topicals, for fear of

21  violating BAH's no-generics rule, losing BAH's anti-competitive discounts and rebates, or

22  losing access to Seresto.

23       154.    After the original complaint was filed, Tevra continued to offer its generic

24  Imidacloprid topical product to Online and Pet Specialty Retailers at prices significantly lower

25  than those offered by BAH.  Online and Pet Specialty Retailers continue to refuse to purchase

26  Tevra's generic Imidacloprid topicals.

27       155.    BAH's foreclosure of the market has been substantial, both in the size of the

28  market that has been foreclosed and in the length of time the relevant market is foreclosed.

1  ████████████████████████████████████████████████████████████

2  ████████████████████████  BAH's market foreclosure is effectively infinite, as Online

3  and Pet Specialty Retailers have no choice but to renew these contracts for fear of losing BAH's

4  anti-competitive discounts and rebates, as well as access to Seresto.

5  **F.    BAH required exclusive dealing using BAH's Exclusion Scheme.**

6  156.   The statements from retailers above show that they understood and agreed with

7  BAH that BAH would be their sole supplier of Imidacloprid topicals, and that they have

8  additional agreements and understandings to that effect.

9  157.   BAH used its Exclusion Scheme to force retailers into an illegal exclusive dealing

10  scheme, under which they effectively agree not to purchase or carry generic alternatives to

11  BAH's name brand Imidacloprid topicals.

12  158.   BAH's Exclusion Scheme contained a discount with an ██████████ condition,

13  and other discounts, agreements, or understandings that prevented retailers from purchasing or

14  carrying lower-cost generic alternatives to BAH's name brand Imidacloprid topicals.

15  159.   Further, the BAH's Exclusion Scheme also forced retailers into an illegal

16  exclusive dealing scheme ████████████████████████████████████████

17  ████████████████████████████████████████

18  **G.    BAH tied Advantix to the Seresto flea collar using its Exclusion Scheme.**

19  160.   As discussed above, BAH's Purchase Agreements with retailers contain ██████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████

22  161.   BAH also used its Exclusion Scheme to tie purchases of its name brand

23  Advantage and Advantix Imidacloprid topicals to purchases of its "must-have" Seresto Flea

24  Collar.  In at least this respect, BAH has used its Seresto patent improperly, as it used it to force

25  retailers and distributors to purchase Imidacloprid topicals at anti-competitive prices and to

26  exclude BAH's competitors, like Tevra, from the relevant market.

27

28

FIRST AMENDED COMPLAINT
CASE NO. 3:19-cv-04312-BLF

162.   BAH's Exclusion Scheme is structured so that a retailer (such as Retailer A, described in ¶135 to ¶141, above) would lose a "HUGE" amount of rebates (to quote Retailer D in ¶147, above) if the retailer did not demonstrate loyalty by purchasing all of the bundled BAH products, including BAH's higher-cost Advantage and Advantix Imidacloprid topicals.  Retailer A calculated that it would lose a net $3 Million in BAH rebates by purchasing Tevra's generic Imidacloprid topical, even though Tevra's product was less expensive and could be re-sold at a higher profit margin.

163.   BAH's Exclusion Scheme is coercive, in part because BAH has market power in the tying product.  BAH here has a patent on the Seresto flea collar, as well as EPA-registered "exclusive use" of the Seresto flea collar, and BAH has used its market power to force retailers and distributors to buy BAH's branded Imidacloprid topicals.

164.   BAH's conduct is also coercive because of the terms of the Purchase Agreements. The Purchase Agreements contain a ████████████████████████████████████████████ ████████████████████████████████████████████ They also contain an ██████ ██████████████████████████████████████████████████████ ██████   Further, and as explained in this Complaint, the Purchase Agreements effectively require retailers and distributors to purchase Imidacloprid topicals from BAH exclusively, thereby requiring retailers and distributors to forego purchasing generic Imidacloprid topicals that are just as effective and significantly less expensive than BAH's Imidacloprid topicals.

165.   BAH's agreements also contain purchase requirements of up to ████████, and they threaten termination of the agreements and the loss of discounts if ████████████████ ████████████████████████████████████████.  Additionally, BAH's Purchase Agreements are coercive and impose burdensome on retailers by requiring them to pay exorbitant prices for Imidacloprid topicals that ████████████████████████████████ ██████████████████████████.

166.   Here, an appreciable number of buyers have had no choice but to accept BAH's burdensome and coercive terms, as well as BAH's tie between Seresto and the Imidacloprid topicals.  Retailers who comprise at least seventy-five percent of the Online Retailer sub-market

-38-

have agreed to Bayer's tie-ins, as have retailers who comprise at least seventy percent of the Pet Specialty Retailer sub-market.

167.   Tevra and other generic manufacturers cannot offer a generic version of the Seresto flea collar.  As explained above in ¶91, BAH has "exclusive use" under FIFRA over the formulation for the Seresto flea collar for several more years, so generic manufacturers of flea and tick medication cannot compete with BAH's illegal tying agreement.

168.   Given the popularity of the Seresto flea collar with consumers and the fact that no other manufacturer can make a generic version of that product, retailers need to carry the Seresto flea collar to compete with other retailers in their selection of products.  And they also need to obtain the BAH rebate on the entire bundle of BAH products, to offset the high price of the Seresto Flea Collar and enable them to compete with other retailers on the price of the Seresto flea collar.

169.   Because of BAH's Exclusion Scheme, the only viable economic option for retailers was to purchase the bundled Advantage and Advantix products (the tied products) together with the Seresto flea collar (the tying product).  Given the need of retailers and distributors to carry Seresto, retailers and distributors have no choice but to buy Imidacloprid topicals from BAH at exorbitant prices.

170.   BAH structured its Exclusion Scheme such that the purchase of the tied product (BAH's name brand Imidacloprid topicals) with the tying product (BAH's "must have" Seresto flea collar) is the only viable economic option for retailers.  Even if BAH were willing to sell its Seresto flea collar at its undiscounted wholesale price without the concomitant purchase of its Imidacloprid topicals, this would not be a viable economic option for retailers because they could not resell the Seresto flea collar at a competitive retail price if they did not receive the anti-competitive ███████████████████████████████████████████.  If other similarly situated retailers are receiving a rebate on the Seresto flea collar, and can resell that collar at a price that reflects the rebate, the only viable economic option for a retailer is to comply with BAH's Exclusion Scheme, in order to be able to sell the Seresto flea collar at a competitive price.

-39-

**H.   FTC Staff Report on Competition in the Pet Medications Industry Found
that Exclusive Dealing has Anticompetitive Effects.**

171.   In 2015, after conducting a public workshop and reviewing over 700 public
comments, the Federal Trade Commission ("FTC") published a Staff Report titled "Competition
in the Pet Medications Industry: Prescription Portability and Distribution Practices" (the
"Report"), which is available at https://www.ftc.gov/system/files/documents/reports/competition-
pet-medications-industry-prescription-portability-distribution-practices/150526-pet-meds-
report.pdf.

172.   The Report examined manufacturer distribution policies and practices for both
prescription and OTC pet medications to shed light on how those policies and practices might
"directly affect consumers' access to competitively priced pet medications." Rep. at 1.

173.   The FTC Staff found that the "kinds of savings realized on the human drug side
have not occurred for pet medications" and examined potential causes of the lack of available
competitive generics.  *Id.* at 98.

174.   The FTC Staff explained that generic manufacturers claim "that at least some
pioneer drug manufacturers are impeding competition from generic entrants by entering into
exclusive dealing agreements with distributors that prohibit them from also distributing generic
drugs that might be substituted for their own branded products.  *Id.* at 100.

175.   FTC Staff found "that some manufacturers and distributors enter into exclusive
dealing agreements, whereby a distributor is contractually prohibited from selling either branded
(also referred to as 'pioneer') or generic pet medication products that compete with the
manufacturer's products."  *Id.* at 20-21.  The Report advised that "[i]f such agreements are in
effect, they may not only impact generic manufacturers' ability to enter the animal drug industry,
but also the ability of larger pioneer manufacturers who decide to launch generic versions of
animal drugs."  *Id.* at 101.  These are exactly the kinds of agreements that Bayer coerces retailers
and distributors to enter into and the effects on generic manufacturers like Tevra are exactly as
the FTC predicted.

176.    Testimony at the FTC hearings provided an example of how an exclusive dealing agreements between a manufacturer and distributors excluded a promising new generic flea and tick treatment.  The FTC reported:

> For example, Novartis launched a generic version of a blockbuster product, that it claimed provided superior efficacy at a lower price and was well received by the veterinarians that tried it. Novartis claimed that it was unable to capture more than two percent of the market, however, because distributors refused to carry the product. Novartis presumed that this was due to exclusive dealing agreements that distributors had with the pioneer manufacturer of the blockbuster product, but could not confirm this. To the extent that exclusive dealing agreements protect manufacturers from generic competition, Novartis expressed the belief that they are anticompetitive.

*Id.* at 101.  It has been reported in the trade press that the product Novartis attempted to launch was Parastar, a generic version of Frontline (a fipronil topical flea and tick treatment). Lau, *Veterinary Generics Squeezed by Blocking Agreements*, VIN News Service (September 8, 2015), https://news.vin.com/vinnews.aspx?articleId=38031.

I.    **BAH possesses monopoly power in the relevant market.**

177.    BAH possesses monopoly power in the relevant market and the sub-markets of Pet-Specialty retailers and Online retailers, and has possessed monopoly power in the relevant market and the sub-markets of Pet-Specialty retailers and Online retailers at all relevant times to this Complaint.

178.    There is substantial direct evidence that BAH possesses monopoly power.

179.    Direct evidence of BAH's monopoly power includes its demonstrated ability to control price and exclude competition in the relevant market.

180.    BAH has the ability to price Imidacloprid topicals substantially higher than its generic competitors without losing customers.

181.    BAH can and does exclude competitors like Tevra from the relevant market.

182.    Other direct evidence of BAH's market power includes the lack of any meaningful competition in the relevant market.  For example, Tevra cannot meaningfully compete with BAH in the relevant market because virtually no Pet Specialty Retailer or Online

-41-

1    Retailer is willing or able to purchase Tevra's generic Imidacloprid products, in fear that they

2    will lose BAH's anti-competitive discounts or access to Seresto.

3           183.    There is also substantial indirect evidence that BAH possesses monopoly power.

4           184.    BAH possesses extremely high market shares in the relevant market of at least

5    85%, and, on information and belief, receives patent royalties for most of the other 15%.

6    **J.      Anti-Competitive Effects of BAH's Conduct.**

7           185.    BAH's illegal Exclusion Scheme substantially lessened competition and tended to

8    create and maintain a monopoly in the relevant market for Imidacloprid topicals sold at

9    wholesale to OTC Retailers and the sub-markets for Imidacloprid topicals sold to Online

10   Retailers and Pet Specialty Retailers.  It also had the following anti-competitive effects:

11          a.      Tevra, and other sellers of generic Imidacloprid topicals, were substantially

12                  foreclosed from entering the market for Imidacloprid topicals and effectively

13                  prevented from entering the relevant market.

14          b.      Retailers were prevented from purchasing lower-cost, equally-effective, generic

15                  Imidacloprid topicals, causing them to pay higher prices and make less profit.

16          c.      Retailers were prevented from offering consumers a wider selection of

17                  Imidacloprid topicals.

18          d.      Retailers were coerced into buying BAH's name brand Imidacloprid topicals,

19                  causing them to pay higher prices.

20          e.      Consumers were prevented from purchasing lower-cost, more effective,

21                  Imidacloprid topicals, causing them to pay higher prices, and

22          f.      Consumers were denied choices of competing Imidacloprid topicals.

23   **K.      Lack of Pro-Competitive Justification for BAH's Actions**

24          186.    There are no pro-competitive justifications for BAH's Exclusion Scheme.  BAH's

25   Exclusion Scheme serves only to preserve BAH's sales and profits.  It does nothing to advance

26   market efficiency or consumer welfare.  To the contrary, BAH's Exclusion Scheme damages

27   competition, raises prices, and diminishes choices for retailers, distributors, and consumers.

28

### L.      Antitrust Injury

187.     Tevra has suffered injuries of the type that U.S. antitrust laws were intended to prevent, and those injuries flow directly and proximately from BAH's illegal Exclusion Scheme. The BAH's Exclusion Scheme reduced competition, and Tevra was injured by the reduction in competition.

188.     BAH's illegal Exclusion Scheme substantially foreclosed Tevra from entering the pet specialty market and the online market for Imidacloprid topicals, thereby causing Tevra to lose prospective profits on the sale of its generic Imidacloprid topical.

189.     Tevra was nearly 100% foreclosed from the Pet Specialty and Online sub-markets of the OTC market for Imidacloprid topicals, which prevented it from competing for nearly $100,000,000 in sales to Pet Specialty and Online retailers.

190.     Even using the broader "all OTC" market for Imidacloprid topicals (including General Retail), Tevra was still foreclosed from about 75% of possible sales to OTC Retailers.

191.     Tevra has been substantially foreclosed from entering the relevant market indefinitely, as all of the loyalty contracts so far provided by BAH with Pet Specialty Retailers and Online Retailers that continue to do business today were renewed.

192.     BAH's Exclusion Scheme disrupts competition in the relevant market.  Because BAH has foreclosed at least 70-80% of the relevant sub-markets of Pet Specialty Retailers and Online Retailers, even when a competitor like Tevra offers significantly lower per-transaction prices, no customer will do business with that competitor.  Because of BAH's conduct, no competitor, including Tevra, can compete with BAH.  BAH's Exclusion Scheme and its anti-competitive agreements or understandings ensure that no Pet Specialty Retailer or Online Retailer could ever buy Tevra's Imidacloprid topicals, even if (in the case of Retailer A), Tevra offered those products for free.  Because the Exclusion Scheme has limited competitors' expansion, and thereby reduced Pet Specialty Retailers' and Online Retailers' leverage with BAH, BAH is enabled, free from competitive discipline, to continue to demand higher prices from its customers for Imidacloprid topicals.  In turn, BAH's anti-competitive conduct has resulted in Pet Specialty Retailers, Online Retailers, and ultimate consumers being harmed by

-43-

1   having to pay higher prices for Imidacloprid topicals.

2         193.     BAH's illegal Exclusion Scheme has succeeded in excluding all meaningful

3   competition from the relevant market and substantially lessened competition and tended to create

4   and maintain a monopoly, by keeping generic Imidacloprid topical manufacturers from selling to

5   Pet Specialty Retailers and Online Retailers.

6         **M.    Tevra has attempted to mitigate its damages, but has been unable to obtain
                    other customers for its products**
7

8         194.     Tevra has made numerous attempts to mitigate its damages by selling its generic

9   Imidacloprid topicals wherever, and to whomever, it can.  Tevra has sold small quantities of its

10  products to small independent pet stores, and has sold to general retailers wherever possible.

11  Tevra has also sold its products direct to consumers, through its own website and through

12  Amazon.  However, as set forth above, in ¶64, these direct-to-consumer sales present

13  significantly higher transactional costs, lower profit margins, and higher risks for Tevra and

14  other manufacturers of generic Imidacloprid topicals than do sales to OTC Retailers and are

15  therefore not cost efficient for Plaintiff or for other manufacturers of generic Imidacloprid

16  topicals.  Moreover, direct-to-consumer sales are more difficult for products, like Tevra's

17  Imidacloprid topicals, that have been excluded from the largest Online and Pet Specialty

18  Retailers.  Accordingly, these few alternative sales do not represent interchangeable demand with

19  the sales that have been foreclosed.

20        **N.    Tevra Has Been Damaged and Continues to be Damaged by BAH's Anti-
                   Competitive Conduct.**
21

22        195.     Tevra was damaged by BAH's Exclusion Scheme, which was used to carry out

23  both an illegal exclusive dealing scheme, and an illegal tying scheme.  These schemes foreclosed

24  Tevra from selling generic Imidacloprid topicals to Pet Specialty Retailers and Online Retailers,

25  and caused it to lose the prospective profits it would have earned, as described in ¶¶196 to 201,

26  below.

27        196.     One way to estimate Tevra's lost profits caused by BAH's Exclusion Scheme is to

28  compare Tevra's 2016 projections of its future sales of its generic Fipronil products and its

-44-

generic Imidacloprid products to its actual sales of these products.

197.   Tevra's 2016 projections of its future sales of its generic Fipronil products were conservative, and Tevra actually sold more generic Fipronil products than it projected, as shown in Table 3, below.

| Year | Projected Fipronil Sales to Online Retailers | Actual Fipronil Sales to Online Retailers | Projected Fipronil Sales to Pet Specialty Retailers | Actual Pet Fipronil Sales to Pet Specialty Retailers |
|---|---|---|---|---|
| 2017 | $85,179 | $61,322 | $133,093 | $190,505 |
| 2018 | $689,947 | $1,986,219 | $1,078,052 | $2,319,479 |
| 2019 | $1,294.716 | Est. $2M | $2,023,011 | Est. $3M |
| TOTALS | $2,069,841 | $4,047,541 | $3,234,156 | $5,448,662 |

**Table 3 – Projected and Actual Wholesale Sales of Fipronil by Tevra**

198.   In 2016, Tevra also made projections of the future sales of its generic Imidacloprid products, using the same methodology and assumptions as its Fipronil sales projections.  Tevra's projections, which should have been as accurate as its Fipronil projections, and the actual sales into the foreclosed markets, are set forth in Table 4, below.

| Year | Projected Imidacloprid Sales to Online Retailers | Actual Imidacloprid Sales to Online Retailers | Projected Imidacloprid Sales to Pet Specialty Retailers | Actual Imidacloprid Sales to Pet Specialty Retailers |
|---|---|---|---|---|
| 2017 | $5,016,213 | $119,040 | $4,859,458 | $413,979 |
| 2018 | $9,278,240 | $17,267 | $8,988,295 | $549,652 |
| 2019 | $13,823,310 | Est. $13,500 | $13,391,380 | Est. $506,925 |
| 2020 | $13,823,310 | Est. $13,500 | $13,391,380 | Est. $506,925 |
| 2021 | $13,823,310 | Est. $13,500 | $13,391,380 | Est. $506,925 |
| TOTALS | $55,764,433 | Est. $149,807 | $54,021,891 | Est. $2,484,406 |

**Table 4 – Projected and Actual Wholesale Sales of Imidacloprid by Tevra.**

199.   If Tevra had actually sold the projected amount of Imidacloprid in 2017, 2018, 2019, 2020, and 2021, it would have made a total net profit, after the cost of goods sold and other expenses are deducted, of at least $76,058,900.

-45-

200.     Tevra is entitled to treble damages, totaling at least $228,176,000, plus its attorney fees and the costs of this action.

201.     Tevra's damages will continue to accrue until BAH's anti-competitive conduct is enjoined.

## CLAIMS FOR RELIEF

### COUNT I
### EXCLUSIVE DEALING IN VIOLATION OF § 3 CLAYTON ACT, 15 U.S.C. § 14

202.     Tevra incorporates all other allegations in this Complaint into Count I.

203.     BAH has engaged in substantial U.S. interstate commerce by selling goods, including flea and tick collars and flea and tick topicals, to distributors and retailers.

204.     BAH's Exclusion Scheme based the price of goods it sold on the condition, agreement or understanding that the purchaser thereof shall not deal in the goods of a competitor, in violation of § 3 of the Clayton Act, 15 U.S.C. § 14.

205.     One effect of the condition, agreement or understanding described in ¶204, above, is to substantially lessen competition in a line of commerce and tend to create and maintain a monopoly in the relevant market.

206.     Another effect of the condition, agreement or understanding, described in ¶204, above, was to foreclose Tevra from a substantial share of the pet specialty market for Imidacloprid topicals.

207.     Tevra has been damaged by the exclusive dealing scheme by being substantially foreclosed from selling its products in the relevant market, and by losing profits it would have made but for the exclusive dealing scheme.

208.     If not enjoined, BAH's anticompetitive conduct will continue to cause immediate and irreparable injury, loss, or damage to Tevra.

**WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards against each BAH defendant:

a.     A declaration that BAH has violated the Clayton Act § 3, 15 U.S.C. § 14;

-46-

b.      A permanent injunction against BAH and its agents, restraining them from using the BAH's Exclusion Scheme to carry out any exclusive dealing scheme;

c.      Damages in the amount of at least $76,058,900, for lost profits and lost value of the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15 to a total of at least $228,176,000;

d.      The costs of this action, including reasonable attorney fees; and

e.      Such other relief as the Court finds just and equitable.

**COUNT II**
**TYING ARRANGEMENT IN VIOLATION OF § 3 CLAYTON ACT, 15 U.S.C. § 14**

209.    Tevra incorporates all other allegations in this Complaint into Count II.

210.    BAH engaged in substantial U.S. interstate commerce, including the sale of two separate products sold in separate markets:  (1) its Seresto flea collar, and (2) its brand name Imidacloprid topicals including K-9 Advantix II.

211.    BAH tied the sale of its brand named Imidacloprid topicals (the tied goods) to the sale of its Seresto flea collar (the tying good) by means of its Exclusion Scheme, described in ¶¶160 to 170, above, in violation of § 3 of the Clayton Act, 15 U.S.C. § 14.

212.    As alleged above, BAH's agreements with retailers and distributors contained ███████████████████████████████████████████████████████████████████ ███████████████████████.

213.    Because of BAH's Exclusion Scheme, the only viable economic alternative for retailers was to purchase the tied product, instead of the less expensive generic alternatives offered by Tevra, and other manufacturers of generics.

214.    BAH has substantial market power in the tying good—its Seresto flea collar—as described in ¶92, above, and used that market power to condition the sale of its Seresto flea collar on the purchase of its name brand Imidacloprid topicals.

215.    The effect of the tying scheme described above is to substantially lessen competition and to create and maintain a monopoly in the market for Imidacloprid topicals.

-47-

216.   Tevra has been damaged by the tying scheme by being substantially foreclosed from selling its products in the relevant market, and by losing profits it would have made but for the tying scheme.

217.   If not enjoined, BAH's anticompetitive conduct will continue to cause immediate and irreparable injury, loss, or damage to Tevra.

**WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards against each BAH defendant:

a.   A declaration that BAH has violated the Clayton Act § 3, 15 U.S.C. § 14;

b.   A permanent injunction against BAH and its agents, restraining them from enforcing the tying requirements in its contracts, or using its Exclusion Scheme to carry out any tying scheme;

c.   Damages in the amount of at least $76,058,900, for lost profits and lost value of the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15 to a total of at least $228,176,700;

d.   The costs of this action, including reasonable attorney fees; and

e.   Such other relief as the Court finds just and equitable.

### COUNT III
### UNLAWFUL MAINTENANCE OF A MONOPOLY, IN VIOLATION OF § 2 SHERMAN ACT, 15 U.S.C. §2

218.   Tevra incorporates all other allegations in this Complaint into Count III.

219.   BAH has a monopoly on the sale of Imidacloprid topicals to OTC retailers in the U.S., and made approximately 85% of all sales of that product into the relevant market in 2018.

220.   At all relevant times, Bayer has had monopoly power in the United States on the sale of Imidacloprid topicals to OTC retailers.

221.   BAH has willfully maintained its monopoly by means of its unlawful and anticompetitive exclusive dealing arrangements, extensive loyalty discounts aimed at preventing retailers and distributors from doing business with BAH's competitors, unlawful tying arrangements, and other understandings or agreements with retailers and distributors. Collectively, BAH's agreements, contracts, and understandings substantially foreclose the

-48-

1 relevant market.

2      222.    The effects of BAH's monopoly have been to raise prices for both retailers and

3 consumers, prevent the sale of lower cost, equally or more effective, competing products in the

4 relevant market, to substantially foreclose competitors from access to the relevant market, to

5 substantially lessen competition, and to create and maintain a monopoly in the relevant market.

6      223.    Tevra has been damaged by BAH's maintenance of its monopoly by being

7 substantially foreclosed from selling its products in the relevant market and by losing profits it

8 would have made, but for BAH's unlawful maintenance of its monopoly.

9      224.    If not enjoined, BAH's anticompetitive conduct will continue to cause immediate

10 and irreparable injury, loss, or damage to Tevra.

11      **WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards

12      against each BAH defendant:

13      a.      A declaration that BAH has violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

14      b.      A permanent injunction against BAH and its agents, restraining them from using

15              any of the actions outlined in this Complaint to maintain their monopoly power;

16      c.      Damages in the amount of at least $76,058,900, for lost profits and lost value of

17              the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15 to a

18              total of at least $228,176,700;

19      d.      The costs of this action, including reasonable attorney fees; and

20      e.      Such other relief as the Court finds just and equitable.

21                         **COUNT IV**
22 **CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE, IN VIOLATION**
23                 **OF § 1 SHERMAN ACT, 15 U.S.C. §1**

24                         **Exclusive Dealing**

25      225.    Tevra incorporates all other allegations in this Complaint into Count IV.

26      226.    BAH entered into contracts, combinations, or conspiracies in unreasonable

27 restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

28      227.    BAH's illegal agreements included, but were not limited to, (a) exclusive dealing

                                    -49-

agreements with retailers and distributors that contain, among other things, a web of anti-competitive loyalty discounts, with the intent and effect of substantially foreclosing the relevant market and excluding Tevra and other competitors from entering the relevant market; (b) agreements or understandings between BAH and its customers through which BAH's customers agreed not to purchase generic Imidacloprid products like Tevra's; and (c) other agreements and understandings with retailers and distributors that operated to prevent Tevra and other competitors from entering the relevant market.

228.    Defendants' anti-competitive acts involved United States commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising prices for Imidacloprid topicals and excluding competitors from the relevant market in the United States.

229.    As a direct and proximate result of BAH's anti-competitive conduct, Tevra has been injured in its business or property and will continue to be injured in its business and property by being excluded from the relevant market as a result of BAH's conduct.

230.    If not enjoined, BAH's anticompetitive conduct will continue to cause immediate and irreparable injury, loss, or damage to Tevra.

**WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards against each BAH defendant:

a.    A declaration that BAH has violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.    A permanent injunction against BAH and its agents, restraining them from using the BAH's Exclusion Scheme to carry out any exclusive dealing scheme, as well as restraining them from entering into agreements that unreasonably restrain trade with retailers and distributors;

c.    Damages in the amount of at least $76,058,900, for lost profits and lost value of the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15 to a total of at least $228,176,700;

d.    The costs of this action, including reasonable attorney fees; and

e.    Such other relief as the Court finds just and equitable.

**COUNT V**
**CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE, IN VIOLATION**
**OF § 1 SHERMAN ACT, 15 U.S.C. §1**

**Tying**

231.    Tevra incorporates all other allegations in this Complaint into Count V.

232.    BAH entered into a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

233.    BAH's illegal agreements included, but were not limited to, (a) ▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and (b) other agreements and understandings with retailers and distributors that operated to prevent Tevra and other competitors from entering the relevant market.

234.    Defendants' anti-competitive acts involved United States commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising prices for Imidacloprid topicals and excluding competitors from the relevant market in the United States.

235.    As a direct and proximate result of BAH's anticompetitive conduct, Tevra has been injured in its business or property and will continue to be injured in its business and property by being excluded from the relevant market as a result of BAH's conduct.

236.    If not enjoined, BAH's anticompetitive conduct will continue to cause immediate and irreparable injury, loss, or damage to Tevra.

**WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards against each BAH defendant:

f.      A declaration that BAH has violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

g.      A permanent injunction against BAH and its agents, restraining them from using the BAH's Exclusion Scheme to carry out any tying scheme, as well as restraining them from entering into agreements that unreasonably restrain trade with retailers and distributors;

-51-

h.      Damages in the amount of at least $76,058,900, for lost profits and lost value of the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15 to a total of at least $228,176,700;

i.      The costs of this action, including reasonable attorney fees; and

j.      Such other relief as the Court finds just and equitable.

<u>COUNT VI</u>
<u>"NO GENERICS" CONSPIRACY IN VIOLATION</u>
<u>OF § 1 SHERMAN ACT, 15 U.S.C. §1</u>

237.    Tevra incorporates all other allegations in this Complaint into Count VI.

238.    BAH invited or coerced resellers of Imidacloprid topicals to join a hub-and-spoke horizontal conspiracy to prevent generic Imidacloprid topicals from competing with BAH's products, in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

239.    BAH told resellers of Imidacloprid topicals that it would offer all other competing retailers and distributors ███████████████████████████ in the market for Imidacloprid topicals.

240.    BAH intended that resellers of Imidacloprid topicals act with the knowledge that BAH was offering the same incentives, and imposing the same penalties, to all other competing retailers and distributors.

241.    BAH intended that resellers of Imidacloprid topicals would understand that  if it acted contrary to the conspiracy by selling generic Imidacloprid topicals, that other resellers of Imidacloprid topicals would respond by also selling generic Imidacloprid topicals, and profits for BAH, the retailers and distributors would decrease.

242.    As alleged above, several retailers told Tevra that they agreed with BAH to enforce a "no generics" policy and therefore refused to purchase or sell generic Imidacloprid topicals.

243.    BAH succeeded in convincing or coercing resellers of Imidacloprid topicals to join its conspiracy, and the conspiracy successfully prevented generic Imidacloprid topicals from competing with BAH's products.

-52-

244. Defendants' anti-competitive acts involved United States commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising prices for Imidacloprid topicals and excluding competitors from the relevant market in the United States.

245. As a direct and proximate result of BAH's anticompetitive conduct, Tevra has been injured in its business or property and will continue to be injured in its business and property by being excluded from the relevant market as a result of BAH's conduct.

246. If not enjoined, BAH's anticompetitive conduct will continue to cause immediate and irreparable injury, loss, or damage to Tevra.

**WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards against each BAH defendant:

a. A declaration that BAH has violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

b. A permanent injunction against BAH and its agents, restraining them from entering into agreements that unreasonably restrain trade with resellers of Imidacloprid topicals;

c. Damages in the amount of at least $76,058,900, for lost profits and lost value of the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15 to a total of at least $228,176,700;

d. The costs of this action, including reasonable attorney fees; and

Such other relief as the Court finds just and equitable

### JURY DEMAND

Tevra hereby demands a trial by jury on all issues so triable.

Dated:  February 10, 2020

Respectfully Submitted,

POLSINELLI LLP

*/s/ Daniel D. Owen*

By:   Daniel D. Owen

Attorneys for Plaintiff
TEVRA BRANDS, LLC

-53-