NITIN GAMBHIR (SBN 259906)
ngambhir@polsinelli.com
POLSINELLI LLP
1661 Page Mill Road, Suite A
Palo Alto, CA 94304
T:  650-461-7700
F:  650-461-7701

DANIEL D. OWEN (*Admitted Pro Hac Vice*)
dowen@polsinelli.com
G. GABRIEL ZOROGASTUA (*Admitted Pro Hac Vice*)
gzorogastua@polsinelli.com
POLSINELLI PC
900 w. 48TH Place, Ste. 900
Kansas City, MO 64112
T:  816-753-1000
F:  816-753-1536

Attorneys for Plaintiff
TEVRA BRANDS, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TEVRA BRANDS, LLC, | Case No. 3:19-cv-04312-BLF |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS OF THE SHERMAN ACT § 2 (MAINTENANCE OF A MONOPOLY), THE SHERMAN ACT § 1 (EXCLUSIVE DEALING)  AND THE CLAYTON ACT §3 (EXCLUSIVE DEALING)** |
| v. | |
| BAYER HEALTHCARE LLC, and BAYER ANIMAL HEALTH GmbH, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |
| | Judge:  Honorable Beth Labson Freeman |

**[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]**

## TABLE OF CONTENTS

**Page(s)**

NATURE OF ACTION ................................................................................1

PARTIES ...................................................................................................3

JURISDICTION AND VENUE .................................................................4

FACTS COMMON TO ALL COUNTS......................................................6

    A.    THE RELEVANT ANTITRUST MARKET...........................................6

        1.    The Product Market ...............................................6

            a.    Economic substitutes and cross-elasticity of demand.....................7

            b.    Single-product markets for pharmaceuticals and chemicals...........9

            c.    Defining relevant antitrust markets using the Hypothetical Monopolist Test ................................................9

            d.    Application of the Hypothetical Monopolist Test to Several of Bayer's  documents and datasets ................................13

                i.    Bayer documents showing significant price increases from between 2011 and 2016, including the PetCo dataset ................................14

                ii.    Bayer documents relating to generic price differentials ................................15

                iii.    Several Bayer documents contain data to support direct estimates of high cross-elasticity between Imidacloprid topicals but low cross-elasticity between Imidacloprid and Fipronil topicals ...................16

            e.    Examination of the Elanco/Bayer acquisition by U.S. FTC ..........17

            f.    Imidacloprid topicals are distinct from and non-interchangeable with Fipronil topicals...........................................19

            g.    Topical flea and tick medications and delivery systems.............222

        2.    The Geographic Market ..........................................244

    B.    FIPRONIL GENERICS LOWERED PRICES OF FIPRONIL FLEA AND TICK MEDICATIONS........................................................244

    C.    BAYER HAS SUBSTANTIALLY FORECLOSED IMIDACLOPRID TOPICAL GENERICS FROM THE RELEVANT MARKET. .......................255

        1.    Imidacloprid products, including Advantix ............................255

-i-

2.   Registration of insecticides with EPA and "exclusive use".....................266

D.   TEVRA'S ATTEMPTS TO ENTER THE MARKET FOR
IMIDACLOPRID TOPICALS .............................................................277

1.   Tevra's successful entry into the separate Fipronil topical market..........288

2.   Tevra was foreclosed from entering the Imidacloprid topical
market ........................................................................................28

E.   BAYER'S MONOPOLIZATION AND EXCLUSIVE DEALING
FORECLOSED ENTRY INTO THE MARKET FOR IMIDACLOPRID
TOPICALS ..........................................................................................299

1.   Bayer's "second brand strategy" to block generic entry............................30

2.   Bayer's "no generics" conspiracy with retailers.....................................311

3.   Bayer's direct payments to remove generic competition........................388

4.   Bayer changed its Purchase Agreements to block generic entry .............399

5.   Bayer succeeded in maintaining its monopoly and foreclosing
competition through exclusive dealing ........................................44

F.   BAH GMBH ACTIVELY PARTICIPATED IN MONOPOLY
MAINTENANCE AND EXCLUSIVE DEALING IN THE U.S. .......................46

G.   BAYER POSSESSES MONOPOLY POWER IN THE RELEVANT
MARKET...............................................................................................49

H.   ANTICOMPETITIVE EFFECTS OF BAYER'S CONDUCT. ............................50

I.   LACK OF PRO-COMPETITIVE JUSTIFICATION FOR BAYER'S
ACTIONS ...............................................................................................511

J.   ANTITRUST INJURY ...............................................................................511

K.   TEVRA HAS ATTEMPTED TO MITIGATE ITS DAMAGES,
WITHOUT SUCCESS...............................................................................522

L.   TEVRA HAS BEEN DAMAGED BY BAYER'S ANTI-COMPETITIVE
CONDUCT. ...............................................................................................522

JURY DEMAND ...................................................................................................57

-ii-

Plaintiff Tevra Brands, LLC ("Tevra"), by its undersigned counsel, complains against Defendants Bayer Healthcare LLC ("BHC LLC"), and Bayer Animal Health GmbH ("BAH GmbH") for violations of the Sherman Act §§ 1 and 2 (maintenance of a monopoly and exclusive dealing) and the Clayton Act § 3 (exclusive dealing). BAH GmbH and BHC LLC will be referred to collectively as "Bayer," unless the context requires differentiating the two companies.

Plaintiff has significantly reduced its claims from those alleged in the First Amended Complaint.  First, this Second Amended Complaint uses a much broader definition of the relevant market that includes **all** sales of Imidicloprid topicals in the U.S., and reduces the percentage of sales from which the plaintiff was foreclosed to 56%, based on this updated market definition.  Second, this Second Amended Complaint does not include claims against Bayer AG, nor does it include claims for Sherman Act and Clayton act violations arising from tying or a hub-and-spoke conspiracy.

## NATURE OF ACTION

1.      Plaintiff Tevra Brands, LLC ("Tevra") competes with Defendants BHC LLC and BAH GmbH (collectively "Bayer") by producing more effective generic alternatives to Bayer's Advantage and Advantix products, which it offers for sale at much lower prices.  As set forth below, Bayer's illegal maintenance of monopoly and illegal exclusive dealing have substantially foreclosed competition from Tevra and other generic manufacturers, excluding Tevra from a substantial share of the relevant market, resulting in higher prices and fewer choices for buyers in the relevant market.

2.      Tevra was, and continues to be, damaged by a reduction in competition caused by Bayer's violations of the Sherman Act and the Clayton Act, including Bayer's monopolization and illegal exclusive dealing in the sale of "squeeze-on" Imidacloprid topical flea and tick treatments for dogs and cats ("Imidacloprid topicals"), which are purchased by retailers, distributors, veterinarians, and consumers throughout the United States.  Bayer's brands of Imidacloprid topical include Advantage and Advantix, which have been sold with various brand names in the U.S. for approximately 20 years.

-1-

3.     Tevra makes generic Imidacloprid topicals that are lower priced and more effective than the name brand Advantage and Advantix flea and tick treatments made by Bayer. For example, in 2017, Bayer sold 6-dose Advantix II to Chewy.com for ██████ per unit, before applying discounts and rebates.  After applying the discounts and rebates of ███████ under the agreement between Bayer and Chewy.com, the buyer still paid approximately ████ per unit in 2017.  That same year, Tevra offered to sell a 6-dose generic of Advantix II to Chewy.com for ██████ which is approximately ████ less expensive than Bayer's brand-name product, and approximately ████ less expensive after applying all of Bayer's discounts and rebates.  Despite the fact that Tevra's generic Imidacloprid topicals are significantly less expensive and more effective than Bayer's Imidacloprid topicals, Chewy.com and other retailers did not purchase Tevra's generic Imidacloprid topicals.  This is due to Bayer's anti-competitive conduct, through which Bayer has maintained its monopoly in the market for Imidacloprid topicals, substantially foreclosed generics like Tevra's from the market, and ensured that both retailers and consumers pay supra-competitive prices.

4.     Bayer made approximately 85% of all sales in the relevant market during 2018 and received patent license royalties for most of the other 15%.  To maintain its monopoly, and to stop Tevra and other makers of generic flea and tick treatments from competing against its Advantage and Advantix brands, Bayer carried out four different strategies to block generic competition:

a.     As described in Section E.1, below, a "2nd Brand Strategy" led by BAH GmbH, that included packaging a Bayer product to appear that it was generic, and using it to fill shelf space that would otherwise have been available for generic competitors,

b.     As described in Section E.2, a verbal "no generics" agreement with retailers, under which retailers would agree not to sell generic competitors to Bayer's product, in exchange for monetary compensation,

c.     As described in Section E.3, direct payments to a retailer to have a generic competitor removed from its shelves, and

SECOND AMENDED COMPLAINT
CASE NO. 3:19-cv-04312-BLF

1

       d.     As described in Section E.4, changes to its contracts with retailers to

2

                punish those who carried generic competitors to Bayer's products, and

3

                reward those who did not with discounts, growth bonuses, and trade funds.

4

     5.     As a result of Bayer's conduct, generic Imidacloprid topical manufacturers,

5

including Tevra, were, and continue to be, substantially foreclosed from entering the market for

6

Imidacloprid topicals in competition with Bayer's name-brand products Advantage and

7

Advantix. The exclusion of generic Imidacloprid topicals from the market has resulted in

8

substantially less competition, higher prices, and fewer product choices for retailers, distributors,

9

and consumers.

10

## PARTIES

11

     6.     Plaintiff Tevra is a Nebraska limited liability company, with its headquarters in

12

Omaha, Nebraska.  Tevra was founded in 2015 by a group of six veterans of the pet products

13

industry.  Prior to founding Tevra, they had acquired a tremendous depth and breadth of

14

experience with flea and tick treatments, having worked at Sergeant's Pet Care Products, Perrigo,

15

Bayer Animal Health, and other leading companies in the industry.

16

     7.     Defendant Bayer HealthCare LLC ("BHC LLC") is a limited liability company

17

organized and existing under the laws of the State of Delaware, with its principal place of

18

business at 100 Bayer Blvd., Whippany, NJ 07981.  BHC LLC is a wholly owned subsidiary of

19

Bayer AG. Bayer Animal Health was a division of BHC LLC with its principal place of business

20

at 12809 Shawnee Mission Parkway, Shawnee, Kansas.  The business of BHC LLC relevant to

21

this action was operated by its division Bayer Animal Health.  This division should not be

22

confused with Defendant Bayer Animal Health GmbH, described below.  In 2020, Bayer AG

23

completed the sale of it animal health assets, including the Bayer Animal Health division of BHC

24

LLC, to Elanco Animal Health, Inc.

25

     8.     Defendant Bayer Animal Health GmbH ("BAH GmbH") is a corporation

26

organized and existing under the laws of Germany, with a place of business at Kaiser-Wilhelm-

27

Allee 50, 51373 Leverkusen, Germany.  BAH GmbH is a wholly owned subsidiary of Bayer AG.

28

Defendant BAH GmbH should not be confused with the Bayer Animal Health division of

-3-

1 | Defendant BHC LLC, described above.

2 | 9. BAH GmbH and BHC LLC are affiliated companies under common control. BHC

3 | LLC licenses a patent described in this Complaint from BAH GmbH, and these two companies,

4 | under the common control of Bayer AG, are jointly engaged in research, development and

5 | marketing of the Bayer products described in this complaint. BAH GmbH and BHC LLC will

6 | be referred to collectively as "Bayer," unless the context requires differentiating the two

7 | companies.

8 | **JURISDICTION AND VENUE**

9 | 10. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a),

10 | because this action arises under Sections 3, 4 and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15 and

11 | 26, as well as Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

12 | 11. This Court has personal jurisdiction over each of the defendants, pursuant to

13 | Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants may be found and transact

14 | business in the State of California. This Court also has personal jurisdiction over each defendant

15 | because, inter alia, each defendant: (a) transacted business throughout the United States,

16 | including in California; (b) researched, developed, sold, shipped, and/or delivered substantial

17 | quantities of Imidacloprid topicals throughout the United States, including in California; (c) had

18 | substantial contacts with the United States, including in California; (d) engaged in

19 | anticompetitive agreements with companies in the United States, including in California, that

20 | were directed and had the direct, foreseeable, and intended effect of causing injury to the

21 | business or property of companies and consumers residing in, located in, or doing business

22 | throughout California and the United States; (e) engaged in the anticompetitive conduct

23 | described in below that had the direct, foreseeable, and intended effect of causing injury to the

24 | business or property of companies and consumers residing in, located in, or doing business

25 | throughout California and the United States;  and (f) sold and/or directed their sale of

26 | Imidacloprid products to retailers throughout the United States, including in California.

27 | 12. This Court also has personal jurisdiction over BHC LLC and BAH GmbH

28 | because BHC LLC and BAH GmbH intended and knew, or should have known, that their

-4-

anticompetitive conduct and anticompetitive agreements outlined in this Second Amended Complaint with nationwide retailers would have the effect of preventing manufacturers of generic Imidacloprid topicals from competing with BHC LLC and BAH GmbH and of increasing prices for both retailers and consumers.  BHC LLC and BAH GmbH knew, or should have known, that their anticompetitive agreements and anticompetitive conduct had an impact in California, and throughout the United States.

13.     BAH GmbH was not a passive observer in the anticompetitive conduct described in this Second Amended Complaint, but was an active participant that purposefully directed its illegal activities at the U.S.  Examples of its active participation, more fully described in Section F below, include:

(a)     Creating and conducting a global generic defense strategy including anti-generic pricing, second brands, and other measures designed to block generic entry, and executing this strategy in the U.S.

(b)     Creating and conducting the second brands strategy in the U.S. including the placement of the Bayer's Defense Care decoy generic at PetSmart.

(c)     Continuously monitoring and modeling potential generic entry in many countries, including the U.S., so that various tactics could be used to block generic entry. This was done through a series of working groups that included BAH GmbH executives, including the Strategic Leadership Team, the Global Brand Team, and the Key Country Panel, all of which also included U.S. employees.  It was also accomplished through the yearly "Straco," or "strategic consensus" process that was directed and controlled by BAH GmbH, and included detailed reports on the timing and effect of generic entry, and strategies for counteracting it.

14.     Venue is proper in this District because each of the defendants transacts business in this District and may be found in this District, as defined by 15 U.S.C. § 22.   Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant BHC LLC maintains a facility in which it transacts business at 455 Mission Bay Blvd. South in San Francisco, California, and claims to be third largest biotech employer in the Bay Area.

Defendant Bayer Health Care LLC also resides in this District, as it is subject to the Court's personal jurisdiction with respect to this action for the reasons stated in this Second Amended Complaint.

**FACTS COMMON TO ALL COUNTS**

**A.     The Relevant Antitrust Market**

15.     As explained in detail below, in Sections A.1.a through A.2, the relevant antitrust market for analyzing the illegal acts committed by BHC LLC and BAH GmbH is: topical flea and tick products for dogs and cats containing Imidacloprid sold in the U.S.  This relevant antitrust market can be clearly defined by reference to several of Bayer's own documents and data, and a straightforward application of the Hypothetical Monopolist Test as used by U.S. antitrust enforcement authorities.

16.     The term "market" has many meanings in many different contexts, other than antitrust analysis.  In business, politics, journalism, and many other contexts the term "market" is often used in a very broad sense to encompass many loosely related products.  Antitrust analysis requires a more precise term and economic definition that is used in answering the core questions of antitrust matters:  (1) is the price of a particular product at a competitive level, (2) what products are strong economic substitutes for each other, and (3) has a seller created a monopoly and/or injured competition in a particular product.

17.     The U.S. antitrust enforcement authorities, the Department of Justice and the Federal Trade Commission, routinely use the term "relevant antitrust market" to describe the market for a product and its economic substitutes, for the purpose of antitrust analysis.  This Second Amended Complaint will use the DOJ/FTC terminology, which is also widely used in the legal and economic literature on antitrust subjects.

**1.     The Product Market**

18.     The relevant product market in this case is topical flea and tick products for dogs and cats containing Imidacloprid (including Bayer's name-brand Advantage and Advantix products, and Tevra's generic equivalents of those products). For the reasons explained below, the relevant product market does not include topical products containing other active ingredients

-6-

1   such as Fipronil (for example, Frontline and its generic equivalents), or non-topical products like

2   flea collars, oral medications, or shampoos.  The limits of the relevant product market are

3   described below in terms of cross-elasticity of demand (Section A.1.a), the Hypothetical

4   Monopolist Test (Section A.1.c-A.1.d), and interchangeability (Section A.1.e-A.1.g).

5              **a.**      **Economic substitutes and cross-elasticity of demand**

6        19.     Different products may have similar intended purposes, but whether they are in

7   the same or different relevant antitrust markets depends on: (a) their similarity of characteristics

8   and (b) whether, as an economic matter, buyers actually switch between them based on price.

9   Aspirin and ibuprofen both relieve pain but they are not in the same relevant antitrust market,

10   because buyers do not switch between them based on price.  Aspirin is much cheaper than

11   ibuprofen, but many buyers nonetheless purchase ibuprofen (they do not substitute do to price),

12   because ibuprofen is a different product with different characteristics.  In fact, many buyers

13   would likely reject aspirin even if the price of aspirin declined or the price of ibuprofen

14   increased, because they want the more desirable characteristics of ibuprofen and do not view

15   aspirin as interchangeable.

16        20.     Different products may be said to "compete" in the general sense (because they

17   have the same intended purpose), but the colloquial use of the term "compete" does not mean

18   that they are in the same relevant antitrust market and does not preclude the possibility that one

19   of the "competing" products has been monopolized.  It is common for pharmaceuticals and

20   chemicals to be monopolized (often legally by patent protection), even though there are other

21   products that have a similar intended purpose.

22        21.     All products have a chain of substitutes, but not every product has "economic

23   substitutes" that are relevant for antitrust analysis.  At one end of the chain of substitutes for a

24   particular product are "strong" substitutes.  One example is the substitution of beet sugar for cane

25   sugar.  In their processed form, they are nearly identical, and buyers treat them as

26   interchangeable.  Further down the chain are "weaker" substitutes, such as honey for cane sugar.

27   They are similar, but not identical, in characteristics, and fewer buyer treat them as

28   interchangeable.  Ultimately, there may be very weak substitutes for a particular product, such as

saccharin for cane sugar, with significantly different characteristics and little or no interchangeability in the eyes of buyers.

22.     As a matter of economic theory, at competitive prices, buyers will only consider "strong" substitutes for a product they wish to purchase.  At competitive prices, buyers would have no reason to consider "weak" substitutes for the product they desire, and would not accept the inferior characteristics of those weak substitutes.  For example, buyers have no reason to consider medicines with less-desirable active ingredients if the generic equivalent of their favored medicine (with the same active ingredient) is readily available at a competitive price.

23.     The economic concept of price elasticity provides a method of separating strong substitutes from weak substitutes for a given product.  Price elasticity measures the number of buyers that would switch from Product A to Product B, in response to a change in the price of Product A.  Strong substitutes for a given product have a "high elasticity of demand" with respect to that product.  Even a small price increase in Product A would cause buyers to switch to the strong substitute Product B.  Conversely, weak substitutes for a given product exhibit a "low elasticity of demand" with respect to that product.  A small increase in the price of Product A would not result in switching to the weak substitute, Product B, since buyers would want to avoid the inferior characteristics of that substitute.

24.     As a matter of economic theory, unrestrained competition by strong substitutes keeps prices at a competitive level.  That is, if Product A and Product B are strong substitutes, competition from Product A helps maintain competitive prices for Product B, and vice versa.  If strong substitutes are unrestrained and competitively available, no opportunity to monopolize the market will arise.

25.     If strong substitutes are not available (or otherwise constrained), a monopolist is able to increase prices above competitive levels, as buyers are forced into two inferior choices: (1) consider weaker and weaker substitutes, or (2) pay inflated prices.  For example, if the manufacture of ibuprofen was monopolized and the average price rose from $5 per bottle to $20 per bottle, buyers would be faced with the inferior choice of: (1) switch to aspirin, or (2) pay inflated prices. If a monopoly in the manufacture of automobiles raised the average price of a car

to \$75,000, buyers would be faced with the inferior choice of: (1) learn to ride motorcycles, or (2) pay inflated prices.

**b.    Single-product markets for pharmaceuticals and chemicals**

26.    Many pharmaceuticals and chemicals are sold in single product markets, because the price of those products is not constrained by other pharmaceuticals and chemicals that can be used for the same purpose but are weak substitutes.  This is not surprising, since new chemicals and pharmaceuticals are typically invented, patented, and sold as improvements over the existing pharmaceuticals and chemicals already available to buyers.  Branded products and their generics typically have high cross elasticity of demand with one another, so markets with generics typically include the original branded product and its generic equivalents.  However, absent evidence of high cross-elasticity of demand with other products, the branded product and its generic equivalents are part of a single-product market that does not include other products. Single product markets for chemicals and pharmaceuticals are common, and have often been recognized by courts.

27.    One example of such a single-product market is the market for drugs containing memantine hydrochloride ("memantine") for the treatment of Alzheimer's disease.  The Food and Drug Administration has approved acetylcholinesterase inhibitors ("CIs") and Namenda, a drug containing memantine.  However, Namenda and generics containing memantine are in a single product market that does not include CIs.

**c.    Defining relevant antitrust markets using the Hypothetical Monopolist Test**

28.    One widely-recognized economic tool for determining the limits of a relevant antitrust market (and identifying the products in that market) is the Hypothetical Monopolist Test ("HMT").  This test is commonly used by DOJ and FTC to determine whether certain products are, or are not, included in a relevant antitrust market.

29.    As set forth below, a straightforward application of the HMT, using several Bayer documents and Bayer's own calculations, shows that Fipronil topicals (including Frontline and its generics) and non-topical flea and tick treatments are NOT in the same relevant antitrust

-9-

1    market as Imidacloprid topicals (including Advantage, Advantix and their generics).

2         30.    The HMT is used to determine whether a particular product is part of a relevant

3    antitrust market by considering that product as a possible substitute and answering the following

4    question:  Could a hypothetical monopolist raise the price of Product A by a Small, but

5    Significant Non-Transitory Increase in Price ("SSNIP"), without decreasing its profits because of

6    price-induced switching to Product B?

7         31.    If a SSNIP would be profitable to a hypothetical monopolist in Product A, then

8    the possible substitute Product B is a weak substitute that should be excluded from the relevant

9    antitrust market.  Conversely, if switching to Product B renders a SSNIP unprofitable from the

10   hypothetical monopolist producing Product A, then Product B is a strong substitute and should

11   be included in the relevant antitrust market with Product A.

12        32.    The HMT is an iterative process that tests the cross-elasticity (substitutability) of

13   one product after another, and continues until the outer limits of the relevant antitrust market

14   have been defined.  If Product B is determined to be in the same relevant antitrust market as

15   Product A (because it renders a SSNIP unprofitable for the hypothetical monopolist in Product

16   A) then the next iteration of the HMT tests the next strongest substitute – Product C.  If

17   switching to Product C renders a SSNIP unprofitable from the hypothetical monopolist

18   producing Product A, then Product C is a strong substitute and should be included in the relevant

19   antitrust market with Product A.  The process continues until a weak substitute if found that does

20   not render a SSNIP unprofitable for the hypothetical monopolist.  At that point, the weak

21   substitute, and all other weaker substitutes, are excluded from the relevant antitrust market.

22   Below is a graphic representation of this analysis:

23   / /

24   / /

25   / /

26   / /

27   / /

28   / /



**Diagram 1 - Hypothetical Monopolist Test and possible substitutes.**

33.     To apply the HMT to decide which products are in the same antitrust relevant product market as Bayer's brand-name Imidacloprid topicals, economists and antitrust enforcement agencies begin by identifying the product that is the closest substitute for Bayer's brand-name Imidacloprid topicals.  The *Horizontal Merger Guidelines* (§ 4.1.3) state that this product should be identified based on evidence of "how customers have shifted purchases in the past in response to relative changes in price or other terms and conditions."  Bayer has identified that product:  it is generic Imidacloprid topicals.  Bayer knows this because when brand-name and generic Imidacloprid topicals are sold in the same store, more customers switch from Bayer's brand-name Imidacloprid topicals to generic Imidacloprid topicals than to any other product.

34.     The agencies would then apply the HMT to a candidate market that includes only branded and generic Imidacloprid topicals.  In that market, a hypothetical monopolist who controlled both the branded and generic products could profitably raise price by a SSNIP.  Bayer knows this because it did profitably increase price when it controlled both the branded and the authorized generic Imidacloprid topicals.  That price increase was not rendered unprofitable by customers switching to any other product.  Therefore, the HMT and the real-world data support the conclusion that no other product is in the antitrust relevant product market.

-11-

1    35.    The Merger Guidelines (§ 4.4.1) state that the agencies will choose "the smallest

2 relevant market satisfying the hypothetical monopolist test."  Therefore, a market that satisfies

3 the HMT is an antitrust relevant product market even if some weaker substitutes exist outside the

4 market.  As the Merger Guidelines (§ 4.4.1) explain:

5          "Groups of products may satisfy the hypothetical monopolist test
          without including the full range of substitutes from which
6          customers choose. The hypothetical monopolist test may identify a
          group of products as a relevant market even if customers would
7          substitute significantly to products outside that group in response
          to a price increase.
8
          Example 5: Products A and B are being tested as a candidate
9          market. Each sells for $100, has an incremental cost of $60, and
          sells 1200 units. For every dollar increase in the price of Product
10          A, for any given price of Product B, Product A loses twenty units
          of sales to products outside the candidate market and ten units of
11          sales to Product B, and likewise for Product B. Under these
          conditions, economic analysis shows that a hypothetical profit-
12          maximizing monopolist controlling Products A and B would raise
          both of their prices by ten percent, to $110. Therefore, Products A
13          and B satisfy the hypothetical monopolist test using a five percent
          SSNIP, and indeed for any SSNIP size up to ten percent. This is
14          true even though two-thirds of the sales lost by one product when it
          raises its price are diverted to products outside the relevant market"
15

16

17    36.    Bayer has identified other, weaker substitutes for its Imidacloprid topicals, and

18 monitors the extent to which consumers switch from Imidacloprid topicals to those other

19 products in response to changes in price.  The products that Bayer tracks most closely are

20 Fipronil topicals such as Frontline, and non-topical Imidacloprid products such as Seresto flea

21 collars and Advantus soft chews.  Bayer's studies show that these weaker substitutes do not

22 constrain Bayer's ability to raise the price of its Imidacloprid topicals above the competitive

23 level.  This confirms that these products are not in the antitrust relevant product market under the

24 HMT.

25    37.    Other flea and tick medications exist, such as sprays, shampoos, and drugs

26 available only by prescription.  All of those products are weaker substitutes than any of the

27 products discussed above, and are also excluded from the market by the HMT.  Below is a

28 graphic representation of the relevant antitrust market for Imidacloprid topicals.  Because the

-12-

closest substitute, Fipronil topicals, did not constrain Bayer's repeated and significant price increases between 2011 and 2016, they are not included in the relevant antitrust market and neither are more distant substitutes such as oral, collars and shampoos:



**Diagram 2 - Application of the HMT to the Relevant Antitrust Market for Imidacloprid Topicals**

38.     Thus, to apply the HMT in the present case, one should begin with Bayer's Imidacloprid topicals as Product A, and test whether Product B – Fipronil topicals, renders a SSNIP unprofitable for Bayer.  If a SSNIP is profitable for Bayer, then the limits of the relevant antitrust market have been found and Fipronil topicals should be excluded from the market definition.

   **d.**  **Application of the Hypothetical Monopolist Test to Several of Bayer's documents and datasets**

39.     Bayer documents discussed in this Section A.1.d demonstrate that Bayer repeatedly raised its prices until they reached monopoly levels, and these price increases were not constrained by Fipronil products or non-topical flea and tick treatments – because they are not in the same relevant antitrust market.  In other words, Bayer has repeatedly carried out the SSNIP test in the real world, thereby demonstrating that its Imidacloprid topicals are monopoly

-13-

1   products (in a single-product market), being sold at monopoly prices, and making monopoly

2   profits for Bayer.

3           i.      **Bayer documents showing significant price increases from
                    between 2011 and 2016, including the PetCo dataset**
4

5           40.     The first set of Bayer documents that show its price increases were unrestrained

6   by the presence of Fipronil products and non-topical flea and tick treatments are five years of

7   weekly sales reports for Bayer products at Petco.  These reports show price increases between

8   ██ and ██ over the five year period between 2011 and 2016, making them both significant and

9   non-transitory within the meaning of SSNIP.  Other publicly available price data confirms that

10  the price of Bayer's Imidacloprid topicals increased repeatedly and significantly during these

11  years.

12          41.     These price increases were profitable for Bayer and did NOT induce enough

13  switching to either Frontline, generic Fipronil topicals, or non-topical flea and tick treatments to

14  make them unprofitable.  This shows that the cross-elasticity of demand between Bayer's

15  Imidacloprid topicals and Fipronil topicals is low, and that they are not in the same relevant

16  antitrust market.  The same is true for non-topical flea and tick treatments, which were also weak

17  substitutes, with low cross-elasticity, that did not constrain Bayer's price increases.  Indeed, at a

18  March 2017 Strategic Leadership Team meeting in Neuss, Germany (led by BAH GmbH)

19  featured a presentation containing Bayer's own analysis, showing ████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████  This shows that there was no significant switching to

22  Frontline, or to any other flea and tick treatments, in response to Bayer's price increases.  This

23  means that, under the HMT, neither Frontline, nor any of the other flea and tick treatments, are in

24  the same relevant antitrust market.

25          42.     Bayer ████████████████████████████████████████

26  ████████████████████████████████████  To the contrary, by

27  2016, Bayer was charging monopoly prices and reaping monopoly profits.  Indeed, certain Bayer

28  documents show that its gross profits on Advantix were over ███ (meaning that its cost of goods

-14-

1    sold was under ▮), and it net profits on Advantix (after all expenses), were ▮ and rising.

2         43.    Bayer's price increases between 2011 and 2016 clearly demonstrate that Fipronil

3    topicals and non-topical flea and tick treatments are not strong substitutes for Imidacloprid

4    topicals.  During that time period, generic Fipronil topicals from three different manufacturers

5    entered the market: (1) Pet Care Products, Inc. in 2011, (2) Horizon Valley Generics, Inc. in

6    2013, and (3) Hartz Mountain Corporation in 2014.  None of these generic Fipronil topicals

7    forced Bayer to cut, or even stabilize, the prices of its Imidacloprid topicals.  To the contrary,

8    Bayer was able to repeatedly raise the prices of its Imidacloprid topicals by more than a SSNIP.

9         44.    The 2011 to 2016 data collected by Bayer proves that Fipronil topicals and

10   Imidacloprid topicals are not strong substitutes for one another and are not in the same relevant

11   antitrust market.  The same is true for non-topical flea and tick treatments, which were also weak

12   substitutes, with low cross-elasticity, that did not constrain Bayer's price increases.

13                   **ii.    Bayer documents relating to generic price differentials**

14        45.    A second set of Bayer documents also prove that the HMT is satisfied with

15   respect to Bayer's Imidacloprid topicals and that they, and their generic equivalents, comprise a

16   relevant antitrust market, with no other strong substitutes.  As of 2016, K9 Advantix was ▮

17   more expensive per monthly dose than the Fipronil-based Frontline.  Bayer's own document

18   stated that K-9 Advantix sold for ▮ per dose, whereas Frontline sold for ▮ per dose.

19        46.    This extraordinary ▮ price differential shows that Frontline and generic

20   Fipronil topicals were not price constraints on Bayer's Imidacloprid topicals, and is also direct

21   evidence that Bayer was a monopolist, charging monopoly prices and reaping monopoly profits.

22        47.    In single-product pharmaceutical markets, it is common for the branded product

23   initially to sell at a higher price than the generics, until competition from generics erodes that

24   price difference. One of Bayer's own documents shows that Bayer's Imidacloprid topicals were

25   selling at a substantial price premium above the first generic Imidacloprid topicals that entered

26   the market.  As one Bayer executive complained:  ▮▮▮▮▮▮▮▮▮▮▮▮

27   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

-15-

48.     Thus, Bayer's price premium over generic Imidacloprid topicals far exceeded Frontline's price premium over generic Fipronil topicals.  Frontline lost more than half of the market for Fipronil topicals to generic competition, but Bayer lost virtually none of the market for Imidacloprid topicals to generic competition.  The difference in outcomes is the direct result of Bayer's illegal maintenance of its monopoly and illegal exclusive dealing, which the makers of Frontline apparently did not engage in.

49.     The enormous price premium that Bayer Imidacloprid topicals were able to maintain over generic Imidacloprid topicals, which was much larger than the price premium that Frontline was able to maintain over generic Fipronil topicals, is further direct evidence that Imidacloprid topicals and Fipronil topicals are not strong substitutes for each other, and that they are in separate relevant antitrust markets.  If they were close substitutes and in the same relevant antitrust market, the presence of multiple generic Fipronil topicals would put tremendous downward pressure on the price of Bayer's Imidacloprid topicals.  However, as shown by Bayer's own documents discussed below, this did not occur.

50.     The enormous premium commanded by Bayer's Imidacloprid topicals over generic Imidacloprid topicals is also strong evidence that Bayer successfully blocked generic competition by the multi-faceted strategy set forth in Sections C, E, and F, below.  This differential also shows that Bayer was operating as a monopolist, charging monopoly prices and reaping monopoly profits.

          **iii.     Several Bayer documents contain data to support direct estimates of high cross-elasticity between Imidacloprid topicals but low cross-elasticity between Imidacloprid and Fipronil topicals**

51.     Bayer's own documents discussed in this Section reflect estimates of the cross-elasticity between various flea and tick products.  These documents consistently show a high cross-elasticity between different Imidacloprid topicals (e.g., between Bayer's Advantix and Tevra's Activate II) and a low cross-elasticity between Imidacloprid topicals and Fipronil topicals (e.g., between Bayer's Advantage II and Frontline Plus).  The high cross-elasticity (i.e., strong substitution) between Imidacloprid topicals explains why generic Imidacloprid topicals (if

-16-

unrestrained) can significantly constrain the price of Bayer's name brand Imidacloprid topicals. The low cross-elasticity (i.e., weak substitution) between Imidacloprid topicals and Fipronil topicals explains why Fipronil topicals such as Frontline have not been effective constraints on the price of Bayer's Imidacloprid topicals.  The facts, once again, prove the HMT is satisfied for the relevant antitrust market of only Imidacloprid topicals.  Other products, such as Fipronil topicals, are weak substitutes, cannot prevent a SSNIP, and should, thus, be excluded from the relevant antitrust market.

52.     Two different documents by Bayer state ███████████████████████ ██████████████████████  and ████████████████████████████████ ████████████████████  Both imply that the cross-elasticity between Imidacloprid topicals is very high and the cross-elasticity between Imidacloprid and Fipronil topicals is nearly zero. Thus, the cross-elasticity between Imidacloprid topicals is many times (possibly hundreds or thousands of times) greater than the cross-elasticity between Imidacloprid and Fipronil topicals.

53.     Another real-world example of Bayer's Imidacloprid topicals satisfying the HMT can be found in Bayer's data regarding sales at 458 Pet Supplies Plus stores between 2018 and 2019.  These stores sold Frontline Fipronil topicals, generic Fipronil topicals, Bayer Imidacloprid topicals, and a small quantity of generic Imidacloprid topicals, which were subject to Bayer's ████████████  contractual restraints, described in Section E.4, below.  This data supports the conclusion that there is high cross-elasticity between Bayer's Imidacloprid topicals and generic Imidacloprid topicals, but low cross-elasticity between Bayer's Imidacloprid topicals and Fipronil topicals.

54.     Thus, Imidacloprid topicals and Fipronil topicals have low cross elasticities of demand and are not in the same relevant antitrust market.

**e.     Examination of the Elanco/Bayer acquisition by U.S. FTC**

55.     An investigation by the U.S. Federal Trade Commission suggests that the FTC does NOT consider Fipronil topicals and Imidacloprid topicals to be interchangeable or in the same relevant antitrust market.  Since the filing of the First Amended Complaint in this case, Bayer sold its animal health business to Elanco, in a transaction that was reviewed and

-17-

1   challenged as a violation of Section 7 of the Clayton Act by the antitrust regulators at the U.S.

2   Federal Trade Commission.  Further evidence that Imidacloprid topicals and Fipronil topicals

3   have a low cross- elasticity of demand and are not in the same relevant antitrust market can be

4   found in FTC's treatment of the Elanco/Bayer acquisition that was completed in 2020.

5       56.     In the FTC's investigation of the proposed acquisition, Bayer and Elanco were

6   required to make detailed disclosures about the animal medications manufactured by each

7   company, including Bayer's Imidacloprid topicals (Advantage and Advantix) and Elanco's

8   Fipronil topical (Parastar).

9       57.     FTC carefully examined each company's portfolio of animal medications, looking

10  for any "overlaps" of products which might result in Elanco having market power or a monopoly

11  in a particular product after the acquisition was completed.  To identify and evaluate "overlaps"

12  which might have anti-competitive effects, FTC typically uses the Hypothetical Monopolist Test,

13  as described in its *Merger Guidelines*.

14      58.     During its review of the Elanco/Bayer acquisition, the FTC identified three

15  overlapping products in which Elanco might obtain market power or monopoly after the

16  acquisition was complete: (1) low-dose prescription treatments for canine otitis externa, (2) fast-

17  acting oral treatments that kill adult fleas on canines, and (3) cattle pour-on insecticides.

18      59.     The FTC narrowly defined the market for canine otitis externa treatments,

19  rejecting "numerous" proposed substitutes, and placing particular emphasis on both the

20  therapeutic action and the method of administration, as follows:

21          Numerous prescription products treat canine otitis externa, but
            only the parties' products—Elanco's Osurnia and Bayer's Claro—
22          require only one or two doses to treat the condition. … other
            products require numerous applications to the ear canal, up to
23          twice daily for 14 consecutive days, and are thus not reasonable
            substitutes for the parties' products, which are considerably more
24          convenient to use.

25

26  Federal Trade Commission, Analysis of Agreement Containing Consent Orders to

27  Aid Public Comment, *In the Matter of Elanco Animal Health, Inc., and Bayer*

28  *Animal Health, GmbH*, File No. 1910198.

-18-

60.     The FTC also narrowly defined the market for fast-acting oral flea and tick treatments, again rejecting "numerous" proposed substitutes and again placing particular emphasis on both the therapeutic action and the method of administration, as follows:

> While there are numerous products that kill and prevent fleas on dogs, most are slower acting or preventative, targeting flea larvae. In contrast, Elanco's Capstar and Bayer's Advantus start killing adult fleas quickly (within 30 minutes for Capstar, and within 60 minutes for Advantus), and eliminate all adult fleas within four hours. Medicated shampoos and sprays that can be used to kill adult fleas are much less convenient to administer and are slower-acting.

*Id.*

61.     In each case where an overlap was identified, FTC required Bayer and/or Elanco to divest one or more products, to settle the FTC's antitrust challenge to the transaction.

62.     Significantly, FTC did not identify an overlap between Bayer's Imidacloprid topicals and Elanco's Fipronil topicals, and did not order divestiture of either of these products. This is not surprising, since Imidacloprid topicals have different active ingredients and significantly different therapeutic actions.  This is also further evidence that Imidacloprid topicals and Fipronil topicals are not in the same relevant antitrust market.

> **f.     Imidacloprid topicals are distinct from and non-interchangeable with Fipronil topicals.**

63.     The active ingredients in flea and tick treatments are insecticides that kill and/or repel fleas and ticks.  Some of these insecticides are common agricultural insecticides that are manufactured in enormous quantities and used worldwide.  Two common insecticides used for flea and tick protection are Fipronil (which is the active ingredient in the topical treatment Frontline, and generics that compete with Frontline), and Imidacloprid (which is the active ingredient in Bayer's Advantage and Advantix, and generics that compete with those products).

64.     Because common agricultural insecticides like Fipronil and Imidacloprid are widely available, inexpensive commodities, they usually constitute a small percentage of the cost of flea and tick treatments.  Instead, the major costs for most flea and tick treatments are the delivery systems for these active ingredients (such as a collar or a "squeeze-on" topical solution),

together with the very substantial costs of obtaining regulatory approval by the U.S.
Environmental Protection Agency for the use of the particular formulation of active ingredients
in each flea and tick treatment, as well as the costs of marketing, selling and delivering the
products.

65.     Neither wholesale nor retail buyers of Imidacloprid topicals and Fipronil topicals
consider them to be interchangeable because they have distinct characteristics.  In addition,
wholesale buyers overwhelmingly purchase Imidacloprid topicals for re-sale, not to use on their
own pets.

66.     Imidacloprid topicals and Fipronil topicals are not therapeutic equivalents,
because Imidacloprid topicals have therapeutic actions that Fipronil topicals lack.  Specifically,
Imidacloprid topicals repel fleas, ticks and mosquitoes, thereby preventing those insects from
biting the pet.  Fipronil topicals cannot repel fleas, ticks or mosquitoes, and those insects must
bite the pet, in order to receive a lethal dose of the insecticide.

67.     Bayer did not consider Fipronil topicals to be economic substitutes for Bayer's
Imidacloprid topicals.  Instead, Bayer deliberately priced its Imidacloprid-based Advantix
product higher than the Fipronil-based Frontline Plus product, because of ████████████
██████████.

68.     Bayer's contracts with distributors and retailers also demonstrate that Bayer did
not consider Fipronil topicals to be economic substitutes for Bayer's Imidacloprid topicals.
Those contracts single out Imidacloprid generics and give the retailers a financial incentive to
exclude them.  However, those same contracts do not offer any similar financial incentive to
exclude either name-brand or generic Fipronil topicals.

69.     As explained below in Section E, several of Bayer's documents show that it was
extremely concerned about the entry of generic Imidacloprid topicals into the market, that it
created a strategy to ████████████ of Imidacloprid topicals, and that it reached out to its
distributors and retailers to ██████████████████ of Imidacloprid topicals.
However, Bayer did not pursue a similar strategy regarding the entry of new Fipronil topicals,
including the Fipronil topicals manufactured and sold by Tevra.  This further demonstrates that

-20-

1    Bayer did not consider Fipronil topicals to be economic substitutes for its Imidacloprid topicals.

2          70.    Flea and tick medications containing Fipronil are not in the relevant market

3    because several of Bayer's own documents and data show that they have a low cross-elasticity of

4    demand with Bayer's Imidacloprid topicals, and that they are weak substitutes that did not

5    constrain price increases of Bayer products to monopoly levels.

6          71.    In addition to having distinct formulations, distinct purposes, and distinct pricing,

7    the industry recognizes the two types of products as separate from one another.  Nielsen, a global

8    measurement and data analytics company in the industry for pet products, tracks data for Fipronil

9    and Imidacloprid separately.

10          72.    From a merchant's perspective, Imidacloprid topicals and Fipronil topicals are

11   complements, not substitutes.  Merchants who purchase for resale do not substitute one for the

12   other in response to price changes, because consumers expect retailers to carry both products.

13   Consumers generally buy only one flea and tick treatment at a time, but retailers buy a full line

14   of flea and tick treatments.  Imidacloprid and Fipronil are not interchangeable to merchants who

15   purchase for resale.  To remain competitive and to offer the products that customers expect to

16   find, retailers must carry both formulations.  Diagram 3, below, illustrates the different paths

17   through the distribution chain by which Imidacloprid topicals might reach pet owners.  As

18   shown, distributors and retailers are not purchasing Imidacloprid topicals to apply to their pets,

19   but rather for re-sale.  Therefore, they view many different flea and tick products as

20   complements, rather than substitutes, so that they can offer choices to their customers.

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

SECOND AMENDED COMPLAINT
CASE NO. 3:19-cv-04312-BLF



**Diagram 3 – Distribution chains for Imidacloprid topicals**

   **g.**  **Topical flea and tick medications and delivery systems**

  73.  Distinct, non-interchangeable, products deliver flea and tick treatment to pets in different ways, including flea collars, topicals, oral medications, sprays, wipes, and shampoos. As set forth in Section A.1.d in this Second Amended Complaint, Bayer's own data and documents show that a small but significant non-transitory price increase in the price of Imidacloprid topicals did not lead consumers to switch from Imidacloprid topicals to non-topical flea and tick products. These non-topical flea and tick treatments are therefore weak substitutes that are not part of the relevant antitrust market.

  74.  In 2018, the fastest growing type of flea and tick product was the flea and tick collar, led by Bayer's Seresto flea collar. The Seresto flea collar is a comparatively expensive product, typically offered by retailers at $40 to $69 per collar. Bayer claims that the Seresto flea collar has a major advantage over other flea and tick treatment products, because it provides eight months of protection from a single application.

  75.  "Topical" liquid treatments that are applied directly to a pet's skin or fur are distinct from flea collars. In 2018, topicals accounted for the largest dollar amount of flea and tick treatment sales.

76. Flea and tick treatments may also be given to pets orally. However, oral Imidacloprid products like Bayer's Advantus kill only adult fleas, and do not prevent re-infestation unless given every day. Additionally, many consumers think of oral treatments as inconvenient and difficult to administer, because many pets will not consume the oral treatments, or will expel them. In some instances, consumers cannot administer such medications to their pets without using food or pill pouches to conceal the taste and smell of the medication. Even then, pets may reject them. The inconvenience of trying to administer oral products makes them a weak substitute for Imidacloprid topicals.

77. Other products that contain flea and tick treatments include sprays, wipes, and shampoos. Those products account for a small percentage of total flea and tick treatment sales. Sprays, wipes, and shampoos are not part of the relevant market because they are generally not used for the prevention of fleas and ticks. Sprays, wipes, and shampoos are used for alleviating symptoms in animals that are already infested with fleas and/or ticks. These products can kill fleas and ticks on contact, but are generally aimed at relieving infested animals from itching and pain caused by fleas and ticks and washing away dead pests.

78. The relevant product market in this case does not include flea collars. Flea collars and topical flea and tick treatments are not interchangeable for most consumers. Some consumers prefer the convenience and ease of using a single flea collar for up to 8 months, but will not accept the frequency and difficulty of applying a topical treatment to their pet. Other consumers prefer the lower per-dose price of topicals and the control they have over when to apply them, but dislike the higher initial cost, smell, and appearance of flea collars. In addition, some consumers do not purchase flea collars due to safety concerns.

79. Similarly, from the retailer's perspective, topical products are not substitutes for other delivery systems for flea and tick medications like oral treatments, flea collars, shampoos, and baths. Rather, these retailers must carry and sell each of these types of products to remain competitive. For retailers, these different categories of products are complements, not substitutes.

1

       **2.**     **The Geographic Market**

2

       80.     The geographic market for analyzing the antitrust violations committed by Bayer

3

is the United States.  Manufacturers of Imidacloprid topicals sell those products to retailers with

4

locations throughout the United States, and to distributors throughout the United States who sell

5

the products to retailers, and those retailers subsequently sell the products to consumers in all

6

fifty states.  Because these products are based on pesticides regulated by the U.S. Environmental

7

Protection Agency, they can only be imported or sold by companies that register them for

8

particular uses.  This regulatory constraint defines the limited geographic market as the United

9

States.

10

**B.**     **Fipronil generics lowered prices of Fipronil flea and tick medications.**

11

       81.     In 1997, Merial (later purchased by Boehringer-Ingelheim) introduced its

12

Frontline topical formulation of Fipronil to the U.S. market.  Frontline has remained the single

13

best-selling brand of Fipronil topical since that time.

14

       82.     Beginning in 2011, generic Fipronil topicals, which compete directly with

15

Frontline, entered the U.S. marketplace.  By 2018, generic Fipronil topicals accounted for

16

approximately 52% of Fipronil topical sales, with Frontline still accounting for about 48%.

17

       83.     The results of generic Fipronil topicals entering the separate market for Fipronil

18

topicals have been more competition against Frontline, lower prices, and more choices for

19

retailers and consumers in that market.

20

       84.     Unlike Fipronil, despite the attempted entry of at least two generic Imidacloprid

21

topical manufacturers in the past few years, at least 85% of the relevant market for Imidacloprid

22

topicals is still controlled by Bayer.  Bayer has a monopoly in the relevant market and effectively

23

controls 100% of that market, because Bayer receives patent license royalties for most or all of

24

the remaining 15%.  Because of Bayer's anti-competitive conduct, the relevant market has not

25

benefitted from the entry of generics, as the Fipronil market did.

26

27

28

**C.     Bayer has substantially foreclosed Imidacloprid topical generics from the relevant market.**

**1.     Imidacloprid products, including Advantix**

85.     Monopolies are not necessarily illegal, can be acquired legally, and are actually encouraged by U.S. patent laws that give an inventor the temporary right to exclude others from making the same product.

86.     Bayer appears to have initially acquired its monopoly in Imidacloprid topicals legally, through the process of scientific research and invention.  Bayer sought and obtained a 10-year period of "exclusivity" by registering its Imidacloprid formulation with the U.S. Environmental Protection Agency.  Bayer also sought and obtained legal protection for its monopoly by obtaining U.S. patents on its invention.

87.     In 2002, Bayer introduced its Advantage line of Imidacloprid topicals, which now includes Advantage II and K9 Advantix-II.  Bayer protected its inventions by obtaining several U.S. patents, one of which expired in 2015.

88.     In 2016, the generic manufacturer CAP IM Supply, Inc. was granted conditional registration by EPA for its generic Imidacloprid topical, and became the first manufacturer of generic Imidacloprid topicals to attempt to enter the market for Imidacloprid topicals.

89.     On May 22, 2017, three Bayer entities, including Defendant BHC LLC and Defendant BAH GmbH filed a patent infringement lawsuit against CAP IM Supply, Inc. in U.S. District Court for the District of Delaware.  This lawsuit was shortly settled and CAP IM began paying Bayer royalties for the use of its patented formula.

90.     Imidacloprid topicals produced by CAP IM have been sold in the U.S. by several companies including TruRx and PetIQ, under various brand names including Advecta, PetLock and ParaDefense.  These sales do not represent unrestrained generic competition against Bayer, but rather are licensed products, also known as "authorized generics," from which Bayer profits through its receipt of royalties.  Bayer successfully had CAP-IM's product "PetLock" removed from store shelves at PetCo, and appears to have relegated CAP-IM products to the less-lucrative "Food, Mass, and Drug" channel of grocery stores, discount stores, and drug stores.

91.     As set forth below, Bayer has illegally maintained its monopoly and prevented the entry of true generic Imidacloprid topicals by: (1) using a "2nd Brand Strategy" by packaging a Bayer product to appear that it was generic, (2) entering into verbal "no generics" agreements with retailers, (3) making direct payments to a retailer to have a generic competitor removed from its shelves, and (4) changing its contracts with retailers to punish those who carried generic competitors to Bayer, and reward those who did not.

92.     The results of Bayer's illegal, anticompetitive, and exclusionary actions have been less competition, higher prices, and fewer choices for retailers and consumers.

**2.     Registration of insecticides with EPA and "exclusive use"**

93.     The insecticides used as active ingredients in flea and tick treatments are regulated by the U.S. Environmental Protection Agency, under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136a, *et seq.*  This statute requires that manufacturers of insecticides register each formulation before offering it for sale in the U.S.

94.     To obtain EPA registration under FIFRA for the use of an insecticide for a particular purpose, a company must submit detailed scientific data demonstrating the safety and effectiveness of that use of the insecticide formulation.

95.     If the EPA agrees to register the use of an insecticide for a particular purpose, the registering company has "exclusive use" of the data used to register that insecticide for that purpose, for a period of 10 years after registration, pursuant to FIFRA, 7 U.S.C. §  136a, *et seq.*

96.     The 10-year "exclusive use" period created by FIFRA registration effectively gives the registering company a monopoly over the use of the insecticide for the particular purpose.

97.     The 10-year exclusive use period under FIFRA has expired for both Fipronil and Imidacloprid topicals, allowing generic manufacturers such as Tevra to attempt to enter the market.  Although Bayer's Imidacloprid topical is also patented, Tevra's formulation is different and Tevra's Imidacloprid topical does not infringe Bayer's patents.

98.     In 2015, Tevra used the FIFRA statutory procedure to pay Bayer "data compensation" for the use of Bayer's supporting data in its EPA registration of Imidacloprid for

-26-

1    use in topical flea and tick treatments.  This allowed Tevra to manufacture and sell Imidacloprid

2    topicals in the U.S., but it also alerted Bayer to the fact that generic competition was coming.

3    **D.      Tevra's attempts to enter the market for Imidacloprid topicals**

4            99.      In 2016, Tevra created detailed sales forecasts for both its generic Fipronil

5    topicals and its generic Imidacloprid topicals. Tevra recognized that it could sell several times

6    more generic Imidacloprid topicals than generic Fipronil topicals, due to several factors.

7            a.      First, by 2016, the market for Imidacloprid topicals was expanding, while the

8                    market for Fipronil topicals was shrinking.

9            b.      Second, the Fipronil topical market was already crowded with generic

10                   competition.  Velcera's "Pet Armor" generic Fipronil topical entered the market

11                   to compete with the name brand Frontline in 2011.  Since that time at least four

12                   other manufacturers had entered the market for Fipronil topicals.  This crowded

13                   market for Fipronil topicals made it difficult for another entrant, like Tevra, to

14                   obtain sales and market share.

15           c.      Third, there were no generic Imidacloprid topicals being sold.  Tevra could

16                   therefore be the first generic entrant.  Tevra's formulation was patented and did

17                   not infringe Bayer's patents, so Tevra had protection from other generics.

18           d.      Fourth, generic Imidacloprid topicals could be sold at higher prices than generic

19                   Fipronil topicals, because Bayer had acquired a monopoly with its Imidacloprid

20                   topicals due to its patents and its prior "exclusive use" from its EPA registration.

21                   The price of the first generic is lower than the price of the monopoly branded

22                   product, but a high-priced branded product generally permits a higher price for

23                   the first generic.

24           e.      Fifth, consumers are willing to pay more for Imidacloprid topicals than for

25                   Fipronil topicals.

26           100.     Tevra immediately went to work licensing a generic Fipronil topical to compete

27    against Boehringer's name brand Frontline, as well as registering a generic Imidacloprid topical

28    to compete against Bayer's name brand Advantix. Tevra applied for EPA registration of its

-27-

generic Imidacloprid topical.  The EPA granted the registration of Tevra's generic Imidacloprid topical in 2017.

101.    Tevra's Imidacloprid topicals are more effective than Bayer's Imidacloprid topicals.  Both topicals contain the same active ingredient.  However, Tevra's method of delivering that active ingredient to the skin of the pet is superior to Bayer's.

102.    Controlled experiments have demonstrated that Tevra's Imidacloprid topicals kill over 99% of fleas, just as Bayer's do, but Tevra's Imidacloprid topicals also kill ticks more effectively than Bayer's.  In addition, Tevra's Imidacloprid topicals are less toxic than those produced by Bayer, due to their superior delivery method.

103.    Even before EPA registration was complete, Tevra hired a sales team of professionals with experience in the industry, and aggressively pursued sales to retailers. Beginning in 2016, Tevra's salespersons met with representatives of numerous retailers, including those identified below.

### 1.    Tevra's successful entry into the separate Fipronil topical market

104.    In 2017, Tevra made its first sales of its generic Fipronil topical.  Because Tevra's product was a less expensive, equally effective alternative to Frontline, Tevra was able to demonstrate to retailers that carrying Tevra's generic Fipronil topical would increase sales and profits for the retailers.

105.    Attracted by the price and profitability advantages of Tevra's generic Fipronil topical, retailers began buying it in large quantities.  Tevra made a profit of over $2.4 Million from online and pet specialty sales of its generic Fipronil topical in 2018.

### 2.    Tevra was foreclosed from entering the Imidacloprid topical market

106.    Tevra's attempts to sell its less expensive, more effective, generic Imidacloprid topical have been substantially foreclosed by Bayer's illegal monopolization and exclusive dealing.

107.    Tevra attempted to sell its generic Imidacloprid topical to some of the same retailers that were already carrying Tevra's generic Fipronil topical.  However, as set forth in Section E.2, below, numerous retailers refused to carry Tevra's generic Imidacloprid topical, and

-28-

1    five of those retailers, or their distributors, explicitly cited some type of agreement with Bayer as

2    the reason for their refusal.  These retailers have refused to carry generic Imidacloprid topicals

3    from Tevra, even though several of them sell generic Fipronil topicals.

4            108.    In a competitive market, Tevra would be able to sell its products to retailers and

5    distributors.  Its generic Imidacloprid topicals are more effective than Bayer's brand-name

6    Imidacloprid topicals.  Tevra's generic Imidacloprid topicals are also significantly less expensive

7    than Bayer's brand-name Imidacloprid topicals.  Indeed, Tevra has offered to sell retailers

8    generic Imidacloprid topicals for approximately 50% or less of Bayer's discounted wholesale

9    price (as stated in its written contracts) for K9 Advantix II Imidacloprid topicals.

10           109.    Despite the lower prices of Tevra's Imidacloprid topicals, multiple major retailers

11   and distributors have refused to purchase Tevra's Imidacloprid topicals, and Tevra has been

12   unable to sell any significant quantities of its Imiadocloprid topicals.

13           110.    If a retailer purchased Tevra's generic Imidacloprid topicals, the retailer could

14   charge consumers prices that are significantly lower than the retail prices of Bayer's

15   Imidacloprid topicals.

16           111.    From 2017 to 2020, Tevra sold almost none of its generic Imidacloprid topical.

17   **E.      Bayer's Monopolization and Exclusive Dealing Foreclosed Entry into the Market
18            for Imidacloprid Topicals**

19           112.    In order to maintain its monopoly in Imidacloprid topicals, Bayer willfully and

20   deliberately carried out four strategies to block generic entry and competition.  First, as described

21   in Section E.1 below, BAH GmbH initiated and led a "second brands" strategy in which a Bayer

22   product that resembled a generic was used to keep a generic competition off store shelves.

23   Second, as described in Section E.2 below, Bayer made a verbal "no generics" deal with

24   retailers, and shared some of its monopoly profits in exchange for the retailer's agreement not to

25   offer generic Imidacloprid topicals.  Third, as described in Section E.3 below, Bayer directly

26   paid at least one retailer to remove generic Imidacloprid topicals from its shelves.  Fourth, as

27   described in Section E.4 below, Bayer changed the terms of its contracts with retailers to create

28   strong incentives not to carry generic Imidacloprid topicals, and to punish retailers who did.

113.    All of the acts described in the immediately preceding paragraph were done willfully, and purposely directed at the U.S. market, with a specific intent to monopolize the relevant antitrust market for Imidacloprid topicals and to substantially foreclose competition in that market.

**1.    Bayer's "second brand strategy" to block generic entry**

114.    BAH GmbH conceived and led a "second brand strategy" in the U.S., because that strategy had been successful in excluding generics in other countries.  Certain Bayer documents show that BAH GmbH purposefully directed this strategy at the U.S. market for Imidacloprid topicals, citing the success of this strategy in the U.K., Italy, and elsewhere.  These documents are listed and quoted below, in Section F, dealing with BAH GmbH's participation in the illegal monopolization and exclusive dealing in the U.S.

115.    As part of the 2015 Straco process mandated by BAH GmbH, a slide deck dated April 9, 2015 described Bayer's U.S. strategy to ██████████████████████████ ████████

116.    In furtherance of the "second brand" strategy, another German Bayer entity manufactured the Defense Care line of products including what appear to be an "authorized generic" brand of Imidacloprid topical.  This "second brand" was actually intended to be a shelf-space filler, and prevent retailers from stocking true generic competition to Bayer's name-brand products.  It allowed Bayer to continue to make profits on every sales, but to avoid "compare-to" placement and advertising by actual generic competitors – which is critical for a generic product that is being sold against a name-brand.  Not surprisingly, Defense Care did not sell well at PetSmart, since there was no "compare-to" packaging, placement, signage, or advertising.

117.    The purpose of the second brand strategy led by BAH GmbH was to prevent PetSmart from offering any Imidacloprid topicals that were not manufactured by Bayer.  This strategy was used at PetSmart in 2015 and 2016, and continued until Bayer began implementing another strategy to block generic entry, which required the participation of PetSmart and the other major pet specialty and internet retailers.

-30-

118.    The Defense Care brand was approved by BAH GmbH for use as a "second brand" in the U.S., and used at PetSmart in 2015 and 2016.  Documents from BAH GmbH refer to Defense Care as a ████████████████ and a ████████████ at PetSmart.  These documents include an email by Sebastian Holl to David Zapatero, Global Brand Manager at BAH GmbH, dated October 24, 2014 that noted ████████████████████████ ████████████████████████████████████████ ████████████████████.

119.    On November 20, 2015, Kristina Pollok, Strategic Controlling at BAH GmbH, exchanged an email with Ian Spinks, Karl Wehner, and Andy May.  The email, part of which was written by Ian Spinks, then the President and General Manager of Animal Health North America at BHC LLC, said in part that the ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████.

**2.    Bayer's "no generics" conspiracy with retailers**

120.    In addition to the "second brands" anti-generics strategy described above, Bayer went directly to major retailers, including PetSmart and PetCo, with an offer to increase the retailer's profits if, and only if, the retailers would refuse to carry generic Imidacloprid topicals. Bayer was able to do this because it had been charging monopoly prices and making monopoly profits from the sale of its Imidacloprid topicals after years of substantial price increases since at least 2011.  Bayer effectively offered to share its monopoly rents with the retailers in exchange for their help maintaining its monopoly.  The deal was profitable for both Bayer and the retailers – to the detriment of consumers and Bayer's generic competitors like Tevra.

121.    Bayer's documents listed below show that Bayer appealed directly to distributors and retailers to help it ████████████████  These include:

On September 14, 2015, Jeriel Chua, then a U.S. brand manager for BHC LLC and later a global brand manager for BAH GbmH, sent an email to Craig Reinert, the Key Account Manager for PetCo at BHC LLC attaching the ████████████████████████

-31-

On September 22, 2015, Bobbi Messner, then the Key Account Manager-Pet Specialty for BHC LLC, sent an email to other BHC LLC employees, █████████████████████████████████████████████████████████████████████████████████████

On February 15-17, 2016, BHC LLC held a "Distributor Retail Summit" in Ft Worth, Texas, which was attended by most of the major distributors and retailers in the U.S. One of the stated goals of the summit, as shown by one of Bayer's slide presentations, ████████████████████████████████████████████████████████████████████ [Emphasis added.]

122.    The "no generics" agreement with distributors like Veterinary Service, Inc. and Animal Supply Company, and retailers like PetSmart and PetCo was premised on the idea that generic Imidacloprid topicals, █████████████████████████████████ sales of Bayer's name brand Imidacloprid topicals.  Several Bayer documents complain about this ███████████ and the fact that consumers will ███████████ for the less expensive generic Imidacloprid topicals.

123.    To stop the ███████████ and to prevent consumers from ███████████ Bayer approached distributors and retailers, including PetSmart and PetCo, with a remarkably bold (and illegal), proposition:  Keep the generics out, keep the name brand prices high, and Bayer will compensate the retailers (with some of its monopoly profits).

124.    Bayer made written presentations to both PetCo and PetSmart in 2016 and was very explicit about the increased profits both Bayer and the retailers could make by keeping generic Imidacloprid topicals off the store shelves.

125.    When Bayer made its presentation to PetCo in August 2016, PetCo was carrying a generic Imidacloprid topical called "PetLock."  Even though Bayer was collecting royalties on

-32-

1  every unit of PetLock sold (as a result of its settlement agreement with CAP-IM, the maker of

2  PetLock), Bayer still wanted to convince PetCo to remove PetLock from its shelves, so that

3  Bayer could make even more money.

4       126.    Bayer's presentation to PetCo began with the admission that ████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ██████

12      127.    Some of the key provisions of Bayer's August 2016 presentation to PetCo include

13  the following: ████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████

16  ██████████   AUR stands for Average Unit Retail, which means "price."

17      128.    Bayer also showed PetCo that it could benefit from Bayer's ████████████

18  ████████████████   and told PetCo that it would be a ██████████   to get the generic

19  Imidacloprid topicals off its shelves so that it could make more money by cooperating with

20  Bayer to maintain Bayer's monopoly.

21      129.    A month later, in September 2016, Bayer made virtually the same presentation to

22  PetSmart.  Key points in this presentation included the following: ████████████████████

23  ████████████████████████████████████████████████████████

24  ████████████████████████████████   Again, AUR stands for Average

25  Unit Retail, which means "price."

26      130.    Bayer's presentation to PetSmart offered several different sources of money to

27  PetSmart, if it would agree to remove the generic Imidacloprid topicals.  These included the

28  ████████████████████████████████████████████████████████

-33-

131.    Bayer's pitches to both PetCo and PetSmart to "play ball" by removing generic competition and offering their customers only the higher priced Bayer name brands, were successful.  The explicit deal between Bayer, PetCo and PetSmart is price-fixing in its purest form – it is an agreement to exclude competitors, keep retail prices artificially high and to divide the ill-gotten profits.  The only losers in the deal were consumers who were forced to pay higher prices, generic manufacturers such as Tevra that were foreclosed from competition, and the rule of law as enshrined in the Sherman Act and the Clayton Act.

132.    More than one distributor has explicitly told Tevra that it believes it has a "no generics" agreement with Bayer, even though the written contracts do not expressly include the verbatim phrase "no generics."  For example, in March 2017, a representative of Veterinary Services, Inc., a major nationwide distributor, told a salesperson from Tevra about a "Bayer agreement," and said that "they were going to let us know if the agreement prohibits them from adding another Imidacloprid product."  Veterinary Services, Inc. ultimately refused to purchase Imidacloprid topicals from Tevra.  Animal Supply Company, another nationwide distributor, was even more explicit when its agent told a Tevra salesperson in March 2021 that they could not purchase "any products with Imidacloprid" from Tevra due to an agreement with Bayer, and added "If I lose Bayer, I'll get fired."  Notably, by the time this statement was made, Bayer had sold its U.S. animal health assets to Elanco, but the ASC agent still referred to it as "Bayer."

133.    Tevra's foreclosure from major nationwide distributors is, to some extent, even more damaging than its foreclosure from pet specialty and internet retailers.  These distributors re-sell products into multiple sales channels, including independent pet stores, veterinarians, and a variety food, drug, and discount stores.  Foreclosure from distributors like Veterinary Services, Inc. and Animal Supply Company deprives Tevra of a one very effective point of entry into multiple sales channels.

134.    More than one retailer has explicitly told Tevra that it believes it has a "no generics" agreement with Bayer, even though the written contracts do not expressly include the verbatim phrase "no generics."  For example, Chewy.com told Tevra that "they had an agreement with Bayer that prevented them from offering a generic to Bayer's K9 Advantix," or

-34-

1    words to that effect.  Drs. Foster & Smith (later PetCo.com) told Tevra about "the recent Bayer

2    'no generic'" or words to that effect.  PetMed Express (formerly 1-800-Pet-Meds) told Tevra

3    about its "program with Bayer and not allowing any generic equivalence," or words to that

4    effect.

5          135.    Retailers Chewy.com, Drs. Foster & Smith (now Petco.com), and PetMed

6    Express are internet retailers, while PetCo, PetSense and PetSmart are pet specialty "brick and

7    mortar" retailers.  Tevra offered each of these retailers generic Imidacloprid topicals at prices

8    that are about 50% lower than the discounted prices of Imidacloprid topicals offered by Bayer

9    under its Purchase Agreements, but each retailer refused to carry Tevra's product, despite

10   Tevra's generic Imidacloprid topicals being more effective than Bayer's Advantix II product.

11         136.    Tevra began discussions to sell generic Imidacloprid topicals to Chewy.com in the

12   fall of 2016.  In 2017, a representative of Chewy.com told a Tevra salesperson that Chewy.com

13   "had a contract with Bayer and could not offer a generic to K9 Advantix II," or words to that

14   effect.  Chewy.com also told another Tevra salesperson "that they had an agreement with Bayer

15   that prevented them from offering a generic to Bayer's K9 Advantix," or words to that effect.

16         137.    In July 2018, Tevra salespersons again met with representatives from Chewy.com

17   and discussed the possibility of Chewy.com carrying Tevra's generic Imidacloprid topical in

18   competition with Bayer's K9 Advantix II.  A representative of Chewy.com told a Tevra

19   salesperson that "they understand the opportunity but need to be able to make up potential lost

20   marketing dollars from Bayer," or words to that effect.

21         138.    In October 2018, a Tevra salesperson spoke with a representative of Chewy.com,

22   who told the Tevra salesperson that Chewy.com "is trying to work with Bayer on the contract.

23   There was some old language in the old agreement that either prevented [Chewy.com] from

24   offering a generic or featuring 'Compares to' or contains the same active ingredient," or words to

25   that effect.

26         139.    In 2019, Chewy.com told a representative from Tevra that if Chewy.com

27   purchased Tevra's product, "they would lose $3 million dollars in net margin taking into account

28   the reduced Bayer rebate vs. what they thought they would make in margin selling [Tevra's]

-35-

product," or words to that effect.

140.     At the wholesale price Tevra offered Chewy.com, and if Chewy.com had accepted Tevra's proposal, Tevra projected that it would have sold Chewy.com approximately $2 million in Imidacloprid topicals during the time period covered by Chewy.com's $3 million estimate described in the above paragraph.

141.     Tevra could not profitably offer a discount to match Bayer's discount of at least $3 million because it would have had to sell to Chewy.com its product at an approximate $1 million loss.  In addition, Tevra could not offer a comparable bundle of products because only Bayer can offer Seresto, which is protected by U.S. patents.

142.     Chewy.com ultimately refused to purchase Tevra's generic Imidacloprid topical.

143.     In 2018, Tevra salespersons were attempting to convince Drs. Foster & Smith (later PetCo.com) to carry Tevra's generic Imidacloprid topical.  A representative of Drs. Foster & Smith (later PetCo.com) told one of Tevra's salespersons that Drs. Foster & Smith (later PetCo.com) would not carry Tevra's generic Imidacloprid topical because "it was a conflict of interest given the recent Bayer 'no generic' as to pulling advertising funding and lucrative rebates," or words to that effect.

144.     Drs. Foster & Smith (later PetCo.com) ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.

145.     In 2018, salespersons for Tevra made a presentation to PetMed Express (formerly 1-800-Pet-Meds).  During that presentation, a representative of PetMed Express stated that "they had an agreement with Bayer."  PetMed Express did not carry any generics that compete directly against Bayer flea and tick treatments as of December 2018.

146.     In 2019, a sales person for Tevra had a discussion with a representative of PetMed Express in which the representative described PetMed Express's "program with Bayer and not allowing any generic equivalents," or words to that effect.

147.     PetMed Express ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.

148.     In the summer of 2018, Tevra salespersons made presentations to PetCo showing the sales and profitability advantage of Tevra's generic Imidacloprid topical.  A representative of PetCo later told a Tevra salesperson that PetCo had "no interest in Own Brands or generic compromise as the Bayer rebates are HUGE," or words to that effect.

149.     PetCo ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.

150.     In February 2017, a salesperson for Tevra informed PetSense that Tevra had just received EPA registration for its generic Imidacloprid topical.  In March 2017, Tevra made an offer to PetSense with significant incentives to encourage PetSense to carry Tevra's generic Imidacloprid topical.  PetSense directed Tevra to discuss the sale of Tevra's product through the distributor to PetSense.  In discussions with the distributor, Tevra salespersons were told of the existence of a "Bayer agreement," and were told that "they were going to let us know if the agreement prohibits them from adding another Imidacloprid product."

151.     PetSense ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.

152.     An affiliate of PetSmart also told Tevra that Bayer was trying to "bundle" its rebate program for both PetSmart and the affiliate.  The affiliate then stopped negotiating with Tevra, because of the Bayer rebate program.  PetSmart and its affiliate ultimately refused to purchase and stock Tevra's generic Imidacloprid topical.

153.     After the original complaint was filed, Tevra continued to offer its generic Imidacloprid topical product to online and pet specialty retailers at prices significantly lower than those offered by Bayer.  Online and pet specialty retailers continue to refuse to purchase Tevra's generic Imidacloprid topicals.

154.     At least two years after Bayer's "no generics" conspiracy with distributors and retailers began, Jeriel Chua, now a global brand manager with BAH GmbH wrote, in a December 10, 2018 email to Imke Pickardt, also at BAH GmbH, ███████████████████████ ████████████████████████████████████████████  One of the attached documents was called ███████████████████  stated that the ██████████████████████████

1   ███████████████████████████████ According to the

2   document, a ████████████ to a retailer needing ███████████ was

3   ███████████████████ In response to a retailer stating that it desires

4   more margin, the document states as a ██████████████ that ██████████████

5   ████████████████████████████████

6   ██████████████████████████████████████

7   ███████████████ It appears that Mr. Chua was quite proud of Bayer's strategy to

8   ██████████████ as he described it two years earlier, which consisted of Bayer sharing its

9   monopoly profits with distributors and retailer, in exchange for their agreement to keep generic

10  competitors out, and retail prices high.

11      **3.    Bayer's direct payments to remove generic competition**

12      155.    A third strategy used by Bayer to block generic competition was the direct

13  payment of up to ████████ to PetCo in exchange for PetCo removing products, including the

14  PetLock generic Imidacloprid topicals from its shelves.

15      156.    Several Bayer documents confirm that this ████████████████████

16  ████████████████████████████████████████

17  ████████ and eliminated competition by generic Imidacloprid topicals in its stores.  These

18  documents include emails requesting authorization of the payment to Petco and stating that

19  Bayer expected the ████████████████████████████████

20  ████████████████████

21      157.    A 2018 Bayer slide deck proclaimed that at ████████████████████

22  ████████████████████████████████

23      158.    Bayer also apparently made a similar deal with PetSmart, as shown by a Bayer

24  document that details both ████████████████████████████

25  ██████████████████████████████████████

26  ██████████████████ The documents reads, in part:

27

28



**4.      Bayer changed its Purchase Agreements to block generic entry**

159.   A fourth strategy used by Bayer to block generic competition involved numerous changes to its Purchase Agreement with retailers.

160.   Most notably, Bayer introduced an ████████████████████ in which it cut the price of a large bundle of Bayer products, including its "blockbuster" Seresto Flea Collar, on the explicit condition that the retailers refuse to carry generic Imidacloprid topicals that competed with Bayer's higher-priced name brand topicals.  It is important to note that the discount did not just apply to the Imidacloprid topicals it was designed to protect, instead, it applied to an entire bundle of Bayer products, making it even more lucrative for retailers to keep generic competition out.

161.   Bayer also changed its Purchase Agreements to punish retailers that allowed generic products to state that they "compare to" Bayer products in store displays, webpages and advertising.  It rewarded retailers with higher discounts if, and only if, those retailers refused any "compare to" placement of competing generics.  Pet Supplies Plus actually agreed to carry a generic Imidacloprid topical, but was unwilling to give up the lucrative discount on the entire bundle of Bayer products, including the Seresto Flea Collar, and therefore would not allow the generic to state that its products "compare to" Bayer products in any way.  This restriction severely handicapped the sale of the generic Imidacloprid topical at Pet Supplies Plus.

162.   Not only do the Purchase Agreements require retailers and distributors to purchase Bayer's expensive Imidacloprid topicals, but they also include a series of discounts that are aimed at preventing generic competitors from entering the market.  Bayer includes multiple

"loyalty" discount provisions in contracts with retailers and distributors, some of which require exclusivity, exclusive advertising, and carrying Bayer's Imidacloprid topicals.  Other discounts prohibit "compare to" advertising, and making offers "triggering a switch from Bayer's brands." Some of these anti-competitive discounts are:

| Discount | Range | Requirements |
|---|---|---|
| | | |

-40-

| Discount | Range | Requirements |
|---|---|---|
| ███████ | █████ | ████████████████ |
|  |  | ███████████████████ |
|  |  | ████████████████████ |
| ████████ | ███ | ███████████████████████ |
|  |  | ████████████████████ |
| ███████ | █████ | ████████████████████ |
|  |  | █████████████ |

163.   ████████████████████████████████████

in some instances the anti-competitive discounts and rebates amount to approximately ███████

████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

█████████

164.   The Purchase Agreements are not easily terminable by retailers or distributors.

Bayer is a monopolist with at least 85% of sales in the relevant market—and effectively 100%,

since Bayer receives royalties for most of the remaining 15% of sales. A retailer who terminates

or violates its Purchase Agreement with Bayer risks losing the right to buy products that any pet

specialty retailer must have to compete.  That the Purchase Agreements are not easily terminable

is further evident from the fact that none of Chewy.com, Drs. Foster & Smith (later PetCo.com),

or PetMed Express, which represent over 75% of internet sales, nor PetCo, PetSense or

PetSmart, which represent over 70% of pet specialty sales, ever terminated their Bayer contracts

or withdrew from Bayer's anti-competitive scheme to substantially foreclose generic

Imidacloprid topicals during the years that Tevra has been trying to enter the market.  Indeed,

none of those six retailers ever agreed to purchase Tevra's product.

165.    The Purchase Agreements are also not easily terminable in part because retailers and distributors refuse to terminate those agreements in fear that they would lose the anticompetitive discounts and rebates on Bayer's products.

166.    If a retailer were to not participate in Bayer's loyalty discount program, it could not compete with retailers who do participate in the discount program.  This is the case in part because nearly every Purchase Agreement provided by Bayer makes clear that Bayer's customers understand that every other retailer and distributor gets the same base price on Bayer's products, and that discounts will be offered on an "equivalent basis": "[T]he list pricing offered hereunder shall be Bayer's standard list pricing for all channels of trade.  Opportunities for Purchaser to qualify for Discounts and Rebates shall be offered on an equivalent basis."   These provisions are a written assurance given to Bayer's customers, who compete with one another, that they will be getting the same base pricing on Bayer's products, and that discounts will be offered on an "equivalent basis" as their competitors.  The clause in the Bayer written agreements that informs retailers and distributors that their competitors will get the same base pricing is a warning to each retailer that they will be at a severe cost disadvantage if they do not participate in the Bayer's anti-competitive scheme.  Each retailer or distributor can see that its competitors will be getting a very substantial discount that it will not receive if it does not participate in Bayer's anti-competitive scheme.  The discounts individually and collectively permit Bayer to enforce its exclusive dealing by substantially foreclosing manufacturers of generic Imidacloprid topicals.  In addition, as discussed in this Second Amended Complaint, retailers have told Tevra that they have entered into "no generics" agreements with Bayer.  Bayer has utilized these illegal agreements to maintain its monopoly in the relevant market and to substantially foreclose generics from the relevant market.

167.    Regardless of the stated length of the Purchase Agreements or their termination clauses, the Purchase Agreements and the verbal no-generics agreements are not easily terminable and effectively operate as *de facto* long-term exclusive dealing agreements with the intent and effect to substantially foreclose generic manufacturers of Imidacloprid topicals from the relevant market.  Retailers cannot afford to cancel the Purchase Agreements or violate the no-

-42-

1  generics agreements in part because Bayer has market power in the relevant market, and, if

2  retailers were to terminate the Purchase Agreements, they would lose millions of dollars in

3  discounts on Seresto and other products.  Further, and as mentioned above, Bayer can enforce the

4  "no generics" agreements through the terms of the Purchase Agreements, including but not

5  limited to terms stating to Bayer's customers that they and their competitors receive the same

6  base pricing and that discounts will be offered on "an equivalent basis."  In addition, significant

7  barriers to entry into the Imidacloprid topical market exist. These barriers to entry include

8  Bayer's anti-competitive conduct itself, which substantially forecloses generics from the market,

9  as well as Bayer's monopoly of Imidacloprid topicals.  These and other barriers to entry

10  substantially foreclose generics from the relevant market.  Thus, the Purchase Agreements are

11  effectively sufficiently long term to foreclose competition, and are not easily terminable.

12  Through the Purchase Agreements and other understandings and agreements with retailers and

13  distributors, Bayer has foreclosed access to a substantial share of the relevant market by Tevra

14  and other generic manufacturers of Imidacloprid topicals.

15      168.    Thus, the Purchase Agreements, the no-generics agreements, and related

16  understandings amount to long-term exclusive dealing agreements between Bayer and the

17  retailers and distributors.  Due to the terms of the Purchase Agreements, Bayer's market power

18  in Imidacloprid topicals, and the threat that it would discontinue discounts on Bayer's

19  Imidacloprid topicals and other products, including the popular Seresto, retailers and distributors

20  cannot do business with generic manufacturers of Imidacloprid topicals. As a result of Bayer's

21  ongoing anti-competitive conduct, there is no meaningful competition in the relevant market.

22      169.    Not only do the Purchase Agreements contain anti-competitive exclusivity

23  discounts and otherwise amount to *de facto* exclusive dealing between Bayer and the retailers

24  and distributors, but, as set forth above, Bayer and multiple distributors and retailers have a

25  separate verbal understanding or agreement that retailers will not do business with generic

26  manufacturers of Imidacloprid topicals, as explained by the retailers themselves to Tevra.

27

28

-43-

1

2

**5.      Bayer succeeded in maintaining its monopoly and foreclosing competition through exclusive dealing**

3

4      170.    In 2016, Jeriel Chua, a brand manager for Advantage evaluated his own

performance in blocking generic entry in the U.S. against one of Bayer's Imidacloprid topicals.

5   His written comments in his own performance review include the following: ██████████

6   ████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ███████

10      171.    Bayer's four-part strategy to maintain its monopoly and substantially foreclose

11   generic competition from the market was remarkably successful.  Bayer was able to maintain its

12   monopoly and increase its prices and increase its profitability, despite the expiration of one of its

13   patents and the loss of "exclusive use" of its EPA registration data.  In doing, Bayer violated the

14   Sherman Act and the Clayton Act, increased prices for consumers, and damaged its generic

15   competitors, including Tevra, by substantially foreclosing them from the market.

16      172.    Bayer's foreclosure of the market has been substantial, both in the share of the

17   relevant market that has been foreclosed and in the length of time it has been foreclosed.  The

18   purchase agreements have been renewed by retailers who continue doing business today.

19   Bayer's market foreclosure is effectively infinite, as retailers have no choice but to renew these

20   contracts for fear of losing Bayer's anti-competitive discounts and rebates.

21      173.    Imidacloprid topicals are sold in several different sales channels in the U.S.,

22   including pet specialty retailers, internet retailers, general retailers, veterinarians, direct-to-

23   consumer sales, and other small channels, such as military sales.  An August 2017 Bayer

24   document explained it this way:

25

26

27

28

-44-

174.   The same Bayer document gave Bayer's estimates for the ██████ as follows:

██████████████████████████████████
██████████████████████

██████████████████████████████

█    ████████████████

175.   Exact sales data from all channels are not available, but fairly accurate estimates can be made from publicly available data and some of Bayer's own documents.  Based on the best data available to it, including the Bayer estimates quoted above, Tevra has been foreclosed from at least 56% of all sales of Imidacloprid topicals in the U.S., mostly in the two largest channels, pet specialty retailers and internet retailers.  However, the foreclosure in these largest channels spilled over into other channels, particularly direct-to-consumer sales, since Tevra was an "unknown" to these buyers, because it had no presence or visibility in the two largest channels, pet specialty retailers and internet retailers.  Tevra's foreclosure from distributors, as noted in Section E.2 above, also kept it out of multiple channels that are served by those distributors.

176.   As set forth in Section E.2 above, Tevra has direct evidence of foreclosure from three large internet retailers.  Together, Retailers Chewy.com, Drs. Foster & Smith (now Petco.com), and PetMed Express represent over 75% of Imidacloprid topical sales by internet retailers.  Bayer's agreements with these retailers have collectively foreclosed at least that share of the internet sales channel, as these retailers are unwilling or unable to purchase generic Imidacloprid products, even if the prices for such products are significantly lower than the prices for Bayer's Imidacloprid topicals, for fear of violating Bayer's no-generics rule or losing Bayer's anti-competitive discounts and rebates.

177.   Also as set forth in Section E.2 above, Tevra has direct evidence of foreclosure from three pet specialty retailers. Together, PetCo, PetSense, and PetSmart represent over 70% of Imidacloprid topical sales by pet specialty retailers.  Bayer's agreements with these retailers

-45-

1   have collectively foreclosed at least that share of pet specialty sales channel, as these retailers are

2   unwilling or unable to purchase generic Imidacloprid products, even if the prices for such

3   products are significantly lower than the prices for Bayer's Imidacloprid topicals, for fear of

4   violating Bayer's no-generics rule or losing Bayer's anti-competitive discounts and rebates.

5       178.    The percentage of the total market for Imidacloprid topical sales from which

6   Tevra was foreclosed may be estimated as follows:  In 2018, manufacturers sold approximately

7   $270 Million in Imidacloprid topicals in the U.S.  Applying the ███████████ given by Bayer,

8   as stated above, approximately 25% (about $67.5M) was sold to veterinarians, with the

9   remaining 75% (about $202.5M) sold into what Bayer calls "OTV" or "Other Than Vet"

10  channels, including pet specialty, internet, "multi-outlet" (also called MULO or Food, Mass,

11  Drug), and other minor channels.  Of the approximately $202.5 Million that was sold into OTV,

12  about 54% ($109M) was bought by pet specialty retailers, about 21% ($43M) was bought by

13  internet retailers, and the remaining 25% ($50M) was sold into other channels including MULO,

14  direct-to-consumer, independent pet stores, and the distributors that serve these other channels.

15      179.    Tevra was almost totally foreclosed from both the pet specialty and internet

16  channels, which together represent just over 56% ($152M) in total U.S. sales (all channels) in

17  2018.  As noted in Section E.2, Tevra was also foreclosed in some other channels because of

18  Bayer's "no generics" conspiracy and contracts with distributors, who re-sell Imidacloprid

19  topical into those channels.  Ultimately, Tevra was foreclosed from competing for at least 56%

20  of the total market for Imidacloprid sales in the U.S., and probably much more, due to Bayer's

21  foreclosure of distributors.

22      **F.    BAH GmbH actively participated in monopoly maintenance and exclusive
23            dealing in the U.S.**

24      180.    Bayer documents listed below demonstrate the systematic and ongoing

25  involvement of BAH GmbH in helping to design and implement a ███████████████ in

26  the U.S.  BAH GmbH Global Marketing was extremely worried about the threat that generic

27  competition posed to Bayer's profits in the U.S. (Bayer's largest market), and its executives and

28  staff participated in several levels of management committees in which U.S. generic defense was

-46-

1    discussed.  These included the Strategic Leadership Team, the Global Brand Team, and the Key

2    Country Panel, all of which had both BAH GmbH members and BHC LLC members.  In

3    addition, the yearly Straco (or Strategic Consensus) process was implemented and controlled by

4    BAH GmbH.  That process required BHC LLC to provide BAH GmbH with detailed estimates

5    on expected market entry by manufacturers of generic Imidacloprid, and possible ways to

6    combat generic entry.

7    181.    By 2013, BAH GmbH required BHC LLC to make monthly reports about competitive

8    conditions in the U.S.  Oliver Aue, a Global Brand Manager at BAH GmbH, wrote to David

9    VanBrunt, and others at BHC LLC, as follows:

10
11
12

13    182.    This message was later repeated and reinforced to the BHC LLC by Mario

14    Andreoli, the head of Global Marketing, for BAH GmbH, and the monthly reports on

15    competitive conditions, including generic entry, by BHC LLC to BAH GmbH Global Marketing

16    began.

17    183.    In February 2014 a ████████████████ was conducted between several

18    BAH GmbH executives, including Mario Andreoli, Tobias Boldt, Oliver Aue, Marc Stoeber, and

19    the BHC LLC managers in charge of marketing and selling Imidacloprid topicals in the U.S.

20    The Straco template provided by BAH GmbH required BHC LLC to provide detailed estimates

21    of when generic entry against Bayer's products was expected to occur in the U.S. ███████

22    ████████████████████████████████████████████████

23    ████████████████████████

24    184.    Jeriel Chua, who was a U.S. brand manager for Imidacloprid topicals when he

25    worked for BHC LLC, and later transferred to Global Marketing responsibilities at BAH GmbH,

26    testified that ██████████████████████████████████████████████

27    ███████████████████████████████████████ This is further

28    evidence that generic defense strategy was created and controlled on a global basis, including in

-47-

the U.S., by BAH GmbH.

185.    By 2016, BAH GmbH was implementing what it called ██████████ ██████████ led by Frank Rautenberg, a Global Pricing Excellence Manager.  Since generic entry and generic competition could have serious effects on the prices Bayer could obtain for its products, BAH GmbH was deeply concerned with generic defense strategy.  In 2017, Frank Rautenberg sent an email to several Bayer executives, including Jeriel Chua, who had been the U.S. brand manager for Bayer's Imidacloprid topicals.  Mr. Rautenberg's email stated, in part:

██████████████████████████████████████

186.    On November 3 2016, David VanBrunt, a BHC LLC manager for Imidacloprid topicals, reported to David Zapatero, a BAH GmbH executive in charge of global marketing for Bayer's Imidacloprid topicals, as follows:

██████████████████████████████████████

[emphasis added].

187.    In February 2017, BAH GmbH employees, including Jeriel Chua, who had been a U.S. brand manager for Imidacloprid topicals when he worked for BHC LLC, met with the Advantix "Global Brand Team" to discuss ████████████████████ ██████████ It set the agenda for the next global brand team meeting, which was explicitly to include ██████████████████ ████████

188.    April 10, 2017, Imke Rottman, another Global Pricing Excellence Manager for BAH GmbH, emailed several employees of BHC LLC who were responsible for marketing and sales of Bayer's Imidacloprid topicals in the U.S.  Her email read, in part:

████████████

██████████████████████████████████████

SECOND AMENDED COMPLAINT
CASE NO. 3:19-cv-04312-BLF

[Emphasis added].

189.     In a later email Imke Pickardt (formerly Imke Rottman) discussed generic defense strategy and second brands, as follows:

190.     In September 2019, BAH GmbH made a presentation entitled ████████ ██████████████████████████ This presentation explained the experience gained from using ██ █████████████████████████████████████ The presentation also mentioned the ████████████████████ ████ ████████████████████████████ The presentation also mentioned a ███████████████████████████████████

191.     Accordingly, BAH GmbH took the generic defense strategies that it developed and used globally, particularly the second brands strategy, and applied them in the U.S., to help maintain Bayer's monopoly in Imidacloprid topical and to exclude generic competitors.  It was an active participant in the violations of the Sherman Act and the Clayton Act described in this Second Amended Complaint.

**G.     Bayer possesses monopoly power in the relevant market.**

192.     Bayer possesses monopoly power in the relevant antitrust market, and has possessed that monopoly power at all times relevant to this Second Amended Complaint.

193.     There is substantial direct evidence that Bayer possesses monopoly power.

194.     Direct evidence of Bayer's monopoly power includes its demonstrated ability to

-49-

1    control price and exclude competition in the relevant market, as described in Sections A.d.1 and

2    E.

3        195.    Because of its exclusionary conduct, Bayer has the ability to price Imidacloprid

4    topicals substantially higher than its generic competitors without losing customers.

5        196.    Bayer can and does exclude competitors like Tevra from the relevant market.

6        197.    Other direct evidence of Bayer's market power includes the lack of any

7    meaningful competition in the relevant market.  As described in Sections D.2 and E, Tevra

8    cannot meaningfully compete with Bayer in the relevant market because retailers representing a

9    substantial share of the market are not willing or able to purchase Tevra's generic Imidacloprid

10   products, in fear that they will lose Bayer's anti-competitive discounts and financial incentives to

11   exclude generics.

12       198.    There is also substantial indirect evidence that Bayer possesses monopoly power.

13       199.    Bayer possesses extremely high market shares in the relevant market of at least

14   85%, and receives patent royalties for most of the other 15%.

15   **H.    Anticompetitive Effects of Bayer's Conduct.**

16       200.    Bayer's anti-competitive conduct substantially lessened competition and

17   maintained its monopoly in the relevant market for Imidacloprid topicals.  It also had the

18   following anti-competitive effects:

19       a.    Tevra, and other sellers of generic Imidacloprid topicals, were substantially

20           foreclosed from the market for Imidacloprid topicals.

21       b.    Retailers were prevented from purchasing lower-cost, equally-effective, generic

22           Imidacloprid topicals.

23       c.    Retailers were prevented from offering consumers a wider selection of

24           Imidacloprid topicals.

25       d.    Consumers were prevented from purchasing lower-cost, more effective,

26           Imidacloprid topicals, causing them to pay higher prices, and

27       e.    Consumers were denied choices of competing Imidacloprid topicals.

28

-50-

1    **I.      Lack of Pro-Competitive Justification for Bayer's Actions**

2          201.    There are no pro-competitive justifications for Bayer's conduct, which served

3    only to preserve Bayer's monopoly and resulting profits.  It does nothing to advance market

4    efficiency or consumer welfare.  To the contrary, Bayer's anti-competitive conduct has damaged

5    competition, raised prices, and diminished choices for retailers, distributors, and consumers.

6    **J.      Antitrust Injury**

7          202.    Tevra has suffered injuries of the type that U.S. antitrust laws were intended to

8    prevent, and those injuries flow directly and proximately from Bayer's illegal monopolization

9    and exclusive dealing.  Bayer's conduct reduced competition, and Tevra was injured by the

10   reduction in competition.

11         203.    Bayer's illegal monopolization and exclusive dealing substantially foreclosed

12   Tevra from entering the relevant antitrust market for Imidacloprid topicals, thereby causing

13   Tevra to lose prospective profits on the sale of its generic Imidacloprid topical.

14         204.    Tevra was almost totally foreclosed from selling its products to pet specialty

15   retailers and internet retailers, which purchased about 50% of all Imidacloprid topicals in 2018.

16         205.    Tevra has been substantially foreclosed from entering the relevant antitrust market

17   indefinitely, since Bayer (and its successor, Elanco) has been able to maintain both its verbal and

18   written agreements with retailers.

19         206.    Bayer's illegal conduct disrupts competition in the relevant market.  Because

20   Bayer has foreclosed at least 56% of the relevant antitrust market, even when Tevra offers

21   significantly lower per-transaction prices, a substantial share of customers will not do business

22   with Tevra.  Because of Bayer's conduct, no competitor, including Tevra, can compete with

23   Bayer.  Bayer is enabled, free from competitive discipline, to continue to demand higher prices

24   from its customers for Imidacloprid topicals.  In turn, Bayer's anti-competitive conduct has

25   resulted in the ultimate consumers being harmed by having to pay higher prices for Imidacloprid

26   topicals.

27         207.    Bayer's illegal conduct has succeeded in substantially foreclosing all meaningful

28   competition from the relevant market and substantially lessened competition and tended to create

1   and maintain a monopoly, by keeping generic Imidacloprid topical manufacturers from selling to

2   a substantial share of the relevant antitrust market.

3   **K.     Tevra has attempted to mitigate its damages, without success.**

4        208.    Tevra has made numerous attempts to mitigate its damages by selling its generic

5   Imidacloprid topicals wherever, and to whomever, it can.  Tevra has sold small quantities of its

6   products to small independent pet stores, and has sold to general retailers wherever possible.

7        209.    Tevra has also sold its products directly to consumers, through its own website

8   and through Amazon.  Unfortunately, direct-to-consumer sales can only reach a small subset of

9   consumers that are willing to switch from pet specialty retailers like PetCo and major internet

10  retailers like Chewy.com.

11       210.    These direct-to-consumer sales also present significantly higher transactional

12  costs, lower profit margins, and higher risks for Tevra and other manufacturers of generic

13  Imidacloprid topicals than do sales to retailers and are therefore not cost efficient for Plaintiff or

14  for other manufacturers of generic Imidacloprid topicals.  Moreover, direct-to-consumer sales are

15  more difficult for products, like Tevra's Imidacloprid topicals, that have been excluded from the

16  largest internet and pet specialty retailers, rendering them "unknowns" to consumers.

17  **L.     Tevra Has Been Damaged by Bayer's Anti-Competitive Conduct.**

18       211.    Tevra was damaged by Bayer's anti-competitive conduct that foreclosed Tevra

19  from selling generic Imidacloprid topicals to retailers, and caused it to lose the prospective

20  profits it would have earned, as described in this Section of this Second Amended Complaint.

21       212.    One way to estimate Tevra's lost profits caused by Bayer's illegal conduct is to

22  compare Tevra's 2016 projections of its future sales of its generic Fipronil products and its

23  generic Imidacloprid products to its actual sales of these products.

24       213.    Tevra's 2016 projections of its future sales of its generic Fipronil products were

25  conservative, and Tevra actually sold more generic Fipronil products than it projected, as shown

26  in Table 3, below.

27

28

| Year | Projected Fipronil Sales to Online Retailers | Actual Fipronil Sales to Online Retailers | Projected Fipronil Sales to Pet Specialty Retailers | Actual Pet Fipronil Sales to Pet Specialty Retailers |
|---|---|---|---|---|
| 2017 | $85,179 | $61,322 | $133,093 | $190,505 |
| 2018 | $689,947 | $1,986,219 | $1,078,052 | $2,319,479 |
| 2019 | $1,294.716 | Est. $2M | $2,023,011 | Est. $3M |
| TOTALS | $2,069,841 | $4,047,541 | $3,234,156 | $5,448,662 |

**Table 3 – Projected and Actual Wholesale Sales of Fipronil by Tevra**

214.    In 2016, Tevra also made projections of the future sales of its generic Imidacloprid products, using the same methodology and assumptions as its Fipronil sales projections.  Tevra's projections, which should have been as accurate as its Fipronil projections, and the actual sales into the foreclosed markets, are set forth in Table 4, below.

| Year | Projected Imidacloprid Sales to Online Retailers | Actual Imidacloprid Sales to Online Retailers | Projected Imidacloprid Sales to Pet Specialty Retailers | Actual Imidacloprid Sales to Pet Specialty Retailers |
|---|---|---|---|---|
| 2017 | $5,016,213 | $119,040 | $4,859,458 | $413,979 |
| 2018 | $9,278,240 | $17,267 | $8,988,295 | $549,652 |
| 2019 | $13,823,310 | Est. $13,500 | $13,391,380 | Est. $506,925 |
| 2020 | $13,823,310 | Est. $13,500 | $13,391,380 | Est. $506,925 |
| 2021 | $13,823,310 | Est. $13,500 | $13,391,380 | Est. $506,925 |
| TOTALS | $55,764,433 | Est. $149,807 | $54,021,891 | Est. $2,484,406 |

**Table 4 – Projected and Actual Wholesale Sales of Imidacloprid by Tevra.**

215.    If Tevra had actually sold the projected amount of Imidacloprid in 2017, 2018, 2019, 2020, and 2021, it would have made a total net profit, after the cost of goods sold and other expenses are deducted, of at least $76,058,900.

216.    Tevra is entitled to treble damages, totaling at least $228,176,000, plus its attorney fees and the costs of this action.

-53-

## CLAIMS FOR RELIEF

### COUNT I
### UNLAWFUL MAINTENANCE OF A MONOPOLY, IN VIOLATION OF § 2 SHERMAN ACT, 15 U.S.C. §2

217.     Tevra incorporates all other allegations in this Second Amended Complaint into Count I.

218.     Bayer has a monopoly on the sale of Imidacloprid topicals in the U.S., and made approximately 85% of all sales in the relevant market in 2018.

219.     At all relevant times, Bayer has had monopoly power in the United States in the sale of Imidacloprid topicals.

220.     Bayer has willfully maintained its monopoly by means of its unlawful and anticompetitive exclusive dealing arrangements, extensive loyalty discounts aimed at preventing retailers and distributors from doing business with Bayer's competitors, other understandings or agreements with retailers and distributors, its generic defense and "2nd Brand" strategies, its verbal "no generics" agreements with retailers and distributors, direct payments to retailers to remove competitor products from the retailers' shelves, and changes to contracts with retailers to punish those who carried generic competitors to Bayer's products, and reward those who did not with discounts, growth bonuses, and trade funds.  Collectively, Bayer's conduct, agreements, contracts, and understandings substantially foreclose the relevant market.

221.     The effects of Bayer's monopoly have been to raise prices for both retailers and consumers, prevent the sale of lower cost, equally or more effective, competing products in the relevant market, to substantially foreclose competitors from access to the relevant market, to substantially lessen competition, and to create and maintain a monopoly in the relevant market.

222.     Tevra has been damaged by Bayer's maintenance of its monopoly by being substantially foreclosed from selling its products in the relevant market and by losing profits it would have made, but for Bayer's unlawful maintenance of its monopoly.

**WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards against each Bayer defendant:

-54-

a.      A declaration that Bayer has violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

b.      Damages in the amount of at least $76,058,900, for lost profits and lost value of the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15 to a total of at least $228,176,700;

c.      The costs of this action, including reasonable attorney fees; and

d.      Such other relief as the Court finds just and equitable.

## COUNT II
## CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE, IN VIOLATION OF § 1 SHERMAN ACT, 15 U.S.C. §1

### Exclusive Dealing

223.    Tevra incorporates all other allegations in this Second Amended Complaint into Count II.

224.    Bayer entered into contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

225.    Bayer's illegal agreements included, but were not limited to, (a) exclusive dealing agreements with retailers and distributors that contain, among other things, a web of anti-competitive loyalty discounts, with the intent and effect of substantially foreclosing the relevant market and substantially foreclosing Tevra and other competitors from the relevant market; (b) agreements or understandings between Bayer and its customers through which Bayer's customers agreed not to purchase generic Imidacloprid products like Tevra's; and (c) other agreements and understandings with retailers and distributors that operated to substantially foreclose Tevra and other competitors from entering the relevant market.

226.    Defendants' anti-competitive acts involved United States commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising prices for Imidacloprid topicals and substantially foreclosing competitors from the relevant market in the United States.

-55-

227.     As a direct and proximate result of Bayer's anti-competitive conduct, Tevra has been injured in its business or property by being substantially foreclosed from the relevant market.

**WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards against each Bayer defendant:

a.     A declaration that Bayer has violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.     Damages in the amount of at least $76,058,900, for lost profits and lost value of the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15 to a total of at least $228,176,700;

c.     The costs of this action, including reasonable attorney fees; and

d.     Such other relief as the Court finds just and equitable.

## COUNT III
## EXCLUSIVE DEALING IN VIOLATION OF § 3 CLAYTON ACT, 15 U.S.C. § 14

228.     Tevra incorporates all other allegations in this Complaint into Count III.

229.     Bayer has engaged in substantial U.S. interstate commerce by selling goods, including Imidacloprid topicals, to distributors and retailers.

230.     Bayer's anti-competitive conduct described in this Second Amended Complaint based the price of goods it sold, or discounts from, or rebates upon, such price, on the condition, agreement or understanding that the purchaser thereof shall not deal in the goods of a competitor, in violation of § 3 of the Clayton Act, 15 U.S.C. § 14.

231.     One effect of the condition, agreement or understanding described in the paragraph immediately above, above, is to substantially lessen competition in a line of commerce and tend to create and maintain a monopoly in the relevant market.

232.     Another effect of the condition, agreement or understanding, described in ¶ 230, above, was to foreclose Tevra from a substantial share of relevant market.

233.     Tevra has been damaged by the exclusive dealing scheme by being substantially foreclosed from selling its products in the relevant market, and by losing profits it would have

-56-

1    made but for the exclusive dealing scheme.

2          **WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards

3    against each Bayer defendant:

4          a.      A declaration that Bayer has violated the Clayton Act § 3, 15 U.S.C. § 14;

5          b.      Damages in the amount of at least $76,058,900, for lost profits and lost value of

6                  the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15 to a

7                  total of at least $228,176,000;

8          c.      The costs of this action, including reasonable attorney fees; and

9          d.      Such other relief as the Court finds just and equitable.

10                              <u>**JURY DEMAND**</u>

11         Tevra hereby demands a trial by jury on all issues so triable.

12

13   Dated:  March 29, 2021                    Respectfully Submitted,

14                                              POLSINELLI LLP

15

16                                              */s/ Daniel D. Owen*
                                         By:    Daniel D. Owen

17                                              Attorneys for Plaintiff
                                                TEVRA BRANDS, LLC
18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT
CASE NO. 3:19-cv-04312-BLF