1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                         SAN JOSE DIVISION

4

5     TEVRA BRANDS, LLC,              )  C-19-04312 BLF
                                      )
6                    PLAINTIFF,       )  SAN JOSE, CALIFORNIA
                                      )
7              VS.                    )  NOVEMBER 3, 2021
                                      )
8     BAYER HEALTHCARE LLC, AND BAYER )  PAGES 1-63
      ANIMAL HEALTH GMBH, AND BAYER   )
9     AG,                             )
                                      )
10                   DEFENDANTS.      )
      _____ )

11

12

13                  TRANSCRIPT OF ZOOM PROCEEDINGS
                BEFORE THE HONORABLE BETH LABSON FREEMAN
14                  UNITED STATES DISTRICT JUDGE

15

16    A P P E A R A N C E S:

17    FOR THE PLAINTIFF:    POSINELLI LLP
                            BY:  COLBY B. SPRINGER
18                          THREE EMBARCADERO CENTER, SUITE 2400
                            SAN FRANCISCO, CALIFORNIA  94111
19
                            BY:  DANIEL D. OWEN
20                          900 WEST 48TH PLACE, SUITE 900
                            KANSAS CITY, MISSOURI  64112
21

22            APPEARANCES CONTINUED ON THE NEXT PAGE

23    OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                  CERTIFICATE NUMBER 9595
24

25            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                  TRANSCRIPT PRODUCED WITH COMPUTER

1

2      APPEARANCES (CONTINUED)

3

4      FOR THE DEFENDANTS:      ARNOLD & PORTER KAYE SCHOLER LLP
                               BY:  DANIEL B. ASIMOW
5                                   SEAN M. CALLAGY
                               THREE EMBARCADERO CENTER, 10TH FLOOR
6                              SAN FRANCISCO, CALIFORNIA  94111

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      SAN JOSE, CALIFORNIA                    NOVEMBER 3, 2021

 2                      P R O C E E D I N G S

 3          (ZOOM PROCEEDINGS CONVENED AT 9:34 A.M.)

 4              THE COURT:  OKAY.  LET'S GO ON TO OUR NEXT CASE.

 5              THE CLERK:  OKAY.  WE'RE GOING TO BE MOVING ON TO THE

 6      TEVRA BRANDS CASE NEXT.  IF REGISTERED COUNSEL WILL PLEASE

 7      RAISE YOUR HANDS.

 8          (PAUSE IN PROCEEDINGS.)

 9              THE CLERK:  AND I'M GOING TO SEND YOU AN INVITATION

10      TO JOIN AS A PANELIST.  IF YOU WOULD PLEASE ACCEPT THE

11      INVITATION.

12          (PAUSE IN PROCEEDINGS.)

13              THE CLERK:  OKAY, YOUR HONOR.

14              THE COURT:  IS -- OH, THERE'S MR. ASIMOW.  I FIGURED

15      HE WOULD MOST DEFINITELY BE JOINING US TODAY.

16          ALL RIGHT.  GOOD MORNING TO ALL OF YOU.  LET'S CALL THE

17      CASE AND GET YOUR APPEARANCES.

18              THE CLERK:  CALLING CASE 19-4312, TEVRA BRANDS LLC

19      VERSUS BAYER HEALTHCARE LLC, ET AL.

20          COUNSEL, IF YOU WOULD PLEASE STATE YOUR APPEARANCES, AND

21      IF WE COULD BEGIN WITH PLAINTIFF AND THEN MOVE TO DEFENDANT.

22              MR. SPRINGER:  GOOD MORNING, YOUR HONOR.

23          COLBY SPRINGER AND DANIEL OWEN FOR THE PLAINTIFF, AND

24      UNLESS THE COURT HAS ANY OBJECTION, MR. OWEN WILL BE MAKING THE

25      ARGUMENT TODAY, SO I'LL TURN OFF MY CAMERA AND AUDIO UNLESS
```

```
1      THERE'S ANY PARTICULAR NEED.

2              THE COURT:  NO.  YOU'RE WELCOME TO STAY ON.

3              MR. SPRINGER:  I'LL BE HERE.  I JUST FIGURED, I'VE

4      GRACED EVERYONE WITH MY PRESENCE, SO, YOU KNOW --

5          (LAUGHTER.)

6              THE COURT:  THANK YOU.

7              MR. SPRINGER:  I DON'T WANT TO DISTRACT EVERYONE WITH

8      MY GREAT LOOKS, YOUR HONOR, SO I'LL TURN IT OVER TO MR. OWEN.

9              THE COURT:  MR. OWEN, GOOD MORNING TO YOU.

10             MR. OWEN:  GOOD MORNING, YOUR HONOR.

11             MR. ASIMOW:  AND GOOD MORNING, YOUR HONOR.

12         DANIEL ASIMOW AND SEAN CALLAGY FOR DEFENDANTS.

13             THE COURT:  GOOD MORNING.

14         AND, MR. ASIMOW, I JUST WANTED TO FOLLOW UP FROM LAST

15     WEEK.  I'M SORRY I WAS SO EXASPERATED WITH YOU WHEN WE HAD, HAD

16     TO CONTINUE THE HEARING.  WE GAVE SOME THOUGHT TO HOW WE COULD

17     BETTER HAVE BEEN AVAILABLE TO YOU WHEN WE HAD A SCHEDULING

18     PROBLEM, AND I -- SO I'M SORRY IF I SEEMED SO EXASPERATED.

19             MR. ASIMOW:  YOUR HONOR, NOT AT ALL.  IT'S REALLY A

20     LESSON TO ME NOT TO TRY TO CUT IT SO CLOSE WITH THE HEARING.  I

21     DON'T BELIEVE I'VE EVER HAD TO DO ANYTHING LIKE THAT BEFORE,

22     AND I FEEL TERRIBLE ABOUT INCONVENIENCING THE COURT AND OTHER

23     COUNSEL.

24         SO I AM WITH YOU FOR AS LONG AS YOU NEED TODAY AND WE

25     WILL -- WE'LL AVOID CREATING THAT TYPE OF CONFLICT.
```

1          THE COURT:  ALL RIGHT.  AND I HOPE YOU MADE YOUR

2     FLIGHT.

3          MR. ASIMOW:  I DID, WITH ABOUT TEN MINUTES TO SPARE.

4          THE COURT:  YIKES.  THAT'S A LITTLE CLOSE FOR

5     COMFORT.

6       OKAY.  AND, MR. OWEN, YOU CERTAINLY EXTENDED YOUR COURTESY

7     TO MR. ASIMOW, AND I KNOW HE'S EXPRESSED HIS APPRECIATION FOR

8     THAT.

9          MR. OWEN:  SURE THING, YOUR HONOR.

10      CAN WE MOVE THIS ALONG?  I'VE GOT TO CATCH A PLANE IN A

11    FEW MINUTES.

12       (LAUGHTER.)

13          MR. OWEN:  NO, I'M JOKING, OF COURSE.

14          THE COURT:  OKAY.

15          MR. OWEN:  AND I WAS AWARE, AND MR. ASIMOW RAISED IT

16    WITH ME, THAT HE HAD THIS PLANE AND HOPED WE COULD GO AT THE

17    FRONT OF THE DOCKET, AND FRANKLY, I WAS HOPING TO HAVE A

18    HEARING IN PERSON, BUT HE JUST WASN'T ABLE TO GET A WORD IN TO

19    GET TO THE FRONT OF THE DOCKET.  AND I KNEW WHAT HE WAS TRYING

20    TO DO, WE TALKED ON THE PHONE THAT MORNING.  IT'S JUST

21    UNFORTUNATE THE WAY IT WORKED OUT.

22          THE COURT:  OKAY.  SO YOU RAISE AN INTERESTING ISSUE,

23    MR. OWEN.  I WOULD WELCOME AN IN PERSON HEARING IF ALL COUNSEL

24    WERE WILLING.  YOU ARE THE ONES WHO WOULD HAVE TO GET ON AN

25    AIRPLANE, AND SO I'M VERY SENSITIVE TO PEOPLE'S RETICENCE TO DO

1      THAT.

2          BUT IF YOU, IN THE FUTURE -- ALTHOUGH AFTER THIS HEARING,

3      WE MAY BE DONE FOR AWHILE -- BUT IF YOU WANT AN IN PERSON

4      HEARING, ALL YOU NEED TO DO IS ASK, BECAUSE I'M IN COURT.

5      WE'RE HERE EVERY DAY.

6          MR. OWEN:  OKAY.  I WOULD HAVE PREFERRED TO HAVE DONE

7      IT, BUT, AGAIN, MR. ASIMOW AND I SPOKE A COUPLE WEEKS BEFORE

8      THE HEARING AND CONCLUDED IT WOULD BE BETTER TO DO IT BY ZOOM.

9          THE COURT:  OKAY.

10         MR. OWEN:  SO I AM --

11         THE COURT:  THAT'S FINE.

12         MR. OWEN:  I DON'T WANT TO SPEND MONEY UNNECESSARILY,

13     BUT I THINK THERE'S VALUE IN IN PERSON HEARINGS.

14         THE COURT:  SURE.

15         MR. OWEN:  AND QUITE FRANKLY, I LIVE IN KANSAS, BUT

16     MY GREAT GRANDFATHER WAS BROUGHT IN A LITERAL COVERED WAGON AND

17     WE'VE BEEN TRAPPED HERE FOR GENERATIONS.

18         THE COURT:  THERE YOU GO.

19        (LAUGHTER.)

20         THE COURT:  ALL YOU NEED TO DO IS PULL THAT COVERED

21     WAGON OUT OF THE GARAGE AND BRING IT ON.  THAT WOULD BE FINE.

22        OKAY.  ALL RIGHT.  SO LET'S GET DOWN TO WORK.  I CERTAINLY

23     HAVE SPENT A LOT OF TIME LOOKING OVER THE NEW PLEADING, AND

24     MR. OWEN HAS MADE SIGNIFICANT CHANGES IN THE SHAPE AND CONTOURS

25     OF THE CASE.

```
1          I WANTED TO GO THROUGH WHAT I IDENTIFIED AS FIVE ISSUES,
2    AND THAT MAY BE A GROSS OVERSIMPLIFICATION, TO GIVE YOU SOME
3    GUIDANCE ON WHERE I'M LEANING, AND THEN I, AS ALWAYS, WANT
4    REALLY TO HEAR FROM YOU.  BUT I THINK IT HELPS YOU TO KNOW
5    WHERE I AM AT THIS POINT.
6          SO I'M GOING TO START WITH THE BIGGEST ISSUE, WHICH IS THE
7    RELEVANT MARKET.  THERE'S BEEN A BIG CHANGE.  THE LIMITATION ON
8    THE CHANNELS OF SALES HAS BEEN ELIMINATED.  THAT AFFECTS THE
9    PERCENTAGE OF THE MARKET THAT CAN BE ALLEGED THAT BAYER HAS,
10   BUT I DON'T THINK IT TAKES IT DOWN TOO LOW FOR THE ARGUMENTS
11   THAT ARE MADE.
12         I CONTINUE TO HAVE CONCERNS ABOUT THE -- ABOUT THE
13   RELEVANT MARKET.  I AM CONCERNED THAT PRODUCTS WITH --
14   CONTAINING FIPRONIL ARE ELIMINATED AND THAT THE -- AND THAT THE
15   IMIDACLOPRID IS THE SOLE INGREDIENT.
16         BUT I -- AND THAT COLLARS ARE ELIMINATED AND THE ORAL
17   MEDICATIONS HAVE BEEN ELIMINATED.  THIS IS ONLY SQUEEZE ON WITH
18   THIS PARTICULAR CHEMICAL.
19         IT SEEMS VERY NARROW TO ME, BUT I -- AT THE END OF THE
20   DAY, MR. ASIMOW, I THINK I'M REACHING TOO FAR INTO WHAT EXPERTS
21   REALLY NEED TO TELL ME ABOUT THE MARKET.  I DON'T EVEN OWN A
22   DOG, SO I DON'T EVEN KNOW WHAT -- I MEAN, AND NOT THAT -- AND
23   MAYBE THAT'S GOOD BECAUSE I DON'T KNOW WHAT CONSUMERS THINK
24   WHEN THEY'RE STANDING AT THE STORE LOOKING TO BUY ONE OF THESE
25   PRODUCTS.
```

1            BUT A -- I WOULD EXPECT THAT IN A CASE LIKE THIS, THE

2     PARTIES WILL CONSIDER CONSUMER SURVEYS ON THIS ISSUE.  YOU'RE

3     NOT REQUIRED TO.  I HAVE HAD CASES WHERE THERE WERE NO CONSUMER

4     SURVEYS AND IT'S JUST A WAY OF PRESENTING IT.  I'M NOT THE ONE

5     WHO'S MAKING THOSE DECISIONS.

6            BUT AT THE END OF THE DAY, I THINK AT A MOTION TO DISMISS

7     THAT I CAN'T GO ANY FURTHER.

8            YOU KNOW MY VIEW ON WHAT I THINK THE WEAKNESSES ARE, BUT

9     ULTIMATELY A JURY WILL TELL US IF THEY AGREE, AND WE'LL ALL BE

10    BETTER EDUCATED LATER.

11           THE SECOND ISSUE THAT IS RAISED IS THIS SECOND BRAND

12    STRATEGY.  IT -- AND IT'S AN INTERESTING ARGUMENT, AND

13    MR. OWEN, I ACTUALLY FOUND, ALTHOUGH I DIDN'T READ THE ARTICLES

14    THEMSELVES, BUT THE BRIEF SUMMARY OF THE ACADEMIC STUDIES THAT

15    YOU PRESENTED MAKE ECONOMIC SENSE IN TERMS OF THE POTENTIAL

16    ANTICOMPETITIVE EFFECTS OF A SPONSORED SECOND BRAND ON PRICES,

17    OF KEEPING ALL PRICES UP ARTIFICIALLY.

18           BUT I DON'T SEE ANY SUPPORT FOR THE SECOND BRAND STRATEGY

19    BEING ANTICOMPETITIVE IN THE LAW, AND IN FACT, I'M INCLINED TO

20    FIND THAT IT'S PRO COMPETITIVE AS A MATTER OF LAW, AS

21    MR. ASIMOW HAS ARGUED, WHICH WOULD ELIMINATE THE SECOND BRAND

22    STRATEGY AS ONE OF YOUR THEORIES.

23           THAT -- I'LL JUMP TO WHAT IS I THINK SORT OF A SEPARATE

24    ISSUE, WHICH IS THE PERSONAL JURISDICTION ARGUMENT REGARDING

25    BAYER GMBH.  I'LL POSE THE QUESTION TO YOU:  IF I PRECLUDE THE

1    SECOND BRAND STRATEGY, IS THAT THE END OF THE ARGUMENT ON

2    PERSONAL JURISDICTION?  I THINK IT MAY BE.

3        BUT EVEN IF IT'S NOT, I ACTUALLY AM NOT PERSUADED THAT YOU

4    HAVE SHOWN PURPOSEFUL DIRECTION UNDER THE EFFECTS TEST, AND I'M

5    REALLY BASING THAT ON THE DEPOSITIONS OF THE DEFENDANT'S

6    EMPLOYEES, BOTH IN THE U.S., AND THOSE DEPOSITIONS THAT I FEEL

7    SAY -- CAN ONLY BE INTERPRETED AS SAYING THAT THIS WAS HIGH

8    LEVEL STRATEGY AND NOT DIRECTION.

9        ON THE LAST TWO ISSUES THAT I THINK ARE ADDRESSED -- AND

10   IF I'VE MISSED THINGS, YOU'LL CERTAINLY REMIND ME OF THEM -- ON

11   THE FORECLOSURE ISSUE, EXCLUSIVE DEALING, MR. ASIMOW, I THINK

12   YOU'VE MADE SOME GOOD POINTS, BUT I'VE ALREADY RULED ON THIS.

13   I SEE NO REASON TO GO BACK ON THAT RULING.

14       AND ON MONOPOLY POWER, I'VE ALREADY APPROVED THAT AS WELL

15   AND, YES, YOU POINT OUT SOME FLAWS ON THE MONOPOLY POWER, BUT I

16   THINK I'M PREPARED TO GO FORWARD ON THAT AS WELL.

17       AND I DID NOT READ QUALCOMM AS REQUIRING ME TO GO BACK

18   OVER THE MONOPOLY POWER ISSUE, ALTHOUGH QUALCOMM IS A LITTLE

19   HARD TO GET THROUGH FOR MANY REASONS.

20       ALL RIGHT.  THAT'S MY HIGH LEVEL.  I JUST WANTED TO WALK

21   THROUGH IT.

22       I ORGANIZED THE ISSUES THAT WAY AS TO THOSE FIVE THINGS.

23       SO, MR. ASIMOW, IT IS YOUR MOTION.  IF I'VE MISSED SOME

24   GROSS CATEGORY, PLEASE LET ME KNOW BECAUSE THIS IS SORT OF MY

25   OUTLINE.  BUT THERE ARE OBVIOUSLY SUB-ISSUES HERE AND I

1    RECOGNIZE THAT.

2         SO LET ME START WITH THE DEFENDANTS, IT IS YOUR MOTION,

3    AND THEN I'LL TURN TO MR. OWEN.

4         MR. OWEN:  YOUR HONOR, COULD I JUST TAKE ONE OF THOSE

5    ISSUES OFF THE TABLE FOR YOU?

6         THE COURT:  SURE.

7         MR. OWEN:  I WOULD AGREE THAT THE ONLY ALLEGATIONS OF

8    GM -- OF THE GERMAN COMPANY, BAYER ANIMAL HEALTH GMBH,

9    PARTICIPATING IN STRATEGIES TO BLOCK GENERIC ENTRY COME IN THE

10   FORM OF THE SECOND BRAND STRATEGY.

11        NOW, WE THINK THEY'RE SUFFICIENT, BUT IF, IN FACT, THE

12   COURT FINDS THE SECOND BRAND STRATEGY TO BE PRO COMPETITIVE, WE

13   DON'T MAKE ANY OTHER ALLEGATIONS THAT GMBH WAS DIRECTLY

14   INVOLVED OR PURPOSEFULLY DIRECTING WITH ANYTHING OTHER THAN THE

15   SECOND BRAND STRATEGY.

16        THE COURT:  THANK YOU.  THAT'S REALLY HELPFUL.  GOOD.

17   ALL RIGHT.  WITH THAT, MR. ASIMOW, WHY DON'T YOU START?

18        MR. ASIMOW:  SURE.  THANK YOU, YOUR HONOR.  I

19   APPRECIATE THE COURT'S GUIDANCE.  I KNOW THE COURT HAS SPENT A

20   LOT OF TIME ON THIS CASE AND THINKING ABOUT IT.

21        OUR PLAN WAS I WOULD ADDRESS THE ANTITRUST ISSUES AND MY

22   PARTNER, MR. CALLAGY, WILL ADDRESS PERSONAL JURISDICTION.

23        THE COURT:  ALL RIGHT.

24        MR. ASIMOW:  AND I CERTAINLY AGREE WITH THE COURT,

25   THE MARKET DEFINITION IS THE MOST IMPORTANT ISSUE HERE, BECAUSE

1    IF THE MARKET IS NOT ADEQUATELY ALLEGED, ALL OF THE CLAIMS NEED

2    TO BE DISMISSED THEN, SO THAT'S THE FOUNDATION FOR EVERY ONE OF

3    THE CLAIMS HERE.

4         THE COURT:  RIGHT.

5         MR. ASIMOW:  AND I ALSO AGREE WITH THE COURT THAT THE

6    SECOND AMENDED COMPLAINT IS BETTER.  IT DOES HAVE MORE

7    ALLEGATIONS THAN THE FIRST AMENDED COMPLAINT.

8         BUT I STILL THINK, WHEN WE -- WHEN WE DRILL DOWN ON IT,

9    THERE IS NOT ENOUGH THERE TO OVERCOME THE COMMON SENSE

10   REALIZATION THAT TWO FLEA AND TICK PRODUCTS FOR COMPANION

11   ANIMALS THAT DO THE SAME THING THAT ARE SOLD SIDE BY SIDE

12   AGAINST EACH OTHER ARE COMPETITIVE.

13        AND THE ONE I REALLY WANT TO FOCUS ON, BECAUSE IT'S ENOUGH

14   TO GRANT THE MOTION, IS THE BRAND FIPRONIL PRODUCT, FRONTLINE.

15   IF FRONTLINE IS IN THE SAME MARKET AS THE BAYER TOPICAL

16   IMIDACLOPRID PRODUCTS, THEN I THINK THE RELEVANT SHARES WILL BE

17   TOO LOW FOR, FOR EITHER EXCLUSIVE DEALING AND CERTAINLY FOR

18   MONOPOLIZATION TO GO FORWARD.

19        I THINK THE OTHER PRODUCTS, THE TOPICALS AND THE COLLARS

20   ARE ALSO IN THE SAME MARKET, BUT WE DON'T EVEN HAVE TO GET

21   THERE IF THE BRAND FIPRONIL PRODUCT IS IN THE SAME MARKET.

22        BUT I DO THINK, AS THE COURT NOTED IN ITS PRIOR ORDER,

23   COMMON SENSE DOES PLAY A ROLE HERE AS A STARTING POINT.

24        AND WE ALSO KNOW, FROM THE COMPLAINT, AS WELL AS SHOWN IN

25   THE DOCUMENTS THAT ARE REFERENCED IN THE COMPLAINT, THAT BAYER

1    TRACKS ITS PRODUCTS AGAINST OTHER FLEA AND TICK PRODUCTS, AND

2    IN PARTICULAR AGAINST FRONTLINE, WHICH IS ACTUALLY THE MARKET

3    LEADER WITH A SIGNIFICANTLY LARGER SHARE THAN THE BAYER

4    PRODUCT.

5         AND AS IN THE GERMAN AUTO PARTS CASE, THE CAR CASE, IT

6    WOULDN'T MAKE ANY SENSE TO DO THAT IF THE PRODUCTS DID NOT

7    COMPETE.

8         AGAINST THAT BACKGROUND, AS I READ THE COMPLAINT,

9    PLAINTIFF HAS COME FORTH WITH FOUR SETS OF ALLEGATIONS ABOUT

10   WHY FRONTLINE SHOULD NOT BE IN THE SAME MARKET, AND I -- I'LL

11   TAKE THOSE ONE BY ONE WITH THE COURT'S PERMISSION.

12         THE COURT:  OKAY.

13         MR. ASIMOW:  WE CAN STOP THERE IF ARE QUESTIONS ABOUT

14    ANY OF THEM.

15         THE FIRST REASONS THAT PLAINTIFF GIVES ARE THAT THERE ARE

16   SOME DIFFERENCES BETWEEN THE PRODUCTS, THAT CONSUMERS MIGHT

17   HAVE A PREFERENCE FOR ONE OVER THE OTHER.

18         WE'VE SEEN THIS ALLEGATION BEFORE, ONE KILLS FLEAS AND THE

19   TICKS; AND THE OTHER, IN ADDITION TO KILLING THEM, REPELS THEM.

20         I THINK THOSE ARGUMENTS HAVE ALREADY BEEN CONSIDERED BY

21   THE COURT AND REJECTED IN THE LAST ORDER, THE SEPTEMBER 2020

22   ORDER.

23         AND AS THE COURT EXPLAINED AT THAT TIME, THESE ARE MINOR

24   DIFFERENCES AND THEY ARE INSUFFICIENT TO PUT THE PRODUCTS IN A

25   DIFFERENT MARKET.

1       AND, INDEED, IF THEY -- IF THAT WAS ENOUGH, THEN, AS THE

2   COURT POINTED OUT, TEVRA WOULD NOT BE IN THE SAME MARKET AS

3   BAYER BECAUSE TEVRA ALLEGES THERE ARE DIFFERENCES IN THE

4   EFFECTIVENESS AND THE PRICING OF ITS PRODUCT, AND IT HAS TO BE

5   IN THE SAME MARKET IF IT WANTS TO HAVE STANDING TO BRING AN

6   ANTITRUST CLAIM AGAINST BAYER.

7       SO I THINK THOSE -- THAT SET OF ALLEGATIONS HAS ALREADY

8   BEEN ADDRESSED BY THE COURT.

9       SO I TURN THEN TO ONE THAT I THINK PLAINTIFF PUTS A LOT OF

10  WEIGHT ON AND THAT WE NEED TO CONSIDER CAREFULLY, AND THAT'S

11  ABOUT THE INTRODUCTION OF GENERIC FIPRONIL IN 2011 AND

12  PLAINTIFF'S ALLEGATION THAT THAT CREATED A NATURAL EXPERIMENT

13  TO LET US SEE IF FIPRONIL IS IN THE SAME MARKET AS TOPICAL

14  IMIDACLOPRID PRODUCTS.

15      I THINK THERE ARE MULTIPLE REASONS WHY THE ALLEGATION IS

16  NOT SUFFICIENT.

17      SO, FIRST, THIS IS CONCERNING GENERIC FIPRONIL PRODUCTS,

18  NOT THE BRAND FRONTLINE PRODUCT, WHICH HAS ALWAYS BEEN THE

19  PRIMARY COMPETITOR TO BAYER'S ADVANTIX AND ADVANTAGE PRODUCTS.

20  SO I DON'T THINK THIS EVEN WILL SHOW, AS I'LL GET TO IN A

21  MOMENT, THAT GENERIC FIPRONIL IS IN A DIFFERENT MARKET.

22      BUT EVEN IF IT WERE, THAT WOULDN'T TELL US WHETHER BRAND

23  FIPRONIL IS IN A DIFFERENT MARKET.

24      AND IT'S NOT SURPRISING THAT THE COMPETITION WOULD MORPH

25  BETWEEN THE TWO LEADING BRAND PRODUCTS.  FOR A CONSUMER TO

 1     SWITCH FROM BRAND IMIDACLOPRID, LIKE K9 ADVANTIX, TO A GENERIC

 2     FIPRONIL, THEY'RE KIND OF MAKING TWO JUMPS.  THEY'RE CHANGING

 3     INGREDIENTS, AND THEY'RE GOING FROM A BRAND TO A GENERIC

 4     PRODUCT.

 5          SO IT'S NOT SURPRISING THAT THAT WOULD BE A MORE

 6     ATTENUATED COMPETITION THAN THE COMPETITION BETWEEN THE BRAND

 7     PRODUCTS.  AND AS I SAY, IF THE BRAND PRODUCT IS IN THE SAME

 8     MARKET, THAT MEANS THAT BAYER DOES NOT HAVE MARKET POWER.

 9          BUT EVEN TURNING TO THE GENERIC PRODUCT, HERE'S WHY I

10     DON'T THINK THAT'S A SUFFICIENT ALLEGATION THAT IT IS AN

11     ACCEPTED MARKET.

12          PLAINTIFF TELLS US THAT BAYER WAS ABLE TO INCREASE PRICES

13     OVER A FIVE YEAR PERIOD FROM BETWEEN -- BETWEEN 8 AND 17

14     PERCENT.

15          THE SSNIP TEST THAT THE PLAINTIFF ATTEMPTS TO INVOKE,

16     HOWEVER, FOCUSES ON A SINGLE PRICE INCREASE, NOT A SERIES OF

17     PRICE INCREASES OVER TIME.

18          AND, IN FACT, WE CITE A CASE --

19               THE COURT:  YEAH.

20               MR. ASIMOW:  -- THAT EXCLUDES AN EXPERT, GRANTS A

21      DAUBERT FOR THAT VERY REASON.

22               THE COURT:  IS THAT THE KENTUCKY SPEEDWAY CASE?

23               MR. ASIMOW:  EXACTLY.

24          BUT EVEN -- BUT BEYOND THAT, PLAINTIFF DOESN'T TELL US

25     WHAT HAPPENED TO THE PRICE OF GENERIC FIPRONIL DURING THE SAME

1       PERIOD.  THE PLAINTIFF ALLEGES THAT GENERIC FIPRONIL ENTERED

2       THE MARKET AT A 10 TO 20 PERCENT DISCOUNT TO BRAND FIPRONIL,

3       BUT UNLESS I'VE MISSED IT, THERE'S NO ALLEGATION IN THE

4       COMPLAINT ABOUT WHETHER THOSE PRICES HELD CONSTANT OVER TIME OR

5       HOW THEY CHANGED.

6            SO WE DON'T HAVE A COMPARATOR HERE.  WE DON'T KNOW WHAT

7       WAS HAPPENING TO COMPETITIVE PRICES DURING THIS TIME, SO WE

8       DON'T KNOW IF BAYER HAD THE POWER, OVER A FIVE YEAR PERIOD, TO

9       INCREASE ITS PRICE EVEN AS COMPETITORS HELD THEIR PRICES

10      CONSTANT.

11           SO I THINK THAT THAT'S A FATAL FLAW, EVEN TO THE

12      CONCLUSION THAT GENERIC FIPRONIL IS IN A DIFFERENT MARKET FROM

13      TOPICAL IMIDACLOPRID BRAND, THE BAYER PRODUCTS.

14           THE THIRD REASON PLAINTIFF GIVES FOR SAYING THAT THE

15      PRODUCTS ARE IN DIFFERENT MARKETS IS DOCUMENTS THAT WE'VE

16      PRODUCED IN DISCOVERY.  YOU KNOW, WHAT'S INTERESTING ABOUT THIS

17      CASE IS THAT WE'RE TWO AND A HALF YEARS INTO THE CASE AND THE

18      DOCUMENT DISCOVERY IS LARGELY COMPLETED.

19                THE COURT:  YEAH.

20                MR. ASIMOW:  WE HAVEN'T HAD DEPOSITIONS, OTHER THAN

21       THE JURISDICTIONAL ONES, BUT TEVRA HAS A LOT OF OUR DOCUMENTS

22       AND, YOU KNOW, IT'S DOING ITS BEST TO MAKE USE OF THOSE IN

23       ORDER TO STATE A CLAIM.

24                THE COURT:  UM-HUM.

25                MR. ASIMOW:  YOU KNOW, I THINK THAT THE HORSE IS OUT

1    OF THE BARN ON THAT ONE ABOUT WHETHER YOU NEED TO STATE A CLAIM

2    BEFORE YOU GET DISCOVERY, BUT WE ARE WHERE WE ARE AND I ACCEPT

3    THAT.

4              THE COURT:  YEAH.

5              MR. ASIMOW:  BUT I DON'T THINK THESE DOCUMENTS -- I

6    THINK IF YOU LOOK AT THESE DOCUMENTS, THEY ACTUALLY SUPPORT THE

7    OPPOSITE CONCLUSION, AND I HAVE -- I DON'T KNOW IF THIS WILL

8    WORK, BUT I HAVE A FEW OF THEM UP HERE WITH A POWERPOINT THAT I

9    CAN TRY TO SCREEN SHARE.

10             THE COURT:  TIFFANY, CAN YOU -- I DON'T KNOW WHETHER

11   YOU HAVE TO GIVE MR. ASIMOW SOME AUTHORITY TO DO THAT.

12             THE CLERK:  YES, HE SHOULD BE ABLE TO SHARE NOW.

13             MR. ASIMOW:  IT'S GOING TO TAKE UP MY SCREEN -- RIGHT

14   NOW IT'S GOING TO TAKE UP MY SCREEN WHERE I SEE THE COURT.

15             THE COURT:  WELL, WE'RE MOSTLY GOING TO SEE -- OKAY,

16   YEAH, GOOD.

17             MR. ASIMOW:  OKAY, GREAT.

18        SO, YOUR HONOR, THIS ONE, WHICH IS EXHIBIT 1 TO THE

19   DECLARATION THAT I SUBMITTED WITH THE MOTION TO DISMISS, IS

20   FROM A DOCUMENT REFERENCED AT PARAGRAPHS 41 AND 42 OF THE

21   COMPLAINT.  IT'S AN INTERNAL PRESENTATION TO THE STRATEGIC

22   LEADERSHIP TEAM, AND IT'S CITED BY THE PLAINTIFF FOR THE

23   PROPOSITION THAT BAYER DID NOT LOSE A LOT OF SALES BETWEEN 2010

24   AND 2016.

25             THERE ARE A NUMBER OF SLIDES IN THE DECK, AND I PICKED ONE

1       THAT I THOUGHT WAS SIGNIFICANT TO SHARE WITH THE COURT.

2           I THINK THERE ARE SEVERAL -- SO, YES, IT DOES SHOW MODEST

3       GROWTH IN THE ADVANTIX OR THE BAYER MARKET SHARE FROM 2010 TO

4       2013, BUT THEN IT SHOWS IT STARTING TO DECLINE.

5           IT ALSO SHOWS THAT FRONTLINE CONSISTENTLY HAD A MUCH

6       LARGER SHARE.  IT SEEMS TO ME THAT IF THIS IS THE EVIDENCE FOR

7       THE SUPPORT FOR THE ALLEGATION THAT BAYER'S MARKET SHARE HELD

8       UP EVEN AS GENERIC FIPRONIL PRODUCTS ENTERED, THE STRONGER

9       CONCLUSION TO DRAW FROM IT IS THAT BAYER TRACKS A VARIETY OF

10      PRODUCTS, THAT BAYER'S MARKET SHARE DECLINED AFTER -- F PLUS T

11      IS FLEA AND TICK --

12              THE COURT:  THANK YOU.

13              MR. ASIMOW:  YEAH.  THE ABBREVIATION WE MOST OFTEN

14      SEE IN THIS CASE, IF YOU LOOK THROUGH THE DOCUMENTS, ARE F AND

15      T --

16              THE COURT:  OKAY.

17              MR. ASIMOW:  -- AND C-A-P, WHICH IS COMPANION ANIMAL

18      PRODUCTS, SO THESE ARE FOR THE DOGS AND CATS AND NOT FOR FARM

19      ANIMALS.

20              THE COURT:  OKAY.  SO THEN ORALS MEANING A LIQUID OR

21      PILL THAT IS INGESTED?

22              MR. ASIMOW:  THAT'S EXACTLY RIGHT.

23          THE STRONGEST COMPETITION AND WHAT, IN OUR VIEW, HAS

24      CAUSED BOTH ADVANTIX AND FRONTLINE TO LOSE SHARE IS THE

25      INTRODUCTION OF ORALS, MANY OF WHICH HAVE IMIDACLOPRID AS THEIR

1    ACTIVE INGREDIENT, AND THE ABILITY TO PURCHASE THESE IN SOME

2    INSTANCES OVER THE COUNTER.

3         A LOT OF PET OWNERS FIND THAT TO BE MORE EFFECTIVE, AND

4    THAT'S REALLY THE POINT OF THIS SLIDE.

5         YOU KNOW, I DON'T THINK THIS WILL SUPPORT A CONCLUSION

6    THAT ADVANTIX AND FRONTLINE ARE DIFFERENT MARKETS.  IF

7    ANYTHING, THEY'RE KIND OF RISING AND FALLING TOGETHER AS THEY

8    FACE OTHER COMPETITION.

9         THE COURT:  WELL, AND OF COURSE THIS ALSO WOULD SHOW

10   THAT, AND WOULD SUPPORT YOUR ARGUMENT THAT ORAL PRODUCTS ARE IN

11   THE SAME PRODUCT MARKET AS THE TOPICAL.

12         MR. ASIMOW:  CORRECT.  I HAVE A COUPLE OTHERS I WILL

13   SHOW YOU TO THE SAME POINT.

14         THE COURT:  OKAY.

15         MR. ASIMOW:  I DON'T THINK THERE'S ANY DOUBT THAT

16   THAT'S WHAT MY CLIENT BELIEVES.

17         THE COURT:  OKAY.

18         MR. ASIMOW:  SO LET ME SHOW YOU A TOTAL OF THREE

19   DOCUMENTS ON THIS.

20         THE COURT:  OKAY.

21         MR. ASIMOW:  THE SECOND -- AGAIN, AN EXHIBIT TO THE

22   DECLARATION THAT WE SUBMITTED, AND REFERENCED IN THE SECOND

23   AMENDED COMPLAINT AT PARAGRAPHS 52 AND 129 -- IS A PRESENTATION

24   TO A PARTICULAR RETAILER.  I REDACTED THE NAME OF THE RETAILER.

25         THE COURT:  UM-HUM.

1          MR. ASIMOW:  BUT THIS IS TO A RETAILER THAT OFFERED A

2     PRODUCT CALLED PETLOCK.  PETLOCK IS A GENERIC IMIDACLOPRID

3     PRODUCT.  IT'S A PRODUCT THAT TEVRA WOULD LIKE TO BE SELLING.

4     IT'S A COMPETITOR OF TEVRA SELLING A GENERIC IMIDACLOPRID.

5          AND TEVRA CITES THIS DOCUMENT FOR THE PROPOSITION THAT

6     BAYER TRIED TO PERSUADE THIS RETAILER NOT TO CARRY THE GENERIC

7     PRODUCT.  AND THAT'S TRUE, BAYER DID TRY TO PERSUADE THE

8     RETAILER NOT TO CARRY THE GENERIC PRODUCT.

9          BUT I THINK THE BIGGER TAKE AWAY FROM IT HERE IS THAT

10    BAYER SAW THE STRONGEST COMPETITION AS THE ORAL PRODUCTS AND

11    DESIGNED A CAMPAIGN WITH THIS RETAILER TO COMPETE AGAINST THE

12    ORAL PRODUCTS, IT'S CALLED "BATTLE THE BITE," AND THE IDEA IS

13    THAT THE ORALS KILL THE FLEA AFTER IT BITES THE ANIMAL AND THAT

14    THEN INGESTS SOME OF THE ACTIVE INGREDIENT FROM THE PET'S

15    BLOOD, WHEREAS TOPICAL PRODUCTS HAVE SOME ABILITY TO REPEL

16    BEFORE THE FLEA AND TICK BITES.  SO, YOU KNOW, THEY THOUGHT

17    THAT WAS A USEFUL MARKETING CAMPAIGN AND THEY WORKED ON THAT

18    WITH THE RETAILER.

19          AND YOU CAN SEE, YOU KNOW, THEM TELLING THE RETAILER THE

20    ORAL FORM IS NOW DOMINATING.  57 PERCENT SHARE.

21          BAYER IS FOCUSSED ON, HOW DOES IT COMPETE AGAINST THAT?

22          SO THERE'S OTHER INTERESTING THINGS IN THIS DOCUMENT I

23    WON'T TAKE THE TIME ON, BUT IT SHOWS A LOT OF WILLINGNESS AMONG

24    CONSUMERS TO SWITCH, THE SAME TYPE OF CONSUMER SURVEY EVIDENCE

25    THAT THE COURT ALLUDED TO EARLIER.

20

1          AND THE THIRD AND FINAL DOCUMENT I'LL SHOW THE COURT IS A

2     DOCUMENT THAT'S REFERENCED AT PARAGRAPH 173 AND 174 OF THE

3     SECOND AMENDED COMPLAINT.  AND IT -- IT IS CITED BY THE

4     PLAINTIFF FOR THE PROPOSITION THAT BAYER SELLS 75 PERCENT OF

5     THE TOPICAL IMIDACLOPRID --

6               THE COURT:  I'M LOSING YOUR VOICE, YOUR SOUND ON

7      THIS.

8               MR. ASIMOW:  IS THAT BETTER IF I HOLD THIS UP A

9      LITTLE CLOSER?

10              THE COURT:  YEAH.  SOMETIMES THE MICROPHONE JUST

11     DOESN'T QUITE CATCH.

12              MR. ASIMOW:  I'M SORRY, YOUR HONOR.

13              THE COURT:  THAT'S OKAY.

14              MR. ASIMOW:  I THINK WHEN I LOOK DOWN, THAT'S WHAT

15     DOES IT.

16              THE COURT:  OH, YEAH.

17              MR. ASIMOW:  I'M --

18              THE COURT:  THANKS.

19              MR. ASIMOW:  I'M BORROWING MR. OWEN'S PODIUM NEXT

20     TIME IF WE DON'T COME SEE YOU IN PERSON.

21         SO THIS IS IN REFERENCE TO PARAGRAPH 173 AND 174.  IT'S AN

22     INTERNAL BAYER BRIEFING.  IT'S CITED BY THE PLAINTIFF FOR THE

23     CHANNEL SPLIT, BUT I THINK THE MORE INTERESTING THING IS IT'S

24     RECOGNITION THAT FRONTLINE CONTINUES TO BE THE NUMBER ONE

25     PRODUCT; THE FLEA AND TICK MARKET, IF YOU READ THE DOCUMENT, IS

1      VERY COMPETITIVE; DIFFICULT FOR CONSUMERS TO UNDERSTAND THE

2      DIFFERENCES; PEOPLE BELIEVE THAT THERE IS LITTLE OR NO

3      DIFFERENCE BETWEEN THE PREMIUM SPOT ON BRANDS SUCH AS ADVANTIX

4      AND FRONTLINE; AND THEN THE FINAL POINT IN ADDITION TO THE

5      ENTRENCHED BRANDS, LIKE FRONTLINE, THE NEWER PRESCRIPTION ORAL

6      FLEA AND TICK PRODUCTS HAVE BEEN GAINING RAPID AWARENESS AND

7      PENETRATION.

8           MY VIEW IS IF THE PLAINTIFF WANTS TO RELY ON THESE

9      DOCUMENTS, THE WHOLE DOCUMENT IS FAIR GAME.  YOU DON'T USUALLY

10     SEE THIS IN A COMPLAINT, BUT THIS, TO ME, PROVIDES SUPPORT FOR

11     WHAT'S, AGAIN, REALLY COMMON SENSE, THAT THESE PRODUCTS COMPETE

12     WITH EACH OTHER.

13          AND THEN -- LET ME -- I'LL STOP THE SHARE HERE.

14          THE -- THE FOURTH AND FINAL REASON TO ADDRESS IS THE

15     ALLEGATION IN THE COMPLAINT THAT BAYER'S PRODUCTS ARE A MARKET

16     UNTO THEMSELVES BECAUSE BAYER ALLEGEDLY GETS HIGH PRICES.

17          THE PLAINTIFF THERE PRIMARILY RELIES ON A TREATISE, AND

18     I'M NOT SURE PLAINTIFF CITES A CASE FINDING IT SUFFICIENT AT

19     THE PLEADING STAGE SIMPLY TO ALLEGE THAT THE DEFENDANT HAD HIGH

20     MARGINS.

21          AND THERE'S NO ALLEGATION IN THE COMPLAINT THAT BAYER'S

22     PROFITS OR MARGIN ARE OUT OF LINE WITH OTHER COMPETITORS IN THE

23     MARKET, AND THERE ARE A NUMBER OF COSTS HERE THAT BAYER WOULD

24     HAVE INCURRED IN DEVELOPING AND OBTAINING REGULATORY APPROVAL

25     FOR AN INSECTICIDE LIKE IMIDACLOPRID.  AND I -- THERE'S NO

1    ALLEGATION THAT WHEN THAT IS TAKEN INTO ACCOUNT, THE PROFITS OR

2    MARGINS ARE EXCESSIVE.

3         IN FACT, THE PROVISIONS OF THE AREEDA TREATISE THAT

4    PLAINTIFF CITES TALK A LOT ABOUT HOW DIFFICULT IT IS TO MEASURE

5    MARKET POWER DIRECTLY BY LOOKING FOR HIGH PRICES, AND THAT'S

6    WHY COURTS SELDOM RELY ON IT.

7         WE DIRECT THE COURT TO THE SOLODYN CASE THAT NOTED THE

8    HIGH MARGINS ALONE, WITHOUT KNOWING SUBCOSTS AND OTHER FACTORS,

9    DON'T SHOW THAT THE PRICES ARE ACTUALLY SUPRA COMPETITIVE, MUCH

10   LESS SHOWING MARKET POWER.

11        SO OUR VIEW IS WHILE PLAINTIFF HAS DONE A BETTER JOB OF

12   TRYING TO ESTABLISH WHAT IS A DIFFICULT AND COUNTERINTUITIVE

13   PROPOSITION FOR IT, THAT THE BAYER MARKET IS A MARKET UNTO

14   ITSELF, IT'S NOT ENOUGH TO CARRY THE DAY AND ALL OF THE CAUSES

15   OF ACTION SHOULD BE DISMISSED ON THAT BASIS.

16        THE COURT:  ALL RIGHT.  MR. ASIMOW, I GUESS WHAT

17   TROUBLES ME HERE IS THAT I ACTUALLY FEEL THAT YOU'RE ASKING ME

18   TO MAKE SOME FACTUAL DETERMINATIONS IN -- WHERE THERE ARE SOME

19   DISPUTES.  AND THIS WHOLE ARGUMENT OF COMMON SENSE, I -- IT IS

20   CLEARLY A THREAD THROUGH THE CASE LAW THAT -- AND IN THE VW

21   CASE I THINK IT'S FAIRLY PROMINENT -- ABOUT JUDGES APPLYING

22   COMMON SENSE.

23        AND I -- SO I CERTAINLY UNDERSTAND THAT.

24        I WILL SAY THAT I'M GOING TO COUNTER THIS WITH SOMETHING

25   THAT SEEMS LIKE IT'S COMING OUT OF LEFT FIELD.  IN THE LAST

1      MONTH OR SO, I'VE BEEN READING DANNY KAHNEMAN ON

2      DECISION-MAKING, YOU MAY HAVE READ KAHNEMAN AND TVERSKY, AND

3      ONE OF THEIR FINDINGS -- HE WON A NOBEL PRIZE ON THESE

4      THEORIES -- IS THAT YOUR INITIAL IMPRESSION IS USUALLY WRONG

5      AND THAT -- AND THAT THERE ARE GREAT FALLACIES IN THINKING AND

6      IN GUT INSTINCT THINKING THAT HAS MANY MISTAKES.

7           SO I'M CHASTENED A LITTLE BIT ABOUT WHAT I'VE BEEN

8      READING, AND I -- BUT I THINK I HAVE TO BE VERY CAREFUL.

9           BUT EVEN PUTTING THAT ASIDE, I HAVE TO BE REALLY CAREFUL

10     ABOUT WHERE COMMON SENSE TAKES ME BECAUSE I CAN'T SUPPLANT THE

11     ROLE OF THE JURY.

12          AND I -- YOU KNOW, ABSENT SOME CONSUMER SURVEYS, I JUST

13     DON'T KNOW HOW I CAN APPLY MY COMMON SENSE WHEN I DON'T EVEN

14     HAVE A DOG.  I MEAN, THIS IS -- I HAVE NO COMMON EXPERIENCE

15     HERE, AND, YOU KNOW, SO WHAT -- YOU KNOW, I DON'T KNOW HOW TO

16     EVEN TETHER MY -- WHAT IS COMMON SENSE TO ME.  I MEAN, I

17     CERTAINLY DON'T LIKE FLEAS AND TICKS.  MAYBE THAT'S WHY I DON'T

18     HAVE A DOG.  SO MY METHOD IS THE MOST EFFECTIVE OF ALL, BUT

19     MOST PEOPLE WOULD SAY THAT'S NOT A VIABLE OPTION.

20          BUT ANYWAY, COMMENTS?

21          MR. ASIMOW:  YES.  I DON'T THINK WE WANT -- WE'RE NOT

22      GOING TO ARGUE THAT THE DECISION NOT TO HAVE A DOG IS IN THE

23      SAME MARKET.

24          THE COURT:  RIGHT, RIGHT.

25          (LAUGHTER.)

1          MR. ASIMOW:  WE DON'T COMPETE WITH THAT.  I GUESS

2     THAT WOULD BE PET REMOVAL.

3          THE COURT:  THERE YOU GO.

4          MR. ASIMOW:  YOU KNOW, I THINK IT'S A DIFFICULT CALL

5     BECAUSE IT DOES -- IT STARTS TO INCH INTO FACTUAL ISSUES AND

6     THE PROVINCE OF THE JURY, OR PERHAPS A SUMMARY JUDGMENT MOTION

7     IF THERE'S NO TRIABLE ISSUE OF FACT HERE.

8          WE DO HAVE A NUMBER OF CASES, THOUGH, IN WHICH THE COURTS

9     TAKE A PRETTY HARD LOOK AT THE MARKET DEFINITION FROM THE

10    OUTSET OF THE CASE.  THERE'S A NUMBER IN THIS DISTRICT THAT WE

11    PROVIDED TO THE COURT.

12         AND I THINK THAT THE TEACHING OF THOSE CASES IS THAT A

13    PLAUSIBILITY REQUIREMENT OF TWOMBLY HAS A BITE HERE, TO TAKE A

14    WORD WE'VE ALREADY USED TODAY.

15          THE COURT:  YEAH.

16          MR. ASIMOW:  WHEN TWO PRODUCTS THAT DO THE SAME THING

17     AND ARE SOLD THROUGH THE SAME CHANNELS ARE SUGGESTED TO BE IN A

18     DIFFERENT MARKET, THAT'S A LITTLE BIT IMPLAUSIBLE ON ITS FACE.

19         AND YOU'VE GOT TO HAVE PRETTY GOOD REASONS WHY SUCH AN

20    ALLEGATION SHOULD BE ALLOWED TO GO FORWARD, BECAUSE OTHERWISE

21    IT'S JUST TOO EASY TO ALLEGE THAT A SINGLE DEFENDANT'S PRODUCT

22    IS A MARKET TO ITSELF.

23         IT'S REALLY A CRITICAL SCREENING FOR SO MANY ANTITRUST

24    CLAIMS THAT, YOU KNOW, AS TWOMBLY ITSELF OF COURSE IS AN

25    ANTITRUST CASE AND TALKS ABOUT THE PARTICULAR EXPENSE AND

1    BURDEN OF ANTITRUST CASES THAT GO BEYOND THE PLEADING STAGE.

2         SO WHEN WE'RE STARTING FROM A PREMISE THAT IS IMPLAUSIBLE,

3    I THINK THERE IS A HEIGHTENED BURDEN, AND THAT'S WHY I WENT

4    THROUGH WHAT I THINK ARE PLAINTIFF'S FOUR REASONS TO TRY TO

5    OVERCOME WHAT'S IMPLAUSIBLE ON ITS FACE AND WHY I THINK NONE OF

6    THOSE ACTUALLY CARRY THE DAY.

7         THE COURT:  OKAY.  ALL RIGHT.

8         I'M GOING TO LET YOU GO ON TO THE OTHER ISSUES AND THEN

9    WE'LL HEAR FROM MR. CALLAGY ON THE PERSONAL JURISDICTION.

10         MR. ASIMOW:  WELL, I THINK, YOUR HONOR, ON

11    FORECLOSURE, I THINK THE COURT DID ADDRESS THE ISSUE

12    PREVIOUSLY.  THERE IS THIS QUESTION -- PLAINTIFF HAS PIVOTED ON

13    SOME OF ITS MATH BETWEEN THE FIRST AMENDED COMPLAINT AND THE

14    SECOND AMENDED COMPLAINT IN ORDER TO HELP GET A LARGER

15    FORECLOSURE, BUT I RECOGNIZE THAT PLAINTIFF HAS GROUNDED THAT

16    IN DOCUMENTS.

17         THE COURT:  YEAH.

18         MR. ASIMOW:  I THINK GIVEN THE -- YOU KNOW, WE WOULD,

19    IF THIS CASE GOES FORWARD, WE WILL MOST CERTAINLY TAKE ANOTHER

20    RUN AT SUMMARY JUDGMENT.

21         THE COURT:  SURE, SURE.

22         MR. ASIMOW:  YOU KNOW, IN ADDITION, WE HAVE THE ISSUE

23    WE DISCUSSED LAST TIME AROUND, THAT ALL OF THESE AGREEMENTS ARE

24    SHORT TERM AND EASILY TERMINABLE ON THEIR FACE, AND THE CASE

25    LAW SAYS UNLESS THERE IS SOME REASON WHY THEY DON'T MEAN WHAT

1      THEY SAY, THAT IS A COMPLETE DEFENSE.

2           BUT THE COURT LOOKED AT THAT LAST TIME, AND I DON'T WANT

3      TO REARGUE THINGS.

4           SO I THINK WITH REGARD TO FORECLOSURE, OUR POINT WOULD BE

5      WE'LL RELY ON THE MARKET DEFINITION.

6           THE COURT:  OKAY.

7           MR. ASIMOW:  AND WITH RESPECT TO MONOPOLIZATION, I

8      RECOGNIZE THAT THE COURT HAS, YOU KNOW, ALREADY SAID THAT IF

9      THE -- THAT IF THERE'S ENOUGH POWER HERE, THE CONDUCT COULD BE

10     EXCLUSIONARY FOR PURPOSES OF SECTION 2.

11          I'D LIKE TO POINT OUT THAT IT'S AN EVEN HIGHER MARKET

12     POWER STANDARD -- YOU KNOW, 30 OR 40 PERCENT MIGHT BE ENOUGH

13     FOR EXCLUSIVE DEALING.  YOU PROBABLY NEED 60 OR 70 PERCENT FOR

14     MONOPOLIZATION.  SO IT'S A MORE DIFFICULT MARKET POWER SCREEN

15     TO OVERCOME, AND IF ANY OTHER PRODUCT IS IN THE MARKET, YOU

16     DON'T HAVE ENOUGH POWER ALLEGED FOR A SECTION 2 CLAIM.

17          WITH REGARD TO THE SECOND BRAND STRATEGY, I CERTAINLY

18     AGREE WITH THE COURT THAT IT CANNOT BE ANTICOMPETITIVE TO OFFER

19     AN ALTERNATIVE LOWER COST BRAND.  THAT'S BENEFICIAL TO

20     CONSUMERS.  THAT LOWERS PRICES.

21          IT MAY HURT A COMPETITOR.  IT MIGHT -- TEVRA MIGHT NOT

22     LIKE IT.  I UNDERSTAND THAT.  BUT, OF COURSE, THE ANTITRUST

23     LAWS PROTECT COMPETITION, NOT COMPETITORS, AND THIS IS A PRIME

24     EXAMPLE OF THAT.

25          AND, IN FACT, IF YOU LOOK AT THE PRODUCT IMPROVEMENT

1       CASES --

2               THE COURT:  YEAH.

3               MR. ASIMOW:  -- THEY CERTAINLY RECOGNIZE THAT PRODUCT

4        IMPROVEMENT CAN BE DEVASTATING TO A COMPETITOR.

5           BUT THE NINTH CIRCUIT HAS SAID SO LONG AS IT'S A GENUINE

6        PRODUCT IMPROVEMENT, THAT'S THE END OF THE ANALYSIS.  GENUINE

7        NEW PRODUCT?  WE'RE NOT GOING TO WEIGH HOW MUCH OF AN

8        IMPROVEMENT IS IT VERSUS HOW MUCH DOES IT HURT A COMPETITOR?

9               AND OFFERING, YOU KNOW, A DIFFERENT BRAND AT A LOWER PRICE

10       IS AN IMPROVEMENT.

11          SO I THINK THAT'S WHAT I -- THOSE WOULD BE MY COMMENTS FOR

12       YOUR HONOR ON THE FOUR ANTITRUST POINTS THAT YOU RAISED.

13          DO YOU WANT TO HEAR FROM MR. CALLAGY?

14              THE COURT:  I DO, YES.  LET ME HEAR FROM HIM ON

15       PERSONAL JURISDICTION SO WE'RE SURE WE'VE COVERED EVERYTHING.

16              MR. CALLAGY:  THANK YOU, YOUR HONOR.  AND I'LL TRY TO

17        KEEP THIS BRIEF.

18          WE HEARD YOU SAY LAST WEEK THAT PERSONAL JURISDICTION

19       MOTIONS ARE RARELY EASY, AND WE THINK THIS IS THE EXCEPTION

20       THAT SHOULD PROVE THAT RULE.

21          TEVRA HAS A BURDEN AT THIS STAGE TO NOT JUST ALLEGE, BUT

22       ALSO TO BRING FORWARD EVIDENCE SUFFICIENT TO SHOW THE EXERCISE

23       OF JURISDICTION.

24          THE COURT PERMITTED TEVRA TO TAKE JURISDICTIONAL DISCOVERY

25       IN SEARCH OF, AT THE TIME, AN ALTER EGO THEORY, WHICH IS NO

1    LONGER PRESENTED, AND AS MR. OWEN CONFIRMED AT THE OUTSET,

2    TEVRA'S SOLE BASIS FOR ALLEGING THE ABILITY TO EXERCISE

3    JURISDICTION RELATES TO THE SECOND BRAND STRATEGY.

4         MR. ASIMOW DISCUSSED WHY THAT'S PRO COMPETITIVE, OR

5    CERTAINLY TEVRA HAS NOT PLAUSIBLY ALLEGED THAT IT IS

6    ANTICOMPETITIVE.

7         I'VE JUST LOOKED OVER TEVRA'S BRIEF AGAIN.  I DON'T SEE A

8    CASE SAYING OTHERWISE.

9         IN FACT, ALMOST ALL OF ITS DISCUSSION OF THE SECOND BRAND

10   STRATEGY IS TIED IN WITH ITS PERSONAL JURISDICTION DISCUSSION.

11             THE COURT:  YEAH.

12             MR. CALLAGY:  SO IF THE COURT FINDS AS A MATTER OF

13    LAW THAT IT'S PRO COMPETITIVE, THEN THE COURT NEED NOT REACH

14    PERSONAL JURISDICTION ISSUES.

15             THE COURT:  OKAY.

16             MR. CALLAGY:  BUT IF YOU DO, THEY ALSO FAIL TO SHOW

17    PURPOSEFUL DIRECTION, AND THAT'S WHAT TEVRA HAS TAKEN ON NOW IN

18    ALLEGING THAT BAYER ANIMAL HEALTH GMBH DIRECTLY TARGETED THE

19    U.S. MARKET.

20        AND THE EVIDENCE ISN'T THERE.  THE EVIDENCE SHOWS THAT

21   THERE WERE DISCUSSIONS ABOUT STRATEGY, AND THE TESTIMONY BY

22   MR. ZAPATERO MAKES VERY CLEAR THAT IT WAS A MATTER FOR THE

23   SPECIFIC COUNTRY TO DEAL WITH.

24        AND, YES, THERE'S AN EXCHANGE ON THAT, AND THE EMAILS

25   TEVRA SEEMS TO BE RELYING ON INCLUDE FYI TYPE EXCHANGES, OR

1      HERE'S LESSONS WE LEARNED FROM THIS INSTANCE THAT YOU MAY

2      CONSIDER IN OTHER INSTANCES.

3           AND QUITE OFTEN IT SHOWS THE UNITED STATES INSTRUCTING

4      MANAGERS ELSEWHERE IN THE WORLD.

5           WHAT IT DOESN'T SHOW IS THE GERMAN ENTITY DIRECTING,

6      APPROVING, IMPLEMENTING, OR OVERSEEING SUCH STRATEGY.  THERE'S

7      NOT AN EMAIL THAT SAYS, "MR. ZAPATERO, PLEASE TELL US WHAT TO

8      DO," OR "MR. ZAPATERO, WE NEED YOUR APPROVAL TO GO FORWARD WITH

9      THIS."

10          AND MR. ZAPATERO MADE VERY CLEAR THAT THAT WAS NOT HOW IT

11     WORKED.  THEY CONSULTED WITH HIM AND HE DISCUSSED WHAT THEY

12     WERE DOING, SURE.

13          BUT IT WAS THEIR ACCOUNTABILITY, AND THE ACCOUNTABILITY

14     AND THE DECISION TO BE TAKEN LIES ON THE COUNTRY.  THOSE ARE

15     HIS WORDS.

16          AND SO TEVRA HASN'T SHOWN SOMETHING TO CONTRADICT THAT,

17     AND IT IS THEREFORE AN UNREFUTED SHOWING AND THAT IS A

18     SUFFICIENT BASIS FOR THE COURT TO GRANT THE MOTION UNDER THE

19     FIRST PRONG OF THE EFFECTS TEST, WHICH IS THE FIRST PRONG OF

20     THE PERSONAL JURISDICTION TEST, NO DIRECTED ACTION.

21          AND MR. CHUA'S TESTIMONY IS NOT TO THE CONTRARY, EITHER.

22     HE -- YOU KNOW, AS TEVRA POINTED OUT, HE WORKED AT BOTH THE

23     U.S. ENTITY FOR A TIME AND THEN THE GERMAN ENTITY FOR A TIME,

24     AND SO HE WOULD KNOW.

25          AND HE WAS ASKED POINT BLANK, ARE YOU AWARE OF ANY

1    STRATEGY RELATING TO GENERIC FLEA AND TICK PRODUCTS IN THE U.S.

2    THAT WAS DIRECTED BY BAYER ANIMAL HEALTH GMBH?

3         HIS ANSWER WAS A SIMPLE NO.  IT'S VERY STRAIGHTFORWARD.

4    THAT WAS CITED IN OUR BRIEF.  IT'S EXHIBIT 5 TO MR. ASIMOW'S

5    DECLARATION.

6         SO THAT'S THE EVIDENCE, AND ATTORNEY ARGUMENTS AND

7    ALLEGATIONS DON'T OVERCOME THAT.

8         AND, YES, THE ALLEGATIONS PURPORT TO PARAPHRASE THE

9    EVIDENCE, BUT THEY HAVEN'T PRESENTED IT, AND WHERE WE HAVE, WE

10   HAVE SHOWN THAT IT DOESN'T MATCH UP TO THE ALLEGATION ITSELF.

11        AND SO THE EVIDENCE IS VERY STRAIGHTFORWARD AND THE COURT

12   CAN DISMISS WITH PREJUDICE ON THAT BASIS.

13        AND WE DON'T NEED TO GO TO THE SECOND OR THE THIRD

14   ELEMENTS OF THE PERSONAL JURISDICTION TEST, AND I DON'T THINK,

15   UNLESS THE COURT HAS QUESTIONS, IT'S WORTH OUR TIME TO DO SO

16   TODAY.

17             THE COURT:  NO.  I THINK WE'RE FINE.

18        ALL RIGHT.  WELL, THANK YOU.  THAT'S VERY HELPFUL.

19        MR. OWEN, I'M GOING TO TURN TO YOU, AND OBVIOUSLY WE'RE

20   GOING TO DEVOTE MOST OF OUR TIME TO RELEVANT MARKET.  SO GO

21   AHEAD, PLEASE.

22             MR. OWEN:  ALL RIGHT.  I CAN BEGIN WHEREVER THE COURT

23    WANTS.

24        THE -- IT'S INTERESTING THAT THE COURT MENTIONED THE IDEA

25   OF CONSUMER SURVEYS AT AN EARLIER -- AT A LATER STAGE OF THE

1    CASE, BECAUSE WHAT HAPPENED BETWEEN 2011 AND 2016 WHEN BAYER IS

2    A MONOPOLIST AND IS MAKING SUCCESSIVE PRICE INCREASES TO SUCH

3    AN EXTENT THAT BY THE TIME THEY'RE DONE IN 2016, THEIR NAME

4    BRAND, ADVANTIX, WINDS UP COSTING 64 PERCENT MORE PER DOSE THAN

5    NAME BRAND FRONTLINE.

6         WHAT THEY'RE DOING DURING THOSE FIVE YEARS OF PRICE

7    INCREASES RESULTING IN THIS ENORMOUS PRICE DIFFERENTIAL BY

8    2016, THAT IS A CONSUMER SURVEY.  THAT ANSWERS THE QUESTION,

9    WILL CONSUMERS SWITCH AWAY FROM ADVANTIX IN SUFFICIENT NUMBERS

10   TO RENDER THOSE PRICE INCREASES UNPROFITABLE FOR THE

11   MONOPOLIST?

12        AND, IN FACT, THE ANSWER IS NO, THEY WON'T SWITCH AWAY,

13   AND THAT BAYER WAS ABLE TO KEEP INCREASING PRICES UNTIL THEY

14   REACHED A MONOPOLY LEVEL.  BY MONOPOLY LEVEL, I MEAN THIS AS

15   ALLEGED IN THE COMPLAINT, 95 PERCENT GROSS MARGIN, 71 PERCENT

16   NET MARGIN.

17        NOW, THAT ALONE IS NOT CONCLUSIVE THAT BAYER IS A

18   MONOPOLIST IN THESE -- IN THIS PARTICULAR MARKET.

19             THE COURT:  UM-HUM.

20             MR. OWEN:  BUT WHEN YOU COMBINE IT WITH WHAT APPEARS

21   TO BE AN 85 PERCENT MARKET SHARE OF ALL IMIDACLOPRID TOPICALS

22   THAT THEY CONTROL DIRECTLY THROUGH THEIR OWN BRAND, FOLLOWED BY

23   THE CONTROL OVER THE OTHER 15 PERCENT, WHICH WAS THAT

24   AUTHORIZED GENERIC THAT PETLOCK -- PETLOCK THAT MR. ASIMOW

25   MENTIONED, THEY CONTROL THAT, BECAUSE THEY SUED THE MAKER OF

1    PETLOCK, FORCED THEM TO AGREE TO A PATENT LICENSE AND GET

2    ROYALTIES OFF OF EVERY BOX.

3          SO YOU HAVE MULTIPLE INDICIA THAT BAYER IS A MONOPOLIST.

4          BUT THIS CASE --

5               THE COURT:  I GUESS I'M GOING TO STOP YOU, MR. OWEN,

6    BECAUSE I THOUGHT MR. ASIMOW JUST SHOWED ME A DOCUMENT SHOWING

7    FRONTLINE HAS THE PRIMARY MARKET SHARE, HAS OVER -- HAS 57

8    PERCENT MARKET SHARE.  I'M CONFUSED BY THAT.  IT LOOKS LIKE THE

9    PRICE HAS EATEN INTO THE SALES OF ADVANTIX OVER FRONTLINE.

10               MR. OWEN:  THE -- THE DOCUMENT THAT HE SHOWED YOU

11   DIDN'T HAVE ANYTHING TO DO WITH PRICES.  THAT HAD AN ARBITRARY

12   MARKET DEFINITION -- I'M SORRY, YOUR HONOR.  GO AHEAD.

13               THE COURT:  GO AHEAD.  I INTERRUPTED.

14               MR. OWEN:  IT DIDN'T HAVE ANYTHING TO DO WITH PRICES.

15   IT DOESN'T HAVE ANYTHING TO DO WITH PROFITABILITY.  IT DIDN'T

16   HAVE ANYTHING TO DO WITH THE LOSS OF COMPETITION TO GENERICS.

17          FRONTLINE WAS SUBJECT TO GENERIC COMPETITION FOR A LONG

18   TIME.

19               THE COURT:  YEAH.

20               MR. OWEN:  AND ITS PRICES WENT DOWN SIGNIFICANT LY.

21               THE COURT:  OKAY.

22               MR. OWEN:  ON THE OTHER HAND, AS WE ALLEGE, ADVANTIX,

23   BAYER'S NAME BRAND IMIDACLOPRID, WAS NOT SUBJECT TO GENERIC

24   COMPETITION, AND IT WENT UP -- ITS PRICES WENT UP SO MUCH OVER

25   THE PERIOD THAT WE DOCUMENT FROM 2011 TO 2016 -- AND THIS IS

1    DOCUMENTED AT SECTION A1D, ROMAN AT I, LITTLE ROMAN NUMERAL I.

2    IT'S THE FIRST OF THREE TESTS UNDER THE HYPOTHETICAL MONOPOLIST

3    TEST.

4         DURING THAT FIVE YEAR PERIOD, THE PRICES WENT UP FROM

5    BETWEEN 8 AND 17 PERCENT -- AND THIS IS THE CRITICAL POINT --

6    THOSE PRICE INCREASES WERE NOT RESTRAINED BY THE PRESENCE OF

7    FIPRONIL IN THE MARKET.

8         IF FIPRONIL WAS THE SAME PRODUCT, IF FRONTLINE WAS THE

9    SAME PRODUCT, IT WOULD NOT BE POSSIBLE FOR A MONOPOLIST LIKE

10   BAYER TO INCREASE THOSE PRICES TO A MONOPOLY LEVEL AND TO MAKE

11   THEM STICK.

12        BUT YET, THAT'S EXACTLY WHAT HAPPENED UP UNTIL 2016.

13        AND THAT ALONE SHOWS YOU THAT FIPRONIL AND ITS GENERICS

14   ARE NOT SUBSTITUTES FOR -- THEY ARE NOT STRONG SUBSTITUTES FOR

15   ADVANTIX.  THEY DON'T CONSTRAIN THE PRICE INCREASES.

16        BUT HERE'S THE MORE TELLING, TELLING NUMBER, AND IT'S --

17   IT IS IN THE SECOND ROMAN AT NUMERAL, ROMAN AT II, AGAIN, IN

18   SECTION A1D.  IT'S WHAT HAPPENED BY 2016 AFTER ALL THOSE PRICE

19   INCREASES OCCURRED.

20        BY THE TIME THAT HAD HAPPENED -- AND I'LL READ FROM THE

21   COMPLAINT.  "AS OF 2016, K9 ADVANTIX WAS 64 PERCENT MORE

22   EXPENSIVE PER MONTHLY DOSE THAN THE FIPRONIL-BASED FRONTLINE.

23   BAYER'S OWN DOCUMENTS STATED THAT K9 ADVANTIX SOLD FOR $21.87

24   PER DOSE, WHEREAS FRONTLINE SOLD FOR $13.33 PER DOSE."

25        NOW, IF THOSE WERE THE SAME PRODUCTS, THAT COULD NOT

1    HAPPEN.  IF THEY WERE THE SAME IN THE EYES OF CONSUMERS, TO

2    HEARKEN BACK TO THE COURT'S STATEMENT ABOUT CONSUMER SURVEYS,

3    IF THOSE WERE THE SAME, YOU SIMPLY CAN'T SELL ONE FOR 64

4    PERCENT MORE.

5         THAT IS THE SECOND OF TWO HYPOTHETICAL MONOPOLIST TESTS.

6         BUT THERE'S ANOTHER ONE COMING.  IT'S ROMAN AT III IN

7    SECTION A1D, ROMAN AT III.  THERE WAS A MOMENT AT WHICH BAYER'S

8    NAME BRAND IMIDACLOPRID FACED COMPETITION FROM BOTH FRONTLINE

9    AND ITS GENERICS AND FROM THE AFOREMENTIONED GENERIC

10   IMIDACLOPRID.

11        WHAT HAPPENED WHEN GENERIC IMIDACLOPRID ENTERED THE FRAY?

12   I'M GOING TO READ TO YOU FROM BAYER'S OWN DOCUMENTS.  WHAT

13   HAPPENED WAS CONSUMERS SWITCHED, BUT THEY DIDN'T SWITCH FROM

14   THE IMIDACLOPRID -- I'M SORRY -- THEY DON'T SWITCH FROM

15   FIPRONIL, THEY DIDN'T SWITCH FROM FRONTLINE, THEY SWITCHED

16   ALMOST ENTIRELY FROM BAYER'S NAME BRAND.

17        I'M QUOTING A BAYER DOCUMENT THAT IS AT PARAGRAPH 52 OF

18   THE SECOND AMENDED COMPLAINT.  QUOTE, "NEARLY 100 PERCENT OF

19   GENERIC SALES COMING FROM TRADE DOWN FROM ADVANTIX," THAT'S

20   BAYER'S IMIDACLOPRID NAME BRAND.

21        I'LL QUOTE AGAIN FROM THE SAME PARAGRAPH.  QUOTE, "ALMOST

22   ALL OF THE GENERIC IMIDACLOPRID SALES WERE PULLED FROM

23   ADVANTAGE II," END QUOTE.

24        SO WHEN CONSUMERS HAVE AN OPPORTUNITY TO SWITCH FROM

25   GENERIC IMIDACLOPRID, THEY'RE NOT SWITCHING FROM FIPRONIL, BUT

1      THEY ARE SWITCHING FROM BAYER'S NAME BRAND PRODUCTS.

2           ALL THREE OF THOSE EXAMPLES, UNRESTRAINED PRICE INCREASES,

3      EXTREME PRICE DIFFERENTIALS SHOWING MONOPOLIST, MONOPOLY

4      PROFITS BY THE END OF THOSE PRICE INCREASES, AND SWITCHING NOT

5      FROM THE ALLEGED COMPETING PRODUCTS, FIPRONIL, BUT FROM THE

6      NAME BRAND TO THE GENERIC, ALL OF THOSE SHOW THAT THE GENERIC

7      PRODUCED BY MY CLIENT, TEVRA, AND BAYER'S NAME BRAND ARE IN THE

8      SAME MARKET AND THEY'RE IN THE SAME MARKET BY THEMSELVES.

9           YOUR HONOR, IT IS EXTREMELY COMMON FOR A CHEMICAL,

10     PESTICIDE, PHARMACEUTICAL, MOLECULE, SO TO SPEAK, TO USE PATENT

11     SPEAK, MOLECULE TO REALLY BE -- FOR THERE TO BE A SINGLE

12     COMPOUND MARKET.

13          AND I'LL MENTION SIX CASES THAT ARE ALL IN OUR BRIEF.

14     CARDIZEM, LIDODERM, AGGRENOX, ASACOL, SUBOXONE, ALL OF THESE

15     COURTS REACH EXACTLY THE SAME CONCLUSION, THAT THE PRODUCT --

16     THAT GIVEN A HYPOTHETICAL MONOPOLIST TEST ANALYSIS, THE

17     TOUCHSTONE OF WHICH IS, YOU KNOW, CROSS-ELASTICITY OF DEMAND,

18     WHEN WILL CONSUMERS SWITCH FROM ONE TO THE OTHER, THEY ALL

19     REACH THE CONCLUSION THAT IT'S THE NAME BRAND AND ITS GENERICS

20     THAT ARE ALONE IN THE MARKET.

21          AND SO --

22               THE COURT:  MR. OWEN, LET ME JUST INTERRUPT HERE.

23          I REALLY APPRECIATE THAT YOU WENT BACK AND GAVE ME THE,

24     THE ANALYSIS OF THE GENERIC DRUG CASES.  I HAD -- I HAD

25     DISCUSSED THAT WITH YOU LAST TIME, AND I APPRECIATED IT.

1      WHAT WAS INTERESTING TO ME WHEN I READ THOSE CASES AND

2   READ THE REPLY BRIEF WAS THAT THERE ARE SOME VERY SIGNIFICANT

3   DIFFERENCES WITH PRESCRIPTION DRUGS IN CONSUMER CHOICE AND

4   CROSS-ELASTICITY OF DEMAND.

5      AND SO IF MY DOCTOR PRESCRIBES A DRUG TO ME, I CAN'T JUST

6   GO TO MY PHARMACIST AND SAY -- OTHER THAN THE GENERIC, I CAN'T

7   SAY, "WHAT ELSE DO YOU HAVE FOR MY SYMPTOMS?"  THE PHARMACIST

8   WILL SAY, "I CAN ONLY GIVE YOU WHAT YOUR DOCTOR PRESCRIBED."

9      SO I'M NOT SURE THOSE CASES REALLY HELP, ALTHOUGH I HAD

10   WANTED TO KNOW ABOUT THEM.

11      AND THEN WHEN I READ THE CASES AND READ MR. ASIMOW'S

12   ARGUMENT ON IT, I WAS PERSUADED THAT THEY'RE -- IT MAY NOT HURT

13   YOUR CASE BECAUSE, IN FACT, YOU STARTED TODAY BY BEING ABLE TO

14   GO FORWARD ON THIS MARKET, BUT I DON'T THINK IT HELPS DEFINE A

15   SINGLE PRODUCT MARKET.

16      MR. OWEN:  THERE IS ANOTHER ONE, BY THE WAY, TWO DAYS

17   AGO, THE COURT -- THE MAGISTRATE DOUGLAS MILLER IN THE ZETIA

18   CASE BACK IN THE EASTERN DISTRICT OF VIRGINIA CAME OUT WITH A

19   VERY, VERY SIMILAR REPORT AND RECOMMENDATION.

20      BUT I THINK, YOUR HONOR, EVEN THOUGH THERE'S A DIFFERENCE

21   BETWEEN PRESCRIBING HUMAN PHARMACEUTICALS WHICH ARE REGULATED

22   UNDER THE FDA AND CHOOSING FLEA AND TICK MEDICATIONS, WHICH

23   MIGHT BE RECOMMENDED BY A VET OR THEY MIGHT BE OVER THE

24   COUNTER, WHICH ARE REGULATED UNDER THE EPA, EVEN THOUGH THERE'S

25   A FUNCTIONAL DIFFERENCE, I WOULD SUGGEST THAT THE HYPOTHETICAL

1    MONOPOLIST TEST IS NO DIFFERENT WHEN APPLIED TO THOSE TWO

2    THINGS.

3         CONSUMERS CAN ASK FOR DRUGS FROM THEIR DOCTORS.  CONSUMERS

4    CAN CHOOSE TO BUY EITHER THE NAME BRAND OR THE GENERIC --

5         THE COURT:  THAT'S CERTAINLY TRUE.

6         MR. OWEN:  -- OF WHATEVER THE DOCTORS PRESCRIBE.

7    SO I DON'T THINK IT CHANGES THE MATHEMATICAL ANALYSIS.

8         THE COURT:  OKAY.

9         MR. OWEN:  YOUR HONOR, I'M PREPARED TO MOVE ON --

10        THE COURT:  OKAY.  LET'S DO THAT.

11        MR. OWEN:  -- AND SAY A FEW OTHER THINGS.

12   I WANT TO ADDRESS THE COURT'S CONCERNS JUST A LITTLE BIT

13   ABOUT THE WIDE VARIETY OF THINGS THAT KILL TICKS AND FLEAS.

14        DIPPING YOUR DOG IN KEROSENE WILL KILL FLEAS AND TICKS,

15   AND IT WAS USED BY THE PIONEERS.

16        IT COMPETES -- KEROSENE COMPETES, AT LEAST IN A GENERAL

17   SENSE, WITH THE ORALS THAT ARE PRESCRIBED, IT COMPETES WITH

18   FLEA COLLARS, IT COMPETES WITH SHAMPOOS, ET CETERA, ET CETERA.

19        NAME BRAND IMIDACLOPRID COMPETES IN A GENERAL SENSE WITH

20   ALL OF THOSE THINGS.  TEVRA'S GENERIC IMIDACLOPRID COMPETES

21   WITH THEM.

22        THE PROBLEM IS THAT THE WORD "COMPETE" IS WAY TOO BROAD

23   WHEN WE'RE TALKING ABOUT MONOPOLIZATION AND EXCLUSIVE DEALING.

24        EVEN THOUGH PRODUCTS COMPETE GENERALLY, IT IS STILL

25   POSSIBLE TO MONOPOLIZE ONE OF THEM.  AND TO DETERMINE WHETHER

1    THAT WAS MONOPOLIZED, YOU HAVE TO DO A MATHEMATICAL INQUIRY OF

2    A HYPOTHETICAL MONOPOLIST TEST AND SEE WHETHER PRICE INCREASES

3    IN THE MONOPOLIZED PRODUCT ARE UNRESTRAINED OR NOT PREVENTED BY

4    THE OTHER PRODUCTS THAT ARE ALLEGEDLY IN THE MARKET.

5         IT IS NOT POSSIBLE TO MONOPOLIZE ANYTHING IN ORDER TO EARN

6    MONOPOLY LEVEL PROFITS IF CONSUMERS WILL JUST SWITCH TO

7    SOMETHING THEY CONSIDER THE SAME.  AS WE TELL YOU IN SECTION

8    A1D, THAT'S NOT WHAT HAPPENED HERE ACCORDING TO BAYER'S OWN

9    DOCUMENTS.

10        I THINK I SHOULD MOVE ON.

11        I DO WANT TO POINT OUT A COUPLE OF MISTAKES THAT I BELIEVE

12   BAYER HAS MADE IN MISCHARACTERIZING THE HYPOTHETICAL MONOPOLIST

13   TEST.

14        THEY'VE SUGGESTED TO YOU THAT A SSNIP CAN ONLY BE A SINGLE

15   PRICE INCREASE.  THERE IS NO SUCH REQUIREMENT.

16        IN THEIR BRIEF, THEY DO SOMETHING MORE SERIOUS.  THEY

17   SUGGEST THAT IT HAS TO BE AN ANNUAL PRICE INCREASE, AND THERE

18   IS NO SUCH REQUIREMENT THERE.

19        IN ANY EVENT, I THINK THAT THE MAGNITUDE OF THE PRICE

20   INCREASE THAT IS, THAT IS SHOWN IN THE FIRST HYPOTHETICAL

21   MONOPOLIST TEST IN OUR SECOND AMENDED COMPLAINT IS MORE THAN

22   ENOUGH TO DEMONSTRATE THAT IT'S A GOOD DATA POINT.

23             THE COURT:  SO YOU BELIEVE THE SIXTH CIRCUIT WAS

24    INCORRECT IN THE KENTUCKY SPEEDWAY CASE --

25             MR. OWEN:  THE --

1          THE COURT:  -- ON THE NINTH CIRCUIT LAW?

2          MR. OWEN:  I BELIEVE THE KENTUCKY SPEEDWAY CASE HAS

3     NO APPLICATION AT ALL BECAUSE THE, THE EXPERT WHOSE REPORT WAS

4     STRUCK ON DAUBERT DIDN'T PROPERLY APPLY THE HYPOTHETICAL

5     MONOPOLIST TEST AT ALL.

6          HE MADE UP HIS OWN WAS THE CRUX OF KENTUCKY SPEEDWAY.

7          THE COURT:  I THINK THE CRUX OF MR. ASIMOW'S ARGUMENT

8     MAY BE THAT YOU'RE MAKING UP YOUR OWN AS WELL, SO --

9          MR. OWEN:  WELL, I AM HOPEFUL THAT THE COURT WILL

10    HAVE AN OPPORTUNITY TO EVALUATE THE WELL COMPENSATED AND HIGHLY

11    CREDENTIALED EXPERTS THAT MR. ASIMOW AND I WILL BRING AT A

12    LATER STAGE.  I'M HOPEFUL THAT WE'LL GET THE OPPORTUNITY TO DO

13    THAT.

14          THE COURT:  I UNDERSTAND.

15          MR. OWEN:  ALL RIGHT.  I'M GOING TO MOVE ON TO SECOND

16    BRAND STRATEGY UNLESS THE COURT WANTS TO HEAR ANYTHING FURTHER.

17          THE COURT:  LET'S MOVE ON.

18          MR. OWEN:  ALL RIGHT.  I AM GOING TO TRY TO CALL UP

19    MY SLIDE SHOW HERE.

20          THE COURT:  OKAY.  AND TIFFANY CAN GIVE YOU THAT.

21          MR. OWEN:  SO I'LL SHARE MY SCREEN.

22          THE COURT:  YEAH.

23          THE CLERK:  GO AHEAD.

24          MR. OWEN:  AND I'M GOING TO EXPLAIN WHY -- LET'S SEE.

25    IF I NOW PUSH THIS SHARE BUTTON, IT SHOULD SHARE THE SCREEN.

1      AND IT DID.

2           CAN EVERYONE -- CAN THE COURT SEE THAT?

3               THE COURT:  YES, I CAN.  THANK YOU.

4               MR. OWEN:  WHY DO I THINK THAT THE SECOND BRAND

5      STRATEGY IS ANTICOMPETITIVE?

6           BECAUSE WHAT THE COURT IS LOOKING AT HERE IS EXHIBIT 1,

7      EXHIBIT 1 THAT WAS USED IN THE DEPOSITIONS.

8           OF COURSE MR. CHUA AND MR. ZAPATERO DENY THAT THERE WAS

9      ANY DIRECTION FROM, FROM GERMANY TO THE UNITED STATES.  OF

10     COURSE THEY DO.

11          IN FACT, THEY DID IT ON EXAMINATION BY MR. CALLAGY, WHO

12     ASKED THEM THESE DIRECT EXAMINATION QUESTIONS THAT HE'S QUOTED

13     THE COURT TODAY.

14          WE BEG TO DIFFER, AND WE BEG TO DIFFER BASED ON THE

15     DOCUMENTS.

16          HERE'S ONE OF THE DOCUMENTS.  THIS DOCUMENT WAS NOT

17     CREATED BY ME OR ANYONE ASSOCIATED WITH THE PLAINTIFF IN THIS

18     CASE.  THIS DOCUMENT WAS CREATED BY BAYER, AND YOU CAN SEE

19     WHERE I'M HIGHLIGHTING NOW WHAT BAYER'S STATED GOALS WERE.

20          BAYER'S STATED GOALS INCLUDED THE FOLLOWING:  BLOCK

21     GENERIC ENTRY.

22          NOW, WHAT WERE THEY GOING TO DO TO BLOCK GENERIC ENTRY?

23     HOW ABOUT A SECOND BRAND STRATEGY?

24          WHY DO I THINK THAT THEY USED THE SECOND BRAND STRATEGY TO

25     BLOCK GENERIC ENTRY?  WELL, THAT HAS TO DO WITH SLIDE NUMBER 2.

1          HERE'S SLIDE NUMBER 2 IN EXHIBIT 1, AND YOU'RE GOING TO

2     SEE -- EXCUSE ME -- YOU'RE GOING TO SEE WHAT BAYER DID TO TRY

3     TO BLOCK GENERIC ENTRY:  BLOCK GENERIC ENTRY BY USING

4     DEFENSECARE AS A GENERIC BRAND.

5          AND THAT IS EXACTLY WHAT THEY DID AT PETSMART AND THEY

6     CONGRATULATED THEMSELVES FOR DOING THAT, AND IT WAS THE

7     GERMAN -- AS WE'LL SEE LATER ON WHEN WE TAKE A LOOK AT

8     SECTION F OF THE COMPLAINT, THE GERMAN COMPANY CAME UP WITH THE

9     STRATEGY, OVERSAW IT BEING DONE IN THE UNITED STATES, AND THEN

10    CONGRATULATED ITSELF FOR IT HAVING WORKED IN THE UNITED STATES

11    OF AMERICA.  THAT, WE CONTEND, IS PURPOSEFUL DIRECTION.

12         LET ME SHOW YOU SOMETHING ELSE THAT BAYER DID.  THERE IS

13    ANOTHER BAYER -- ANOTHER BAYER --

14              THE COURT:  WELL, I GUESS -- MR. OWEN, IF I COULD

15     STOP YOU HERE?

16              MR. OWEN:  SURE.

17              THE COURT:  I'M JUST CONCERNED THAT YOU'RE DRIFTING

18     INTO HARM TO A COMPETITOR VERSUS HARM TO COMPETITION.

19         AND SO, YOU KNOW, THAT'S -- YES, I -- SURE, I MEAN,

20     ANYTHING THAT BAYER DOES TO HURT TEVRA'S CHANCES OF GETTING IN

21     THE MARKET HARMS A COMPETITOR.

22         BUT IT -- I'M FOCUSSED, UNDER THE ANTITRUST LAWS, ON HARM

23     TO COMPETITION, MEANING THE CONSUMERS.

24              MR. OWEN:  WELL, THERE WAS HARM TO COMPETITION

25     BECAUSE BAYER USED THIS IN ORDER TO KEEP THEIR PRICES AT

1    MONOPOLY LEVELS.  THAT'S THE WHOLE CRUX OF OUR SECOND AMENDED

2    COMPLAINT.

3            THE COURT:  THERE'S NO CASE AUTHORITY THAT SUPPORTS

4    THIS THEORY AT ALL.  YOU'VE GIVEN ME NOTHING BUT ACADEMIC

5    ARTICLES.

6            MR. OWEN:  THAT BAYER WAS AT MONOPOLY LEVELS, OR THAT

7    THEY USED --

8            THE COURT:  WELL, THAT THE SECOND BRAND STRATEGY IS

9    ANTICOMPETITIVE, AS OPPOSED TO MR. ASIMOW'S ARGUMENT THAT IT'S

10   PRO COMPETITIVE AS A MATTER OF LAW.

11           MR. OWEN:  I THINK BAYER'S OWN DOCUMENTS CALL IT

12   ANTICOMPETITIVE.  IT'S NOT COMPETING WITH GENERICS THAT THEY'RE

13   DOING.  IT'S BLOCKING THEIR ENTRY INTO THE MARKET.  HOW IS THAT

14   NOT ANTICOMPETITIVE ON ITS FACE?  IT'S ONE THING TO COMPETE.

15   IT'S ANOTHER THING TO BLOCK ENTRY.

16       AND BAYER'S DOCUMENTS, AS WE QUOTE IN THE SECOND AMENDED

17   COMPLAINT -- I'M ONLY SHOWING A SUBSET OF THEM -- ARE RIFE WITH

18   THE IDEA THAT WE'VE GOT TO KEEP COMPETITORS OUT OF THE MARKET,

19   WE'VE GOT TO BLOCK GENERIC ENTRY.

20       THE DOCUMENT THAT I'M ABOUT TO SHOW IS YET ANOTHER EXAMPLE

21   OF BLOCKING GENERIC ENTRY.  WHEN THEY WENT AND CONDUCTED WHAT

22   THEY CALLED A DISTRIBUTOR RETAILER SUMMIT, THEY WENT TO THE

23   DISTRIBUTORS AND RETAILERS, AND WHAT DID THEY ASK OF THEM?

24   WHAT WAS THEIR ASK OF THE CUSTOMER?  IT WAS GAIN SUPPORT TO

25   BLOCK GENERIC ENTRY.

1          SO THEY'RE NOT ONLY SETTING OUT TO DO IT, THEY'RE REACHING

2     OUT TO RETAILERS TO DO IT.

3          FURTHERMORE, WHAT HAPPENED WHEN GENERICS ACTUALLY MADE IT

4     ON TO THE RETAILER'S SHELF?

5          WELL, YOU CAN SEE THAT DETAILED AT SECTION E3 OF THE

6     COMPLAINT.  BAYER BOUGHT THOSE GENERICS OFF THE RETAILER'S

7     SHELF, PAID PETCO $400,000 TO DO IT, ALSO GOT THEM OFF THE

8     SHELVES AT -- ALSO GOT THEM OFF THE SHELVES AT PETSMART, AND

9     IMMEDIATELY AFTER THEY DID THAT, IMMEDIATELY IN THE SAME

10    DOCUMENT THAT YOU SEE QUOTED IN SECTION E3 OF THE COMPLAINT,

11    THEY RAISED THE PRICE OF THE NAME BRAND.

12         NOW, THAT'S HARM TO CONSUMERS.  THAT'S HARM TO THE MARKET,

13    NOT JUST HARM TO A COMPETITOR.  THAT'S HARM TO COMPETITION.

14         YOU CAN'T FIND A DOCUMENT --

15         THE COURT:  MR. OWEN, IT SEEMS TO ME THAT YOU ARE

16    CONCEDING THAT NO COURT HAS EVER CONDONED THIS SECOND BRAND

17    THEORY AS ANTICOMPETITIVE.

18         MR. OWEN:  WELL, WE DIDN'T CITE A CASE DIRECTLY ON

19    THE SECOND BRANDS.

20         THE COURT:  I DON'T THINK YOU CITED A CASE EVEN

21    REMOTELY ON THE SECOND BRAND.

22         MR. OWEN:  YEAH.  WHEN -- BUT THE IDEA OF KEEPING

23    GENERIC COMPETITION OUT BY WHATEVER MEANS RUNS THROUGH THE

24    ENTIRE LINES OF CASE LAW WE CITED WITH ALL THOSE PHARMACEUTICAL

25    CASES.

1      THE IDEA OF KEEPING GENERIC COMPETITION OUT SO THAT YOU

2  CAN MAINTAIN THOSE MONOPOLY PRICES THAT WE'VE DOCUMENTED RUNS

3  THROUGH EVERYTHING.

4      WHAT DOES IT MATTER WHETHER IT WAS BECAUSE OF INJECTING

5  SECOND BRANDS OR PAYING BRIBES OR CHANGING CONTRACTS TO ENGAGE

6  IN EXCLUSIVE DEALING?  WHAT DOES IT MATTER?  IF THE OBJECT WAS

7  TO BLOCK GENERIC ENTRY AND IT SUCCEEDED, HOW IS THAT NOT

8  COMPETITIVE, ESPECIALLY AT THE PLEADING STAGE?

9          THE COURT:  UM-HUM.

10         MR. OWEN:  NOW, IF THEY HAVE AN EXPERT THAT

11  DEMONSTRATES IT'S PRO COMPETITIVE, IF THIS COMES BACK TO YOU AT

12  THE S.J. STAGE AND THERE'S INDICIA THAT IT WAS PRO COMPETITIVE,

13  THAT IT LOWERS PRICES FOR CONSUMERS, IT DIDN'T.  IT DIDN'T

14  LOWER PRICES.  IN FACT, IT RAISED THEM.

15      YOUR HONOR, IF YOU WANT TO SEE THEM RAISE PRICES, TAKE A

16  LOOK AT SECTION E3 OF THE COMPLAINT.  I'LL GIVE YOU THE

17  PARAGRAPH.  AND, IN FACT, I CAN BRING IT UP ON THE SCREEN IF

18  THE COURT WOULD PREFER.

19          I'M GOING TO SHOW YOU A DOCUMENT -- NOW, BY THE WAY --

20          THE COURT:  IF YOU COULD GIVE ME THE PARAGRAPH

21  NUMBER, THAT'S A BIG HELP.

22          MR. OWEN:  YEAH.  IT HAPPENS TO BE AT PARAGRAPH 158.

23          THE COURT:  OKAY.

24          MR. OWEN:  NOW, THIS -- THIS IS A DOCUMENT THAT IS, I

25  THINK, MARKED HIGHLY CONFIDENTIAL.  IT'S REDACTED OUT OF THE

1    SECOND AMENDED COMPLAINT.  I'M CALLING MR. ASIMOW'S ATTENTION

2    TO THAT.

3         THE COURT:  WHY DON'T YOU -- MR. OWEN, I MIGHT BE

4    ABLE TO LOOK AT THE HARD COPY SO THAT WE DON'T NEED TO WORRY

5    ABOUT IT.

6    TELL ME, WHERE AM I GOING TO FIND -- THIS IS IN OUR

7    OPPOSITION PAPERS?

8         MR. OWEN:  YES.  NO, IT'S PARAGRAPH 158 OF THE SECOND

9    AMENDED COMPLAINT.

10        THE COURT:  OH, LET ME -- OKAY.  LET ME -- I'VE GOT A

11   LOT OF PAPER HERE.  LET ME FIND THE SECOND AMENDED COMPLAINT.

12   HERE WE GO.  AND PARAGRAPH 158?

13        MR. OWEN:  YEAH.

14        THE COURT:  OKAY.

15        MR. OWEN:  AND IT REALLY RUNS PARAGRAPHS -- THE

16   ENTIRE ALLEGATION RUNS PARAGRAPHS 155 TO 158.  IT ONLY RUNS

17   ABOUT A HALF A PAGE.

18        THE COURT:  OKAY.

19        MR. OWEN:  YOU CAN BARELY READ IT.  IT LOOKS LIKE A

20   CIA DOCUMENT SO MUCH HAS BEEN REDACTED.

21        THE COURT:  SO I -- GIVE ME JUST ONE SECOND TO READ

22   THIS.  THAT WAY YOU DON'T NEED TO PUT IT UP ON THE SCREEN.

23        MR. OWEN:  SURE.

24      (PAUSE IN PROCEEDINGS.)

25        THE COURT:  OKAY.  SO WE'VE MOVED -- BUT THIS IS NOT

1        THE SECOND BRAND STRATEGY, THESE ALLEGATIONS.  THIS IS A

2    DIFFERENT CLAIM ON FORECLOSURE, ISN'T IT?

3              MR. OWEN:  THAT IS CORRECT, YOUR HONOR.

4              THE COURT:  OKAY.

5              MR. OWEN:  THIS IS INDEPENDENT OF THE SECOND BRAND

6    STRATEGY.

7              THE COURT:  AND JUST SO THAT WE'RE CLEAR, I WAS NOT

8    INCLINED TO REVISIT MY PRIOR RULING ON FORECLOSURE WHERE I WAS

9    ALLOWING IT TO GO FORWARD.

10             MR. OWEN:  OKAY.  I -- THE ONLY -- THE REASON I POINT

11   THE COURT TO THAT IS IT SIMPLY SHOWS THE LENGTHY DESIRE OF

12   BAYER TO GET THE GENERICS OFF THE SHELF, AND THE LENGTHS THAT

13   IT WOULD GO TO, AND THE FACT THAT ONCE IT GOT THOSE GENERICS

14   OFF THE SHELF, IT IMMEDIATELY RAISED THE PRICE -- THAT'S WHAT

15   YOU SEE IN 158 -- AND --

16             THE COURT:  I GUESS -- I'M JUST NOT SURE THAT I'M

17   WILLING TO TAKE THOSE ARGUMENTS, WHICH I HAVE ALREADY APPROVED

18   TO GO FORWARD TO DEVELOPMENT OF EVIDENCE ON FORECLOSURE, TO

19   COLOR WHAT I THINK IS A LEGAL THEORY -- IS YOUR THEORY WITHOUT

20   ANY SUPPORT IN THE CASE LAW ON THE INTRODUCTION OF A SECOND

21   BRAND AS BEING ANTICOMPETITIVE BECAUSE THE SECOND BRAND COSTS

22   LESS MONEY THAN THE NAME BRAND.

23        AND SO, YOU KNOW, YOUR ACADEMIC RESEARCH ON THE EFFECT OF

24   A SPONSORED BRAND BY THE NAME BRAND COMPANY FINDS NO BASIS IN

25   THE LAW AT THIS POINT.

1      I MEAN, YOU CAN SAY TO ME, LET'S CREATE NEW LAW, BUT

2  ANTITRUST LAW HAS BEEN FROZEN FOR 30 YEARS.  IT'S MAYBE THE

3  ONLY THING THAT ISN'T THAWING IN OUR WORLD RIGHT NOW.

4          MR. OWEN:  YOUR HONOR, IF THIS IS THE FIRST CASE,

5  IT'S STILL A VALID ARGUMENT.

6          THE COURT:  WELL --

7          MR. OWEN:  IF THIS IS THE FIRST CASE EVER, THE FACT

8  THAT YOU HAVE ALL THESE DOCUMENTS THAT ARE QUOTED -- AND

9  THEY'RE QUOTED EXTENSIVELY AT SECTION F OF THE SECOND AMENDED

10  COMPLAINT -- THAT SAY, LET'S BRING IN A SECOND BRAND AS A

11  GENERIC DEFENSE STRATEGY, THEY TALK ABOUT THE ANTI-GENERIC

12  EFFECT OF IT, THEY TALK ABOUT IT'S OUR BUFFER AGAINST GENERIC

13  COMPETITION.

14      IF THIS IS THE FIRST CASE, THEN SO BE IT.

15      THE REASON ACADEMICS THAT WE QUOTED ARE TALKING ABOUT IT

16  IS BECAUSE IT'S REAL, IS BECAUSE IT'S A WAY TO BLOCK

17  COMPETITION.

18      NOW, IT'S NOT HARMLESS --

19          THE COURT:  WELL, BUT THE PROBLEM IS THE THEORY MAY

20  BE -- IT'S A BLACK AND WHITE THEORY, BECAUSE IF I BUY WHAT

21  YOU'RE SAYING, THEN NO COMPANY COULD INTRODUCE A GENERIC.  IT

22  WOULD BE -- IT'S EITHER IN OR OUT.

23      TO THEN HAVE TO EVALUATE, WELL, THIS SECOND BRAND IS PRO

24  COMPETITIVE AND THIS ONE IS ANTICOMPETITIVE, THAT BECOMES AN

25  IMPOSSIBLE JOB.  THEN COURTS ARE RUNNING BUSINESSES IN A WAY

1    THAT THE COURTS HAVE DECLINED TO DO IN THE ANTITRUST FIELD, I

2    THINK.

3            MR. OWEN:  I RESPECTFULLY DISAGREE, YOUR HONOR.  IT'S

4    NOT BLACK AND WHITE.

5        THE QUESTION OF A SECOND BRAND COMING IN IS TWO-FOLD.

6    NUMBER ONE, WAS IT DONE FOR THE EXPRESS PURPOSE OF BLOCKING

7    GENERIC COMPETITION, AS OPPOSED TO JUST GIVING A CHEAPER

8    ALTERNATIVE TO CONSUMERS; AND, TWO, AND MOST IMPORTANTLY, DID

9    IT BLOCK GENERIC COMPETITION AND ALLOW THE MONOPOLIST TO

10   CONTINUE TO RAISE PRICES TO A MONOPOLY LEVEL?

11       THE SECOND AMENDED COMPLAINT IN FRONT OF YOU CLEARLY

12   ALLEGES THAT BOTH OF THOSE THINGS HAPPENED.

13       SO 20 YEARS FROM NOW, WHEN A SECOND BRAND CASE GETS THROWN

14   OUT, THEY CAN SAY, THEY DIDN'T HAVE THE EVIDENCE THAT

15   JUDGE FREEMAN CONSIDERED WAY BACK 20 YEARS AGO IN THE TEVRA

16   CASE.

17       SO I DON'T -- IF THIS IS THE FIRST TIME EVER, IT'S THE

18   FIRST TIME EVER.  BUT IT DOES STATE -- WE THINK IT STATES A

19   CLAIM.

20           THE COURT:  I GUESS ONE OF THE PROBLEMS I HAVE IS

21    THAT ANY COMPANY, INCLUDING TEVRA, IS GOING TO WANT TO

22    INTRODUCE ITS PRODUCTS AT THE HIGHEST PRICE THE MARKET WILL

23    BEAR.  THAT'S THE WHOLE POINT.

24       AND SO THAT'S WHERE WE GET INTO THIS VERY DIFFICULT

25   ANALYSIS IS THAT YOU'RE SAYING, BUT IF THE NAME BRAND

1    INTRODUCES A GENERIC, IT CAN'T INTRODUCE IT AT THE HIGHEST

2    PRICE THE MARKET WILL BEAR BECAUSE THAT WOULD BE

3    ANTICOMPETITIVE, SO THEN IT HAS TO GO TO SOME LOWER PRICE.

4         I GUESS I'M JUST NOT BUYING THE PREMISE.

5              MR. OWEN:  WELL, I UNDERSTAND, YOUR HONOR.

6         IF -- I WILL -- I MEAN, I WOULD CONCEDE, IF THE NAME BRAND

7    INTRODUCES A GENERIC THAT'S A LOWER PRICED ALTERNATIVE FOR

8    EVERYONE, THAT ON NET, THEN IT COULD BE PRO COMPETITIVE.

9         BUT IF ITS PURPOSE IS TO BE ABLE TO MAINTAIN THAT

10   EXTREMELY HIGH PRICE, THE MONOPOLIST PRICE THAT WE'VE

11   DOCUMENTED IN THE SECOND AMENDED COMPLAINT, THEN IT IS

12   ANTICOMPETITIVE.

13        HERE'S THE WAY YOU SHOULD REALLY --

14             THE COURT:  WELL, AND I CERTAINLY UNDERSTAND THAT IN

15   OTHER -- I MEAN, THAT'S NOT THE ISSUE HERE, BUT ONE CAN BE

16   ANTI -- CAN BE A MONOPOLIST BY LOWERING ONE'S PRICES, WHICH

17   HELPS THE CONSUMER IN THE SHORT TERM, AS A WAY OF GETTING RID

18   OF THE COMPETITION AND THEN COMING IN WITH THE MONOPOLY POWER

19   AND INCREASING.  I UNDERSTAND THAT.

20             MR. OWEN:  I WOULD ALSO URGE THE COURT TO VIEW --

21   JUST AS I'M URGING THE COURT TO VIEW THE ALLEGATIONS ABOUT

22   SECOND BRANDS THAT ARE CONTAINED IN SECTION E1 THROUGH THE LENS

23   OF SECTION E3 WHERE THEY BOUGHT THE GENERICS OFF THE SHELF AND

24   THEN RAISED THE PRICE, I'M ALSO GOING TO URGE THE COURT TO VIEW

25   THE SECOND BRAND STRATEGY IN SECTION E1 THROUGH THE LENS OF

1        SECTION E2.

2            WHAT IS E2?  WELL, THOSE ARE THE ALLEGATIONS THAT THE

3        COURT SAW THE FIRST TIME IN THE FIRST AMENDED COMPLAINT WHERE

4        MULTIPLE DISTRIBUTORS AND RETAILERS SAID THEY COULDN'T CARRY

5        IT.

6            HOWEVER, SECTION E2 HAS SOMETHING NEW IN IT THAT WE DIDN'T

7        HAVE THE FIRST TIME BECAUSE WE DIDN'T HAVE ANY DOCUMENTS.

8            SECTION E2 HAS A VERY IMPORTANT ARGUMENT THAT BAYER MADE

9        TO THE RETAILERS.  THEY WENT -- AND IT'S FLESHED OUT THROUGH

10       THE DOCUMENTS.  THEY'RE QUOTED IN THERE.  BAYER WENT TO THE

11       RETAILERS AND SAID TO THEM, "GET THE GENERICS OFF THE SHELF AND

12       WE CAN ALL MAKE MORE MONEY, BECAUSE EVEN THOUGH THE PROFIT

13       MARGIN YOU MAKE ON THE GENERICS IS HIGHER, THE TOTAL DOLLARS

14       YOU CAN GET FROM SELLING THE NAME BRAND AT A HIGHER PRICE WILL

15       PUT MORE MONEY IN YOUR POCKET.  BUT THE EXPLICIT CONDITION OF

16       THAT DEAL IS TO GET THOSE GENERICS OFF THE SHELF."

17           SO VIEW IT THROUGH THAT LENS WHEN BAYER GOES TO THE

18       RETAILERS AND SAID, "LET'S KEEP THE PRICE OF THE MONOPOLY

19       PRODUCT HIGH, BUT YOU HAVE TO GET THE GENERICS OFF THE SHELF SO

20       THERE'S NO DOWNWARD PRICE PRESSURE ON IT, WE CAN ALL MAKE MORE

21       MONEY."

22           I MEAN, THAT'S A NAKED, IN OUR VIEW, VIOLATION.

23           AND LOOK AT THE GENERIC -- THE SECOND BRAND STRATEGY

24       THROUGH THAT LENS BECAUSE IT'S THE SAME MONOPOLISTS TALKING TO

25       THE SAME RETAILERS FOR THE SAME GOAL AS TO BLOCK GENERIC ENTRY.

1        IS THERE ANYTHING ELSE THE COURT IS CURIOUS ABOUT ON THE

2    SECOND BRAND STRATEGY?

3            THE COURT:  NO.  WE CAN MOVE ON.

4            MR. OWEN:  OKAY.  LET'S MOVE ON TO THE, TO THE

5    ALLEGATIONS REGARDING WHAT WE BELIEVE ARE PURPOSEFUL DIRECTION

6    OF THE, OF THE SECOND BRAND STRATEGY FROM BAYER ANIMAL, THE

7    BAYER ANIMAL HEALTH GMBH, THAT I MAY JUST REFER TO AS GMBH, THE

8    GERMAN ENTITY TO THE UNITED STATES.

9        I WON'T BELABOR THE POINT.  I COULD SIMPLY READ THINGS

10    INTO THE RECORD, BUT THEY'RE ALL DETAILED AT SECTION F OF THE

11    SECOND AMENDED COMPLAINT.

12        WE QUOTE NO FEWER THAN NINE DIFFERENT BAYER DOCUMENTS FROM

13    THE YEAR 2013, RIGHT UP TO THE YEAR 2019, IN WHICH BAYER --

14    BAYER'S GERMAN EXECUTIVES, WHICH AT ONE POINT INCLUDE

15    JERIEL CHUA, ARE SUGGESTING THIS SECOND BRAND STRATEGY, THEY'RE

16    GUIDING THE SECOND BRAND STRATEGY, AND ULTIMATELY THEY'RE

17    CROWING ABOUT THE SUCCESS OF THE SECOND BRAND STRATEGY.  YOU

18    CAN SEE THIS BETWEEN PARAGRAPHS 181 AND 190.

19        NOTICE THE TITLES OF SOME OF THE PEOPLE THAT ARE SAYING

20    THIS.  FRANK RAUTENBERG IS WHAT IS KNOWN AS THE, QUOTE, "GLOBAL

21    PRICING EXCELLENCE MANAGER," PARAGRAPH 185, WHO IS IMPLEMENTING

22    WHAT IS CALLED GLOBAL PRICE GOVERNANCE, AND HE TELLS HIS

23    EXECUTIVES, INCLUDING U.S. EXECUTIVES, SOONER OR LATER, THE

24    PATENT PROTECTION OF ADVANTIX WILL EXPIRE.  FROM THE EXPERIENCE

25    OF OTHER BRANDS, WE CAN ASSUME THAT PROVIDERS OF GENERICS WILL

1       ENTER THE MARKET AT A SIGNIFICANT PRICE GAP TO ADVANTIX.  THIS

2       IS A HUGE THREAT TO OUR SALES AND PROFITABILITY.

3           AND THE DOCUMENTS CONTINUE.  THEY REQUIRE THE

4       UNITED STATES TO REPORT ON WHAT IS KNOWN AS, QUOTE, "THE

5       LIKELIHOOD OF GENERICS ENTERING THE MARKET."  THEY CONTROL THE

6       ENTIRE PROCESS BY SOMETHING THAT IS KNOWN AS STRACO,

7       S-T-R-A-C-O.

8           NOW, IT IS A VERY PRECISE SERIES OF TEMPLATES AND

9       SPREADSHEETS THAT HAVE TO BE REPORTED BY EACH COUNTRY TO THE

10      GERMAN PARENT EVERY YEAR.  THE STRACO PROCESS REQUIRES EACH

11      COUNTRY, INCLUDING THE UNITED STATES, TO PUT TOGETHER DETAILED

12      LISTS OF WHEN THEIR PRODUCTS FACE GENERIC COMPETITION AND WHAT

13      THEY'RE GOING TO DO ABOUT IT.

14          AT PARAGRAPH 187, YOU HAVE ANOTHER SERIES OF DOCUMENTS

15      TALKING ABOUT GENERIC DEFENSE STRATEGY, INCLUDING SECOND

16      BRANDS.  THAT'S A MEETING ITEM, INCLUDING U.S. EXECUTIVES IN

17      GERMANY, OF WHAT IS CALLED THE GLOBAL BRAND TEAM.

18          NOW, THIS IS SIMPLY NOT THE PASSIVE OBSERVER OR GENERAL

19      ADVICE THAT MR. CALLAGY WOULD HAVE YOU BELIEVE.  THIS IS ACTIVE

20      INVOLVEMENT IN THE SECOND BRAND'S STRATEGY IN THE

21      UNITED STATES, SO I THINK IT MEETS THE PURPOSEFUL DIRECTION --

22      PURPOSEFUL DIRECTION PRONG.

23          YOU HAVE PEOPLE LIKE IMKE ROTTMAN, WHO'S LATER KNOWN AS

24      IMKE PICKARDT, WRITING IN -- WRITING ABOUT SECOND BRAND

25      STRATEGY.  NOW, SHE'S A GERMAN EXECUTIVE FROM GMBH AND SHE'S

1    WRITING THAT WE NEED TO TALK ABOUT, QUOTE, "GROSS NET PRICE

2    STRATEGY SHOULD INCLUDE STABLE PRICES FOR THE BRAND AFTER

3    GENERIC ENTRY AND SECOND BRAND PRIVATE LABEL LAUNCH."

4         BY 2019, JERIEL CHUA, WHO WAS MENTIONED EARLIER, HE'S

5    ACTUALLY MOVED FROM THE U.S. ENTITY TO THE GERMAN ENTITY, AND

6    HE WRITES A SELF-CONGRATULATORY LETTER.  HE WRITES EMAILS THAT

7    INCLUDE SLIDE DECKS ABOUT HOW THE U.S. IMPLEMENTED ITS SECOND

8    BRAND STRATEGY, AND HE WRITES A SELF-CONGRATULATORY LETTER

9    ABOUT THE U.S. EXPERIENCE WITH THE SECOND BRAND DEFENSECARE

10   WHICH WAS SUCCESSFULLY DEPLOYED AT PETSMART.

11        NONE OF THIS IS PASSIVE.  NONE OF THIS IS SIMPLY

12   REPORTING.  ALL OF THIS IS ACTIVE INVOLVEMENT AND PURPOSEFUL

13   DIRECTION BY THE GERMAN ENTITY.

14        DOES THE COURT HAVE ANY QUESTIONS FOR ME ABOUT ANY OF

15   THAT?

16             THE COURT:  (SHAKES HEAD FROM SIDE TO SIDE.)

17             MR. OWEN:  I BELIEVE I'VE LOST YOUR AUDIO.

18             THE COURT:  NO, I DON'T HAVE ANY QUESTIONS.  THANK

19   YOU.

20             MR. OWEN:  YOUR HONOR, I APPRECIATE THE COURT'S TIME.

21   I'M HAPPY TO ANSWER ANY QUESTIONS ABOUT ANY ASPECT OF THE CASE.

22        I THINK WE'VE TOUCHED ON YOUR MARKET ISSUES, THE SECOND

23   BRAND ISSUES, THE ISSUES REGARDING THE GERMAN ENTITY.

24        I DON'T ASSUME THE COURT HAS ANY QUESTIONS FOR ME ABOUT

25   EITHER THE FORECLOSURE ANALYSIS OR MONOPOLY POWER, BUT I'D BE

1    HAPPY TO ANSWER THEM IF THE COURT DOES.

2         THE COURT:  OKAY.  NO, THANK YOU.

3         I WOULD LIKE TO RETURN TO MR. ASIMOW ON THE SECOND BRAND

4    STRATEGY.

5         MR. ASIMOW, I MADE SOME COMMENTS, AND I MIGHT HAVE BEEN

6    WAY OUT IN LEFT FIELD.  YOU NEVER WANT A JUDGE DOING THAT.

7         BUT I DO THINK THAT MR. OWEN RAISES SOME REALLY

8    INTERESTING ISSUES, AND THEY MAY ONLY BE IN THE CATEGORY OF

9    INTERESTING ECONOMIC ISSUES AND NOT LEGAL ISSUES HERE, AND

10   SINCE WE'RE NOT SITTING AROUND A COFFEE TABLE, THEY WOULDN'T BE

11   PARTICULARLY RELEVANT.

12        BUT I -- YOU'RE THE EXPERT HERE AND NOT ME.

13        MR. ASIMOW:  WELL, YOU'RE THE ONE THAT MATTERS, YOUR

14   HONOR.

15        BUT LET ME RESPOND TO SOME OF THE COMMENTS THERE THAT

16   MR. OWEN MADE.

17        THE ALLIED ORTHOPEDIC CASE IN THE NINTH CIRCUIT IS OUR

18   CONTROLLING AUTHORITY ABOUT PRODUCT IMPROVEMENTS, AND IT MAKES

19   THE POINT THAT WE REALLY DO NOT WANT TO CHILL PEOPLE FROM

20   IMPROVING THEIR PRODUCT, AND ONE VERY IMPORTANT ELEMENT IS

21   LOWER PRICES FOR OFFERING AN ADDITIONAL PRODUCT AT LOWER PRICES

22   ON ITS FACE IS GOING TO BE A BENEFIT TO CONSUMERS.

23        AND SO THAT CASE TELLS US THERE OFTEN WILL BE DOCUMENTS

24   ABOUT HOW THE NEW PRODUCT WILL HARM COMPETITORS.

25        THAT MAY VERY WELL BE THE MOTIVATION.  WE DON'T CONSIDER

1    THAT AT ALL.  SO LONG AS IT IS A GENUINE PRODUCT IMPROVEMENT

2    AND NOT A SHAM, THAT'S THE END OF THE -- THAT SHOULD BE THE END

3    OF THE INQUIRY.

4            THE COURT:  SO IS THIS A PRODUCT IMPROVEMENT?

5            MR. ASIMOW:  YES, IT'S A NEW PRODUCT AT A LOWER

6    PRICE.

7            THE COURT:  OKAY.

8            MR. ASIMOW:  AND, OF COURSE, THE LAST THING YOU WANT

9    TO DO WITH ANTITRUST LAW IS CHILL COMPANIES FROM LOWERING

10   PRICES.  YES, IT'S TRUE, IT CAN BE AN ANTICOMPETITIVE STRATEGY,

11   BUT THE CASE LAW THAT THE COURT ALLUDED TO MAKES THE POINT THAT

12   WE ARE INCREDIBLY SKEPTICAL OF THAT PARTICULAR THEORY OF

13   ANTICOMPETITIVE CONDUCT, AND SINCE THE SUPREME COURT'S DECISION

14   IN THE BROOKE GROUP CASE, THAT'S ESSENTIALLY AN IMPOSSIBLE

15   THEORY TO PROCEED ON.

16       WITH REGARD TO THE AUTHORIZED GENERICS IN THE HUMAN

17   PHARMACEUTICAL SPACE, THERE HAS BEEN A LOT OF DEBATE ABOUT

18   THAT, AND THERE WAS A TIME WHEN IT WASN'T CLEAR IF THAT WAS

19   SOMETHING A BRAND COMPANY COULD DO UNDER THE HATCH-WAXMAN ACT.

20       BUT THE FTC LONG AGO CONCLUDED THAT AUTHORIZED GENERICS

21   WERE BENEFICIAL TO COMPETITION, AND IN FACT, ALMOST ALL OF THE

22   CASES HAVE BEEN ABOUT, AND MANY OF CASES THAT MR. OWEN CITES,

23   ARE WHEN THE BRAND COMPANY AGREES NOT TO DO AN AUTHORIZED

24   GENERIC.

25            THE COURT:  RIGHT.

1          MR. ASIMOW:  THAT'S WHAT'S ANTICOMPETITIVE.

2          THE COURT:  YES.

3          MR. ASIMOW:  THE GENERIC COMPANY, THE EQUIVALENT OF

4     TEVRA, IS DELIGHTED NOT TO HAVE TO COMPETE WITH AN AUTHORIZED

5     GENERIC, BUT THAT HAS BEEN HELD CONSISTENTLY TO BE

6     ANTICOMPETITIVE.

7          AND HERE, TOO, RIGHT, THE -- TEVRA WOULD HAVE MORE

8     COMPETITION WITH MORE GENERICS ON THE MARKET, WHETHER THEY COME

9     FROM PETLOCK OR WHETHER THEY COME FROM BAYER.  YES, IT MAKES

10    ITS LIFE MORE DIFFICULT, BUT THAT'S COMPETITION.

11         YOU KNOW, IN GENERAL, AS THE COURT'S POINTED OUT, ALTHOUGH

12    ON THIS POINT I THINK THE PHARMACEUTICAL CASES HAVE SOME

13    PERTINENCE BECAUSE THEY SAY THAT AN AUTHORIZED -- THAT NOT TO

14    DO AN AUTHORIZED GENERIC IS ANTICOMPETITIVE.

15         ON THE MARKET ISSUE DEFINITION, THAT REALLY IS A SPECIAL

16    MARKET WHERE IN ALMOST EVERY STATE -- MAYBE IT'S EVERY STATE

17    NOW -- THE PHARMACIST IS REQUIRED TO SUBSTITUTE THE GENERIC

18    BRAND UNLESS THE DOCTOR WRITES "DO NOT SUBSTITUTE."  SO YOU

19    HAVE VERY UNUSUAL MARKET DEFINITION PATTERNS IN THOSE CASES.

20         THE COURT:  SURE.

21         MR. ASIMOW:  IF THE COURT WOULD INDULGE ME, I WOULD

22    JUST COMMENT --

23         THE COURT:  OH, WOULD YOU --

24         MR. ASIMOW:  GO AHEAD.

25         THE COURT:  YOU MENTIONED A CASE YOU WANTED ON THE

```
1        PRODUCT IMPROVEMENT CASES.  I DIDN'T GET THE NAME OF THAT CASE.
2             MR. ASIMOW:  IT'S CITED IN OUR BRIEF.  IT'S ALLIED
3        ORTHOPEDIC, AND IT IS -- LET'S SEE.  IT'S CITED IN THE OPENING
4        BRIEF ON PAGE 16.
5             THE COURT:  OKAY, GOOD.  I WAS LOOKING AT THE REPLY
6        BRIEF, BUT I HAD THE WRONG BRIEF IN FRONT OF ME.
7             MR. ASIMOW:  WOULD YOU LIKE THE CITE?
8             THE COURT:  NO.  IF IT'S IN THE BRIEF, I HAVE IT.  I
9        HAVE THE NAME NOW.
10            MR. ASIMOW:  OKAY.  THANK YOU.
11            THE COURT:  OKAY.  GO AHEAD.
12            MR. ASIMOW:  I'LL JUST COMMENT ON THREE POINTS THAT
13       MR. OWEN RAISED ABOUT APPLICATION OF THE HYPOTHETICAL
14       MONOPOLIST TEST, AND EACH OF THESE WITH CLOSER SCRUTINY IS NOT
15       A HYPOTHETICAL MONOPOLIST TEST AND DOESN'T SUPPORT THE
16       INFERENCE THAT PLAINTIFF WOULD LIKE IT TO.
17            THE ALLEGED 64 PERCENT PRICE DIFFERENTIAL IS A PRICE
18       DIFFERENTIAL AT A MOMENT IN TIME.  IT IS NOT ALLEGED THAT IT
19       WAS INCREASED TO 64 PERCENT.
20            AND AS THE COURT PREVIOUSLY HELD, AND THERE ARE MANY CASES
21       THAT SUPPORT THIS, A MERE PRICE DIFFERENTIAL IS NOT MARKET
22       DEFINING.
23            THE INCREASE IN PRICE OF 8 TO 17 PERCENT DURING THE TIME
24       THAT GENERIC FIPRONIL WAS INTRODUCED INTO THE MARKET, THE
25       DEFICIENCY THERE IS THAT WE DON'T HAVE A CONTROL.  WE DON'T
```

1    KNOW WHAT HAPPENED TO FIPRONIL PRICES DURING THAT TIME, IN

2    ADDITION TO MY POINT THAT 8 TO 17 PERCENT OVER FIVE YEARS IS

3    NOT A -- IS NOT AN INCREASE AT A MOMENT IN TIME.

4         AND THEN WITH REGARD TO THE PETLOCK POINT, I THINK

5    MR. OWEN RAISED THAT PETLOCK SALES SEEM TO BE COMING FROM A

6    TRADE DOWN FROM K9 ADVANTIX.

7         WE DON'T DISPUTE THAT THE BRAND AND THE GENERIC OF THE

8    TOPICAL IMIDACLOPRID ARE IN THE SAME MARKET, AND THAT DOCUMENT

9    WOULD CERTAINLY TEND TO SUPPORT THE CONCLUSION THAT THE GENERIC

10   IS IN THE SAME MARKET AS THE BRAND.

11        IT DOESN'T REALLY TELL US, THOUGH, WHAT ELSE IS IN THAT

12   MARKET.

13        AND I HAVE A POINT I MADE BEFORE, WHICH IS THAT WE WOULD

14   EXPECT THERE TO BE MORE INTENSE COMPETITION BETWEEN BRANDED

15   GENERIC WITH THE SAME INGREDIENT.

16             THE COURT:  SURE.

17             MR. ASIMOW:  AND THAT, YOU KNOW, A SWITCHING, OR

18   DIAGONALLY BOTH SWITCHING YOUR ACTIVE INGREDIENT AND SWITCHING

19   WHETHER IT'S THE PREMIUM BRAND OR THE OFF PRICE GENERIC IS A

20   DOUBLE JUMP, BUT THAT DOESN'T MEAN THAT THE PRODUCTS ARE IN A

21   DIFFERENT MARKET.  IT JUST MEANS THAT WITHIN THE MARKET, SOME

22   THINGS COMPETE MORE INTENSELY THAN OTHER THINGS DO.

23        I THINK THOSE WERE -- THOSE WERE THE MAIN POINTS I WANTED

24   TO RESPOND TO.  I KNOW WE'VE BEEN AT IT FOR AWHILE.

25             THE COURT:  I APPRECIATE THAT.

1        ALL RIGHT.  WELL, THANK YOU.  THIS HAS BEEN REALLY VERY

2   HELPFUL.

3        I'M GOING TO GIVE SOME THOUGHT TO THE SECOND BRAND

4   STRATEGY, BUT AS MR. CALLAGY POINTS OUT, IN TERMS OF PERSONAL

5   JURISDICTION, IT MIGHT STILL BOTTOM OUT BECAUSE THERE'S STILL

6   NOT ENOUGH EVIDENCE ON PURPOSEFUL DIRECTION.

7        BUT IT'S A -- IT'S A STRATEGY OF ANTICOMPETITIVE CONDUCT

8   THAT WOULD LIVE ON EVEN IF IT IS NOT -- EVEN IF BAYER GMBH IS

9   NOT A PARTY TO THE CASE.

10            MR. OWEN:  SO, YOUR HONOR?

11            THE COURT:  YES.

12            MR. OWEN:  MR. ASIMOW RAISED SOMETHING THAT I -- IT

13   WAS NEW TO ME, AND I WOULD BEG THE COURT'S LEAVE TO CITE YOU TO

14   ONE PARAGRAPH IN THE SECOND AMENDED COMPLAINT IN RESPONSE.

15            THE COURT:  OKAY.

16            MR. OWEN:  I'M NOT JUST TRYING TO GET THE LAST WORD,

17   BUT I WASN'T READY FOR IT.

18        PARAGRAPH 117 ALLEGES THAT THE SECOND BRAND STOPPED BEING

19   OFFERED AND THAT IT, QUOTE, "CONTINUED UNTIL BAYER BEGAN

20   IMPLEMENTING ANOTHER STRATEGY TO BLOCK GENERIC ENTRY," AND

21   THOSE OTHER STRATEGIES ARE LISTED AT SECTIONS E3 -- OR E2, E3,

22   AND E4.

23        SO I JUST WANTED TO MAKE THE POINT THAT I DIDN'T EARLIER,

24   THAT IF HAVING A SECOND BRAND ON THE SHELF WAS PRO COMPETITIVE

25   AND BENEFITED CONSUMERS, IT STOPPED.  THEY QUIT DOING IT AND

1    THEY YANKED ALL OF THE GENERICS, INCLUDING THEIR OWN, OFF THE

2    SHELF AS FAR AS WE CAN TELL BASED ON THE ALLEGATIONS IN E2 AND

3    E3 AND E4, AND THEY GOT RID OF THEM BY MAKING THIS NEW NO

4    GENERICS DEAL.

5         SO I WOULD AGAIN URGE THE COURT TO AGAIN TAKE A LOOK AT

6    PARAGRAPH 117, AND FURTHER 118 AND 119, WHEN EVALUATING WHETHER

7    IT'S PRO COMPETITIVE.

8         THEY'RE REALLY ASKING YOU TO FIND IT'S PRO COMPETITIVE AS

9    A MATTER OF LAW ON THE PLEADINGS, AND I WOULD URGE THE COURT --

10             THE COURT:  WELL, I DON'T KNOW THAT STOPPING TO OFFER

11   A SECOND BRAND IS A SIGN THAT OFFERING IT WAS ANTICOMPETITIVE.

12   IT MIGHT HAVE FAILED.  MAYBE NOBODY WANTED IT.

13             MR. OWEN:  NO, I DON'T THINK STOPPING OFFERING IT

14   MEANS THAT IT WAS ANTICOMPETITIVE.  BUT IT MEANS IT'S NOT PRO

15   COMPETITIVE BECAUSE IT'S NOT THERE FOR THE CONSUMERS TO BUY THE

16   CHEAPER PRODUCT.

17        IF THEY'RE ASKING --

18             THE COURT:  WELL, NO, NO, NO.  I'M -- LOGICALLY, THAT

19   DOESN'T MAKE SENSE BECAUSE YOU COULD PUT YOUR PRODUCT OUT THERE

20   AND IT'S CHEAPER AND IT'S THE SAME CHEMICAL AND NOBODY BUYS IT.

21   THAT DOESN'T MAKE IT ANTICOMPETITIVE JUST BECAUSE YOUR BUSINESS

22   FAILED.

23             MR. OWEN:  WELL, WE'RE HOPING WE CAN DO THAT

24   EXPERIMENT.

25             THE COURT:  I KNOW YOU ARE.

1          MR. OWEN:  MY POINT IS -- MY POINT IS THAT IT'S BAYER

2     THAT'S CONTENDING THAT THEY ACTED PRO COMPETITIVELY BY OFFERING

3     THE CONSUMER A CHEAPER PRODUCT, BUT THEN THEY YANKED IT BACK.

4          THE COURT:  OKAY.  SO --

5          MR. OWEN:  OKAY.

6          THE COURT:  MR. ASIMOW, ANY COMMENT ON PARAGRAPH 117

7     TO 119?

8          MR. ASIMOW:  WELL, I GUESS I DIDN'T REALIZE THAT THE

9     THEORY HERE WAS THAT IT WAS ANTICOMPETITIVE TO PRODUCE IT AND

10    IT'S ALSO ANTICOMPETITIVE TO STOP IT.  THAT SORT OF SEEMS LIKE

11    A CAN'T WIN ARGUMENT.

12         BUT THAT'S EXACTLY IT.  THE LAW IS YOU'RE ALLOWED TO

13    INTRODUCE AND IMPROVE A DISCOUNTED PRODUCT, AND YOU'RE ALSO

14    ALLOWED TO DISCONTINUE A PRODUCT, AND THERE CAN BE MANY REASONS

15    FOR THAT.

16         AND IT SEEMS ODD TO ME THAT TEVRA WOULD COMPLAIN -- IF

17    TEVRA THINKS THAT THE INTRODUCTION OF THE PRODUCT WAS

18    ANTICOMPETITIVE, THAT TEVRA WOULD ALSO COMPLAIN THAT THE

19    REMOVAL OF THE PRODUCT WAS ANTICOMPETITIVE.  IT WOULD SEEM TO

20    ME THAT THAT WOULD ONLY BENEFIT TEVRA.

21         THE COURT:  OKAY.  THANK YOU FOR POINTING THAT OUT.

22    I WOULD HAVE MISSED THAT IN YOUR SECOND AMENDED COMPLAINT,

23    MR. OWEN.

24         ALL RIGHT.  I'M GOING TO THINK THROUGH ALL OF THIS.  I

25    REALLY APPRECIATE THE CARE THAT YOU'VE TAKEN AND THE ARGUMENT.

1    I WILL SAY ON THE MARKET DEFINITION, MR. ASIMOW, THAT I

2    FIND MANY OF YOUR POINTS COMPELLING AND I THINK THEY MAY TAKE

3    ME BEYOND WHAT I CAN DO ON A MOTION TO DISMISS.

4    AND THEN -- I MEAN, THEN WE ALL RECOGNIZE THAT AT SUMMARY

5    JUDGMENT, IF I HAVE DUELING EXPERTS, THEN MY HANDS ARE TIED.

6    SO I APPRECIATE THE DIFFICULTIES AS YOU GO FORWARD, BUT

7    THAT'S -- YOU KNOW, THAT'S WHERE I SEE IT IS.  I THINK

8    YOU'RE TAKING ME OUT BEYOND WHERE I CAN BE.

9    BUT LET ME -- I'LL CERTAINLY LOOK AT IT THOROUGHLY.

10   OKAY.  THANK YOU ALL.  I MAY NOT SEE YOU AGAIN UNTIL

11   SUMMARY JUDGMENT, AND AT THIS POINT I DON'T ACTUALLY RECALL

12   WHEN THAT IS, BUT SINCE WE'RE DOING MOTIONS TO DISMISS SO LATE,

13   IT MAY BE SOON.

14   THESE CLAIMS ARE EITHER GOING TO BE IN OR OUT.  THERE WILL

15   BE NO MORE AMENDMENT.  I THINK WE ALL UNDERSTOOD THAT.

16   AND SO YOU CAN GO AHEAD AND PROCEED AS -- AND, YOU KNOW,

17   THIS IS A COMPLICATED ORDER.  IT WON'T BE GOING OUT

18   IMMEDIATELY.  BUT I THINK YOU HAVE A PRETTY GOOD SENSE.

19   OKAY.  THANK YOU ALL.

20   MR. OWEN:  THANK YOU, YOUR HONOR.

21   MR. ASIMOW:  THANK YOU VERY MUCH.  YOUR HONOR.

22   MR. OWEN:  YOUR HONOR, JUST TO PREVIEW, THERE ARE A

23   SET OF DISCOVERY DEADLINES, AND MR. ASIMOW AND I HAVE ALREADY

24   TALKED ABOUT IT A LITTLE BIT, THEY'RE ALL GOING TO HAVE TO

25   MOVE.

```
 1                    THE COURT:  OKAY.

 2                    MR. OWEN:  THEY'RE VERY, VERY TIGHT.

 3                    THE COURT:  SURE.

 4                    MR. OWEN:  AND WE'LL VISIT ABOUT IT OFFLINE.

 5                    THE COURT:  OKAY.  JUST -- AND I'M GLAD YOU RAISED

 6      THAT.  I'M -- I HAVE NO CONCERN ABOUT YOU MODIFYING DISCOVERY

 7      DEADLINES.  ONCE IT IMPACTS YOUR SUMMARY JUDGMENT DATE, THEN

 8      THE TRIAL DATE GETS POSTPONED.  AND SO I JUST -- AND THAT'S

 9      FINE.  BUT I'M NOW SETTING CASES IN MID-2024, SO THAT'S WHAT

10      YOU'D BE LOOKING AT.  I JUST WANT THAT TO -- AS SOME GUIDANCE.

11      IT'S NICE TO KNOW THAT BEFORE YOU HAVE THE CONVERSATIONS.

12           AND I WOULDN'T -- I WOULDN'T DISAGREE WITH A REQUEST TO

13      POSTPONE THE TRIAL AT ALL, BUT I JUST WANT YOU TO KNOW WHAT THE

14      REALITY IS.

15                    MR. OWEN:  I UNDERSTAND, YOUR HONOR.

16                    THE COURT:  OKAY.  THANK YOU.

17                    MR. ASIMOW:  OKAY.  THANK YOU AGAIN, YOUR HONOR.

18                    MR. OWEN:  THANK YOU.

19           (THE PROCEEDINGS WERE CONCLUDED AT 11:03 A.M.)

20

21

22

23

24

25
```

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF ZOOM PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     LEE-ANNE SHORTRIDGE, CSR, CRR
17   CERTIFICATE NUMBER 9595

18           DATED:  NOVEMBER 24, 2021

19

20

21

22

23

24

25