DANIEL B. ASIMOW (Bar No. 165661)
daniel.asimow@arnoldporter.com
SEAN M. CALLAGY (Bar No. 255230)
sean.callagy@arnoldporter.com
ANDREW S. HANNEMANN (Bar No. 322400)
andrew.hannemann@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone:     415.471.3100
Facsimile:     415.471.3400

SONIA K. PFAFFENROTH (Bar No. 223984)
sonia.pfaffenroth@arnoldporter.com
LAURA S. SHORES (appearance *pro hac vice*)
laura.shores@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone:     202.942.5000
Facsimile:     202.942.5999

Attorneys for Defendant
BAYER HEALTHCARE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TEVRA BRANDS, LLC,<br><br>                    Plaintiff,<br><br>      v.<br><br>BAYER HEALTHCARE LLC,<br><br>                    Defendant. | Case No. 5:19-cv-04312-BLF<br><br>**[CORRECTED] BAYER HEALTHCARE LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          March 21, 2024<br>Time:          9:00 a.m.<br>Courtroom:  3, 5th Floor<br>Judge:         Hon. Beth Labson Freeman |

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

STATEMENT OF UNDISPUTED FACTS ........................................................................... 4

LEGAL STANDARD ........................................................................................................... 10

ARGUMENT ........................................................................................................................ 11

    I.     TEVRA'S EXCLUSIVE DEALING CLAIMS UNDER SHERMAN ACT
           SECTION 1 AND CLAYTON ACT SECTION 3 FAIL AS A MATTER OF
           LAW .......................................................................................................... 11

          A.     Tevra's Proposed Product Market is Not Cognizable, and Bayer did
               not have Substantial Market Power in a Properly Defined Market. ............. 11

          B.     Bayer's Agreements Did Not Foreclose a Substantial Share of the
               Market. .................................................................................................... 15

          C.     Bayer's Agreements are Short-Term and Easily Terminable, and the
               Imidacloprid Exclusivity Discount Can Be Terminated Without Any
               Prior Notice. ............................................................................................ 18

    II.    TEVRA'S MONOPOLIZATION CLAIM UNDER SHERMAN ACT
           SECTION 2 FAILS AS A MATTER OF LAW ........................................ 22

          A.     Bayer Does Not Possess Monopoly Power in Any Properly Defined
               Market .................................................................................................... 22

          B.     Bayer Has Not Engaged in Any Anticompetitive or Exclusionary
               Conduct .................................................................................................. 23

    III.   TEVRA'S CLAIMS FOR DAMAGES AFTER JULY 2020 FAIL AS A
           MATTER OF LAW DUE TO BAYER'S EXIT FROM THE BUSINESS ............. 24

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ................................................................................ 21, 24

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ............................................................... 15, 17, 18, 20

*Balaklaw v. Lovell*,
14 F.3d 793 (2d Cir. 1994) ..................................................................................... 19

*Bazemore v. Friday*,
478 U.S. 385 (1986) ................................................................................................ 14

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998) ................................................................................... 15

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ................................................................................................ 11

*Church & Dwight Co. v. Mayer Lab'ys, Inc.*,
868 F. Supp. 2d 876 (N.D. Cal. 2012) ............................................................... 17, 21

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) ................................................................................... 23

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ..................................................................................... 3, 12, 13

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ................................................................................... 23

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ................................................................................ 22

*In re California Bail Bond Antitrust Litig.*,
511 F. Supp. 3d 1031 (N.D. Cal. 2021) ................................................................. 24

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. 1999) ................................................................................ 24

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
545 F. Supp. 3d 922 (D. Kan. 2021) ................................................................. 18, 21

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
No. 04–md–1628 (RMB)(MHD), 2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009) ................ 14

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................................. 15

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 914 (9th Cir. 2015) ...................................................................... 10, 11

*In re Optical Disk Drive Antitrust Litig.*,
   303 F.R.D. 311 (N.D. Cal. 2014) ......................................................................... 12

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) .............................................................................. 10

*John Roe 1 v. State Bar of Cal.*,
   No. SA CV 22-00983-DFM, 2023 WL 6194088 (C.D. Cal. Apr. 3, 2023) ........................... 23

*Johnson Elec. N. Am. v. Mabuchi Motor Am. Corp.*,
   103 F. Supp. 2d 268 (S.D.N.Y. 2000) ................................................................... 14

*Joshua David Mellberg LLC v. Will*,
   No. 20-16215, 2021 WL 4480840 (9th Cir. Sept. 30, 2021) .......................................... 25

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
   588 F.3d 908 (6th Cir. 2009) ........................................................................ 13, 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................................. 10, 11, 24

*Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*,
   467 F. Supp. 841 (N.D. Cal. 1979), *aff'd sub nom. Murphy Tugboat Co. v.
   Crowley*, 658 F.2d 1256 (9th Cir. 1981) ............................................................... 24

*Omega Env't, Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) ..................................................................... *passim*

*PNY Techs., Inc. v. SanDisk Corp.*,
   No. 11-cv-04689-WHO, 2014 WL 2987322 (N.D. Cal. July 2, 2014) ........................ 19, 21, 22

*Rebel Oil Co., v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ............................................................................. 22

*Sterling Merch., Inc. v. Nestle, S.A.*,
   656 F.3d 112 (1st Cir. 2011) ....................................................................... 16, 17

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
   373 F.3d 57 (1st Cir. 2004) .............................................................................. 16

*Sumotext Corp. v. Zoove, Inc.*,
   No. 16-cv-01370-BLF, 2020 WL 6544410 (N.D. Cal. Nov. 6, 2020) ................................. 13

*Syufy Enters. V. Am. Multicinema, Inc.*,
   793 F.2d 990 (9th Cir. 1986) ............................................................................. 22

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
  676 F.2d 1291, (9th Cir. 1982)............................................................................ 17

*United States v. Microsoft Corp.*,
  87 F. Supp. 2d 30 (D.D.C. 2000), *rev'd in part on other grounds*, 253 F.3d 34
  (D.C. Cir. 2001) ................................................................................................... 16

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*,
  108 F. Supp. 2d 549 (W.D. Va. 2000) ................................................................. 15

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn*,
  98 F. Supp. 2d 729 (W.D. Va. 2000) ................................................................... 14

## **Rules**

Fed. R. Civ. P. 56(a)............................................................................................... 10

Fed. R. Evid. 702 ................................................................................................... 12

## **Other Authorities**

11 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1807a (2d ed. 2000) ..................... 18

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Please take notice that on March 21, 2024 at 9:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Beth Labson Freeman, Courtroom 3, 5th Floor, Robert F. Peckham Federal Building and United States Courthouse, 280 South 1st Street, San Jose, California, Defendant Bayer HealthCare LLC ("Bayer") will and hereby does move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting summary judgment, on all claims asserted in Plaintiff Tevra Brands, LLC's ("Plaintiff" or "Tevra") Second Amended Complaint.

**ISSUES TO BE DECIDED**

Whether there is a genuine dispute of material fact regarding whether: (1) the relevant product market is limited to topical imidacloprid products; (2) Bayer has substantial market power in a properly defined market; (3) Bayer's conduct substantially foreclosed competition in the line of commerce affected, (4) Bayer's agreements were of long duration or not easily terminable; (5) Bayer engaged in exclusionary or anticompetitive conduct in a relevant market, and (6) Tevra can recover damages for the period after Bayer exited the market.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Four years of discovery confirms that there are no material disputed facts in this case and that the sole remaining defendant, Bayer Healthcare LLC ("Bayer"), is entitled to summary judgment. Plaintiff Tevra Brands, LLC ("Tevra") contends that Bayer used improper exclusive dealing agreements to exclude Tevra from selling Tevra's topical flea and tick medications. Tevra concedes that exclusive dealing arrangements are not *per se* unlawful; such arrangements violate the antitrust laws only if they cause actual harm to competition. In this context, that requires a showing of substantial market power and substantial and long-term foreclosure of distribution. Tevra does not come close to presenting a triable issue with regard to these elements.

The most straightforward reason why Tevra cannot prevail—and why summary judgment should be granted—is that all the arrangements at issue are short-term and easily terminable. Because a purportedly excluded competitor may simply compete for the customer upon expiration of the

1  arrangement, short-term exclusive dealing arrangements are presumptively lawful.  It is undisputed

2  that by their written terms, Bayer's agreements have a short duration and in fact a retailer or distributor

3  can choose *at any time* not to be exclusive.  ████████████████████████████

4  ███████████████████████████████████████████████

5  ████████████████████████  At the motion to dismiss stage, Tevra speculated that there

6  might be unwritten or side agreements that imposed longer-term restrictions and went beyond the

7  written agreements.  Discovery has shown there are no such unwritten or side agreements.  Tevra's

8  expert also admits he has seen no evidence of them.  Indeed, many retailers and distributors offered

9  Bayer's exclusivity incentive chose *not* to take it and some carried generic imidacloprid products.

10  The fact that the agreements may have been attractive and that some number of customers chose to

11  renew the agreements or to accept the exclusivity incentive does not suffice to convert short-term

12  agreements into long-term coercive arrangements.  *See* Section I.C., *infra.*

13      But that is hardly all.  An exclusive dealing case can only proceed if the defendant has market

14  power.  This is normally established by defining a relevant market and showing a high market share.

15  Tevra attempts to rely on a narrow and artificial market: it contends that Bayer's topical imidacloprid

16  products compete only with other topical imidacloprid products and not with any other flea and tick

17  treatment products—not even with other topical products with different active ingredients.   In

18  particular, Tevra attempts to exclude from the market Bayer's most direct competitor, Frontline,

19  which is a topical product containing the active ingredient fipronil.  The Court previously granted a

20  motion to dismiss with leave to amend on this issue, but ultimately permitted Tevra to proceed to

21  discovery.  That discovery has shown that Tevra's narrow market definition is as fanciful as it seems.

22  *Without exception*, the hundreds of ordinary course business documents produced in this case indicate

23  that both parties believe the market is broader and includes Frontline at a minimum.  The companies

24  make pricing and marketing decisions on that basis.  ███████████████████████

25  ███████████████████████████████████████████████

26  ████████████████████  Economic analysis by Bayer's expert likewise confirms that

27  the market includes Frontline and likely many other flea and tick treatments.

28      Against this mountain of evidence, Tevra submits an expert report that attempts to argue that

because ████████████████████████████████████████████████████████

████████████████████████, Bayer must have market power.  The calculation of the price increase

is itself quite suspect (it relies on estimates and is very sensitive to the choice of starting and ending

point; in truth, in some years, Bayer's price declined).  *See* Ex. 5 at Ex. 6B.  But even beyond that, it

does not suffice to create a triable issue of fact.  To the extent Tevra's expert contends that a price

increase of this magnitude over this period of time establishes market power, he is using an aberrant

approach to market definition without support in the literature and that should be excluded under

*Daubert*.  Tevra's expert also attempts to implement a regression analysis, but at bottom this analysis

supports the unsurprising – and irrelevant – conclusion that generic fipronil products impacted

Frontline more than they did Bayer.  In short, the evidence confirms common sense: Bayer

participated in a broad, competitive market for flea and tick treatments in which it had a limited

market share.  *See* Section I.A., *infra.*

Moreover, even if a firm has market power and imposes long-term exclusive dealing

arrangements (neither of which occurred here), those arrangements are of competitive concern only

if they substantially foreclose competition.  This requires analysis of the market for *distribution* of

the products in question.  Undisputed evidence shows that topical flea and tick products are sold

through four primary channels: pet specialty, online, general merchandisers, and veterinarians.  The

arrangements at issue concerned only the pet specialty channel, and not even all of that channel.

Undisputed evidence shows that only a small fraction—always under 30% and in most periods much

less – of topical flea and tick products moved through channels in which customers accepted Bayer's

exclusivity incentives.  The balance of distribution opportunities were open to Tevra.[1]  Tevra attempts

---

[1] Tevra in fact sold very little through the non-foreclosed parts of the market.  But this can hardly be

laid at Bayer's doorstep.  Rather, it shows that Tevra faced much stronger generic competitors and

likely faced other headwinds, such as not being the first to market, lacking an adequate marketing

budget, charging high prices, and suffering quality difficulties.  Remarkably, ███████████████

████████████████████████████████████████████████████████████████████

████████████████████████████  While not a summary judgment issue, Bayer will bring a

separate *Daubert* motion concerning Tevra's damages report at the appropriate time.

to inflate this foreclosure measure by limiting its analysis to retailers where imidacloprid topicals were sold, but that is the wrong analysis. The relevant distribution market is the full range of available sellers and certainly includes channels that sell other over-the-counter topical flea and tick treatments (and are therefore perfectly capable of selling generic imidacloprid products). The undisputed evidence showing a lack of substantial foreclosure is a further independent reason why summary judgment should be granted. *See* Section I.B., *infra*.

Tevra's monopolization claim fails for similar reasons. Tevra has not established market power, much less *monopoly* power, as required for a Section 2 claim. And while Tevra once contended that Bayer engaged in anticompetitive conduct beyond the agreements with retailers and distributors, Tevra seems to have abandoned those claims in light of undisputed evidence that the conduct had no effect on Tevra. *See* Section II, *infra*.

Finally, at a minimum, Bayer is entitled to partial summary judgment with regard to damages arising from Tevra's alleged lost sales occurring after July 2020. Bayer divested its animal health business to Elanco effective July 31, 2020 and exited the business. The agreements at issue in this case were assigned to Elanco. Tevra is well aware of this and made no attempt to add Elanco as a party. Tevra advances no claim of "lingering" damages accruing post-July 2020 that relate to conduct by Bayer occurring before that time; rather, it attributes its losses in the post-July 2020 period to conduct by Elanco, a non-party in the case. Tevra cannot recover these damages from Bayer. *See* Section III, *infra*.

## STATEMENT OF UNDISPUTED FACTS

### A.  The Market for Flea and Tick Treatments

1.  K9 Advantix® II is a topical flea and tick product for dogs containing the active ingredients imidacloprid, pyriproxyfen, and permethrin. Advantage® II is a topical flea and tick product for dogs and cats containing the active ingredients imidacloprid and pyriproxyfen. Prior to August 2020, Bayer manufactured and sold both K9 Advantix® II and Advantage® II. Other topical flea and tick products including Frontline Plus contain the active ingredients fipronil and (S)-methoprene.

2.  ████████████████████████████████████████████████
████████████████████████████████████████████████

-4-

1  ██████████████████████████████████████████████████████

2  ██████████████████████████████████████████████████████

3  ██████████████████████████████████████████████████████

4  ██████████████████████████████████████████████████████

5  ████████████

6   3. ███████████████████████████████████████████████

7  ██████████████████████████████████████████████████████

8  ████████████████████████████████████████████

9   4. ███████████████████████████████████████████████

10 ██████████████████████████████████████████████████████

11 ██████████████████████████████████████████████

12  5. ███████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ██████████████████████████████████████████████████████

15 ██████████████████████████████████████████████████████

16 ██████████████████████████████████████████████████████

17 ██████████████████████████████████████████████████████

18 ██████████████████████████████████████████████████████

19 ██████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████

21 █████████████████████████████████

22  6. ████████████████████████████████████████████

23 ██████████████████████████████████████████████████████

24 ██████████████████████████████████████████████████████

25 ████████████

26   **B.  Bayer's Agreements with Retailers and Distributors**

27   7.  Between January 2011 and July 2020, Bayer sold its K9 Advantix® II and Advantage® II

28  products to retailers and distributors and entered into written agreements with retailers and

distributors pertaining to the purchase of Bayer's products.

8. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

9. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

10. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

11. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

12. ████████████████████████████████████████████████████████████

13. ████████████████████████████████████████████████████████████

17. ████████████████████████████████████████████████████████████

**C. Retailer and Distributor Acceptance of the Imidacloprid Exclusivity Discount and Flea & Tick Preferred Premium Category Discount**

14. ████████████████████████████████████████████████████████████

15. ████████████████████████████████████████████████████████████

1 ▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮

3 16. ▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮▮▮▮▮▮▮▮▮

6 ▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮

8 ▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮

### D. Share of Potential Distribution Affected by Bayer's Exclusivity Discount

17.   By examining where generic *fipronil* was sold, Bayer's expert calculates, and Tevra's expert does not dispute, the portion of distribution foreclosed was between 15% and 23% in 2019 and 2020, respectively.  Ex. 5 ¶ 187–88 (Saravia Report).  If the sales of all topical flea and tick medications are considered, the portion made through retailers accepting the Imidacloprid Exclusivity Discount was below 30% in every quarter between 2017 and Q1 2020 and under 15% during the period in which Tevra launched its products.  *See id.* ¶ 189. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮   ▮▮▮▮▮▮ ▮

▮▮▮▮▮▮▮▮▮

### E. Bayer Sales of Its Defense Care Product and Payment to Petco

18. Prior to 2017, Bayer sold an imidacloprid topical flea and tick product called Defense Care, which was sold only at PetSmart.  In 2016, that product was discontinued.  Ex. 6 ¶ 119 (Wong Report).

19. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

1

2      20. ████████████████████████████████████████

3   ████████████████████████████████████████████

4   ████████████████████████████████████████████

5   ████████████████████████████████████████████

6   ████████████████████████████████████████████

7   ████████████████████████████████████████████

8   ████████████████████████████

9      21. ████████████████████████████████████████

10  ████████████████████████████████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████████████████

### F.  Tevra's EPA Registration of Its Imidacloprid Flea and Tick Products

22. Tevra first registered its equivalents to Frontline Plus for Dogs (Tevrapet Firstact Plus, Vetality Firstect Plus) under EPA Registration No. 88052-15-92413 on January 11, 2017.  Ex. 21 at 2 (Joint 30(b)(6) Stip.).  Tevra first registered its equivalents to Frontline Plus for Cats (Tevrapet Firstact Plus, Vetality Firstect Plus) under EPA Registration No. 88052-16-92413 on January 11, 2017.  *Id.*

23. Tevra first registered its equivalents to K9 Advantix® II (Tevrapet Activate II, Vetality Avantect II) under EPA Registration No. 92334-1-92413 on May 4, 2017.  Ex. 21 at 2 (Joint 30(b)(6) Stip.).  Tevra first registered its equivalents to Advantage® II for Cats (Tevrapet Actispot II, Vetality Advotect II) under EPA Registration No. 92413-10 on August 30, 2017.  *Id.*

### G.  Bayer's Sale of Animal Health Business

24. Bayer completed the sale of its animal health business to Elanco Animal Health Inc. ("Elanco") in or around August 1, 2020.  Ex. 5 at n.3 (Saravia Report); Ex. 22 (Elanco Press Release).

25. Elanco is not a party to the above-captioned case.  Second Am. Comp. ("SAC").  Tevra has

never sought the Court's leave to add Elanco as a named party.  *See id.*

26. Tevra knew of the planned sale of Bayer's Animal Health business to Elanco by no later than December 10, 2019, prior to the filing of its First and Second Amended Complaints, when Plaintiff's counsel referenced the transaction at a Case Management Conference in this action.  *See* Ex. 23 at 4:24–5:2 ("They're selling it to another…company called Elanco.  The sale's been widely discussed in the Wall Street Journal and other places, and it is due to close next summer.").

27. After the transaction closed, Bayer and Tevra made references to the completed transaction, including during a September 2020 hearing (Ex. 24 at 16:22–17:5 (Transcript of Proceedings, Sept. 10, 2020)) and in pleadings.  ECF Nos. 149–50 (Corporate Disclosure Statements); SAC ¶ 205 (referring to Elanco as Bayer's "successor" with respect to the agreements with retailers).

28. Tevra never attempted to name Elanco as a defendant in this case.  In September 2022, Bayer informed Tevra of its position that given the amount of time that has passed since the acquisition and the advanced stage of the lawsuit, Bayer would oppose an attempt to amend the complaint to name Elanco.  Ex. 25 (Sept. 27, 2022 S. Callagy Ltr.).

## LEGAL STANDARD

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 921 (9th Cir. 2015) (citing Fed. R. Civ. P. 56(a)).  "The moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).  "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  *Id.*  "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial."  *Id.*  "[T]he non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor."  *Id.*

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party, there is no genuine issue for trial." *Id.* at 587 (citation and internal quotation marks omitted). "[A]ny presumption against the granting of summary judgment in complex antitrust cases has now disappeared." *Online DVD-Rental*, 779 F.3d at 921 (citation and internal quotation marks omitted).

## ARGUMENT

**I.      TEVRA'S EXCLUSIVE DEALING CLAIMS UNDER SHERMAN ACT SECTION 1 AND CLAYTON ACT SECTION 3 FAIL AS A MATTER OF LAW**

### A.   Tevra's Proposed Product Market is Not Cognizable, and Bayer did not have Substantial Market Power in a Properly Defined Market.

Tevra's proffered relevant market limited to "topical flea and tick products for dogs and cats containing Imidacloprid sold in the U.S." (SAC ¶ 15), is a made-for-litigation label that no reasonable jury could find reflects the competitive realities in which Tevra or Bayer operates.   In reality, consumers are not loyal to (or likely even aware of) particular active ingredients.   The record is replete with evidence showing that imidacloprid topicals compete with topicals that use different active ingredients, including fipronil.   *See* Statement of Undisputed Facts ("SOF") 2–6.   It is also replete with evidence that topical flea and tick products compete with non-topical products, including orals and collar products.   *See, e.g.,* SOF 3–6.   Not only are these various products functionally interchangeable, as required by *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (*see* Ex. 5 ¶¶ 60, 87–94 (Saravia Report)), but they exhibit high cross-elasticity of demand with Bayer's products.



In other words, a firm controlling only the topical imidacloprid market could not profitably increase prices unless it also controlled – at least – Frontline Plus.   This means the market must, at a minimum, include Frontline.

### 1.   Dr. Wong's Market Definition Opinions Should Be Excluded Under *Daubert*

Rather than account for this undisputed evidence of competition from non-imidacloprid and non-topical flea and tick products, Tevra has proffered the inadmissible opinion of Dr. Paul Wong.

1   ██████████████████████████████████████████████████████████████

2   ██████████████████████████████████████████████████████████████

3   ██████   Dr. Wong's opinion should be excluded because it is not the product of reliable economic

4   principles and methods.   The amended Federal Rule of Evidence 702 allows an expert to offer

5   opinions at trial only if it is more likely than not that "(a) the expert's scientific, technical, or other

6   specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in

7   issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

8   principles and methods; and (d) the expert's opinion reflects a reliable application of the principles

9   and methods to the facts of the case." Fed. R. Evid. 702.  Courts applying this rule must ensure "that

10  an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*

11  *v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  "[T]he trial court acts as a 'gatekeeper' by

12  'making a preliminary determination of whether the expert's testimony is reliable.'" *In re Optical*

13  *Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 325 (N.D. Cal. 2014) (citation omitted).

14      Dr. Wong did not employ the economic methods courts have recognized as valid for defining

15  a relevant market.  For instance, one widely recognized method is the so-called "SSNIP" test where

16  the economist asks whether the hypothetical monopolist could implement a small but significant and

17  non-transitory price increase without losing sufficient sales to other products to render the price

18  increase unprofitable.  While Dr. Wong claims to apply this test, he does not. ████████████████

19  ██████████████████████████████████████████████████████████████

20  ██████████████████████████████████████████████████████████████

21  ██████████████████████████████████████████████████████████████

22  ██████████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████████████████

25  ████████████████████   The use of average or cumulative increases over long periods—during which

26  many other market events can affect the analysis (e.g., something as simple as an increase in the

27  number of households with pets)—is not an acceptable or reliable method.  As the Sixth Circuit noted

28  in rejecting just such an analysis under *Daubert*:

[The expert] did not perform the standard SSNIP test.  Rather than analyzing whether a price increase at a particular point in time would result in consumer substitution of an alternative product, [he] looked at average … ticket prices and attendance figures over an eight-year span and concluded that both price and demand increased in this time period.   The district court properly characterized this analysis as [his] "own version" of the SSNIP test and noted that "[i]t has not been tested; has not been subjected to peer review and publication; there are no standards controlling it; and there is no showing that it enjoys general acceptance within the scientific community."

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009); *see also Sumotext Corp. v. Zoove, Inc.*, No. 16-cv-01370-BLF, 2020 WL 6544410 at \*7, \*9 (N.D. Cal. Nov. 6, 2020) (rejecting a "natural SSNIP test" that "compar[ed], over time, prices of StarStar numbers and prices for ten-digit telephone numbers, 1-800 numbers, and short codes" as "not appear[ing] to be grounded in any accepted methodology for conducting a market analysis").

While the extended time frame alone requires rejecting of this aspect of Dr. Wong's report, it also bears mention that the purported price increase is largely illusory.  After accounting for inflation, Dr. Wong's calculated net price increase amounts to ██████████████████████████ ████████████████████████ Ex. 5 ¶ 107 (Saravia Report).  This is much smaller than the usual 5% threshold for applying a SSNIP test. *Id.* ¶ 73.  Moreover, ███████████████████████████ ████████████████████████████████████ When Dr. Saravia corrects these estimates, she finds a net price increase of only █████ over the six-year period ███████████████████████████ *See* Ex. 6 n.59 (Wong Report); Ex. 5 ¶ 108.  Dr. Wong also fails to address many intervening events during this lengthy period, ████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████ Ex. 5 ¶ 120 (Saravia Report); Ex. 6 ¶ 80 (Wong Report).

Once Dr. Wong's faulty SSNIP test is set aside, he is left with a purported "difference- in- differences regression framework … to formally test the comparison between Bayer's Advantage/Advantix and Frontline." Ex. 6 ¶¶ 88–91, Exhibits 8A–8C.  Dr. Wong's analysis compares the degree to which generic fipronil products affected sales of Frontline and sales of Bayer's

imidacloprid products.  Even if correctly implemented (which it is not) (*see* Ex 5 ¶ 117–21 (Saravia Report))[2], this regression only supports the unsurprising conclusion that generic fipronil affected Frontline more than it affected Bayer.  It does not answer the question of whether Bayer's products were impacted by the introduction of generic fipronil, much less the most important question of whether sales of Bayer's products are influenced by sales of the *brand* fipronil product, Frontline, such that Bayer's products are in the same market as Frontline.  *See id.* ¶ 124; *see also Johnson Elec. N. Am. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000) (expert's regression analysis not based on correct market facts is inadmissible); *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986) (acknowledging that regression models omitting salient variables could be "so incomplete as to be inadmissible as irrelevant").

Finally, Dr. Wong's report is subject to exclusion because it fails to meaningfully account for the extensive record evidence showing competition between Frontline and Bayer's products.  SOF 2–6; *see also In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04–md–1628 (RMB)(MHD), 2009 WL 3241401, at *8 (S.D.N.Y. Sept. 30, 2009) (excluding expert testimony and granting summary judgment where expert did not meaningfully consider reasonable substitutes, *aff'd sub nom. American Banana Co v. J. Bonafede Co.*, 407 F. App'x 520 (2d Cir. 2010)); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn*, 98 F. Supp. 2d 729, 737 (W.D. Va. 2000) (excluding expert testimony for failing to take into account obvious substitutes in market definition).  ████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████  He ignores the volumes of ordinary course documents that are not supportive

---

[2] For instance, because Dr. Wong does not have any data prior to 2011 when generic fipronil products entered the market, his regression model is not in fact a "differences-in-differences" model.  *See* Ex. 5 ¶¶ 117–19 (Saravia Report).  Such a framework compares outcomes for the treated group before and after the treatment but Dr. Wong only measures trends in sales of Bayer's products and Frontline after the 2011 introduction of generic fipronil products.  *See id.*

of his narrow market. [3]

## 2. Bayer Did Not Have Substantial Market Power in a Properly Defined Market

In a properly alleged relevant market that includes oral products and collars, Bayer's market share is less than 20 percent. *See* Ex. 5 at Ex. 16–17 (Saravia Report). Even if the relevant market were limited to only topical products, Bayer's share was never greater than 31 percent in the relevant period. *Id.* at Ex. 18. These market shares cannot result in substantial market power under Section 1 or Section 3. *See, e.g.*, *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162-65 (9th Cir. 1997) (upholding series of exclusive dealing arrangements with distributors by firm with 55% market share); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 517 (3d Cir. 1998) ("[S]ince *Jefferson Parish* no court has inferred substantial market power from a market share below 30 percent.").

Because, absent Dr. Wong's opinion, Tevra has no proof upon which to base its relevant market, summary judgment should be granted. *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 1000 (C.D. Cal. 2012) (granting summary judgment for lack of proof of relevant market after excluding expert witness opinion); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 576 (W.D. Va. 2000) (same); *Ky. Speedway*, 588 F.3d at 919 (affirming summary judgment after concluding that expert testimony on relevant market had been properly excluded).

## B. Bayer's Agreements Did Not Foreclose a Substantial Share of the Market.

Even if Bayer had market power in a relevant product market, its conduct would not violate Section 1 or Section 3 because Bayer never foreclosed more than 30% of relevant distribution. "[A]n exclusive dealing arrangement violates Section 1 only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'" *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) (citation omitted); *see also Omega Env't,*

---

[3] Dr. Wong asserts that Bayer documents showing substitution between branded and generic imidacloprid topical products somehow imply that fipronil is not in the relevant market. *See* Ex. 6 ¶¶ 92–93, 96 (Wong Report). But of course substitution between generic and brand-name medications of the same ingredient and substitution between brand-name medications of different ingredients are not mutually exclusive. *See* Ex. 5 ¶¶ 125–33 (Saravia Report).

127 F.3d at 1162 ("Only those arrangements whose 'probable' effect is to 'foreclose competition in a substantial share of the line of commerce affected' violate Section 3.") (citation omitted).  When analyzing whether an agreement forecloses competition, the foreclosure calculation "includes the full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for, using easily convertible plants and marketing organizations." *Omega Env't*, 127 F.3d at 1162.

Here, sales by retailers that accepted Bayer's Imidacloprid Exclusivity Discount constituted less than 30% of Tevra's potential sales during the relevant period.  *See* Ex. 5 at Ex. 23–24 (Saravia Report).  Two separate analyses conducted by Dr. Saravia make this clear.  First, Dr. Saravia calculated the share of sales of topical flea and tick medications made through retailers accepting the discount.  These shares were below 30% in every quarter between 2017 and Q1 2020 and under 15% during the period in which Tevra launched its products.  *See id.* ¶ 189, Ex. 24.  Thus, retailers accounting for at least 70% of potential topical sales could have sold Tevra's generic imidacloprid products during the relevant time period.  Alternatively, Dr. Saravia calculated the share of generic fipronil topical sales made at retailers that accepted the discount.  *See id.* ¶ 187.  Dr. Saravia found that in 2019 and 2020, only 15% and 23% of generic fipronil topicals, respectively, were sold through retailers accepting the discount.  *See id.* ¶ 188, Ex. 23.

These levels of foreclosure are inadequate to state a claim for exclusive dealing.  *See Omega Env't,* 127 F.3d at 1162–65 (upholding exclusive dealing arrangements foreclosing 38% of relevant market); *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 123–24 (1st Cir. 2011) ("'[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent,' and while high numbers do not guarantee success for an antitrust claim, 'low numbers make dismissal easy.'") (quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004)); *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 52–53 (D.D.C. 2000) (foreclosure rate closer to 40 percent is required before exclusivity raises competitive concerns), *rev'd in part on other grounds*, 253 F.3d 34 (D.C. Cir. 2001)).

Dr. Wong incorrectly attempts to measure foreclosure by looking only at where topical imidacloprid products were sold.  As an initial matter, even this incorrect analysis finds foreclosure

1    that is generally below the threshold required to support a finding of anticompetitive effect. ████

2    ████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████

5    ████████████████████  Most recent cases find that foreclosure under 40% is inadequate to

6    permit an exclusive dealing case to go forward.  *See Omega Env't, Inc.*, 127 F.3d at 1162–65; *Sterling*

7    *Merch.*, 656 F.3d at 123–24.[4]

8        But, in any event, Dr. Wong's approach is incorrect.  By looking at only sales of topical

9    imidacloprid, of which it is undisputed that Bayer sells a large percentage, this measure is necessarily

10    distorted by Bayer's strategic choices about where to sell its products.  It is not surprising that a

11    manufacturer that offers exclusivity discounts will sell a lot of its products through retailers that are

12    exclusive.  A car manufacturer that uses only exclusive dealers (a common practice) will sell 100%

13    of its cars through exclusive dealers, such that a foreclosure analysis looking only at where that

14    manufacturer happened to sell will incorrectly report 100% foreclosure—notwithstanding the

15    existence of many other car dealerships.  A proper foreclosure analysis in an exclusive dealing case

16    must instead consider "the full range of selling opportunities reasonably open to" competitors (*Omega*

17    *Env't*, 127 F.3d at 1162) and even all "potential alternative channels of distribution."  *Allied*

18    *Orthopedic*, 592 F.3d at 997; s*ee also Church & Dwight Co. v. Mayer Lab'ys, Inc.*, 868 F. Supp. 2d

19    876, 904 (N.D. Cal. 2012) (no actual foreclosure where "alternative channels leave competitors a

---

[4] At the motion to dismiss stage, the court cited *Twin City Sportservice, Inc. v. Charles O. Finley &*
*Co.*, where the Ninth Circuit held that 24% market foreclosure was substantial given the facts there.
*See* 676 F.2d 1291, 1304–05 (9th Cir. 1982) (emphasizing the "considerable length" of the contracts
at issue, which "locked up a large portion of the … market for many years").  The Court concluded
that "*Twin City* is more pertinent than *Omega*" because "Tevra has plausibly pled that the
contractual provisions at issue were '*de facto* long term and not easily terminable.'"  ECF No. 235
at 19 (Order Denying 12(b)(6) Motion to Dismiss).  However, as discussed below, the undisputed
facts following discovery make clear that Bayer's agreements were not "*de facto* long term and not
easily terminable," and *Omega* is the more applicable precedent.  *See supra* Section I.C.

wide range of options to get their products to customers"), *order vacated in part on reconsideration on other grounds*, No. C-10-4429 EMC, 2012 WL 1745592 (N.D. Cal. May 16, 2012).  This is a different inquiry than the product market definition analysis discussed in Section I, *supra*.  Even if the product market were properly defined as topical imidacloprid products only, that does not mean that current sellers of topical imidacloprid products reflect "the full range of selling opportunities."  By insisting that the foreclosure analysis only account for sales of imidacloprid topicals, Dr. Wong ignores the potential to make sales at retailers where Bayer does not have a strong presence.  *See* Ex. 5 ¶ 191.

### C. Bayer's Agreements are Short-Term and Easily Terminable, and the Imidacloprid Exclusivity Discount Can Be Terminated Without Any Prior Notice.

Setting aside that Bayer lacked market power in the relevant market and never foreclosed a substantial share of the market, its conduct also did not violate Section 1 or Section 3 because all agreements were short-term and easily terminable.  "The 'easy terminability' of an exclusive dealing arrangement 'negate[s] substantially [its] potential to foreclose competition.'"  *Allied Orthopedic*, 592 F.3d at 997 (quoting *Omega Env't,* 127 F.3d at 1163–64).  "Discounts conditioned on exclusivity in relatively short-term contracts are rarely problematic."  *Id.* (quoting 11 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1807a, at 129 (2d ed. 2000)).  "This is so because while a dominant firm's ongoing policy of offering discounts in exchange for exclusivity gives buyers incentives to stay with the same firm[,] any above-cost discount can be matched by an equally efficient firm."  *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 545 F. Supp. 3d 922, 1008 (D. Kan. 2021) (citation and internal quotation marks omitted) ("*In re EpiPen*"); *see also Omega Env't,* 127 F.3d at 1163–64 (collecting cases holding that short contract duration and easily terminability negates potential to foreclose competition).  Exclusive arrangements that are easily

terminable "may actually encourage, rather than discourage, competition, because the incumbent and [its competitors] have a strong incentive continually to improve the [service] and prices they offer in order to secure the exclusive positions." *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (discussing three-year exclusive agreement that could be terminated for any reason on six months' notice). "[E]ven a high foreclosure percentage will not exclude competition if the period covered by the exclusive-dealing arrangement is short *and* there are no other impediments to switching." *PNY Techs., Inc. v. SanDisk Corp.*, No. 11-cv-04689-WHO, 2014 WL 2987322, at *4 (N.D. Cal. July 2, 2014) (citation omitted).

Here, it is undisputed that █████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████

Yet even those contract terms overstate the duration of the exclusivity provisions. ███████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████



Therefore, as in *Allied Orthopedic*, "[a]ny customer subject to one of [the] agreements could choose at anytime to forego the discount … and purchase from a generic competitor." *Allied Orthopedic*, 592 F.3d at 997.

At the motion to dismiss stage, the Court acknowledged the force of this argument but credited, as it was required to do, Tevra's allegations that the agreements were *de facto* long term and not easily terminable.  ECF No. 155 at 19 (noting that "it will not be an easy feat for Tevra to *prove* that Bayer's Purchase Agreements with retailers were *de facto* long term and not easily terminable").  "[U]nder a 'de facto' exclusive dealing theory … [the court] look[s] 'past the terms of the contract to

ascertain the relationship between the parties and the effect of the agreement in the real world.'"

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016) (noting that the Ninth

Circuit has not explicitly recognized a "de facto" exclusive dealing theory but that "we need not reach

the issue here").  The undisputed facts now demonstrate that the discount provisions were not *de facto*

long-term agreements and were easily terminable in practice.  ███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████; *see also PNY Techs.*, 2014 WL 2987322, at *7 (dismissing

exclusive dealing claim where complaint was "devoid of any indication that [defendant] engaged in

anticompetitive conduct to preclude retailers from considering [plaintiff] or other manufacturers or to

prevent [plaintiff] or other manufacturers from approaching retailers with better offers").

       As in other cases granting summary judgment, the record here "includes no facts from which

a jury could infer that the practical effects of the … agreements made it so [retailers] were not free to

walk away from the agreements and purchase products from the supplier of their choice."  *In re*

*EpiPen*, 545 F. Supp. 3d at 1011 (citation and internal quotation marks omitted).  In that case, the

court held that rebate agreements were not unlawful exclusive dealing contracts due to lack of

coercion and because the agreements "had terms of just two or three years" and allowed termination

"without cause on 90 days' notice or less."  *Id.* at 1009.  Likewise, in *Church & Dwight Co.*, the court

concluded that a program in which the only consequence of giving shelf space to competitors was

"that retailers may not receive a rebate based on those decisions" was "arguably permissible as a

matter of law under the controlling law of this circuit."  868 F. Supp. 2d at 903.  The court granted

summary judgment due to the contracts' short duration, rejecting an argument that they had a coercive

effect.  *See id.* at 906–07 (noting that "a significant number of large retailers do not participate in the

[rebate] program" and that "[t]he record also contains qualitative evidence that retailers can and do

reduce or eliminate their participation in the planogram agreements based on market forces").

       Without addressing any of the foregoing, Dr. Wong contends that ███████████████

████████████████████████████████████████████████████████████

████████       Ex. 7 ¶¶ 144–46  (Wong Rebuttal Report).   However, Dr. Wong  himself  also

acknowledges that a large number of customers opted out of the exclusivity provision.  Dr. Wong

states that ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████  That a slight majority

of retailers chose to take a modest discount at some point in time in no way establishes that Bayer's

agreements were *de facto* long-term and not easily terminable.  To the contrary, as the court noted in

*PNY*, the fact that "SanDisk ha[d] exclusive contracts with 11 of 16 retailers" did not "evince unlawful

foreclosure as opposed to the fruits of legitimate competition."  *PNY Techs., Inc.*, 2014 WL 2987322,

at *6; *see also Omega Env't*, 127 F.3d at 1164 (the fact "that a competitor with a proven product and

strong reputation is likely to enjoy success in the marketplace" is not anticompetitive but rather "is

the essence of competition").

## II. TEVRA'S MONOPOLIZATION CLAIM UNDER SHERMAN ACT SECTION 2 FAILS AS A MATTER OF LAW

### A. Bayer Does Not Possess Monopoly Power in Any Properly Defined Market

To prove a monopolization claim under Section 2 of the Sherman Act, Tevra must prove that

Bayer actually possessed monopoly power in a properly defined relevant market, and that it willfully

acquired or maintained that power through anticompetitive conduct.  *Image Tech. Servs., Inc. v.

Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997).  The threshold market share to establish a

prima facie case of monopoly power is generally no less than 65%.  *See id.* at 1206; *Syufy Enters. V.

Am. Multicinema, Inc.*, 793 F.2d 990, 995 (9th Cir. 1986).  "[N]umerous cases hold that a market

share of less than 50 percent is presumptively insufficient to establish" the requisite level of market

power under a Section 2 claim.  *Rebel Oil Co. v. Atl. Richfield Co*., 51 F.3d 1421, 1438 (9th Cir.

1995).  As discussed *supra* in Section I.A., the undisputed record evidence makes clear that Bayer

did not have either monopoly power or substantial market power in a properly defined market.

Bayer's market share was never above 31% in a topical-only market, well below the threshold needed

to infer monopoly power.  *See* Ex. 5 at Ex. 18 (Saravia Report).

1

**B.  Bayer Has Not Engaged in Any Anticompetitive or Exclusionary Conduct**

2       "[I]f, in reviewing an alleged Sherman Act violation, a court finds that the conduct in question

3   is *not* anticompetitive under § 1, the court need not separately analyze the conduct under § 2."  *FTC*

4   *v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (emphasis in original) (citation omitted).

5   Because the undisputed facts show that Tevra cannot make out an exclusive dealing claim, Tevra's

6   monopolization claim necessarily fails.  *See, e.g.*, *John Roe 1 v. State Bar of Cal.*, No. SA CV 22-

7   00983-DFM, 2023 WL 6194088, at *9 (C.D. Cal. Apr. 3, 2023) (where Section 1 claim failed, Section

8   2 claim based on same conduct "fail[ed] as a matter of law").

9       Moreover, it is unclear if Tevra even continues to assert harm from anticompetitive conduct

10  beyond the purported exclusive dealing arrangements.  Tevra previously complained of Bayer's

11  "second-brand strategy" and alleged "direct payment to remove generic competition," but in its expert

12  report, ████████████████████████████████████████████████████████████████

13  ██████████████████   In any event, the undisputed facts show that Tevra was not harmed by Bayer's

14  alleged strategy to "block generic competition with the entry of Defense Care."  SAC ¶ 115.  Dr.

15  Wong admits that ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████████

17  ██████████████████   Tevra did not enter the market until 2017 (SOF 22–23) and could not have

18  been harmed by such conduct.  *See, e.g.*, *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 456 (9th

19  Cir. 2021) (antitrust injury requires a showing of unlawful conduct causing an injury to the plaintiff

20  that flows from that which makes the conduct unlawful).  The allegations regarding a ████████

21  ████████████████████████   fail to state a claim for numerous reasons.  *See* SAC ¶¶ 155–58.  The

22  undisputed facts make clear that ██████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████████

25  ███████████████████████████████████████████████████████████████   *See*

26  SAC ¶ 156.  Tevra's products were not sold at █████ at this time.  SAC ¶ 149.

27      Finally, Tevra can provide no evidence of any "'no generics' conspiracy" or "verbal 'no

28  generics' deal" between Bayer and any retailers.  *See* SAC ¶¶ 112, 120.  "[T]o survive a motion for

summary judgment ..., a plaintiff seeking damages for a violation of [the Sherman Act] must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)); *see also In re California Bail Bond Antitrust Litig.*, 511 F. Supp. 3d 1031, 1041 (N.D. Cal. 2021) ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."). At the summary judgment stage, Tevra "cannot sustain its burden by offering broad allegations and complaints that are unhinged from any specific agreement." *Aerotec Int'l*, 836 F.3d at 1180. Following extensive discovery, Tevra can adduce no evidence from Bayer or retailers of any extra-contractual "no generics" agreements that are beyond (and contrary to) the express terms of Bayer's retailer and distributor agreements. Tevra points only to presentations made to retailers including PetSmart and Petco in which Bayer made its case for why carrying Bayer's imidacloprid products rather than generic imidacloprid products would be most profitable for retailers. *See* Ex. 6 ¶ 62 (Wong Report). These presentations indicate that Bayer was competing for retailers' business, conduct that is far from being anticompetitive. *See* Ex. 5 ¶ 215 (Saravia Report); *In re Citric Acid Litig.*, 191 F.3d at 1094 ("[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.") (citation omitted).

## III.   TEVRA'S CLAIMS FOR DAMAGES AFTER JULY 2020 FAIL AS A MATTER OF LAW DUE TO BAYER'S EXIT FROM THE BUSINESS

Causation is "relevant in the first instance to proof of the fact of damages …. Unless the amount sought to be recovered is shown to be 'definitely attributable' to defendant's wrongful conduct, there is no basis for [damages]." *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 863 (N.D. Cal. 1979), *aff'd sub nom. Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981)). It is undisputed that Bayer exited the relevant market at the end of July 2020 when it sold the entire line of business to Elanco, a non-party in this case.

Ignoring this principle, Dr. Wong "present[s] estimates of damages" through ███████████ ████████████████████████████████████████████████ Ex. 6 ¶ 136, Ex. 13A–13B. Tevra cannot seek damages against Bayer for post-divestiture conduct. ████████████

1

2

3

4

5

6     Nor can Tevra obtain a remedy from a party that it has never sued.  Elanco is not the corporate

7 affiliate or owner of the Bayer entity named in this lawsuit; it purchased assets from Bayer in a well-

8 publicized deal that Tevra has been aware of practically since the inception of this lawsuit in 2019.

9 SOF 26–27.  Despite being allowed to amend its complaint twice, and despite asserting in passing

10 that Elanco had continued the complained-of conduct post-acquisition (*see* SAC ¶ 205), Tevra never

11 sought to add Elanco to the case, instead purporting to "reserve[]…the right to bring a separate lawsuit

12 against" Elanco.  *See* Ex. 30 at 1 (Oct. 13, 2022 D. Owen Ltr.) (stating that certain issues will be taken

13 up "if and when Tevra brings a claim against Elanco based on Elanco's conduct after its purchase of

14 some of Bayer's assets").  Whether or not that is something Tevra can do, any alleged claims for

15 conduct by Elanco are not at issue in the present lawsuit.

16     Because Bayer exited the market at the end of July 2020, the Court should enter partial

17 summary judgment with regard to all damages claimed after July 2020.  *See*, *e.g.*, *Joshua David*

18 *Mellberg LLC v. Will*, No. 20-16215, 2021 WL 4480840, at *1 (9th Cir. Sept. 30, 2021) (holding that

19 "[s]ummary judgment was appropriate … because plaintiffs failed to establish defendants' conduct

20 caused [the] damages" and the expert simply "assumed liability on the part of the defendants").

21 **CONCLUSION**

22     For the reasons stated herein, Bayer respectfully requests that summary judgment be granted

23 in Bayer's favor on all of Plaintiff's claims.

24 Dated: November 21, 2023.     Respectfully submitted,

25

26     **ARNOLD & PORTER KAYE SCHOLER LLP**

27

28     By:  /s/ *Daniel B. Asimow*

                DANIEL B. ASIMOW

     *Attorneys for Defendant*
     BAYER HEALTHCARE LLC