COLBY B. SPRINGER (SBN 214868)
cspringer@polsinelli.com
**POLSINELLI** *LLP*
Three Embarcadero Center, Suite 2400
San Francisco, CA 94111
T:  415-248-2100
F:  415-248-2101

DANIEL D. OWEN (*admitted pro hac vice*)
dowen@polsinelli.com
**POLSINELLI** *PC*
900 W. 48TH Place, Ste. 900
Kansas City, MO 64112
T:  816-753-1000
F:  816-753-1536

EMILY C. MCNALLY (*admitted pro hac vice*)
emcnally@polsinelli.com
**POLSINELLI** *PC*
1000 Second Avenue, Suite 3500
Seattle, WA  98104
T:  206.393.5400
F:  206.393.5401

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| TEVRA BRANDS, LLC, | Case No. 5:19-cv-04312-BLF |
| Plaintiff, | **TEVRA BRANDS, LLC'S OPPOSITION TO BAYER'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| BAYER HEALTHCARE LLC, , | Date:        March 21, 2023 |
| Defendant. | Time:        9:00 a.m.<br>Courtroom: 3, 5th Floor<br>Judge:      Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

I.   INTRODUCTION AND ISSUES TO BE DECIDED ........................................................ 1

II.  RESPONSIVE AND ADDITIONAL STATEMENTS OF FACT .................................... 1

    A.   RESPONSES TO BAYER'S STATEMENT OF FACTS ("RSOF") .................... 1

    B.   ADDITIONAL STATEMENT OF UNDISPUTED FACTS ("ASOF")............... 4

III. LEGAL STANDARD.................................................................................................... 8

IV.  ARGUMENT ............................................................................................................... 9

    A.   BAYER IS NOT ENTITLED TO SUMMARY JUDGMENT ON TEVRA'S EXCLUSIVE DEALING CLAIMS........................................................ 9

        1.   Bayer Fails to Disprove Tevra's Relevant Product Market Defined Using Well-Accepted Methodology ...................................... 9

            a.   Dr. Wong Properly Employed the Hypothetical Monopolist Test to Define the Relevant Market ................................. 12

            b.   Bayer's Premature Daubert Challenge Misapplies the Law and Misrepresents Dr. Wong's Methodology .............................. 15

                (i)   The Cases Bayer Cites are Inapposite ................................... 15

                (ii)   Dr. Wong Properly Applied a SSNIP Test........................... 16

                (iii)   Bayer's Dispute of Dr. Wong's Regression Analysis has no Basis ................................................................................... 17

                (iv)   Bayer's Additional Daubert Grievances are Unsupported by the Record ................................................................................ 17

            c.   Bayer's Denial of Substantial Market Power Relies Entirely on its Overly Broad and Erroneous Definition of the Relevant Market.............................................................................. 18

        2.   Bayer Cannot Point to Undisputed Facts to Support its Foreclosure Analysis............................................................................ 18

        3.   Despite the Language of Bayer's Agreements, the Record Demonstrates that the Contracts are Anticompetitive ............................. 20

    B.   BAYER IS NOT ENTITLED TO JUDGMENT ON TEVRA'S SHERMAN 2 CLAIM............................................................................................................ 22

1.   Bayer's Monopoly Power is Clear in a Properly Defined Market of Imidacloprid Topicals ................................................................. 22

2.   Bayer's Conduct Including Exclusionary Contracts and Stated Company Goals Qualify as Anticompetitive and Exclusionary Conduct ........................................................................................... 23

C.   BAYER IS NOT ENTITLED TO SUMMARY JUDGMENT ON DAMAGES AFTER JULY 2020 .......................................................... 24

V.   CONCLUSION ........................................................................................... 25

TEVRA'S OPPOSITION TO BAYER'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:19-cv-04312-BLF

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,

   836 F.3d 1171 (9th Cir. 2016) ............................................. 21

*Amarel v. Connell*,

   102 F.3d 1494 (9th Cir. 1996) ............................................. 25

*American Ad Mgmt., Inc. v. General Tel. Co.*,

   190 F.3d 1051 (9th Cir.1999) ............................................. 25

*Arista Networks, Inc. v. Cisco Systems, Inc.*,

   2018 WL 11230167 (N.D. Cal. May 21, 2018) ...................... 9

*Associated General Contractors v. California State Council of Carpenters*,

   459 U.S. 519 (1983) ............................................. 25

*Brown Shoe Co. v. U.S.*,

   370 U.S. 294 (1962) ............................................. 11

*Celotex Corp. v. Catrett*,

   477 U.S. 317 (1986) ............................................. 8, 17

*D'Lil v. Riverboat Delta King*,

   59 F. Supp. 3d 1001 (E.D. Cal. 2014) ...................... 9

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,

   545 F. Supp. 3d 922 (D. Kan. 2021) ...................... 11, 20, 21

*Fed. Trade Comm'n v. Meta Platforms Inc.*,

   2023 WL 2346238 (N.D. Cal. Feb. 3, 2023) ...................... 10

*Hernandez v. Roberts of Woodside*,

   2022 WL 19315 (N.D. Cal. Jan. 3, 2022) ...................... 9, 22, 23

*Hynix v. Semiconductor Inc. v. Rambus Inc.*,

   2008 WL 73689 (N.D. Cal. Jan. 5, 2008) ...................... 23

*Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.*,

   588 F.3d 908 (6th Cir. 2009) ..................................................................................14, 15

*Klein v. Facebook, Inc.*,

   580 F. Supp. 3d 743 (N.D. Cal. 2022) ....................................................................16, 20

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,

   791 F.2d 1356 (9th Cir. 1986) ........................................................................................24

*In re Live Concert Antitrust Litig.*,

   247 F.R.D. 98 (C.D. Cal. 2007) .....................................................................................25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

   475 U.S. 574 (1986) ..........................................................................................8, 9, 18

*Omega Environmental, Inc. v. Gilbarco, Inc.*,

   127 F.3d 1157 (9th Cir. 1997) ........................................................................................18

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*,

   20 F.4th 466 (9th Cir. 2021) ..................................................................11, 12, 16, 23, 24

*Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.*,

   778 F.3d 775 (9th Cir. 2015) ..........................................................................................10

*Scharf v. U.S. Atty. Gen.*,

   597 F.2d 1240 (9th Cir. 1979) ..........................................................................................9

*Sidibe v. Sutter Health*,

   2019 WL 2078788 (N.D. Cal. May 9, 2019) ................................................................23

*Sumotext Corp. v. Zoove, Inc.*,

   No. 16-cv-01370-BLF, 2020 WL 6544410 (N.D. Cal. Nov. 6, 2020) ...........................15

*Tampa Elec. Co. v. Nashville Coal Co.*,

   365 US 320 (1961)..........................................................................................................23

*Thomas v. Newton Intern. Enterprises*,

   42 F.3d 1266 (9th Cir. 1994) ...........................................................................9, 19, 20

*Times-Picayune Publishing Co. v. United States*,

    345 U.S. 594 (1953) ................................................................................................11, 12

*United States v. Aetna Inc.*,

    240 F.Supp.3d 1 (D.D.C. 2017) ...............................................................................11

*Worldwide Basketball & Sport Tours Inc. v. NCAA*,

    388 F.3d 955 (6th Cir. 2004) ...................................................................................15

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,

    401 U.S. 321 (1971)..................................................................................................24

TEVRA'S OPPOSITION TO BAYER'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 5:19-cv-04312-BLF

## I.  INTRODUCTION AND ISSUES TO BE DECIDED

Bayer's motion asks the Court to ignore disputes of material fact.  Nowhere is this more evident than the relevant antitrust market.  Given that Tevra's causes all resonate relative the topical imidacloprid product market, the Court must deny Bayer's motion.  This includes refusing Bayer's challenge as to: (a) having substantial market power in that market; (b) substantially foreclosing competition through long-term and not readily terminable contracts; and (c) engaging in exclusionary conduct that (d) gave rise to damages before *and* after the July 2020 divestiture.

## II.  RESPONSIVE AND ADDITIONAL STATEMENTS OF FACT

### A.  RESPONSES TO BAYER'S STATEMENT OF FACTS ("RSOF")

1.  Admitted in part and denied in part.  Admitted as to the active ingredients in Bayer's Imidacloprid topicals.  Bayer's contention that it "manufactured and sold" those topicals is denied; Bayer was the exclusive manufacturer and seller of imidacloprid topicals in the U.S. prior to 2016.  Bayer possessed both patents and EPA 10-year sales exclusivity. ASOF at ¶ 1.  Admitted that other topical flea and tick treatments exist and "contain the active ingredient[s] fipronil" but denied that such treatments are in the relevant antitrust market for  imidacloprid topicals. ASOF at ¶¶ 6-8.

2.  Denied.  The cited documents do not define a relevant antitrust market or reflect product in/exclusion in the same.  **Ex. A**, Expert Rebuttal Report of Dr. Paul Wong (September 28, 2023) at ¶¶ 106-107.[1]  Bayer incorrectly conflates products that generally "compete" with products in the relevant antitrust market.  SAC, Dkt. 196 at ¶¶ 19-20.  Imidacloprid topicals and fipronil topicals are empirically evidenced to be different relevant antitrust markets.  ASOF at ¶¶ 6-8, 11-13.

3.  Denied.  Bayer incorrectly conflates competing products with a relevant antitrust market.  Bayer depends on inexact use of "compete" refuted by empirical proof from Dr. Wong.

---

[1] All Exhibits are to the Declaration of E. McNally in Support of Tevra's Opposition to Bayer's Motion for Summary Judgment.

SAC, Dκτ. 196 at ¶¶ 19-20; **Ex. B**, Expert Report of Dr. Paul Wong (August 9, 2023) at ¶¶ 74-91; **Ex. A**, Wong Rebuttal at ¶¶ 7-8, 69, 87, 96, 104; ASOF at ¶¶ 6-8.

4.     Admitted in part and denied in part.   Tevra admits the allegations regarding the Bayer consumer survey.   Denied because Bayer never sold its imidacloprid topicals directly to consumers; only retailers or distributors that resold to consumers.   ASOF at ¶ 10.   End-user consumer willingness to switch between imidacloprid and fipronil topicals, based on price, is irrelevant to the purchasers to whom Bayer and Tevra were both attempting to sell.   Direct purchasers of Bayer's imidacloprid topicals were not willing to (and did not) switch to fipronil topicals to any significant extent despite an increase in imidacloprid price.   The cited survey presents incomplete counterfactuals.   ASOF at ¶¶ 3, 6-8, 11-13; **Ex. A**, Wong Rebuttal at ¶¶ 110-112.

5.     Admitted in part and denied in part.   Tevra admits the contents of the identified documents.   Tevra denies their relevance to market definition.   Bayer conflates products generally "competing" with the legal requirements of a relevant antitrust market.   Dr. Wong's HMT analysis establishes that imidacloprid topicals and fipronil topicals were not in the same relevant antitrust market.   **Ex. A**, Wong Rebuttal at ¶ 112; ASOF at ¶ 6-8.

6.     Admitted in part and denied in part.   Tevra admits the documents discuss "competition" between forms of flea and tick treatments but denies their relevance to market definition.   Dr. Wong's economic analysis proves they are not.   ASOF at ¶ 6-8, 11-13.

7.     Tevra admits paragraph 7 with the caveat Bayer did not directly sell imidacloprid topicals to consumers.   ASOF at ¶ 10.

8-10.   Admitted.

11.     Admitted in part and denied in part.   Tevra admits ██████████████████████ ████████████████████████████, but denies they were short-term and easily terminable.   Bayer witnesses testified that: ████████████████████████ ████████████████████████████████████████████████ ██████████████████████████. ASOF at ¶¶ 19-20, 27.

12.     Admitted in part and denied in part.  Tevra admits the contract language appears as written, but denies the contracts were short-term and easily terminable.  Bayer contracts were *de facto* long-term agreements.  ███████████████████████████████████████████

███. ASOF at ¶ 19. ████████████████████████████████████████████████████

███████████████████████████. ASOF at ¶ 20. ████████████████████████████████

█████████████████████████. ASOF at ¶ 27.

13.     Denied.  ████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████. **Ex. A**, Wong Rebuttal at ¶ 144; ASOF at ¶ 21.

14.     Admitted as to the existence of the stipulation but denied as Bayer omits that ██

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████. **Ex. C**, Joint 30(b)(6) Stipulation, at Exs. A and B, Summary of Imidacloprid Exclusivity Discount.

15.     Admitted as to the existence of the stipulation but denied as Bayer omits that ██

██████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████. **Ex.C**, Stipulation, at Exs. A and B.

16.     Admitted as to the existence of the stipulation but denied because Bayer ███████

█████████████████████████████. ASOF at ¶ 21.

17.     Denied.   Bayer's calculations ██████████████████████████████" are irrelevant to determining the extent of foreclosure.  **Ex. A**, Wong Rebuttal at ¶¶ 98-104.  Fipronil and imidacloprid topicals are not in the same relevant antitrust market.  ASOF at ¶¶ 6-8.  Dr. Wong correctly calculated the percentages of foreclosure due to Bayer's exclusionary conduct.  **Ex. A**, Wong Rebuttal at ¶¶ 152-154; ASOF at ¶ 9.

18-20.  Admitted.

21.     Tevra admits proposing ███████████████████████████████████████████. Otherwise denied; Bayer was a monopolist as to imidacloprid topicals and ██████████████████████████████████████. ASOF at ¶ 1; **Ex. B**, Wong Report at ¶¶ 97-110; **Ex. A**, Wong Rebuttal at ¶¶ 113-124.

22-25.  Admitted.

26.     Denied.  Tevra was not a party to any transaction between Bayer and Elanco.  Tevra knew only publicly reported information about the transaction.

27-28.  Admitted.

**B.      ADDITIONAL STATEMENT OF UNDISPUTED FACTS ("ASOF")**

1.      Bayer was the exclusive manufacturer and seller of imidacloprid topicals in the U.S. prior to 2016.  Bayer enforced its germane patents and enjoyed a 10-year right of exclusivity from the EPA.  Dкт. 240 at ¶¶ 86, 88-89 (Bayer's Answer to SAC); **Ex. D**, Reinert Depo. at 58:2-13.

2.      ██████████████████████████████████████████████████████████. **Ex. E**, Bauer Depo. at 49:10-50:1; **Ex. D**, Reinert Depo. at 17:8-19:18; **Ex. F**, Howell Depo. at 51:10-52:23; **Ex. G**, Williams Depo. at 80:12-82:5, 82:25-83:17.

3.      ██████████████████████████████████████████ **Ex. E**, Bauer Depo. at 54:16-57:19; **Ex. F**, Howell Depo. at 53:8-53:16; **Ex. H**, Diesel Depo. at 126:2:10.

4.      Bayer feared ████████████████████████████████████████████████████████████████████████████████████████████████. **Ex. E**, Bauer Depo. at 227:1-229:22; **Ex. I**, Bauer Depo. Ex. 1067; **Ex. H**, Diesel Depo. at 105:12-109:7, 112:5-114:6; **Ex. J**, Diesel Depo. Ex. 1107; **Ex. D**, Reinert Depo. at 142:24-145:13; **Ex. K**, Reinert Depo. Ex. 1436.

5.      ████████████████████████████████████████████████████████

[REDACTED]. **Ex. F**, Howell Depo. at 34:15-38:7; **Ex. L**, Howell Depo. Ex. 1214; **Ex. B**, Wong Report at ¶ 114.

6.      The HMT, Bayer documents, and witness testimony show imidacloprid topicals and fipronil topicals are not in the same relevant antitrust market.  **Ex. B**, Wong Report at ¶¶ 67-68, 74-84; **Ex. A**, Wong Rebuttal at ¶¶ 7-8; **Ex. H**, Diesel Depo. at 105:12-109:7, 109:21-111:9; **Ex. J**, Diesel Depo. Ex. 1107; **Ex. F**, Howell Depo. at 44:19-47:13; **Ex. M**, Howell Depo. Exhibit 1215.

7.      Dr. Wong analyzed sales and pricing data relating to Bayer's imidacloprid topicals and other flea and tick products, including "competing" fipronil topicals, notably Frontline.  **Ex. B**, Wong Report at ¶¶ 85-91.  Dr. Wong's analysis demonstrated that [REDACTED]

[REDACTED]. **Ex. B**, Wong Report at ¶¶ 74-91; **Ex. A**, Wong Rebuttal at ¶¶ 7-8.

8.      Bayer's imidacloprid topicals are not in the same relevant antitrust market as fipronil topicals.  **Ex. B**, Wong Report at ¶¶ 74-91.  Nor are flea and tick collars and flea and tick oral medications.  **Ex. B**, Wong Report at ¶¶ 92-96.

9.      Dr. Wong correctly calculated the foreclosure of Tevra's ability to sell its imidacloprid topicals resulting from Bayer's exclusionary conduct [REDACTED]

[REDACTED]. **Ex. B**, Wong Report at ¶¶ 122-124, **Ex. A**, Wong Rebuttal at ¶¶ 151-158.

10.      [REDACTED]. **Ex. E**, Bauer Depo. at 107:16-22. [REDACTED]. **Ex. E**, Bauer Depo. at 11:13-13:7; **Ex. F**, Howell Depo. at 58:6-59:9.

11.      [REDACTED]. **Ex. D**, Reinert Depo. at 52:2-53:23, 55:23-56:19, 61:11-63:6. Bayer testified it [REDACTED]

█████████████████████████████

████████ **Ex. D**, Reinert Depo. at 54:11-24.

12. Bayer testified it ██████████

█████████████ **Ex. F**, Howell Depo. at 44:19-47:13; **Ex. H**, Diesel Depo. at 105:12-109:7,

109:21-111:9; **Ex. J**, Diesel Depo. Ex. 1107.  Bayer testified this was ███████████

█████████████ **Ex. F**, Howell Depo. at 44:19-47:13; **Ex. M**, Howell Depo. Ex. 1215.

13. ██████████████████████████

████████████████████████████████

██████████. **Ex. E**, Bauer Depo. at 217:4-217:25, 219:4-221:2; **Ex. N**, Bauer Depo. Ex. 1064;

**Ex. D**, Reinert Depo. at 124:25-128:4; **Ex. O**, Reinert Depo. Ex. 1422; **Ex. G**, Williams Depo at

126:19-128:5; **Ex. P**, Williams Depo. Ex. 1128.

14. By late 2015, Bayer had █████████████

████. **Ex. E**, Bauer Depo. at 76:15-77:18; **Ex. D**, Reinert Depo. at 65:6-65:17, 82:16-86:1,

102:21-104:6; **Ex. Q**, Bauer Depo. Ex. 1028; **Ex. R** Winslow Depo. Ex. 1201.

15. Bayer conducted a █████████████

███████████████████████████ **Ex.**

**E**, Bauer Depo. at 78:18-81:4; **Ex. S**, Bauer Depo. Ex. 1029 p.3; **Ex. T**, Williams Depo. Ex. 1125.

████████████████████ **Ex. G**, Williams Depo. at

111:8-22; **Ex. U**, Williams Depo. Ex. 1126 p.52.

16. Bayer testified the ███████████

██████████████. **Ex. E**, Bauer Depo. at 146:25-147:7, 149:25-150:15; **Ex. V**,

Bauer Depo. Ex. 1044; **Ex. H**, Diesel Depo. at 22:17-23:23; **Ex. D**, Reinert Depo. at 114:6-13; **Ex.**

**W**, Winslow Depo. at 27:5-28:22, 40:17-41:18; **Ex. F**, Howell Depo. at 40:6-44:9, 70:13-70:21.

17. Bayer's original █████████████

████████████████████████████████

████████████████████████████. **Ex.**

**E**, Bauer Depo. at 215:22-216:14; **Ex. H**, Diesel Depo. at 51:21-52:8, 148:13-149:18, 153:11-156:2; **Ex. X**, Diesel Depo. Ex. 1112; **Ex. W**, Winslow Depo. at 29:1-30:3, 30:24-31:7.

18.     To make its ███████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

███████     **Ex. E**, Bauer Depo. at 277:19-281:14, 285:3-287:1; **Ex. Y**, Bauer Depo. Ex. 1081; **Ex. Z**, Bauer Depo. Ex. 1084; **Ex. C**, Stipulation, Ex. A.

19.     Bayer testified that ███████████████████████████████████████
████████████████████████████████████████████████████████  **Ex. E**, Bauer Depo. at 143:9-146:14; **Ex. H**, Diesel Depo. at 142:19-143:7, 143:25-146:21; **Ex. D**, Reinert Depo. at 28:20-29:20.

20.     Bayer testified that ███████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████  **Ex. H**, Diesel Depo. at 143:25-146:21; **Ex. D**, Reinert Depo. at 28:20-29:20.

21.     Bayer ███████████████████████████████████████████████████
████████████████████████████. **Ex. W**, Winslow Depo. at 20:5-21:21, 22:6-22:23; **Ex. AA**, Zolynas Depo. at 126:18-127:3, 156:12-158:9. ████████████████████
████████████████████████████████████. **Ex. W**, Winslow Depo. at 22:6-22:23; **Ex. AA**, Zolynas Depo. at 156:12-158:9.

22.     Bayer used at least three tactics ████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████████ (**Ex. BB**, Diesel Depo. Ex. 1110; **Ex. H**, Diesel Depo. at 137:19-140:7); ████████████████████████████████████████
████████████████████████████████████ (**Ex. J**, Diesel Depo. Ex. 1107; **Ex. H**, Diesel Depo. at 112:5-114:6, 114:25-115:6, 121:11-123:8; 124:20-126:15);

1    ████████████████████████████████████ (**Ex. H**, Diesel Depo. at 42:9-43:22; **Ex.**

2    **E**, Bauer Depo. at 230:20-233:9).

3        23.    Bayer ████████████████████████████████

4    ████████████████████████. **Ex. E**, Bauer Depo. at 188:22-190:17, 200:1-202:1;

5    **Ex. CC**, Bauer Depo. Ex. 1055; **Ex. DD**, Bauer Depo. Ex. 1057; **Ex. H**, Diesel Depo. at 54:9-

6    58:25, 61:17-64:12, 64:17-67:25, 96:13-99:16, 137:19-142:7; **Ex. EE**, Diesel Depo. Ex. 1111; **Ex.**

7    **FF**, Diesel Depo. Ex. 1104; **Ex. BB**, Diesel Depo. Ex. 1110; **Ex. W**, Winslow Depo. at 60;15-

8    61:21, 62:22-63:13, 77:8-79-18; **Ex. GG**, Winslow Depo. Ex. 1209.

9        24.    Bayer ████████████████████████████████

10   ████████████████████████████████████████████████████

11   ████████████████. **Ex. E**, Bauer Depo. at 227:21-229:22, 230:20-233:9, 244:8-246:17; **Ex. I**,

12   Bauer Depo. Ex. 1067; **Ex. HH**, Bauer Depo. Ex. 1069; **Ex. H**, Diesel Depo. at 28:1-29:25, 118:16-

13   123:8; **Ex. J**, Diesel Depo. Ex. 1107; **Ex. D**, Reinert Depo. at 92:15-97:14; **Ex. II**, Reinert Depo.

14   Ex. 1430.

15       25.    Bayer's exclusivity discount contracts ████████████████

16   ████. **Ex. C**, Stipulation, Exs. A, B.

17       26.    Bayer testified ██████████████████████████

18   ██. **Ex. D**, Reinert Depo. at 10:2-10:12.

19       27.    Bayer conducted a ███████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ████████████████. **Ex. F**, Howell Depo. at 72:1-76:2; **Ex. JJ**, Howell Depo. Ex. 1220.

## III.   <u>LEGAL STANDARD</u>

    Summary judgment is appropriate only when the record shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a).  The evidence and all reasonably drawn inferences must be viewed in the light most

favorable to non-moving party Tevra.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986).  Bayer, as the moving party, bears the initial burden of showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## IV.   ARGUMENT

### A.   BAYER IS NOT ENTITLED TO SUMMARY JUDGMENT ON TEVRA'S EXCLUSIVE DEALING CLAIMS

Bayer's motion improperly requires the relevant antitrust market to include *all* flea and tick treatments.  Dkt. 264-3 at 11:11-18.  Bayer does not cite any *evidence* supporting this proposition.  Nor does Bayer show that Tevra's more narrowly drawn market is wrong.  Bayer only disagrees.

Bayer relies on the *opinions* of its expert (Dr. Celeste Saravia) to counter the *factual analysis* of Tevra's expert Dr. Paul Wong.  *See generally* Dkt. 264-3 at Sec. I.  Bayer's motion concedes a material dispute between the respective experts that the Court cannot resolve at summary judgment.  *See Hernandez v. Roberts of Woodside*, 2022 WL 19315, at *13 (N.D. Cal. Jan. 3, 2022) (*citing D'Lil v. Riverboat Delta King,* 59 F. Supp. 3d 1001, 1009 (E.D. Cal. 2014) and *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979)).  "Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion."  *Thomas v. Newton Intern. Enterprises*, 42 F.3d 1266, 1270 (9th Cir. 1994).  Bayer incorrectly demands the Court interpret contested opinion in its favor despite the legal requirement that evidence be considered in the light most favorable to Tevra.  *Matsushita*, 475 U.S. at 601.  Bayer's motion should be denied.

#### 1.   Bayer Fails to Disprove Tevra's Relevant Product Market Defined Using Well-Accepted Methodology

Bayer predictably continues its challenge to Tevra's definition of the relevant antitrust market.  *Accord* Dkt. 25 at Sec. I and Dkt. 104-3 at Sec. I (Bayer's Motions to Dismiss).  Tevra bears and has met its burden of defining that market.  *Arista Networks, Inc. v. Cisco Systems, Inc.*, 2018 WL 11230167, at *3 (N.D. Cal. May 21, 2018).  Tevra met this burden using Bayer

-9-

documents, Bayer witness testimony, and analysis of those documents and testimony by Dr. Wong. ASOF at ¶¶ 6-8,11-13.[2]

Tevra identified the product market as topical flea and tick products for dogs and cats containing imidacloprid sold in the geographic market of the United States. DKT. 196 ("SAC") at ¶ 15. ASOF at ¶¶ 6-8. Bayer counters that the product market should include Frontline, a branded flea and tick topical treatment with the active ingredient fipronil, and *possibly* other non-topical flea and tick treatments because Bayer "compete[s]" with those products. DKT. 264-3 at 11:10-15 Bayer's argument relies on a colloquial application of "compete." *Id*. Bayer concludes without evidence that these so-called competing products are "functionally equivalent," "exhibit high cross-elasticity of demand," and that "consumers are not loyal to (or likely even aware of) particular active ingredients." *Id*. Bayer is incorrect.

Bayer's conflation of "competition" and "markets" is evident given its reliance on a Bayer-commissioned survey that concludes ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ DKT. 264-3 at 11:19-22, RSOF at ¶ 4. But this single survey is flawed and does not create a relevant antitrust market. Nor does Bayer sell its imidacloprid topical products directly to **consumers**. RSOF at ¶ 7, ASOF at ¶ 10. Bayer instead sells its imidacloprid products to **distributors and retailers**, who **resell** those products to consumers or other retailers. RSOF at ¶ 7, ASOF at ¶ 10. Moreover, that a consumer who indirectly purchases from retailers *might* choose fipronil over an increased-priced imidacloprid product does not mean—as a matter of law—that the relevant market *must* include fipronil.

The HORIZONTAL MERGER GUIDELINES are instructive on how the Court should consider Bayer's reliance on "competition" in the larger "market" of flea and tick products. *See generally Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.,* 778 F.3d 775, 784

---

[2] Bayer concedes the geographic market is the United States. DKT. 264-3 at 1:10-11

(9th Cir. 2015); *see also Fed. Trade Comm'n v. Meta Platforms Inc.,* 2023 WL 2346238, at *9 (N.D. Cal. Feb. 3, 2023).  The Guidelines state that

> ***Market definition focuses solely on demand substitution factors***, i.e., on customers' ability and willingness to ***substitute away from one product to another in response to a price increase or a corresponding non-price change*** such as a reduction in product quality or service.
>
> . . .
>
> Market shares of different products in narrowly defined market are more likely to capture the relative competitive significance of these products, and often more accurately reflect competition between close substitutes.  As a result, ***properly defined antitrust market often exclude some substitutes to which some customers might turn in the face of a price increase even if such substitutes provide alternatives for those customers***.

U.S. Dep't of Justice and Fed. Trade Comm'n, HORIZONTAL MERGER GUIDELINES (2010), § 4 (emphasis added).  It is not merely whether products broadly compete but whether customers are willing to significantly "substitute away" when the price of a product increases.  *Id.*  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the products themselves and substitutes for it."  *Brown Shoe Co. v. U.S.,* 370 U.S. 294, 325 (1962).  Bayer's reliance on what products it (or any other company) considers "competition" is not a dispositive metric for defining the relevant antitrust market.  RSOF at ¶¶ 2-3; *see Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.,* 20 F.4th 466, 482 (9th Cir. 2021) (there is "no requirement to use any specific methodology in defining the relevant market"); *see also United States v. Aetna Inc.*, 240 F.Supp.3d 1, 19 (D.D.C. 2017) ("[T]he mere fact that a [product] may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes.")

   Proper antitrust markets can "often exclude some substitutes to which some customers might turn in the face of a price increase."  HORIZONTAL MERGER GUIDELINES, § 4.  Multiple products in a broader marketplace does not, by itself inform the relevant ***antitrust*** market.  The GUIDELINES acknowledge the same: "[r]elevant antitrust markets defined according to the

hypothetical monopolist test are not always intuitive and may not align with how industry members use the term 'market.'"  *Id.*

Bayer is motivated to broadly define the market:  a smaller share of a broader market might eliminate the monopolist label.  But the Supreme Court has long criticized such gambits noting that "[f]or every product, substitutes exist."  *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 612 n.31 (1953).  "[A] relevant market cannot meaningfully encompass that infinite range" and "must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn; in technical terms, products whose 'cross-elasticities of demand' are small."  *Id.*

### a.    *Dr. Wong Properly Employed the Hypothetical Monopolist Test to Define the Relevant Market*

Market definition routinely utilizes the Hypothetical Monopolist Test ("HMT") as described in the HORIZONTAL MERGER GUIDELINES:

> Specifically, the test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ("hypothetical monopolist") likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market[.]

HORIZONTAL MERGER GUIDELINES at § 4.1.1.  "[A]n economist proposes a narrow geographic and product market definition and then iteratively expands that definition until a hypothetical monopolist in the proposed market would be able to profitably make [SSNIP]."  *Optronic*, 20 F.4th at 482 n.1; *see also* **Ex. B**, Wong Report at ¶ 67.  Tevra applied the HMT as called for by the enforcement agencies and the courts.

Bayer does not dispute the applicability of the HMT.  Bayer instead criticizes Dr. Wong's SSNIP analysis. DKT. 264-3 at 12:18.  Bayer erroneously interprets Dr. Wong's consideration of Bayer's branded imidacloprid products' price increase from 2011-2016 (when no other imidacloprid products were available) compared to the sales behavior of branded and generic fipronil products and other flea and tick treatments during that same time.  *See* DKT. 264-3 at 12:15-21.  Bayer suggests that Dr. Wong's considerations of this "natural experiment" are

unreliable. DKT. 264-3 at 12:25-28.  But the GUIDELINES specifically identify a natural experiment as valid evidence:

> The Agencies look for historical events, or "natural experiments," that are informative regarding the anticompetititve effects of the merger.  For example, the Agencies may examine the impact of recent mergers, entry, expansion, or exit in the relevant market.  Effects of analogous events in similar market may also be informative.

HORIZONTAL MERGER GUIDELINES, § 2.1.2.  Peer-reviewed literature studying past market definition cases reiterate the same.  **Ex. A**, Wong Rebuttal n. 122-124 (*citing* Choate and Fischer)

Dr. Wong uses real-world sales and pricing data and shows that ████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████.

**Ex. B**, Wong Report at ¶ 16, Wong Report Ex. 7A; ASOF at ¶¶ 6-8.  Frontline sales were impacted beginning in 2011 when generic fipronil and other flea and tick products entered the marketplace. ASOF at ¶ 13.  ████████████████████████████████████████████████████████

██████████████████████████.  **Ex. B**, Wong Report at ¶ 86, Wong Report Ex. 7A, Wong Report Ex. 7B.  But the introduction of lower-cost generic fipronil products ████

████████████████████████████████████████.  ASOF at ¶¶ 11-13. Customers did not view generic fipronil or any other products to be equivalent to branded imidacloprid; they did not "substitute away" in response to more affordable topical treatments. **Ex. B,** Wong Report at ¶¶ 84-88; ASOF at ¶¶ 11-13.

These real-world data—the natural experiment—are reflected in Dr. Wong's HMT analysis. **Ex. B**, Wong Report at ¶¶ 77-87.  As of 2010, there were four categories of flea and tick treatments available to U.S. customers:  (i) Bayer's branded imidacloprid topicals, (ii) Frontline fipronil topicals, (iii) other less popular chemical topicals, and (iv) de-wormer combination treatments and miscellaneous products such as shampoos and sprays.  **Ex. B**, Wong Report at ¶ 77.  Applying the HMT, Dr. Wong found:



*Id*.  Bayer successfully imposed a SSNIP over the ensuing years.  **Ex. B**, Wong Report at ¶¶ 78-84; **Ex. A**, Wong Rebuttal at ¶ 14.

From 2011-2016, the industry saw increasing competition from less expensive products, namely, generic fipronil topicals ███████████████████████████████████████ .  Customers did not consider these alternatives to be reasonably interchangeable with Bayer's Advantage/Advantix and were not substituting away.  **Ex. B**, Wong Report at ¶¶ 84-88; **Ex. A**, Wong Rebuttal at ¶¶ 33-36; ASOF at ¶¶ 11-13.  Real-world data properly applied within the HMT framework shows the relevant antitrust market is appropriately limited to imidacloprid topicals:



**Ex. B**, Wong Report at ¶ 91.

### b.    *Bayer's Premature Daubert Challenge Misapplies the Law and Misrepresents Dr. Wong's Methodology*

#### (i)    The Cases Bayer Cites are Inapposite

Bayer lodges a premature evidentiary challenge to Dr. Wong's expert opinions defining the relevant antitrust market.  *See generally* DKT. 264-3 at Sec. I.A.1.  Bayer attempts to align Dr. Wong's opinion into the readily distinguished facts and findings of *Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908 (6th Cir. 2009).  *Kentucky Speedway* is inapposite to the present dispute; the challenged Kentucky Speedway expert used his own version of a SSNIP that had no controlling standards or scientific support.  *Id*. at 916.

*Kentucky Speedway* saw the plaintiff's expert excluded for multiple other reasons, none of which are applicable here.  Despite the ***availability*** of evidence, the challenged expert failed to conduct a proper substitutability analysis as required under Sixth Circuit precedent.  *Kentucky Speedway*, 588 F.3d at 916-17, 918 (*citing Worldwide Basketball & Sport Tours Inc. v. NCAA*, 388 F.3d 955, 962 (6th Cir. 2004) (defining the "reasonable interchangeability" standard).  The challenged expert also testified in direct contradiction to the plaintiff's position as to the identity of the consumers in the relevant antitrust market.  *Id*. at 917.  The expert further admitted that he did not conduct a SSNIP analysis.  *Id*. at 918.  Bayer's motion omits these facts, including the essential language on which the Sixth Circuit relied in rendering its decision.  DKT. 264-3 at 13:1-9 (*citing Kentucky Speedway*, 588 F.3d at 918 ("*By his own admission, Zimbalist did not perform the standard SSNIP test.*")) (emphasis indicating omitted language).  This dispute has no parallels.

Bayer also cites *Sumotext Corp. v. Zoove, Inc.*, No. 16-cv-01370-BLF, 2020 WL 6544410 (N.D. Cal. Nov. 6, 2020).  DKT. 264-3 at 13:1-013.  Bayer incorrectly claims that *Sumotext* stands for the proposition that any "natural SSNIP test" comparing prices over time should be excluded.  *Id.*  But *Sumotext*—as this Court is uniquely aware—is also distinguishable.  *Sumotext* involved an order denying plaintiff's motion for a new trial.  *Sumotext*, 2020 WL 6544410, at *2.  The Court considered expert testimony tested by cross-examination and noted the expert *did not* perform a SSNIP test despite acknowledging it an appropriate methodology for defining the relevant market.

*Id*. at \*7; *see also id.* (the expert only "looked at the actual prices and said they're very far apart, so this can't be a market").   Sumotext's expert also failed to conduct a market definition considering products customers might deem as "reasonably substitutable."   *Id*. at \*8.   And the Court "was unable to locate any description of his methodology to determine [the relevant market]."   *Id*. at \*9.

Neither *Kentucky Speedway* nor *Sumotext* supports Bayer's demand to exclude Dr. Wong's analysis.  Dᴋᴛ. 264-3 at 13:14.  The challenged opinions in those opinions were inadmissible for want of a SSNIP analysis or use of an otherwise unreliable methodology prohibited by Rule 702. Such inadequacies are not comparable to the tested methodologies employed by Dr. Wong.

### (ii)     Dr. Wong Properly Applied a SSNIP Test

Bayer challenges Dr. Wong's SSNIP analysis because Bayer disagrees with his comparison of sales data over time.  Dᴋᴛ. 264-3 at 12:18, 12:18-27.  But Bayer has shown no requirement that the historical data studied in a SSNIP analysis only involve a single, instantaneous price change. *Contra* Dᴋᴛ. 264-3 at 13:14-24.  A common economic standard involves analysis of "something similar to a SSNIP has occurred in the past and buyers reacted."  **Ex. A**, Wong Rebuttal at ¶ 89, n.122 (citing analogous 2008 peer-reviewed literature).  Dr. Wong documents the numerous measures by which Bayer implemented "something similar to a SSNIP."  **Ex. A**, Wong Rebuttal at ¶ 14, Wong Rebuttal Ex. 3B.  Dr. Wong also shows how "buyers reacted" by comparing Bayer's imidacloprid and Frontline.  **Ex. A**, Wong Rebuttal at ¶ 7.  This buyer reaction shows ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  **Ex. B**, Wong Report at ¶ 90; **Ex. A**, Wong Rebuttal at ¶¶ 7-8.

Bayer again relies only on Dr. Saravia's report and disagreement to suggest Dr. Wong's analysis should be excluded.  Dᴋᴛ. 264-3 at 12:21-22, 13:15-24.  But Dr. Saravia acknowledged that consideration of a natural experiment (as did Dr. Wong) is a legitimate economic methodology.  **Ex. KK**, Saravia Depo. at 16:8-15.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████. *Id.* at

39:11-40:10, 41:4-23; *see Optronic Techs.,* 20 F.4th at 482 (there is "no requirement to use any specific methodology in defining the relevant market"); and *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 765 (N.D. Cal. 2022) ("what constitutes a relevant market is a factual determination for the jury" and "the definition of the relevant market is basically a fact question dependent on the special characteristics of the industry involved") (citations omitted).

### (iii) Bayer's Dispute of Dr. Wong's Regression Analysis has no Basis

Bayer contends that "once Dr. Wong's faulty SSNIP test is set aside, he is left with a purported difference-in-differences regression framework." DKT. 264-3 at 13:25-27. But Bayer relies only on Dr. Saravia's *opinion* and presents no facts to support that Dr. Wong's analysis is misplaced or erroneous. *Id.* at 14:1-10. Bayer's disagreement is with Tevra's conclusions—not the actual methodology.

### (iv) Bayer's Additional *Daubert* Grievances are Unsupported by the Record

Bayer's remaining *Daubert* criticisms are also readily set aside. DKT. 264-3 at 13:14-24. Bayer has not (a) demonstrated the factual significance of inflation on the specific pricing of flea and tick treatments (*Id.* at 13:15), (b) shown data that disproves Dr. Wong's calculations (*Id.* at 13:15-24), (c) explained or factually demonstrated the significance of "intervening events" (*Id.* at 13:21-24), nor (d) provided data that shows why "competition" or "ordinary course documents" would alter the analysis in Bayer's favor or cause the Court to ignore Tevra's evidence (*Id.* at 14:11-15:1). *See* **Ex. A**, Wong Rebuttal at ¶¶ 67-73. Bayer bears the burden of showing the court the absence of a genuine issue of material fact. But all Bayer musters is the contrary opinion of its expert. *See Celotex*, 477 U.S. at 323.

Bayer also claims that Dr. Wong "fails to meaningfully account for the extensive record evidence showing competition between Frontline and Bayer's products." DKT. 264-3 at 14:11-12. Bayer cites to an alleged admission that Dr. Wong "had not identified any business documents in support of his market definition analysis." DKT. 264-3 at 14:18-22. But Dr. Wong made no such

admission.  Dr. Wong testified that market definition is always fact-specific "[s]o ordinary course documents can be more or less informative, just as sales data, testimony, all forms of evidence can be more or less informative." **Ex. LL**, Wong Depo. at 88:2-7.  Dr. Wong also testified that he relied on sales data, "which is the economic historical reflection of what has transpired." *Id.* at 90:3-10.  Dr. Wong's 'admission' was that he had "not seen a single business document that is attempting to define a relevant antitrust market"; not that he refused to consider the same. *Id.* at 90:19-21.

### c.   *Bayer's Denial of Substantial Market Power Relies Entirely on its Overly Broad and Erroneous Definition of the Relevant Market*

Bayer cannot prevail unless the Court improperly excludes (and prematurely at that) Dr. Wong's HMT analysis and identification of the relevant market. *See* Dkt. 264-3 at 15:3-17.  Bayer has done nothing but disagree with Tevra's market definition thus evidencing the matter cannot be disposed of at summary judgment. *See supra* Sec. 1.A.  Bayer cannot defend its substantial market share in Tevra's properly defined relevant antitrust market of imidacloprid topical products.  Bayer instead advocates for an overly broad market that includes all topical products, and possibly oral products and collars.  Dkt. 264-3 at 15:3-6.  Bayer has not borne uncontroverted factual evidence against non-movant Tevra.  Nor has it adequately contested the factual record brought forth by Tevra.  To grant Bayer's motion would contradict the well-established legal standard for motions for summary judgment. *See Matsushita*, 475 U.S. at 601 ("all evidence must be construed in the light most favorable to the party opposing summary judgment").  Bayer's motion must be denied.

### 2.   Bayer Cannot Point to Undisputed Facts to Support its Foreclosure Analysis

"Only those arrangements whose **'probable' effect** is to 'foreclose competition in a substantial share of the line of commerce affected'" violate antitrust laws. *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (emphasis added).  Bayer ignores ample record evidence illustrating its efforts to preclude generic competition following expiration of its intellectual property and EPA exclusivity rights.  ASOF at ¶¶ 2, 4, 5, 14-18, 22-24.  Bayer instead

relies on Dr. Saravia's opinions, which necessarily include Bayer's erroneously broad market definition to suggest foreclosure was insubstantial.  *See generally* Dkt. 264-3 at Sec. I.B; 16:7-17.

But Dr. Saravia's opinions are not fact.  And those opinions reflect nothing more than disagreement with Dr. Wong.  Dr. Saravia's grievances as to application of sales and pricing data, definition of the relevant market, and complained of conduct demonstrate only that the facts are very much in dispute.  *See Thomas*, 42 F.3d at 1270 (differing expert opinion "is itself sufficient to create a genuine issue of dispute fact").

To wit, Bayer criticizes Dr. Wong's approach for "looking at only sales of topical imidacloprid, of which it is undisputed that Bayer sells a large percentage."  Dkt. 264-3 at 17:8-9.  Bayer contests Dr. Wong's analysis suggesting "this measure is distorted by Bayer's strategic choices about where to sell its products."  Dkt. 264-3 at 17:8-10.  But "sales of topical imidacloprid" *is* the relevant antitrust market proffered by Tevra.  ASOF at ¶¶ 6-8.  And Bayer's strategic choices are precisely what created the substantial foreclosure in that market. ASOF at ¶¶ 2, 4, 5, 14-18, 22-24.

Bayer deliberately took steps to foreclose the market through exclusivity agreements with major retailers and distributors.  ASOF at ¶¶ 1-4, 13-27.  These exclusivity agreements ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████.  **Ex. A**, Wong Report at ¶¶122-124; **Ex. B**, Wong Rebuttal at ¶¶ 126-129.  Bayer's agreements foreclosed competition by ████████ ████████████████████████████████.  ASOF at ¶ 9.

Bayer nevertheless insists that "[a] proper foreclosure analysis in an exclusive dealing case must instead consider 'the full range of selling opportunities reasonably open to' competitors and even all 'potential alternative channels of distribution.'"  Dkt. 264-3 at 17:15-18:2 (internal citations omitted).  But Tevra's calculations (as do Bayer's) consider the foreclosure share as a percentage of all distribution channels.  **Ex. LL**, Wong Depo. at 188:11-19; ASOF at ¶ 9; **Ex. B**, Wong Report at ¶¶ 122-124, Wong Report Ex. 11S; **Ex. A**, Wong Rebuttal at ¶¶ 151-158.  Bayer argues the foreclosed channels are *smaller* if one measures: (a) all flea and tick products combined

-19-

or (b) only fipronil.  DKT. 264-3 at 17:8-10.  Tevra contends the foreclosed channels are ***larger*** if one measures imidacloprid topicals only, since those are the products at issue.  **Ex. LL**, Wong Depo. at 185:14-23, 189:12-190:9.  The dispute of fact is not one for summary judgment.  *See Klein*, 580 F. Supp. 3d at 765 (relevant market is basically a fact question for the jury dependent on the special characteristics of the industry).

Moreover, Tevra's calculation ***does*** consider ***all*** distribution channels.  Dr. Wong's report examines facts evidencing a foreclosure share of the entire relevant market.  ASOF at ¶ 9; **Ex. B**, Wong Report at ¶ 123, **Ex. A**, Wong Rebuttal at ¶¶ 153-154.  When asked at deposition for the "numerator and the denominator" for the foreclosure analysis, Dr. Wong unambiguously testified "[t]he numerator are the dose sales to the customers with exclusive contracts.  The denominator is the marketwide sales in the relevant market for imidacloprid spot-ons.  ***So it would be broader than just Bayer's sales***."  **Ex. LL**, Wong Depo. at 185:14-20 (emphasis added).  Pressed further as to whether this includes brand ***and*** generic sales, Dr. Wong testified: "Correct.  It would be ***all imidacloprid spot-on sales***."  *Id*., 185:21-23 (emphasis added).  Bayer is again left with a disagreement on how the relevant market should be defined.  That disagreement is inappropriate for summary judgment.  *Thomas*, 42 F.3d at 1270.

### 3.      Despite the Language of Bayer's Agreements, the Record Demonstrates that the Contracts are Anticompetitive

Bayer contends ███████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████  DKT. 264-3 at 19:9-12.  From this ***attorney argument***, Bayer erroneously concludes its exclusivity agreements do not pose an impediment to competition.  DKT. 264-3 19:9-15.  Bayer cites cases for the proposition that exclusivity discounts in short-term contracts are not problematic because "while a dominant firm's ongoing policy of offering discounts in exchange for exclusivity gives buyers incentives to stay with the same firm[,] any above-cost discount can be matched by an equally efficient firm."  DKT. 264-3 18:18-25 (*citing In*

re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig., 545 F. Supp. 3d 922, 1008 (D. Kan. 2021).  But the realities of the present case show otherwise.

Bayer's branded imidacloprid products bore premium prices, which necessarily yield higher dollar amounts in the form of exclusivity discounts to retailers and distributors.  **Ex. B**, Wong Report at ¶¶ 60-61.  These dollar amounts could not be matched by similar discounts with Tevra, nor could they by other generic manufacturers with lower-cost products.  **Ex. A**, Wong Rebuttal at ¶¶ 144, 147,149.  Bayer also enjoyed *de facto* monopolist status for years until its patent rights and EPA registration expired.  ASOF at ¶ 1.  Bayer thus had a substantial head start in controlling the imidacloprid market.  **Ex. B**, Wong Report Ex. 9 (Bayer's market shares over time).  Bayer's conduct prevented generic manufacturers from making sales despite the fact that they are more "efficient" from a cost and price perspective.  **Ex. B**, Wong Report at ¶ 47; **Ex. A**, Wong Rebuttal at ¶¶ 149-150; *contra In re EpiPen Antitrust Lit*, 545 F. Supp.3d at 1008.

Further, Bayer witnesses testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  ASOF at ¶ 16-20.  Bayer witnesses testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  ASOF at ¶ 19-20.  Bayer also testified about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  ASOF at ¶ 27.  In addition, Bayer responded ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  ASOF at ¶ 21-24.  Under a *de facto* exclusive dealing theory, the court must look past "the terms of the contract to ascertain the relationship between the parties and the effect of the agreement in the real world."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016)).  The facts show that Bayer's contracts had an anticompetitive effect regardless of their duration.  **Ex. A**, Wong Rebuttal at ¶¶ 144, 146, 149-150.

The record also shows that Bayer had strong motivations ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1   ████████████████████████████████████████████████

2   ████████████████████████████████████████████████

3   ████.  ASOF at ¶¶ 2-5,11-18, 22-24, 27.  The facial language of the contract does not comport

4   with the agreement and distributor relationships with Bayer operated in the real world.

5   Summary judgment should be denied.

**B.     BAYER IS NOT ENTITLED TO JUDGMENT ON TEVRA'S SHERMAN 2 CLAIM**

**1.     Bayer's Monopoly Power is Clear in a Properly Defined Market of Imidacloprid Topicals**

Bayer's conclusory statements as to lack of market power do not qualify as undisputed fact. DKT. 264-3 at 15:2-4.  Nor does Dr. Saravia's untested 31% market share estimate—an estimate based on an improperly broad definition of the market including *all* topicals.  DKT. 264-3 at 22:27-28.  Bayer conflates the products with which it *competes* with the legally accepted definition of a *relevant antitrust market*.  DKT. 264-3 at 2:18; *see also supra* Sec. I.A.  The result is a skewed assessment of market power resulting from improperly expanded market definition.

Dr. Saravia failed to present contrary evidence that defines a relevant antitrust market.  *See generally* DKT. 264-3 Sec. I(A).  Dr. Saravia only disagrees with Dr. Wong and incorrectly equates "competition" as the definition of the relevant market for antitrust purposes.  **Ex. MM**, Saravia Report ¶ 77.  Conversely, Dr. Wong measures the intensity of competition and substitution to determine whether the products significantly affect one another, as required by the HMT, relying on data provided by Bayer among other sources.  **Ex. B**, Wong Report Ex.  7A, Wong Report Ex. 7B. This dispute of material fact cannot be resolved at summary judgment. *Hernandez* at *13.

Dr. Wong estimates Bayer ████████████████████████████████████

████.  **Ex. B**, Wong Report at ¶ 101, Wong Report Ex. 9.  Dr. Wong used Bayer's sales data from 2010 to 2016 to compare the sales activity █████████████████████████

████████████████ and confirmed that the relevant market is limited to imidacloprid spot-ons. **Ex. B**, Wong Report at ¶¶ 74-84.  Bayer possessed monopoly power in the relevant market as

it was an actual monopolist up to 2017 and undertook measures to maintain that power after generic imidacloprid products became available.  ASOF at ¶¶ 1, 14-18, 22-24.

Dr. Saravia has not conducted an HMT.  **Ex. KK**, Saravia Depo. at 41:4-9.  But Bayer nevertheless argues that her so-called market definition including imidacloprid, fipronil, and *potentially* other flea and tick products is established fact.  DKT. 264-3 at 15:2-4.  Nothing identified by Bayer supports its conclusion.  Market definition remains an issue for the jury given conflicting expert testimony.  *See Hernandez* at *13.  This District has previously and similarly held such disputes not amenable for summary judgment.  *See Hynix v. Semiconductor Inc. v. Rambus Inc.*, 2008 WL 73689, at *5 (N.D. Cal. Jan. 5, 2008) ("[T]here is a genuine issue of material fact as to market definition and summary judgment cannot be entered"); *see also Sidibe v. Sutter Health*, 2019 WL 2078788, at *25 (N.D. Cal. May 9, 2019) ("[t]he definition of the relevant market – both product and geographic – is generally a question of fact reserved for the jury"); *Optronic Techs.* at 1265 (N.D. Cal. 2019) ("Because the court has found that a triable issue exists as to the relevant market, the court denies both motions for summary judgment on the Clayton Act claim").  Even if Dr. Saravia's 31% calculation proves accurate, the present disagreement compels that determination be left to a jury.  *See Sidibe*, at *10.

### 2.    Bayer's Conduct Including Exclusionary Contracts and Stated Company Goals Qualify as Anticompetitive and Exclusionary Conduct

Tevra's Sherman 2 claim cannot be disposed of at summary judgment because Bayer's contracts with retailers are anticompetitive and exclusionary.  *See supra* Sec. I.C.  The record evidence shows Bayer's stated goal █████████████████████████████████ ASOF at ¶¶ 1-5, 11-18, 21-24, 27.  Retailers remained ██████████████ ████████████████████████████████████████████████ █████████████████████████.  ASOF at ¶¶ 19-21.  Whether a contract creates an exclusive dealing arrangement depends on the contract's "practical effect" and its "practical application."  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 US 320, 327 (1961).  Bayer's contracts are the explicit reason why many suppliers █████████████████████████

1  ████████████████████████████████████████████. ASOF at ¶¶ 16-18.  The practical effect

2  of Bayer's exclusivity discounts ████████████████████████████████████████████

3  ███████████████████████████████████████. **Ex. B**, Wong Report

4  at ¶ 101.  And the practical effect is shown in the fact that Bayer's sales ██████████

5  ████████████████████████████████████████████████████████

6  ██████████████████. **Ex. A**, Wong Rebuttal at ¶7.  Retailers had no incentive to ██████

7  ████████████████████████████████████████████████████████

8  █████████████████████████. ASOF at ¶ 15-18, 22-24.

The practical effect is clear: retailers never reversed their decision after agreeing to the exclusivity discount, and thus kept generic imidacloprid topicals out of stores.  RSOF at ¶¶ 14-15; ASOF at ¶ 27.  Bayer has not disproven or even challenged this anticompetitive, exclusionary behavior.  Bayer is not entitled to summary judgment.

## C.  BAYER IS NOT ENTITLED TO SUMMARY JUDGMENT ON DAMAGES AFTER JULY 2020

Bayer argues "Tevra cannot seek damages against Bayer for post-divestiture conduct." DKT. 264-3 at 24:28.  Tevra disagrees.  It is axiomatic that damages incurred post-July 2020 but resulting from Bayer's pre-divestiture conduct are subject to recovery.  *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 339 (1971) (allowing for both accrued and non-speculative future damages); *see also Optronic*, 20 F.4th at 488 ("where an antitrust plaintiff suffers continuing antitrust injuries . . . recovery of damages is permitted, even after the last proven date of the violative conduct").  When a defendant violates the antitrust laws and harms a market's competitive structure, "it remains liable for the continuing injuries suffered by plaintiffs from the structural harm to competition."  *Optronic*, 20 F.4th at 488; *see also L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1366 (9th Cir. 1986) (requiring only that the antitrust violation constitute "a material cause" of injury.

Dr. Wong's calculations of incurred damages are economically correct; Bayer has made no effort to prove otherwise.  Bayer only implies that Dr. Wong has offered a legal conclusion as

to entitlement to collect post-divestiture damages from Bayer for pre-divestiture conduct.  DKT. 264-3 at 24:26-27.  But Dr. Wong offers no such opinion.  **Ex. B**, Wong Report at ¶ 136.  Dr. Wong states that he has presented estimates of damages for 2021-23 based on available data with the caveat that Bayer's harm "might extend beyond 2023."  *Id.*   But he offers no opinion as to legal propriety of an award post-divestiture; that is within the purview of the Court.  *Cf. Optronic,* 20 F.4th at 488 (the Court determining as a matter of law as to the appropriate period of damages).

Tevra does not suggest "the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation"; "there is a point beyond which the wrongdoer should not be held liable."  *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 151 (C.D. Cal. 2007); *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 534–535 (1983).  But nor does this equate to the *per se* limitation on damages advanced by Bayer.  It is "virtually impossible to identify a black-letter rule that will dictate the result in every case."  *Associated Gen. Contractors of Cal.,* 459 U.S. at 536-37.  The Ninth Circuit explains that the five factors identified in *Associated General Contractors* should be balanced to determine the appropriate window of recovery.  *Amarel v. Connell,* 102 F.3d 1494, 1507 (9th Cir. 1996); *see also American Ad Mgmt., Inc. v. General Tel. Co.,* 190 F.3d 1051, 1055 (9th Cir. 1999).  Not only does Bayer fail to undertake that analysis—it fails to even acknowledge the same.

Bayer's anti-competitive "imidacloprid exclusivity discount" contracts with distributors and retailers continued after Bayer's divestiture on July 31, 2020.  ASOF at ¶ 25.  ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  ASOF at ¶ 26.  It is inappropriate to *per se* limit Tevra's recovery post-July 2020.  That Bayer's pre-divestiture conduct continues to cause post-divestiture harm to Tevra renders summary judgment inappropriate.

V.   **CONCLUSION**

Tevra asks this Court to deny Bayer's Motion for Summary Judgment.

1   Dated:  December 15, 2023

2

Respectfully Submitted,
POLSINELLI LLP

*/s/  Colby B. Springer*

3                        By:

Colby B. Springer (SBN 214868)
**POLSINELLI *LLP***
Three Embarcadero Center, Ste. 2400
San Francisco, CA 94111

Daniel D. Owen (*Admitted PHV*)
**POLSINELLI *PC***
900 W. 48TH Place, Ste. 900
Kansas City, MO 64112

Emily C. McNally (*Admitted PHV*)
**POLSINELLI *PC***
1000 Second Avenue, Suite 3500
Seattle, WA  98104

Attorneys for Plaintiff
TEVRA BRANDS, LLC

## PROOF OF SERVICE

On December 15, 2023, I served the following document(s) in the manner described below:

- **TEVRA BRANDS, LLC'S OPPOSITION TO BAYER'S MOTION FOR SUMMARY JUDGMENT and Supporting Declaration and Exhibits**

☐   BY ELECTRONIC SERVICE:   By electronically mailing a true and correct copy through Polsinelli PC's electronic mail system from dmcnichol@polsinelli.com to the email addresses set forth below.

Daniel B. Asimow
Daniel.asimow@arnoldporter.com
Andrew S. Hannemann
Andrew.hannemann@arnoldporter.com
Sean Michael Callagy
Sean.callagy@arnoldporter.com
ARNOLD & PORTER KAYE
   SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Tel:      415-471-3100
Fax:      415-471-3400

Sonia K. Pfaffenroth
Sonia.pfaffenroth@arnoldporter.com
Laura S. Shores
Sonia.pfaffenroth@arnoldporter.com
ARNOLD & PORTER KAYE
   SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Tel:      202-942-5000
Fax:      202-942-5999

**ATTORNEYS FOR DEFENDANT**

**BAYER HEALTHCARE LLC**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on December 15, 2023, at Seattle, Washington.

By:   */s/ Diane McNichol*
        Diane McNichol