UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TEVRA BRANDS LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>BAYER HEALTHCARE LLC, et al.,<br><br>    Defendants. | Case No. 19-cv-04312-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Re: ECF No. 266] |

Plaintiff Tevra Brands LLC ("Tevra") brings this antitrust action against Bayer HealthCare LLC ("Bayer") alleging it engaged in exclusionary practices that substantially restrained trade in the market for topical imidacloprid flea and tick treatments for dogs and cats. Before the Court is Bayer's Motion for Summary Judgment. ECF No. 266 ("Mot."); ECF No. 283 ("Reply"). Tevra opposes. ECF No. 278 ("Opp."). The Court held a hearing on the motion on March 21, 2024. For the reasons stated below, Bayer's motion is GRANTED IN PART AND DENIED IN PART.

I.  **BACKGROUND**

Tevra's Second Amended Complaint ("SAC") alleges three claims: violations of Sections 1 and 2 of the Sherman Act (exclusive dealing and maintenance of a monopoly) and Section 3 of the Clayton Act (exclusive dealing). ECF No. 1 ("SAC"). Prior to its 2020 exit from the animal health market, Bayer sold name brand Advantage and Advantix topical flea and tick treatments for cats and dogs with the active ingredient imidacloprid. *Id.* ¶¶ 1–2, 7. Tevra competed with Bayer by producing generic imidacloprid topicals. *Id.* Tevra alleges that its generic topical is less expensive and more effective than Bayer's name brand topicals. *Id.* ¶ 3. Tevra alleges that it offered retailers generic imidacloprid topicals at prices about 50% lower than Bayer's prices, but that each retailer refused to carry Tevra's generic imidacloprid topicals. *Id.* ¶ 134.

1  To maintain its monopoly, Tevra alleges Bayer entered into what Tevra dubs as an exclusionary scheme with retailers and distributors of over-the-counter flea and tick treatments. *Id.* ¶ 4. Tevra alleges that Bayer's exclusionary scheme consisted of "a verbal 'no generics' agreement with retailers, under which retailers would agree not to sell generic competitors to Bayer's product, in exchange for monetary compensation." *Id.* Bayer also allegedly "punish[ed] those who carried generic competitors to Bayer's products, and reward[ed] those who did not with discounts, growth bonuses, and trade funds." *Id.*

Tevra's claims center largely around Bayer's exclusivity agreements with certain retailers and distributors. The Court took judicial notice of these agreements at the pleadings stage, and the parties do not dispute that all have terms of ▓▓▓▓ or less and are terminable on ▓▓▓▓ notice or less. *See* ECF No. 160-1 ("1st MTD Order") at 16–17; Mot. at 19; ECF No. 266-1 ("Asimow Decl.") ¶¶ 32–39; ECF Nos. 264-24–264-30 (retailer and distributor agreements); Opp. at 2–3. Despite these terms, the Court found that Tevra plausibly pled that the contractual provisions at issue were "*de facto* long term and not easily terminable." 1st MTD Order at 19; ECF No. 231 ("2nd MTD Order") at 19. Specifically, the Court found that the complaint "sets out the reasons retailers and distributors allegedly cannot easily terminate their agreements with Bayer: (1) they would lose millions of dollars in rebates; (2) they would not be able to profitably sell and (3) they would not be able to compete with other retailers and distributors on price if they were to forgo the rebates." 1st MTD Order at 19. In this motion, Bayer asserts that Tevra has no evidence to back up that claim.

The parties also hotly contest Tevra's definition of the relevant market. Tevra's First Amended Complaint ("FAC") limited the relevant market to "Topical flea and tick products containing Imidacloprid sold at wholesale by manufacturers to Over-The-Counter ("OTC") retailers in the U.S." FAC ¶ 16. The Court dismissed the FAC in its entirety with leave to amend because it failed to plead sufficient facts to justify such a narrowly defined relevant market— above all, because Tevra limited it to (a) particular distribution channels and (b) topical products that used imidacloprid, rather than other active ingredients. *See* 1st MTD Order at 5– 15.

Tevra's Second Amended Complaint "broadened its relevant market to include

1  imidacloprid topicals regardless of distribution channels." *See* 2nd MTD Order at 2, 10–13. But
2  Tevra did not add non-imidacloprid topicals to its market definition, notably excluding Frontline, a
3  flea and tick topical similar to Bayer and Tevra's topicals, but with the active ingredient fipronil
4  instead of imidacloprid. *See id.* Bayer brought a motion to dismiss the SAC on the same relevant
5  market grounds, which the Court denied, finding that "Tevra's allegations of a price increase of up
6  to ▇ [of Bayer's name brand imidacloprid topicals] over five years" along with "Tevra's
7  allegations that Bayer lost little to no sales between 2011 and 2016 are sufficient to plausibly
8  allege that it was able to 'profitably impose' a SSNIP." 2nd MTD Order at 12. The Court,
9  however, cautioned that the alleged market definition "may not survive a *Daubert* motion if relied
10 on as SSNIP test in an expert report." 2nd MTD Order at 10. The Court also found "that Tevra's
11 allegations regarding differences between imidacloprid topicals and **non-topical** flea and tick
12 products, including collars and oral medicines, support its alleged relevant market" but that
13 "Tevra's allegations regarding differences between imidacloprid and ***fipronil topicals***, however,
14 provide no support for the proposed relevant market." 2nd MTD Order at 14 (emphasis added).

## II. LEGAL STANDARD

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of informing the Court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element

3

1  to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). In judging evidence at the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559–60 (2006). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Celotex*, 477 U.S. at 325; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses. *Nissan Fire*, 210 F.3d at 1103. If the nonmoving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "[T]he 'mere existence of a scintilla of evidence in support of the [nonmovant's] position'" is insufficient to defeat a motion for summary judgment. *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513–14 (N.D. Cal. 1995) (quoting *Anderson*, 477 U.S. at 252). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *First Pac. Networks*, 891 F. Supp. at 514 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**III. DISCUSSION**

Bayer moves for summary judgment on all three claims. Bayer argues that Tevra's two exclusive dealing claims fail because Tevra does not put forth a cognizable relevant market, Mot. at 11–15, the agreements are short-term and easily terminable, *id.* at 18–22, and that Bayer's agreements did not foreclose a substantial share of the market. *Id.* at 15–18. Next, Bayer argues that Tevra's monopolization claim fails again because of a faulty relevant market definition and because the underlying exclusionary conduct claims fail. *Id.* at 22–24. Finally, Bayer argues that Tevra should not be entitled to damages beginning in August 2020, after Bayer exited the animal health market. *Id.* at 24. The Court addresses Bayer's three arguments in turn.

4

### A. Exclusive Dealing (Sherman Act § 1 and Clayton Act § 3)

The classic exclusive dealing case "involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). "Exclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012). "[A]n exclusive dealing arrangement violates Section 1 [of the Sherman Act] only if its effect is to foreclose competition in a substantial share of the line of commerce affected." *Allied Orthopedic Appliances*, 592 F.3d at 996 (citations and internal punctuation omitted).

#### 1. Whether Tevra's Relevant Market is Cognizable

An exclusive dealing claim necessarily begins with a definition of the relevant market. "The main antitrust objection to exclusive dealing is its tendency to 'foreclose' existing competitors or new entrants from competition in the covered portion of the relevant market during the term of the agreement." *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997). "A relevant antitrust market is an area of effective competition, comprising both product (or service) and geographic elements." U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines ("Merger Guidelines") § 4.3 (2023). A common method used to define a relevant market is the hypothetical monopolist test ("HMT"). *Id.* One form of the HMT is the SSNIP test, which is described in the Merger Guidelines:

> [T]he HMT asks whether a hypothetical profit-maximizing firm, not prevented by regulation from worsening terms, that was the only present and future seller of a group of products ("hypothetical monopolist") likely would undertake at least a small but significant and non-transitory increase in price ("SSNIP") . . . for at least one product in the group.

*Id.* § 4.3A.

Tevra's expert Dr. Paul Wong defines the following as the relevant market: "sales of imidacloprid spot-on flea and tick treatments by manufacturers to wholesale customers in the United States." ECF No. 264-8 ¶ 64 ("Wong Report"). As support for this opinion, Dr. Wong performed a SSNIP test that observed historical sales and price data for Bayer's imidacloprid

5

topicals and Frontline fipronil topicals in response to the introduction of generic fipronil products in 2011. Opp. at 12–13; Wong Report ¶¶ 67–68, 75–85. To aid his comparison, Dr. Wong also applied a "difference-in-differences ["DiD"] regression framework . . . to formally test the comparison between Bayer's Advantage/Advantix and Frontline." Wong Report ¶¶ 88–91, Exhibits 8A–8C. Bayer challenges both the SSNIP test and the DiD regression, Mot. at 11–14. Bayer also argues that Dr. Wong "fails to meaningfully account for the extensive record evidence showing competition between Frontline and Bayer's products." *Id.* at 14.

The recently amended Federal Rule of Evidence 702 allows an expert to offer opinions at trial only if it is more likely than not that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Courts applying this rule must ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Ninth Circuit has emphasized that "[u]nder *Daubert*, the district judge is a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 564–65 (9th Cir. 2010) (internal quotation marks and citation omitted). "When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id.* at 565. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564.

The Court addresses Dr. Wong's SSNIP test, then his DiD regression, then the purportedly ignored material.

### a. SSNIP Test

Bayer argues that Dr. Wong's SSNIP test should be excluded as unreliable because it "looks at Bayer's overall net price increase of ▮ over the six-year 2011–2016 time period following the entry of generic fipronil products and evaluates the extent to which the total sales of Bayer's product declined during this period." Mot. at 12. Bayer contends that such an analysis is

improper because "[t]he use of average or cumulative increases over long periods—during which many other market events can affect the analysis (e.g., something as simple as an increase in the number of households with pets)—is not an acceptable or reliable method." *Id.* Bayer's expert Dr. Saravia also opines that examination of a price increase over such a long period of time ignores inflation, which she estimates to be 6.9% over the same timeframe. ECF No. 264-6 ("Saravia Report") ¶¶ 107–08.

Tevra responds that "Bayer has shown no requirement that the historical data studied in a SSNIP analysis only involve a single, instantaneous price change." Opp. at 16. Tevra adds that "Dr. Wong also shows how 'buyers reacted' by comparing Bayer's imidacloprid and Frontline." *Id.* (quoting Wong Report ¶ 7). Dr. Wong also defended not accounting for inflation, opining that "[c]omparing two products within the industry and analyzing how those products changed at parallel points in time addresses any general concern about inflation." ECF No. 264-9 ("Wong Rebuttal") ¶ 66.

While the SSNIP test is a widely accepted means for defining a relevant market, there are few concrete guidelines for how one must be performed. In one implementation of a SSNIP test, "an economist proposes a narrow geographic and product market definition and then iteratively expands that definition until a hypothetical monopolist in the proposed market would be able to profitably make [a SSNIP]." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 n.1 (9th Cir. 2021). Other authorities lay out techniques and methods for conducting SSNIP tests. *See* Merger Guidelines § 4.3; Coate, Malcolm B., and Fischer, Jeffrey H., "A Practical Guide to the Hypothetical Monopolist Test for Market Definition," *Journal of Competition Law & Economics*, Vol. 4, No. 4, 2008, pp. 1031–1063 ("Coate & Fischer"); Wong Rebuttal ¶ 89 (citing Coate & Fischer); Saravia Report ¶ 58 (citing Coate & Fischer).

As a starting point, a SSNIP test that looks only at the change in price and sales of a single product over a long period of time is subject to exclusion under *Daubert*. The Sixth Circuit said as much in *Ky. Speedway* when it affirmed exclusion of an expert who performed a SSNIP test that merely examined "ticket prices and attendance figures over an eight-year span and concluded that both price and demand increased in this time period." *Ky. Speedway, LLC v. Nat'l Ass'n of Stock*

United States District Court
Northern District of California

*Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009).  Critically missing from that expert's analysis was "whether a price increase at a particular point in time would result in consumer substitution of an alternative product."  *Id.*

The question here is whether Dr. Wong examines only the price and sales of imidacloprid topicals over time, or whether he analyzes "consumer substitution" of imidacloprid topicals and Frontline after the introduction of fipronil generics.  It appears that he does both.  Dr. Wong first opines that "[f]rom 2010 to 2016 … Bayer was able to raise its prices by more than a SSNIP, both in absolute and relative terms, earn larger profits, *and* sell more quantity."  Wong Report ¶ 76.  Dr. Wong opines that the net price of Bayer's imidacloprid topicals increased ▮, which is "above the 5% threshold that the federal agencies 'most often use' when defining a SSNIP in the context of the HMT."  *Id.* ¶ 78.  This conclusion, on its own, is problematic because it suggests that a ▮ increase in price and steady sales over a six-year span is enough to satisfy the SSNIP test.  Wong Report ¶¶ 76, 78.  Tevra cites no authority supporting that proposition.  Rather, *Ky. Speedway* held the opposite: that analysis of price and sales of a single product or service over a long period of time is not a reliable SSNIP test.  588 F.3d at 918.  While, as discussed below, Dr. Wong's complete analysis is more rigorous, this intermediate conclusion suggests, contra *Ky. Speedway* and in a way that could mislead a jury, that a price increase and steady sales of Bayer's imidacloprid products over six years alone satisfies the SSNIP test.  *See Daubert*, 509 U.S. at 595.

Dr. Wong's complete analysis, however, proves to be far more expansive than just observation of price and sales of Bayer's name brand imidacloprid topicals over a six-year span.  Dr. Wong also opines that the introduction of generic fipronil topicals created a natural experiment with which he could observe a SSNIP.  Wong Report ¶¶ 77, 79.  In 2011, several companies began selling generic fipronil topicals similar to Frontline.  *Id.*  In response to the introduction of fipronil generics, Advantage and Advantix (Bayer's name brand imidacloprid topicals) prices increased ▮ and Frontline prices increased 5.7% from 2011 to 2016.  *Id.* ¶¶ 78, 80.  But unlike Advantage and Advantix, which saw a ▮ *increase* in sales from 2010 to 2016, Frontline sales ***decreased*** 57.6% over the same span.  *Id.* ¶ 86.  Dr. Wong concludes that this disparity shows that "fipronil products and other flea and tick treatments are appropriately excluded from the relevant market"

8

1   because of "direct economic evidence of a lack of substitution to other non-imidacloprid
2   products." *Id.*
3   　　　Literature cited by Dr. Wong in his rebuttal report supports making such a comparison in a
4   natural experiment. One paper posits:

> Entry or exit events are probably the most common experiments to study because entry and exit are readily identifiable. When a new firm enters a market, one expects the prices of all of the existing competitors to change in response to the entry. In particular, if the prices charged by all the firms in a potentially broad market responded significantly to entry, the evidence would support the broad definition. On the other hand, if the prices of the firms in a narrow market niche responded, but the prices of the more distant rivals did not, the experiment would suggest a narrow market.

Coate & Fischer at 1045; Wong Rebuttal ¶ 85. Here, Dr. Wong opines that the introduction of generic fipronil topicals impacted sales of Frontline fipronil topicals, but not Bayer's name brand imidacloprid topicals, which "would suggest a narrow market" of only imidacloprid topicals. Thus, unlike the unreliable analysis in *Ky. Speedway*, Dr. Wong considered "consumer substitution of an alternative product" by comparing the imidacloprid and fipronil products. 588 F.3d at 918. Furthermore, the 57.6% decrease in Frontline sales is substantial enough, particularly when compared to imidacloprid products that saw increases in both price and sales, to counter Bayer's objection to the long period of the measurement. As such, the Court finds that Tevra has shown that it is more likely than not that Dr. Wong's SSNIP test satisfies Rule 702 and *Daubert*. Bayer levels other criticisms at Dr. Wong's analysis such as estimating certain data points and not accounting for intervening events and inflation. Reply at 4. But Dr. Wong addresses these critiques in his rebuttal report, Rebuttal Report ¶¶ 63–73, and his explanations convince the Court that Bayer's critiques go to the weight of his opinion, not its admissibility. Accordingly, the Court denies Bayer's motion to exclude Dr. Wong's SSNIP-based definition of the relevant market.

　　　　　　　　b.   "Difference-in-Differences" Regression

　　　Bayer also challenges Dr. Wong's use of a "Difference-in-differences" ("DiD") regression. Bayer's argument largely just incorporates Dr. Saravia's critiques from her expert report. Mot. at 13–14; Saravia Report ¶ 117–21. Dr. Saravia's main contention is that what Dr. Wong mislabels as a DiD analysis is no more than a simple regression because he fails to include "data from before

and after the event of interest," which in this case is the 2011 introduction of fipronil generics. Dr. Wong responded to Dr. Saravia's critiques in his rebuttal report by adding a 2010 data point and opining that its addition did not impact the results of the DiD regression. Wong Rebuttal ¶¶ 39, 80. Bayer's arguments do not address Dr. Wong's response in his rebuttal report.

Dr. Saravia also opined that Dr. Wong ignores other market factors such as Bayer's launch of a new line of Advantage/Advantix products, other flea and tick products entering the market, Bayer's shift in sales strategy, and advertising investments. Saravia Report ¶ 120. Dr. Wong also addressed these concerns in his rebuttal report, Wong Rebuttal ¶¶ 63–73, and again Bayer's arguments do not address his response. Given Bayer's meager argument, the Court is not convinced that these factors are so critical that Dr. Wong's purported exclusion of them in his DiD regression makes it so flawed or unreliable as to warrant exclusion. Rather, Dr. Saravia's criticisms go to the weight of Dr. Wong's testimony, and can be addressed in her direct examination or Dr. Wong's cross examination. *Primiano*, 598 F.3d at 564.

c.  Ignored Material

Bayer's final argument is that Dr. Wong's opinion is subject to exclusion because it "fails to meaningfully account for the extensive record evidence showing competition between Frontline and Bayer's products." Mot. at 14. Bayer points to Dr. Wong's deposition, where it claims he admitted that "he did not rely on the 'opinions provided in various documents, either from Bayer or Tevra.'" *Id.* (quoting ECF No. 265-17 at 89:3–90:5). Tevra responds that Bayer is mischaracterizing Dr. Wong's testimony.

The documents identified by Bayer that Dr. Wong purportedly ignored consist of surveys, evidence that fipronil and imidacloprid products compete, and evidence that topicals and other products such as orals and collars compete. *See* Mot. at 4–5 (collecting evidence); ECF Nos. 264-5, 264-10–264-12, 265-6–265-9. Such information can be useful in determining the relevant market. *See* Merger Guidelines § 4.3. But such information was not necessary for Dr. Wong's SSNIP test, nor has Bayer identified any document purportedly ignored by Dr. Wong so critical as to warrant the exclusion of his market definition opinion. Whether Dr. Wong should have addressed the documents identified by Bayer is again a matter for cross examination. *Primiano*,

10

598 F.3d at 564.

\* \* \*

Bayer argues that "[b]ecause, absent Dr. Wong's opinion, Tevra has no proof upon which to base its relevant market, summary judgment should be granted." Mot. at 15. But Bayer's *Daubert* arguments fail, so Dr. Wong's SSNIP and DiD analyses create a genuine dispute of material fact about the relevant market that precludes summary judgment.

### 2. Whether Bayer's Agreements are Short-Term and Easily Terminable

Bayer argues that because its agreements were all short-term and easily terminable, its conduct is not an antitrust violation. Mot. at 18. Tevra responds with evidence that the contracts were never terminated early due to "realities in the marketplace" such as annual shelving and punitive measures by Bayer. Opp. at 21; *see id.* at 4–8.

"[T]he short duration and easy terminability of [ ] agreements negate substantially their potential to foreclose competition." *Omega*, 127 F.3d at 1163. If the contracts at issue are short-term or easily terminated, "a competing manufacturer need only offer a better product or a better deal" to get contracts of its own. *Id.* at 1164. The guidelines for what constitutes a short-term contract are not rigid. In *Omega*, the Ninth Circuit held that one-year and two-year contracts can be short-term. 127 F.3d at 1163–64 (citing *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983)). Similarly, courts in this circuit have found three-year and sometimes even five-year contracts to be short-term. *See, e.g.*, *PNY Techs., Inc. v. SanDisk Corp.*, No. 11-CV-04689-WHO, 2014 WL 2987322, at *1 (N.D. Cal. July 2, 2014) ("terms ranging from one year to three year" are "short terms"); *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1064 (N.D. Cal. 1998) (three-year agreement was "relatively short duration"), *aff'd*, 190 F.3d 974 (9th Cir. 1999); *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. 12-cv-2102, 2013 WL 3936394, at *2–5 (C.D. Cal. July 30, 2013) (five-year contract terminable on 12-months' notice was "of relatively short duration" and "termin[able] upon short notice").

The Ninth Circuit has not "explicitly recognized a 'de facto' exclusive dealing theory like that recognized in the Third Circuit and Eleventh Circuit." *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016); *ZF Meritor*, 696 F.3d at 282 n.14; *McWane, Inc.*

11

1   *v. FTC*, 783 F.3d 814, 833–35 (11th Cir. 2015).  Nonetheless, it has recognized that "[i]n certain
2   limited situations, discounts and rebates conditioned on a promise of exclusivity or on purchase of
3   a specified quantity or market share of the seller's goods or services may be understood as 'de
4   facto' exclusive dealing contracts because they coerce buyers into purchasing a substantial amount
5   of their needs from the seller." *Aerotec*, 836 F.3d at 1182 (citing XI Phillip E. Areeda & Herbert
6   Hovenkamp, *Antitrust Law* ¶¶ 1807b1–2 (3d ed. 2011)).

7          The duration of Bayer's agreements with the retailers and distributors is not disputed, and
8   there is substantial evidence favorable to Bayer's position.  As Bayer notes, "every contract
9   between Bayer and a retailer or distributor governing sales of Bayer's imidacloprid products was
10  for a term of ████ or less (with one exception) and that every contract (without exception)
11  was terminable by the customer for any reason with ████ notice." Mot. at 19;
12  Asimow Decl. ¶¶ 32–39; ECF Nos. 264-24–264-30 (retailer and distributor agreements);  Opp. at
13  2–3 (not disputing the written terms of the agreements).  The agreements also gave retailers and
14  distributors the opportunity to opt in and out of Bayer's imidacloprid discounts.  Bayer's
15  agreements from February 2018 to July 2020 specified that ████
16  ████" ECF No.
17  264-13 at 6 ("Joint 30(b)(6) Stip.").  Bayer contends that before that provision was explicitly
18  added to the agreements, and as far back as February 2016, the opportunity to opt out was
19  available to retailers and distributors.  Mot. at 7; ECF No. 266-14 ("Zolynas Dep. Tr.") at 75:9–16
20  (in instances where a retailer decided to carry a competitor's product, Bayer "had to remove the
21  associated discount").  Bayer also points to evidence of several retailers who opted out of the
22  exclusivity agreements during at least one contract cycle. Mot. at 7–8; Joint 30(b)(6) Stip.;
23  Zolynas Dep. Tr. at 116:9–17 (retailers "would go in and out sometimes … where they chose not
24  to utilize [the discount] during some period and they chose to utilize it for other periods"); ECF
25  No. 264-16 at 2–3; Joint 30(b)(6) Stip. Ex. A; *see also* ECF No. 264-21 at 1 (Feb. 2017 Bayer
26  email observing "[a] number of Pet Specialty customers voluntarily losing ██ imidacloprid
27  exclusivity (████)"); ECF No. 264-22 at 1 (████ meeting invitation stating,
28  "Additional topics… Imidacloprid exclusivity ██ discount ending on 3/1"); ECF No. 264-16 at 2–

3 (July 2017 email in which ▮ informs Bayer that it is "trialing a petlock display in about 130 stores," after which Bayer informs ▮ that "Bayer will be removing the ▮ discount from all invoices from [the date that ▮ started carrying PetLock]"); ECF No. 264-23 (2016 email with ▮ stating, "▮ Not Taking Advantage of ▮ Imidacloprid Discount. Bayer Response: Understood."). Bayer also points to Dr. Wong's report, which states that "▮ [Bayer] customers . . . opted for exclusivity at least once" (meaning ▮ retailers never opted for exclusivity) and "▮ customers . . . opted for exclusivity at every opportunity" (meaning ▮ retailers either suspended or terminated exclusivity). Wong Report ¶ 146 n. 221, 222 (citing Joint 30(b)(6) Stip. at Ex. A, B).

But Tevra is not required to prove its case here. At summary judgment, Tevra need only put forth evidence that creates a genuine dispute of material fact as to whether the agreements are not short-term and easily terminable. Here, Tevra points to evidence that Bayer used discounts and other monetary levers to pressure distributors to exclusively carry Bayer's name brand imidacloprid topicals. *See, e.g.*, ECF No. 277-10 (Howell Dep. Tr.) 74:6–76:2 (testifying that a proposed strategy from a "Generic Strategy Brainstorm" was to "block entry through strong load-in promotions for retailers[.]"); ECF No. 277-13 (Bauer Depo Ex. Exhibit 1067) at 4619–24 (Bayer's pitch to ▮ that with Bayer's imidacloprid exclusivity discount it is more profitable for ▮ not to carry generics); ECF No. 277-32 (Diesel July 23, 2017 email regarding an upcoming meeting ▮) ("I'll be implying that Marketing $ will be allocated to partners - and partners will have an 'emphasis' on Bayer brands . . ." and later describing market support "is dependent on continued partnership. Introducing other imidacloprid items would not look like partnership."); ECF No. 277-33 (Diesel December 11, 2015 email to ▮) (listing potential consequences to a retailer's decision to "trade to a generic" including loss of ▮ of Advantage shipments, ▮ of growth rebate, ▮ of trade funds, and marketing funds); ECF No. 277-34 (Diesel December 28, 2015 email to ▮) (similar); ECF No. 277-38 (slides for planning meeting between Bayer and ▮ dated September 8, 2016) (linking "▮ Imidacloprid discount, Growth Fund; Trade Funds and marketing funding" to not carrying generics). Bayer also stated in an email to a retailer:

> Finally, as Bayer does every year, it will evaluate with which customers to invest marketing funds. And allocations, to a certain extent, are driven by customers with whom there is a perception will best partner with Bayer to drive Bayer sales. Using Bayer as the exclusive imidacloprid provider will be an aspect of consideration. We'd also like to believe that our efforts to bring ▮▮▮ to the VIP fund for 2016 is noteworthy - higher than any other pure-play online retailer

ECF No. 277-33 at 2; ECF No. 277-34 (similar). This evidence of pressure and monetary incentives not to carry imidacloprid generics is enough to create a genuine dispute of material fact as to whether Bayer's agreements are not short-term and easily terminable.

### 3. Whether Bayer's Agreements Foreclose a Substantial Share of the Market

The Court next addresses Bayer's argument that it did not foreclose a substantial share of the market. The Court first addresses the experts' different approaches to calculating foreclosure, specifically the significance of alternative distribution channels, then whether the experts' estimates demonstrate foreclosure of a substantial portion of the market.

#### a. Alternative Channels of Distribution

The parties' experts put forth dueling estimates of the percentage of the market foreclosed by Bayer's exclusive agreements. Dr. Wong calculates that between 2016 and 2020, on average, 37.0% of imidacloprid spot-on doses and 38.2% of imidacloprid spot-on dollar sales were subject to the Imidacloprid Exclusivity Discount. *See* Wong Rebuttal ¶ 153. At his deposition, Dr. Wong testified about how he made the calculation: "[t]he numerator are the dose sales to the customers with exclusive contracts. The denominator is the market-wide sales in the relevant market for imidacloprid spot-ons." ECF No. 278-38 ("Wong Dep. Tr.") 185:14–20. Dr. Saravia's foreclosure estimate differs in that it also includes certain mass-market retailers like ▮▮▮ that sell generic fipronil topicals but not imidacloprid topicals. Saravia Report ¶ 180–82, 187, 193, 210. By considering these alternative channels, Dr. Saravia calculates that "less than 30% of Tevra's potential sales" were foreclosed by Bayer's exclusivity agreements. *Id.* ¶¶ 187–89, Ex. 23–24.

Bayer argues that Dr. Wong inflates his foreclosure calculation by not considering mass-market retailers to be alternative distribution channels. Mot. at 17–18. Tevra counters that Dr.

14

Wong's relevant market considered "all distribution channels" and that this disagreement about whether to include mass-market retailers is an issue of fact not appropriate for summary judgment. Opp. at 19–20.

"[P]otential alternative sources of distribution . . . are relevant to assessing market foreclosure." *Omega*, 127 F.3d at 1163; *Church & Dwight Co. v. Mayer Lab'ys, Inc.*, 868 F. Supp. 2d 876, 904 (N.D. Cal. 2012), *order vacated in part on reconsideration*, No. 10-4429 EMC, 2012 WL 1745592 (N.D. Cal. May 16, 2012) (no actual foreclosure where "alternative channels leave competitors a wide range of options to get their products to customers"). "If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether [exclusive dealing arrangements] foreclose from competition any part of the relevant market." *Omega*, 127 F.3d at 1163. However, "[t]he mere existence of other avenues of distribution is insufficient without an assessment of their overall significance to the market." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 196 (3d Cir. 2005); Areeda & Hovenkamp ¶ 1821d4. Applying this guidance, the Court must consider Tevra's evidence regarding the scope of the reasonable channels of distribution.

Bayer has put forth a persuasive argument that Dr. Wong's foreclosure analysis should have considered mass-market retailers that sell only fipronil topicals, and it is undisputed that these retailers are not subject to Bayer's exclusivity agreements. But, as discussed above, Dr. Wong defined a relevant market by presenting "direct economic evidence of a lack of substitution" between fipronil topicals and imidacloprid topicals, Wong Report ¶ 86, and Tevra contends that this market accounts for "all distribution channels." Opp. at 19 (citing Wong Dep. Tr. 188:11–19). Although it is not abundantly clear that Dr. Wong has in fact included potential sales in all reasonable channels of distribution, his opinion testimony is sufficient to raise a disputed factual issue. Having found (*supra*) that Dr. Wong's relevant market opinion is reliable, the Court finds that Dr. Wong's foreclosure calculation is sufficient to defeat summary judgment. That said, it may be no small task for Tevra to prove at trial that other distribution channels were not viable alternatives for selling generic imidacloprid topicals.

\\

b. Substantial Foreclosure

Accordingly, the Court turns to Dr. Wong and Dr. Saravia's foreclosure figures, particularly in light of its finding above that issues of fact preclude summary judgment that Bayer's exclusivity agreements are short-term and easily terminable.

The amount of market foreclosure the Ninth Circuit considers to be "substantial" varies widely based on the underlying facts of the exclusive dealing agreements at issue in particular cases. In *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, the Ninth Circuit held that 24% market foreclosure was substantial. 676 F.2d 1291, 1298, 1304–1305 (9th Cir. 1982). But in *Omega,* the Ninth Circuit later held that market foreclosure as high as 38% did not constitute "substantial foreclosure" where the alleged exclusive dealing agreements were of short duration and easy terminability. 127 F.3d at 1162–65. The *Omega* court also explained that "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern." *Id.* at 1162.

As discussed in the 2nd MTD Order, the *Masimo* case is a helpful guide in determining which of the *Twin City* or *Omega* precedents applies to a particular case—and accordingly, how much market foreclosure is "substantial." *Masimo Corp. v. Tyco Health Care Grp., L.P.*, 2006 WL 1236666 (C.D. Cal. Mar. 22, 2006), *aff'd* 350 Fed. App'x. 95 (9th Cir. 2009). In *Masimo*, the court found that where the alleged exclusive dealing agreements were not in practice terminable on short notice, *Omega* did not apply and *Twin City* did, so it found that a jury could reasonably infer that 24% market foreclosure was substantial. *Id.* at *6.

Bayer argues its exclusive contracts foreclosed "less than 30% of Tevra's potential sales," Mot. at 16 (citing Saravia Report at Ex. 23–24), and that even Dr. Wong's estimates, which range from 31.8% to 38.4%, do not constitute substantial foreclosure. *Id.* at 8 (citing Wong Rebuttal at Ex. 8A); Reply at 15. Whether foreclosure is "less than 30%" or 38.4% is immaterial to the outcome of this order. Because there exists a genuine dispute of material fact as to whether the exclusive contracts at issue are short-term and easily terminable, even foreclosure of "less than 30%" of the market may prove to be substantial. *Twin City*, 676 F.2d at 1298, 1304–1305. Conversely, even 38% foreclosure of the relevant market might not be substantial upon a showing

16

that the agreements are short-term and easily terminable, *Omega*, 127 F.3d at 1162–65. Thus, at this stage the Court cannot find as a matter of law that Bayer's exclusivity agreements did not foreclose a substantial share of the relevant market.

*            *            *

Bayer's three arguments concerning Tevra's exclusive dealing claims fail. The Court has found it more likely than not that Dr. Wong's analysis is reliable, Tevra has demonstrated that fact disputes preclude a summary judgment finding that the contracts are short-term and easily terminable, and thus also preclude a finding that Bayer does not substantially foreclose the relevant market. Accordingly, the Court denies Bayer's motion for summary judgment on Tevra's exclusive dealing claims under Section 1 of the Sherman Act and Section 3 of the Clayton Act.

### B.    Unlawful Monopoly (Sherman Act § 2)

To prevail on a Section 2 monopolization claim, a plaintiff is required to show that the defendant: "(1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). The threshold market share to establish a prima facie case of monopoly power is generally no less than 65%, *see id.* at 1206, and "numerous cases hold that a market share of less than 50 percent is presumptively insufficient to establish" the requisite level of market power under a Section 2 claim. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995). Furthermore, "if, in reviewing an alleged Sherman Act violation, a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (citation omitted).

Bayer makes two arguments to defeat the claim of unlawful monopolization that largely recapitulate its exclusive dealing arguments. First, Bayer argues that the Section 2 claim fails because "the undisputed record evidence makes clear that Bayer did not have either monopoly power or substantial market power in a properly defined market" and that "Bayer's market share was never above 31% in a topical-only market." Mot. at 22 (citing Saravia Report, Exs. 5, 18). Tevra responds that "Dr. Wong estimates Bayer controlled 95% of the relevant antitrust market in 2016 and 87% in 2019." Opp. at 22 (citing Wong Report ¶ 101). Because the Court denies

1    Bayer's motion to exclude Dr. Wong's market definition (*supra*), and Bayer lodges no other

2    challenge to Dr. Wong's market control analysis, the Court rejects Bayer's argument.  This is a

3    classic example of dueling expert testimony that precludes summary judgment.  Second, Bayer

4    argues that where there is no Section 1 violation, there is no Section 2 violation.  *Id.* at 23–24.  But

5    because Tevra has presented issues of fact that preclude summary judgment on its Section 1 claim,

6    this argument also fails.

7    Thus, the Court denies Bayer's motion for summary judgment on Tevra's unlawful

8    monopolization claim under Section 2 of the Sherman Act.

9    **C.    Damages After July 2020**

10   The parties do not dispute that Bayer completed the sale of its animal health business to

11   non-party Elanco Animal Health Inc. ("Elanco") on or around August 1, 2020.  Mot. at 5.

12   (Saravia Report at n.3; ECF No. 266-23 (Elanco Press Release); Opp. at 4.  Bayer argues that

13   Tevra's damages claims are not based on pre-acquisition conduct by Bayer but instead are based

14   entirely on post-acquisition acts by the acquiring party, Elanco.  Mot. at 25.  Tevra responds that

15   contracts with retailers and distributors continued after Bayer's divestiture on July 31, 2020.  Opp.

16   at 25. When pressed at the hearing, Tevra acknowledged its principal damages theory is "the fact

17   that the contracts continued and the contracts were one of the things that cause damage," and

18   offered no evidence or explanation as to how additional harm was caused by Bayer after its

19   divestiture.  ECF No. 318 at 77:3–78:5.  The Court thus finds that Tevra has presented no

20   evidence that creates a genuine dispute of material fact suggesting that Bayer should be liable for

21   damages after July 31, 2020.  Accordingly, the Court grants Bayer's motion for summary

22   judgment that it is not liable for damages after July 31, 2020.  *See Joshua David Mellberg LLC v.*

23   *Will*, No. 20-16215, 2021 WL 4480840, at *1 (9th Cir. Sept. 30, 2021); *Murphy Tugboat Co. v.*

24   *Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 862–63 (N.D. Cal. 1979), *aff'd sub*

25   *nom. Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981).

26   \\

27   \\

28   \\

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Bayer's motion to exclude Dr. Wong's relevant market opinion is DENIED.
2. Bayer's motion for summary judgment that it did not violate Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act is DENIED.
3. Bayer's motion for summary judgment that it is not liable for damages after July 31, 2020 is GRANTED.

Dated: April 15, 2024

_____
BETH LABSON FREEMAN
United States District Judge