1

2

3                  **UNITED STATES DISTRICT COURT**

4                 **NORTHERN DISTRICT OF CALIFORNIA**

5                        **SAN JOSE DIVISION**

6

7    TEVRA BRANDS LLC,                          Case No.  19-cv-04312-BLF

8                    Plaintiff,

9            v.                                 **ORDER DENYING PLAINTIFF'S**
                                                **MOTION TO EXCLUDE; GRANTING**
10   BAYER HEALTHCARE LLC, et al.,              **IN PART AND DENYING IN PART**
                                                **DEFENDANT'S MOTION TO**
11                   Defendants.                **EXCLUDE**

12                                              [Re:  ECF Nos. 252, 288]

13

14           Plaintiff Tevra Brands LLC ("Tevra") brings this antitrust action against Bayer HealthCare

15   LLC ("Bayer") alleging it engaged in exclusionary practices that substantially restrained trade in

16   the market for topical imidacloprid flea and tick treatments for dogs and cats.  Before the Court are

17   two motions.  Tevra brings a motion to exclude Bayer's expert Dr. Saravia, which Bayer opposes.

18   ECF No. 252 ("Saravia Mot."); ECF No. 301 ("Saravia Opp."); ECF No. 310 ("Saravia Reply").

19   Bayer brings a motion to exclude Tevra's expert Dr. Wong, which Tevra opposes. ECF No. 288

20   ("Wong Mot."); ECF No. 302 ("Wong Opp."); ECF No. 312 ("Wong Reply").  The Court held a

21   hearing on the motions on April 18, 2024.  For the reasons stated below, Tevra's motion is

22   DENIED and Bayer's motion is GRANTED IN PART AND DENIED IN PART.

23   **I.    BACKGROUND**

24           Tevra's Second Amended Complaint alleges three claims: violations of Sections 1 and 2 of

25   the Sherman Act (exclusive dealing and maintenance of a monopoly) and Section 3 of the Clayton

26   Act (exclusive dealing).  ECF No. 196 ("SAC").  Prior to its 2020 exit from the animal health

27   market, Bayer sold name brand Advantage and Advantix topical flea and tick topicals for cats and

28   dogs with the active ingredient imidacloprid.  *Id.* ¶¶ 1–2, 7. Tevra competed with Bayer by

1  producing generic imidacloprid topicals.  *Id.*  Tevra alleges that it offered its generic imidacloprid
2  topicals at prices about 50% lower than Bayer's prices, but that each retailer refused to carry them.
3  *Id.* ¶ 134.

4      The Court recently granted in part and denied in part Bayer's motion for summary
5  judgment.  ECF No. 322 ("SJ Order").  The Court found that fact issues precluded summary
6  judgment on all three of Tevra's claims, but found that Tevra cannot recover damages from after
7  July 31, 2020, when Bayer sold its animal health business to non-party Elanco Animal Health Inc.
8  *Id.* at 19.  Bayer also sought to exclude Tevra's expert Dr. Paul Wong's relevant market analysis,
9  but the court found that it was more likely than not that the opinion is reliable.  *Id.* at 9.

10  **II.    LEGAL STANDARD**

11      A qualified expert may provide opinion testimony "if the proponent demonstrates to the
12  court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized
13  knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b)
14  the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable
15  principles and methods; and (d) the expert's opinion reflects a reliable application of the principles
16  and methods to the facts of the case."  Fed. R. Evid. 702.  Courts applying this rule must "ensur[e]
17  that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."
18  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co., Ltd. v.*
19  *Carmichael*, 526 U.S. 137, 147 (1999).  The reliability inquiry is a flexible one, and "whether
20  *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a
21  matter that the law grants the trial judge broad latitude to determine."  *Kumho Tire*, 526 U.S. at
22  153.

23      "Under *Daubert*, the district judge is a gatekeeper, not a fact finder."  *Primiano v. Cook*,
24  598 F.3d 558, 564–65 (9th Cir. 2010) (internal quotation marks and citation omitted).  "When an
25  expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify
26  and the jury decides how much weight to give that testimony."  *Id.* at 565.  "Shaky but admissible
27  evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of
28  proof, not exclusion."  *Id.* at 564.

III.    DISCUSSION

A.    Tevra's Motion to Exclude Dr. Saravia

In her expert report, Dr. Saravia challenges Dr. Wong's relevant market opinions, Saravia Report § 5, and proposes at least two alternative markets. *Id.* ¶¶ 72–75. Tevra argues that her report "proffers no bases for this would-be opinion in the alternative." Saravia Mot. at 3. The Court has distilled Tevra's argument into three parts: 1) that Dr. Saravia's conclusions are inconsistent, Saravia Mot. at 3–5; 2) that she does not provide a reliable basis for her analysis, such as a hypothetical monopolist test (HMT) or SSNIP test, *id.* at 3, 5–6; and 3) that she does not rely on verifiable, empirical evidence. *Id.* at 6–9. The court addresses these three arguments in turn.

First, Tevra argues that Dr. Saravia's opinion is inconsistent, noting for example, that Dr. Saravia proposes at least two relevant markets, one for all flea and tick topicals, and another for "all preventative flea and tick medications." Saravia Mot. at 3 (quoting Saravia Report § 5.1). Bayer responds that there is no requirement that Dr. Saravia put forth only one relevant market. Saravia Opp. at 3–4.

It is well accepted that a defendant has no responsibility to put forth a market definition. *See Sumotext Corp. v. Zoove, Inc.*, No. 16-CV-01370-BLF, 2020 WL 264701, at *3 (N.D. Cal. Jan. 17, 2020). Rather, "[a] defendant may present expert rebuttal of the plaintiff's expert 'by putting forth its own expert who either claims that (1) the plaintiff's expert's methodology was conducted improperly in some way; or (2) the ultimate conclusion the plaintiff's expert makes is flawed because a superior methodology provides a different result.'" *Id.* (quoting *TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, No. CV 15-02370 JVS, 2016 WL 7042085, at *5 (C.D. Cal. Aug. 17, 2016)). And at least one court has declined to exclude an expert opinion that considered multiple possible relevant markets. *Hynix Semiconductor Inc. v. Rambus Inc.*, Nos. CV-00-20905 RMW, 2008 WL 73689, at *11 (N.D. Cal. Jan. 5, 2008).

Here, Dr. Saravia's report identifies potential substitutes for imidacloprid topicals in response to Dr. Wong's narrower relevant market, which consists only of imidacloprid topicals. Saravia Report ¶¶ 70–75. Bayer argues that Dr. Saravia employs a "qualitative hypothetical

United States District Court
Northern District of California

1    monopolist test," which is a "superior methodology for this case."  Saravia Opp. at 2.  The Court

2    finds no issue with Dr. Saravia's general proposition that there are two possible alternative

3    markets, provided that each market definition passes muster under Rule 702.  *Hynix*

4    *Semiconductor*, 2008 WL 73689, at *11.

5         Second, Tevra argues that Dr. Saravia does not use a "verifiable, objective" theory for her

6    market definition.  Specifically, Tevra argues that "Dr. Saravia failed to perform **any** type of

7    empirical analysis" and "avoid[ed] objective use of data" in her report.  Saravia Mot. at 6

8    (emphasis in original).  Bayer responds that Dr. Saravia properly employed a "qualitative

9    hypothetical monopolist test."  Saravia Opp. at 3.

10        "The outer boundaries of a product market are determined by the reasonable

11   interchangeability of use or the cross-elasticity of demand between the product itself and

12   substitutes for it."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  One way to define

13   the relevant market is the SSNIP test, which asks "whether a [hypothetical] monopolist in the

14   proposed market could profitably impose a small but significant and nontransitory price increase."

15   *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008).  As the Court

16   recently noted, "[w]hile the SSNIP test is a widely accepted means for defining a relevant market,

17   there are few concrete guidelines for how one must be performed."  SJ Order at 7; *see also*

18   *Sumotext v. Zoove, Inc.*, No. 16-cv-1370-BLF, 2020 WL 533006, at *11 (N.D. Cal. Feb. 3, 2020)

19   ("there is no requirement in this Circuit that an expert use any particular form of analysis in

20   developing an opinion on market definition.").  Various authorities lay out techniques and

21   methods for conducting SSNIP tests.  For example, the Coate & Fischer paper cited by both

22   parties' experts posits that "[d]ocumentary evidence related to the effect of a hypothetical SSNIP

23   could support specific market delineations.  In effect, this evidence also focuses on a natural

24   experiment, but the analysis is qualitative in nature, as it relies on nonquantitative assessments of

25   past events."  Coate, Malcolm B., and Fischer, Jeffrey H., "A Practical Guide to the Hypothetical

26   Monopolist Test for Market Definition," *Journal of Competition Law & Economics*, Vol. 4, No. 4,

27   2008, pp. 1031–1063 ("Coate & Fischer"); Wong Rebuttal ¶ 89 (citing Coate & Fischer); Saravia

28   Report ¶ 58 (citing Coate & Fischer).

United States District Court
Northern District of California

1    Bayer argues that Dr. Saravia performed a "qualitative hypothetical monopolist test" and

2    "essentially conduct[ed] a SSNIP test" to define her relevant markets.  Saravia Opp. at 3–5, 7.

3    While neither she nor Bayer call it a full-fledged SSNIP test, Dr. Saravia opines in paragraphs 72

4    to 75 of her report that she used a customer survey to define the relevant market.  Saravia Report ¶

5    72–75; Hearing Tr. 71:7–73:14.  Dr. Saravia's analysis begins with a 2019 survey conducted on

6    Bayer's behalf that considered substitution of various flea and tick products including K9

7    Advantix II (Bayer's name brand imidacloprid topical), Frontline (name brand fipronil topical),

8    Seresto (flea and tick collar), and Bravecto (oral flea and tick treatment).  *See* Saravia Report ¶ 72.

9    One result of the survey was that if Bayer increased the price of K9 Advantix II by 7.5%, 29% of

10   users would switch to Frontline Plus and 7% would switch to Bravecto.  *Id.* ¶ 72, Ex. 6.  Dr.

11   Saravia then employed some basic calculations on available data to estimate profitability, and

12   concluded that "the survey results suggest that [Dr. Wong's] candidate market is too narrow and

13   other products, notably Frontline, should also be included in the relevant market."  *Id.* ¶¶ 73–74.

14   Because the survey addresses consumers switching to multiple products including topicals and

15   orals, it supports Dr. Saravia's opinion that the market is at least as broad as all topicals and

16   probably as broad as all preventative flea and tick products.  *Id.* ¶ 60.

17   Tevra has identified nothing so facially wrong with Dr. Saravia's "qualitative HMT" as to

18   warrant exclusion.  Notably, Tevra's reply brief attacks Bayer's "qualitative HMT" label, Saravia

19   Reply at 2, but does not raise any issues with the study itself or Dr. Saravia's calculations based on

20   the study.  At the hearing, Tevra raised several potential issues with the survey such as sample

21   size, the number of products available, the questions asked, and that the survey targeted consumers

22   instead of wholesalers.  Hearing Tr. 60:1–7, 60:22–61:9, 76:12–77:3.  While these are important

23   issues, Tevra has not briefed any of them in sufficient detail to convince the Court that there is any

24   methodological flaw.  Critically, the survey addresses cross-elasticity because it asks respondents

25   whether a change in price would cause the consumer to switch to a similar flea and tick treatment.

26   Saravia Report ¶¶ 72–75.  Tevra can further explore its remaining criticisms of the survey and Dr.

27   Saravia's "qualitative HMT" during her cross examination.

28   Finally, the Court addresses Tevra's argument that Dr. Saravia does not rely on empirical

United States District Court
Northern District of California

1  evidence or empirical market analysis, but instead "claims that the quantity of documents she

2  reviewed are sufficient to support her conclusions."  Saravia Mot. at 6–9.  Tevra also argues that

3  Dr. Saravia fails to identify what methodology she uses to examine the documents.  *Id.* at 6;

4  Hearing Tr. 76:19-77:3; 78:13-18 ("I think what she's doing, she's saying look at all this stuff I

5  looked at, look at all of this information, there's so much information there, this suggests this, this

6  supports the conclusion that.  But she doesn't say how, and that 'how' is what's so important to

7  market definition.").  Bayer responds with a long list of evidence relied on by Dr. Saravia, and

8  argues that the relevant market inquiry can be holistic and does not require quantitative data.

9  Saravia Opp. at 6–7;  Hearing Tr 73:21–74:1.

10      The Court begins with the evidence considered by Dr. Saravia.  The Horizontal Merger

11  Guidelines outline various types of evidence that can be used to implement the HMT.  *Horizontal*

12  *Merger Guidelines* (2010 ed.) § 4.1.3; *Horizontal Merger Guidelines* (2023 ed.) § 4.3.  For

13  example, one can "take into account any reasonably available and reliable evidence" including:

- how customers have shifted purchases in the past in response to relative changes in price or other terms and conditions;
- information from buyers, including surveys, concerning how they would respond to price changes;
- the conduct of industry participants, notably:
  - sellers' business decisions or business documents indicating sellers' informed beliefs concerning how customers would substitute among products in response to relative changes in price;
  - industry participants' behavior in tracking and responding to price changes by some or all rivals;
- objective information about product characteristics and the costs and delays of switching products, especially switching from products in the candidate market to products outside the candidate market;
- the percentage of sales lost by one product in the candidate market, when its price alone rises, that is recaptured by other products in the candidate market, with a higher recapture percentage making a price increase more profitable for the hypothetical monopolist;
- evidence from other industry participants, such as sellers of complementary products;
- legal or regulatory requirements; and
- the influence of downstream competition faced by customers in their output markets.

27  *Horizontal Merger Guidelines* (2010 ed.) § 4.1.3; *see also Horizontal Merger Guidelines* (2023

28  ed.) §§ 4.2–4.3 (similar).

United States District Court
Northern District of California

1    The Court addresses the evidence cited in paragraphs 57 to 137 of Dr. Saravia's Report

2    (what Tevra seeks to exclude, *see* Saravia Mot. at 9) in chunks.  Paragraphs 57 to 62 discuss

3    background information and academic authority about the hypothetical monopolist test and basic

4    economic principles, and does not contain any evidence or opinions.  Saravia Report ¶¶ 57–62.

5    Paragraphs 63 to 69 summarize and discuss internal Tevra and Bayer documents about how

6    various products compete and how price affects market share.  *Id.* ¶¶ 63–69.  This type of

7    information falls under the "conduct of industry participants" such as "how customers would

8    substitute among products in response to relative changes in price" and "industry participants'

9    behavior in tracking and responding to price changes by some or all rivals."  *Horizontal Merger*

10   *Guidelines* (2010 ed.) § 4.1.3.  Paragraphs 70 to 75 summarize and describe Dr. Saravia's

11   "qualitative HMT," discussed above.  Paragraphs 76 to 86 summarize and discuss supplier

12   information on the cross-elasticity of the products.  Saravia Report ¶¶ 76–86.  This type of

13   information falls under "conduct of industry participants," "objective information about product

14   characteristics and the costs and delays of switching products," and "evidence from other industry

15   participants, such as sellers of complementary products."  *Horizontal Merger Guidelines* (2010

16   ed.) § 4.1.3.  Paragraphs 87 to 94 summarize and discuss consumers' willingness to switch

17   between products.  Saravia Report ¶¶ 87–94.  This type of information falls under  "information

18   from buyers, including surveys, concerning how they would respond to price changes."

19   *Horizontal Merger Guidelines* (2010 ed.) § 4.1.3.  Paragraphs 95 to 137 lay out Dr. Saravia's

20   criticism of Dr. Wong's methods.  Saravia Report ¶¶ 95–137.  Tevra clarified at hearing that it

21   does not seek to exclude Dr. Saravia's criticism of Dr. Wong, Hearing Tr. 56:23–57:7, so the

22   Court will not analyze this portion of her report.  Thus, the evidence considered by Dr. Saravia

23   corresponds directly to classes of evidence accepted by the Horizontal Merger Guidelines.

24   The Court next looks to Dr. Saravia's analysis of the evidence.  "Courts in this district and

25   others have often admitted expert testimony on market definition where the expert did not conduct

26   an econometric study."  *Sumotext*, 2020 WL 533006, at *11; *Apple iPod iTunes Antitrust Litig.*,

27   No. 05-CV-0037-YGR, 2014 WL 4809288, at *7 (N.D. Cal. Sept. 26, 2014) (denying *Daubert*

28   motion where economics expert looked to "internal Apple documents, employee testimony, and

1    discovery responses, third-party information such as contemporaneous financial analysis and press

2    coverage").  Objections that expert opinions are "unsupported by econometric or other analysis

3    reflecting a generally accepted methodology . . . go to the weight of the evidence at trial, not to its

4    admissibility."  *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,

5    No. 14-md-02541 CW, 2018 WL 1948593, at *5 (N.D. Cal. Apr. 25, 2018), *aff'd sub nom. In re*

6    *Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, No. 14-md-02541 CW,

7    2018 WL 4241981 (N.D. Cal. Sept. 3, 2018).

8            Despite their emphasis on types of evidence to consider, antitrust authorities impose few

9    restrictions on how that evidence must be analyzed.  The 2023 Merger Guidelines state that

10   "qualitative and quantitative evidence" can be used "to apply the HMT, in particular to assess

11   whether competition among a set of firms likely leads to better terms than a hypothetical

12   monopolist would undertake."  Merger Guidelines (2023 ed.) § 4.3.C; *see also id.* § 4.2.A.  And

13   Dr. Saravia cites academic authority (not challenged by Tevra) for the proposition that qualitative

14   information can be relied upon for market definitions.  Jonathan B. Baker and Timothy F.

15   Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power," in

16   *Handbook of Antitrust Economics*, ed. Paolo Buccirossi, (Cambridge, MA: The MIT Press, 2008),

17   pp. 1–42 at p. 11 ("Market definition is more often conducted without these types of systematic

18   empirical analyses.  This should be no surprise: good data are not always available, key

19   parameters in the estimation can be difficult to pin down . . . moreover qualitative evidence can be

20   compelling, at times more probative than quantitative evidence."); Saravia Report ¶ 58 n.145.

21          Tevra wants to see an underlying methodology, but courts often do not require such a

22   disclosure from an expert forming a relevant market opinion.  *See Apple iPod iTunes Antitrust*

23   *Litig.*, 2014 WL 4809288, at *7; *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap*

24   *Antitrust Litig.*, 2018 WL 1948593, at *5.  Thus, because the evidence cited in section 5 of Dr.

25   Saravia's report properly concerns the cross-elasticity of demand for products in the proposed

26   relevant markets, the Court imposes no additional requirement as to the methodology Dr. Saravia

27   must put forth to analyze this evidence in forming her relevant market opinions.

28          Tevra seeks to brush away Dr. Saravia's opinions, claiming they are even weaker than the

excluded opinions in *Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810 (N.D. Cal. 2021). Saravia Reply at 2. But the Court disagrees. In *Teradata*, the court excluded two portions of the expert's opinion, a qualitative analysis and a quantitative analysis. *Teradata*, 570 F. Supp. 3d at 836–41. The court first found that the qualitative market definition stood on "infirm ground" because the expert did not account for companies of varying sizes. *Id.* at 837–38 ("[The expert] testifies that there are approximately 100,000 companies in his proposed relevant market but he does not sufficiently explain why he then focuses only on documents discussing the largest 500 or 2,000 companies in the world[.]") Tevra makes no argument here that Dr. Saravia focused on the wrong subset of companies in the market. For the quantitative analysis, the expert looked at "'Customer Relationship Management' ('CRM') data from SAP and Oracle, based on the number of times competitors are mentioned in sales representatives' sales report." *Id.* at 839. While the court noted that CRM data can be helpful for eliciting which companies are competitors, it found that the analysis was critically flawed because "CRM data does not measure customer responses to changes in price." *Id.* at 840. As discussed above, the documents Dr. Saravia relies on are distinguishable from the CRM data in *Teradata* because Dr. Saravia's evidence concerns both customer and seller reactions to price changes, which can be used to analyze cross-elasticity.

In its motion, Tevra asks "what *did* Dr. Saravia rely upon to proffer her opinion?" Saravia Mot. at 7 (emphasis in original). Dr. Saravia's "testable methodology," Saravia Reply at 3, is a hypothetical monopolist test based on a market survey about how customers would switch products in reaction to a price change. Her opinion is further buttressed by documents about how industry participants and consumers react to price changes and sales by competitors, which is reliable evidence under the Horizontal Merger Guidelines. Thus, the Court finds that it is more likely than not that Dr. Saravia's relevant market opinion is reliable.

### B.    Bayer's Motion to Exclude Dr. Wong

Whether Dr. Wong's opinions should be excluded is a much closer call. Bayer challenges Dr. Wong's two damages calculations (the "Frontline Method" and "Projection Method"), his consumer harm opinion, and his relevant market opinion. The court addresses these four opinions in turn.

### 1. Frontline Method

Dr. Wong's first approach (the "Frontline Method") estimates the sales of "excess units" of imidacloprid generics (assuming Bayer did not have any exclusivity agreements) by looking to the fipronil topical market, a similar product that saw generic entry but did not have exclusive agreements.  Like generic entry of imidaclopid-based topicals in 2016, generics entered the fipronil topical market beginning in 2011 and steadily cut into sales of Frontline (the name brand product), amounting to a 57.6% decrease in Frontline sales from 2011 to 2016.  Wong Report ¶ 86.  Dr. Wong performed his calculation in two parts.  First, Dr. Wong projected the loss in name brand fipronil sales from 2011 to 2016 onto the imidacloprid market to estimate the quantity of sales Bayer would have lost due to generic entry without its exclusivity agreements in place.  Wong Report ¶¶ 125–129, Exs. 7B, 12A, 12B; ECF No. 287-4 (Wong Dep. Tr.) 200:6–10.  Second, Dr. Wong opines that Tevra would have sold 100% of the "excess units" that would have shifted from Bayer's name brand products to imidacloprid generics.  Wong Rebuttal ¶¶ 185–186 Exs. 9B, 10A.   Bayer challenges both steps of the calculation.

Bayer first argues that Dr. Wong "failed to test his assumption that Frontline was a proper benchmark."  Wong Mot. at 3.  Tevra responds that "Dr. Wong both addressed and controlled for[] purported differences" and points out that Bayer goes to great lengths elsewhere to compare its products to Frontline.  Wong Opp. at 3.

Rule 702 requires that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(d).  "As in any damages case, the calculation [has] to address a hypothetical world that never existed."  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 968 (9th Cir. 2013).  Estimating damages by "comparing the unknown to an analogous known experience" is both a recognized and accepted methodology to address that hypothetical.  *See id.* at 968–70 (affirming admission of expert testimony regarding lost profit damages based on a comparison to financials of a similarly situated rental car company).

Bayer claims that Dr. Wong "failed to test his assumption that Frontline was a proper benchmark," and points out several differences between imidacloprid topicals and fipronil topicals

in its motion: that the products use different ingredients, are sold by different companies to different distributors, were subject to generic entry at different times, and were covered by different patents.  Wong Mot. at 3.  But Bayer fails to address that Dr. Wong's opinion does compare the two product markets.  Wong Report ¶¶ 49–50; Wong Rebuttal ¶¶ 161–167.  As a starting point, Dr. Wong reviewed academic authority addressing how to compare product markets for similar drugs.  *See* Wong Report ¶¶ 49–50.  Dr. Wong also reviewed Bayer's internal documents showing Bayer's reliance on Frontline sales data, the similar time period for both Frontline and Advantage/Advantix relative to respective generic entry, that both products faced generic competition from many of the same companies, and that Bayer and Frontline's manufacturer sold to the same retailers.  Wong Rebuttal ¶¶ 163–166.  The Court concludes that Dr. Wong has adequately addressed the differences between the products.  Whether Dr. Wong persuasively assessed the differences Bayer points out in its motion is a matter for cross examination.  Bayer has not identified any difference between the two product markets so extreme as to render the first part of the "Frontline Method" unreliable.

Bayer also takes issue with the second part of Dr. Wong's damages calculation, arguing that he improperly assumed that "Tevra would have captured 100% of 'excess units' from 2017 to 2023."  Wong Mot. at 3.  Tevra responds that Bayer can critique Dr. Wong's assumptions on cross examination and points to the basis of Dr. Wong's 100% opinion including trends in fipronil generics, Tevra's competitive pricing, and challenges faced by one of Tevra's generic competitors.  Wong Opp. at 4–5.  Dr. Wong has staked out an aggressive position that requires careful consideration of whether it is based on any reliable data.

As Dr. Wong explains, there are several reasons to believe Tevra would have enjoyed a higher market share absent Bayer's exclusivity agreements.  According to Dr. Wong, Tevra made "extensive efforts to win-over the foreclosed customers."  Wong Report ¶ 129 (citing SAC ¶¶ 132–152).  Dr. Wong also claims that Tevra had "competitive or better pricing" than other generic imidacloprid spot-ons."  Wong Rebuttal ¶ 192; Wong Report ¶ 129.  Dr. Wong also opines that because one competitor, PetIQ, "likely owes royalties to Bayer," it would have had a harder time pricing its products below Tevra's products.  Wong Report ¶ 129 n.167.  Dr. Wong also opines

that "had Tevra gained the volume and scale that is predicted under the damages estimates, it would have gained additional operating efficiency, allowing it to compete even more effectively." Wong Rebuttal ¶ 194.

But as Bayer notes, several factors would suggest less than complete dominance of the imidacloprid generic market by Tevra. Tevra was not the only imidacloprid generic or even the first to market. At least five other generic imidacloprid topical brands – Meridian, Tru Rx, Fido Pharm, Capinnovet, and Promika – entered the market in 2016, before Tevra entered the market in 2017. Wong Report at Ex. 3C. And while Tevra's price per dose is competitive, Dr. Wong's data shows that from 2016 to 2019, its topicals were never the cheapest imidacloprid generic. *See id.* In 2017, Tevra's Activate, which sold for $10.07 per dose, was undercut by five imidacloprid generics including Promika's Adventure which sold for $8.67 per dose. *Id.* In 2018, Tevra's Activate, which sold for $8.55 per dose, was undercut by two imidacloprid generics including Promika's Adventure which sold for $7.70 per dose. *Id.* In 2019, Tevra's Activate, which sold for $8.94 per dose, was undercut by three imidacloprid generics including Promika's Adventure which sold for $7.88 per dose. *Id.* Furthermore, Dr. Wong's argument that Tevra would have become more efficient with increased sales, Wong Rebuttal ¶ 194, circularly assumes that it had the means to beat out its generic competitors in the first place, a predicate to reaching higher sales and volume. Also, Bayer points to evidence describing Tevra's ███████████████████ ██████████████████████████████████████████████████████████████ ████████████████. ECF No. 287-2 (Richmond Report) ¶ 114–116. And Bayer's expert Dr. Richmond calculates from Dr. Wong's data that Tevra's market share of the generic imidacloprid market was ████████████ from 2017 to 2019, a far cry from dominance over its generic competition in non-foreclosed markets. *Id.* ¶ 126 (citing Wong Report, Ex. 3C).

Dr. Wong's also looked to trends in the fipronil market, including sales from 2016 to 2019 in four distribution channels: veterinary sales, pet specialty, online retailers, and general retailers. Wong Report ¶ 148, Exs. 3C, 4A, B5–B8. Dr. Wong opined that one company, Perrigo, sold two fipronil generics that commanded a substantial percentage of sales in three of the four distribution channels. Wong Report ¶ 129; Wong Rebuttal ¶ 193. Specifically, from 2016 to 2019, Perrigo

United States District Court
Northern District of California

accounted for 86% of the fipronil generics sold to general retailers (on average), 92% of fipronil generics sold online (on average), and from 38% to 63% of fipronil generics sold in pet specialty (annually).  Wong Rebuttal ¶ 190.  Perrigo does not appear to have any veterinary sales from that timeframe.  *Id.*  Dr. Wong also opines that four out of the seven "foreclosed customers" that sold fipronil products (███████████████████████████) "each sold between 87% and 100% of the fipronil generic spot-ons units from a single company."  Wong Rebuttal ¶¶ 191.  Dr. Wong also opines "Tevra accounts for the vast majority of the sales units" of imidacloprid spot-ons for two customers, Amazon and PSP.  *Id.* ¶ 198.

Dr. Wong's 100% figure presumes that, absent Bayer's exclusivity agreements, Tevra could have beat out each of its generic imidacloprid competitors to pen its own exclusive deals with every single one of the 43 foreclosed retailers and distributors.  But the fipronil generic market does not suggest that 100% control of the incremental generic market is reasonable, or even possible.  Perrigo, the most successful company in fipronil generics by Dr. Wong's account, never enjoyed 100% of sales in the entire fipronil market or even one of its distribution channels.  And while there is evidence that some (four out of seven) foreclosed retailers receive most or all generics from a single company, Wong Rebuttal ¶ 147, and of some success by Tevra, *id.* ¶ 198, Dr. Wong does not explain how it follows that all 43 of the foreclosed retailers and distributors would have moved to a single distributor, much less only Tevra.  Absent evidence that Tevra could significantly distinguish itself from its generic competitors or that the competitors would not have also vied for sales with each of the retailers and distributors, it's unlikely to the point of unreasonable that all 43 retailers and distributors would have exclusively partnered with Tevra.

Here, the 100% figure used by Dr. Wong is undermined by every single predicate fact he considered.  Tevra had several generic imidacloprid competitors, and several beat it to market.  Its price was competitive, but it was never the cheapest.  Other than one company's "headwinds," and a general statement about Tevra's potential to improve its efficiencies, Tevra is not appreciably distinguishable from its competitors.  Even if Tevra had the superior product, the fipronil generic market teaches that no company would garner 100% of the excess units in a distribution channel.  It is not for the Court to say what percentage is correct or exactly how to weigh each data point.

1    But because Dr. Wong picked 100%, a fanciful value divorced from even the most charitable

2    interpretation of the data, the Court can reach no conclusion except that Dr. Wong did not apply

3    reliable principles and methods to the facts of the case, as required by Rule 702.  Thus, the Court

4    finds that it is more likely than not that the second part of Dr. Wong's Frontline Method is not

5    reliable and must be excluded.

6                          **2.  Projection Method**

7          Dr. Wong also put forth a second approach to calculating damages called the "Projection

8    Method."  After initial remarks at the hearing where the Court stated it was "inclined to exclude

9    the Projection Method," Hearing Tr. 8:3–14, counsel for Tevra advised the Court that Tevra would

10   withdraw this opinion and Bayer concurred.  *Id.* 11:11–17.  Thus, the Court denies Bayer's motion

11   to exclude the Projection Method as moot.

12                          **3.  Consumer Harm Test**

13         Dr. Wong also puts forth a short but substantial one-paragraph opinion on the harm to

14   consumers (pet owners).  Wong Report ¶ 135.  Using the first part of the Frontline Method as a

15   starting point, Dr. Wong estimates "the total impact to consumers is potentially more than $214

16   million from 2017 to 2023."  *Id.*

17         Bayer argues that the opinion should be excluded under Rule 702(c) because the number is

18   based on the "unreliable" Frontline method, and under Rule 702(a) because it is not a "fact in

19   issue" in this litigation.  Wong Mot. at 9.  Alternatively, Bayer argues that the $214 million figure

20   should be excluded as irrelevant and unduly prejudicial.  *Id.*  Tevra responds that consumer harm

21   is relevant.  Specifically, Tevra acknowledges that "the relevant antitrust market concerns Bayer's

22   sales to retailers and distributors and not to end-user consumers," but argues that "the Second

23   Amended Complaint expressly addresses how Bayer's exclusionary conduct impacts consumers."

24   Wong. Opp. at 8; SAC ¶ 200.

25         The Court first addresses Bayer's Rule 702(c) challenge.  As discussed above, an expert's

26   opinion must be based on "reliable principles and methods."  Fed. R. Evid. 702(c).  Because the

27   Court finds (*supra*) that it is more likely than not that the ***first*** part of Dr. Wong's Frontline

28   Method, which relates to the volume of sales that would have been lost by Bayer, is reliable, there

United States District Court
Northern District of California

14

1   is no reason to exclude this opinion just for being based on the Frontline Method.

2         Expert evidence must also be relevant, Fed. R. Evid. 401, and "help the trier of fact to

3   understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The Court agrees

4   with Bayer that an opinion is not necessarily relevant or related to a "fact in issue" just because it

5   is related to facts alleged in the complaint. However, at the hearing Tevra noted that evidence of

6   consumer harm is an important "counter[]" to "procompetitive justifications from Bayer."

7   Hearing Tr. 33:4–10. Because general consumer harm arguments may prove to be a relevant issue

8   at trial, the Court will not exclude the opinion under either Rule 702(a) or Rule 401 at this time.

9         Finally, the Court addresses whether the actual consumer harm estimate of $214 million is

10   unfairly prejudicial under Rule 403. "The court may exclude relevant evidence if its probative

11   value is substantially outweighed by a danger of one or more of the following: unfair prejudice,

12   confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

13   cumulative evidence." Fed. R. Evid. 403. Even if consumer harm is relevant rebuttal to Bayer's

14   evidence of pro-competitive effects of it conduct, this figure adds little probative value to any

15   issue at trial, and it is outweighed by the risk of skewing the jury award to a higher damages

16   amount where Dr. Wong did not use the $214 million consumer harm estimate in calculating

17   damages to Tevra. *See Finjan, Inc. v. Cisco Sys. Inc.*, No. 17-CV-00072-BLF, 2020 WL

18   13180005 (N.D. Cal. Apr. 21, 2020). Thus, the Court excludes the consumer harm estimate of

19   $214 million under Rule 403.

20             **4.  Relevant Market Opinion (SSNIP Test and DiD Regression)**

21         Bayer also briefly reraises the same challenges to Dr. Wong's market definition that it

22   brought in its motion for summary judgment. Wong Mot. at 10. Those challenges were

23   thoroughly addressed in the summary judgment order. As discussed by the Court, it is more likely

24   than not that Dr. Wong's relevant market opinions are reliable. SJ Order at 19. Thus, Bayer's

25   motion to exclude Dr. Wong's relevant market opinions is denied.

26   \\

27   \\

28   \\

United States District Court
Northern District of California

**IV.    ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.  Tevra's motion to exclude Dr. Saravia's relevant market opinion is DENIED.

2.  Bayer's motion to exclude Dr. Wong's "Frontline Method" opinion is GRANTED IN PART AND DENIED IN PART.  Dr. Wong may offer his opinions based on his "Frontline Method," but he may not offer opinions that Tevra would have captured 100% of the "excess units" from 2017 to 2023.

3.  Bayer's motion to exclude Dr. Wong's "Projection Method" opinion is DENIED AS MOOT based on Tevra's concession that the opinion will not be offered at trial.

4.  Bayer's motion to exclude Dr. Wong's "Consumer Harm" opinion is GRANTED IN PART AND DENIED IN PART.  Dr. Wong may generally opine about harm to consumers, but he may not testify about his estimated consumer harm projection of $214 million.

5.  Bayer's motion to exclude Dr. Wong's relevant market opinions is DENIED.

Dated: April 30, 2024

BETH LABSON FREEMAN
United States District Judge