DANIEL B. ASIMOW (Bar No. 165661)
daniel.asimow@arnoldporter.com
MEREDITH B. OSBORN (Bar No. 250467)
meredith.osborn@arnoldporter.com
SEAN M. CALLAGY (Bar No. 255230)
sean.callagy@arnoldporter.com
ANDREW S. HANNEMANN (Bar No. 322400)
andrew.hannemann@arnoldporter.com
JEE HEUN ("JEENIE") KAHNG (Bar No. 348556)
jeenie.kahng@arnoldporter.com
JESSICA GILLOTTE (Bar No. 333517)
jessica.gillotte@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone:    415.471.3100
Facsimile:    415.471.3400

SONIA K. PFAFFENROTH (Bar No. 223984)
sonia.pfaffenroth@arnoldporter.com
LAURA S. SHORES (appearance *pro hac vice*)
laura.shores@arnoldporter.com
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743
Telephone:    202.942.5000
Facsimile:    202.942.5999

Attorneys for Defendant
BAYER HEALTHCARE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TEVRA BRANDS, LLC,<br><br>            Plaintiff,<br><br>   v.<br><br>BAYER HEALTHCARE LLC,<br><br>            Defendant. | Case No. 5:19-cv-04312-BLF<br><br>**DEFENDANT BAYER HEALTHCARE LLC'S TRIAL BRIEF**<br><br>Trial Date:   July 19, 2024<br>Judge:        Hon. Beth Labson Freeman |

I.  **INTRODUCTION**

This case is proceeding to trial on three related claims, all involving Bayer HealthCare LLC's ("Bayer") alleged efforts to inhibit the sales of generic imidacloprid products during the period from 2017 to 2020. During that time, Bayer offered certain pet specialty retailers and distributors a discount of ▮% if they would carry Bayer's imidacloprid product exclusively. Some, but by no means all, pet specialty retailers and distributors accepted that discount for at least some portion of the relevant period. The vast majority of imidacloprid products were sold through different channels -- veterinarians, mass merchandisers, and general on-line retailers -- that were never even offered the exclusivity discount.

Plaintiff Tevra Brands, LLC ("Tevra") is a start-up founded in 2015. It has no history of success and over the period from 2017 to 2020 experienced cumulative losses, per its tax returns, of approximately $▮. It was beat to market by nearly two years by a much better capitalized competitor (PetIQ) and ultimately introduced the *seventh* generic imidacloprid product. Its sales at the many outlets not impacted by Bayer's exclusivity incentive were *de mimimis*, never amounting to more than ▮% of generic imidacloprid sales. Yet Tevra incongruously claims that – if only Bayer had not offered the exclusivity discount – Tevra would have flourished, garnering essentially all generic sales and earning tens of millions of dollars of profits.

Tevra's far-fetched claim faces numerous legal hurdles that Bayer expects will result in a jury verdict in Bayer's favor or the entry of judgment for Bayer under Rule 50. These hurdles include:

- All of Tevra's claims are rule-of-reason claims that require, as a starting point, proof of **market power**. Tevra's entire case for market power rests on the premise that the relevant market is limited to topical imidacloprid products for treatment of fleas and ticks on companion animals and *excludes* all other flea and tick products, including topicals with other chemicals as well as collars and orals. The evidence is overwhelmingly to the contrary, and indeed the flimsy testimony of Tevra's expert will not be enough for any reasonable jury to find in Tevra's favor on this threshold issue.

- Tevra must establish **substantial foreclosure**, *i.e.*, that Bayer foreclosed so much distribution that competitors could not reach the ultimate consumer. But Bayer offered

its incentives to only a small fraction of distribution, and even then Bayer offered only a small discount in exchange for exclusivity – which meant that a competitor could access even the allegedly foreclosed retailers and distributors by making a better offer.

- Tevra will need to show that the discounts at issue were **long-term**. They were not. They were voluntary and immediately terminable discount provisions contained in short-term contracts. Tevra's supposed theory that a handful of retailers had an unwritten agreement to maintain exclusivity for the long term will not stand up to scrutiny.

- Tevra must prove **causation**: that its alleged lost sales were due to Bayer. The evidence will show a host of other reasons why Tevra failed to achieve success. It was late to the market, undercapitalized, had higher prices than its competitors, had poor relationships with the very retailers and distributors from which it claims it was foreclosed, suffered quality issues significant enough that retailers and distributors discontinued carrying its product, and even resorted to unethical practices like paying people to write fake reviews.

- Finally, Tevra must provide competent evidence of **damages**. It cannot. It damages expert was excluded by the Court. The Court extended Tevra a lifeline by allowing its founder to offer his own opinion on damages, but that opinion must also be excluded. It is based on documents improperly withheld from discovery, it violates Tevra's own representation that it was withdrawing its projections as a basis for damages, it is offered by an individual without knowledge of the underlying calculations, and it is based on plainly false assumptions, such as the assumption that Tevra would capture all or nearly all of the generic market. Whether as a result of a motion that Bayer filed on July 15, objections at trial or judgment as a matter of law, Tevra will be left without admissible damages evidence.

II. **BACKGROUND**

   **A. Background on Topical Flea and Tick Products**

In 1996, Bayer launched Advantage, a topical flea and tick product for dogs and cats. Advantage contained the active ingredient imidacloprid. It entered a market in which Rhône Mérieux (later Merial) sold a similar product, Frontline, a topical flea and tick product containing the active ingredient fipronil. In 2000, Merial added the insect growth regulator (S)-methoprene to its Frontline

product, which was sold under the name Frontline Plus. Bayer then introduced K9 Advantix in 2002, a topical flea and tick product designed specifically for dogs containing both imidacloprid and permethrin. In 2011, Bayer added the insect growth regulator pyriproxyfen to its topical flea and tick products, which were sold under the names Advantage II and K9 Advantix II. Bayer held patents covering its Advantage II and K9 Advantix II products.

Before 2010, Bayer sold its topical flea and tick products exclusively to veterinarians. However, in 2010, Bayer started to also sell its products directly to pet specialty retailers. Between 2011 and 2014, numerous new products entered the market, including generic versions of Frontline, oral flea and tick products including NexGard and Bravecto, and a flea and tick collar manufactured by Bayer called Seresto.

### B. Entry of Generic Imidacloprid Topical Products

Starting in late 2015, several generic versions of Bayer's topical imidacloprid products were registered with the Environmental Protection Agency ("EPA"). PetLock II, a generic imidacloprid topical product manufactured by Pet IQ, was registered with the EPA in November 2015. Other products, including Pet IQ's PetLock MAX and Advecta3, Perrigo Animal Health's PetArmor Advanced 2, Promika's Adventure Plus, and PARADefense Advanced for Dogs, soon followed, obtaining EPA registration by September 2016. Tevra, on the other hand, did not obtain EPA registration for any of its imidacloprid topical products until May 2017. Trial Exhibit 91 at 2 (30(b)(6) Stipulation).

### C. Bayer's Retailer and Distributor Agreements

Bayer's agreements with retailers and distributors were for a term of two years or less (with one exception)[1], and every contract (without exception) was terminable by the customer for any reason with 90 or fewer days' notice. Starting in the February 2016 – February 2018 contract cycle, Bayer introduced an optional, ▋% discount in its retailer agreements if retailers chose Bayer as their exclusive supplier of imidacloprid topical products (the "Imidacloprid Exclusivity Discount"). Bayer

---

[1] One retailer agreement was drafted as an evergreen contract, but it was terminable with 60 days' notice, and the addenda since 2016 setting forth applicable discounts were limited to a period of two years or less.

sought to maintain its presence in the Pet Specialty channel, where Bayer had focused much of its sales and marketing efforts over the last six years. *See* Trial Exhibit 50 (noting that Bayer's objective in introducing the discount was to "[g]row the Pet Specialty accounts through strong partnerships with retailers," while recognizing that "[s]econdary sales arenas for flea and tick product [where the discount was not offered and/or taken], including veterinarians as well as mass merchandisers like Wal-Mart, Amazon.com, club warehouse stores, grocery stores, etc. also present strong competition for Pet Specialty business"). The discount could be discontinued by the retailer at any time without advance notice. Some retailers chose to take advantage of the discount. Others did not. ▮, for example, did not take advantage of the discount during the 2016 – 2018 contract cycle. ▮ instead decided to carry Pet IQ's PetLock II product during that time period. ▮, who initially took the discount, declined it during the March 2017 – January 2020 time period and carried Pet IQ's PetLock MAX product. Retailers ▮ never took the discount during the relevant time period, and other mass merchandisers were not even offered the discount due to lack of a contractual relationship with Bayer.

Bayer's distributors were not offered the Imidacloprid Exclusivity Discount but were instead offered an optional ▮% discount if Bayer's topical products were the only flea and tick products containing fipronil or imidacloprid sold by the distributor. Bayer's distributors primarily sold to independent pet retailers, which were never offered or accepted any Bayer exclusivity discount.

**D. Tevra's Entry Into the Market**

Tevra, having been beaten to the market by Pet IQ and others, captured only ▮% of generic imidacloprid topical sales during its first year on the market in 2017. *See* Richmond Report, Table 18. It never captured more than ▮% of generic imidacloprid topical sales in any year between 2017 and 2019. *See id.* Tevra blames Bayer for its lack of success, but as discussed below, the reality is that Tevra was not the first mover, was not as well capitalized as others such as Pet IQ, received poor reviews on its products, and had poor relationships with the very same retailers from whom it alleges it was foreclosed. *See infra* at 11–12. Tevra therefore cannot attribute its lack of sales to Bayer and will not be able to present a cognizable damages theory at trial.

### III. FACTUAL AND LEGAL ISSUES

#### A. Market Power

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (citation omitted). "In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'" *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008); *see also Qualcomm Inc.*, 969 F.3d at 990 (monopolization requires the possession of monopoly power). The touchstone of a market definition is reasonable interchangeability. "The outer boundaries of a product market are determined by the *reasonable interchangeability of use* or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (emphasis added). "Often, this inquiry involves empirical evidence in the form of a 'SSNIP' analysis." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023). A SSNIP analysis assesses whether a small but significant non-transitory increase in the price of one good would cause customers to shift their spending to an alternative product. *See id.*

Tevra advances an antitrust market limited to "topical flea and tick products for dogs and cats containing Imidacloprid sold in the U.S." (SAC ¶ 15), which no reasonable jury could find reflects the competitive realities in which Tevra or Bayer operates. In reality, consumers are not loyal to (or likely even aware of) particular active ingredients. The record is replete with evidence showing that imidacloprid topicals compete with topicals that use different active ingredients, including fipronil. *See, e.g.*, Trial Exhibit 66 (Bayer strategic briefing noting that "[t]he flea and tick market is very competitive, and difficult for consumers to understand differences between products. People believe that there is little or no difference between the premium spot on brands such as Advantix and Frontline and believe that that key points of difference such as repellency are common among most products."); Trial Exhibit 79 (Bayer presentation noting that Frontline is a "key competitor" and that "K9 Advantix II is in a competitive battle for Market Share within the E-Commerce/Topical space"); Trial Exhibit 116 at 5 (Tevra presentation noting that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮);

Trial Exhibit 2006 at 15 (Tevra presentation stating that ███████████████████████████████ ███████████████████████████").

The record evidence also shows that topical flea and tick products compete with non-topical products, including orals and collar products. Bayer, for example, noted in 2017 that "[i]n addition to the entrenched brands, like Frontline, newer prescription only oral flea and tick products (Bravecto & Nexgard) have been gaining rapid awareness and penetration in veterinary clinics." Trial Exhibit 66. Bayer's analyses showed that ███████████████████████████████████████████ ███████████████████████████████████████████████████████████████. *See* Trial Exhibit 77 at 3–11. Tevra also noted that shoppers were switching to oral medications. *See* Trial Exhibit 2137.

A 2016 consumer Willingness to Pay study performed by Bayer confirms that Tevra's market is implausible. That survey posed the precise question needed to determine market definition: if Bayer implemented a price increase, would it be profitable? The survey concluded that a 7.5% price increase on K9 Advantix II consumers would cause 29% of buyers to switch to Frontline Plus and that an additional 7% would switch to an oral product. *See* Trial Exhibit 79 at 26. At trial, Bayer witnesses including Jeremy Page will testify regarding this study and other record evidence showing that Bayer's ability to raise prices was constrained by Frontline. Bayer's expert, Dr. Celeste Saravia, will opine that the relevant antitrust market includes, at a minimum, other topical flea and tick products such as Frontline and likely includes oral and collar flea and tick products as well. Tevra cannot point to any ordinary course documents to support its own narrow market definition, instead relying on a flawed market definition analysis from its expert, Dr. Wong.

In a properly alleged relevant market that includes oral products and collars, Bayer's market share is less than 20 percent. *See* Saravia Report, Ex. 16–17. Even if the relevant market were limited to only topical products, Bayer's share was never greater than 31 percent in the relevant period. *Id.* at Ex. 18. These market shares cannot result in substantial market power under Section 1 or Section 3. *See, e.g.*, *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162–65 (9th Cir. 1997) (upholding series of exclusive dealing arrangements with distributors by firm with 55% market share); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 517 (3d Cir. 1998) ("[S]ince *Jefferson Parish* no court has inferred substantial market power from a market share below 30 percent.").

### B. Substantial Foreclosure

Even if Bayer had market power in a relevant product market, its conduct would not violate Section 1 or Section 3 because Bayer never foreclosed more than 30% of relevant distribution. "[A]n exclusive dealing arrangement violates Section 1 only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'" *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) (citation omitted); *see also Omega Env't*, 127 F.3d at 1162 ("Only those arrangements whose 'probable' effect is to 'foreclose competition in a substantial share of the line of commerce affected' violate Section 3.") (citation omitted). When analyzing whether an agreement forecloses competition, the foreclosure calculation "includes the full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for, using easily convertible plants and marketing organizations." *Omega Env't*, 127 F.3d at 1162.

Dr. Saravia will demonstrate that sales by retailers that accepted Bayer's Imidacloprid Exclusivity Discount constituted less than 30% of Tevra's potential sales during the relevant period. The share of sales of topical flea and tick medications made through retailers accepting the discount were below 30% in every quarter between 2017 and Q1 2020 and under 15% during the period in which Tevra launched its products. *See* Saravia Report ¶ 189, Ex. 24. Thus, retailers accounting for at least 70% of potential topical sales could have sold Tevra's generic imidacloprid products during the relevant time period. Channels responsible for the sale of the majority of imidacloprid products, including veterinarians and mass merchandisers, were not impacted by the discount. For example, Bayer witness Chris Diesel will testify that ████, one of Bayer's accounts outside of the pet specialty channel, has never taken the discount and has instead carried both brand and generic imidacloprid products, in addition to fipronil products. Tevra has always had the ability to sell its products in such channels.

The levels of foreclosure here are inadequate to state a claim for exclusive dealing. *See Omega Env't*, 127 F.3d at 1162–65 (upholding exclusive dealing arrangements foreclosing 38% of relevant market); *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 123–24 (1st Cir. 2011) ("'[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent,' and while high numbers

do not guarantee success for an antitrust claim, 'low numbers make dismissal easy.'") (quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004)); *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 52–53 (D.D.C. 2000) (foreclosure rate closer to 40 percent is required before exclusivity raises competitive concerns), *rev'd in part on other grounds*, 253 F.3d 34 (D.C. Cir. 2001)).

Tevra has argued that the foreclosure analysis should look only at where imidacloprid topical products were sold during the relevant period. However, by looking at only sales of topical imidacloprid, of which it is undisputed that Bayer sold a large percentage, this measure is necessarily distorted by Bayer's strategic choices about where to sell its products and ignores the numerous selling opportunities available to Tevra. *See Omega Env't*, 127 F.3d at 1162. The foreclosure analysis must instead account for all "potential alternative channels of distribution." *Allied Orthopedic*, 592 F.3d at 997. Tevra will not be able to demonstrate substantial foreclosure under this standard.

### C. Duration

Setting aside that Bayer lacked market power in the relevant market and never foreclosed a substantial share of the market, its conduct also did not violate Section 1 or Section 3 because all agreements were short-term and easily terminable. "The 'easy terminability' of an exclusive dealing arrangement 'negate[s] substantially [its] potential to foreclose competition.'" *Allied Orthopedic*, 592 F.3d at 997 (quoting *Omega Env't*, 127 F.3d at 1163–64). "Discounts conditioned on exclusivity in relatively short-term contracts are rarely problematic." *Id.* (quoting 11 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1807a, at 129 (2d ed. 2000)). "[E]ven a high foreclosure percentage will not exclude competition if the period covered by the exclusive-dealing arrangement is short *and* there are no other impediments to switching." *PNY Techs., Inc. v. SanDisk Corp.*, No. 11-cv-04689-WHO, 2014 WL 2987322, at *4 (N.D. Cal. July 2, 2014) (citation omitted).

Here, it is undisputed that every contract between Bayer and a retailer or distributor governing sales of Bayer's imidacloprid products was for a term of two years or less (with one exception) and that every contract (without exception) was terminable by the customer for any reason with 90 or fewer days' notice. The one exception was a retailer agreement drafted as an evergreen contract, but that agreement was terminable with 60 days' notice, and the addenda since 2016 setting forth

1  applicable discounts were limited to a period of two years or less.  *See Omega Env't*, 127 F.3d at 1163–64 (noting that two-year contracts are reasonable).  Bayer witness Kent Luther will testify as to the short duration and easy terminability of Bayer's contracts.

More importantly, though, Bayer's witnesses will testify that retailers always had the option to stop taking the Imidacloprid Exclusivity Discount *at any time* without terminating their agreements. Where a retailer "could choose at anytime to forego the discount offered by [Bayer] and purchase from a generic competitor," "[t]he 'easy terminability' of [the] arrangement 'negate[s] substantially [its] potential to foreclose competition.'"  *Allied Orthopedic*, 592 F.3d at 997 (quoting *Omega*, 127 F.3d at 1163–64).

Tevra does not dispute these facts but instead contends that Bayer's agreements were "de facto" long term and not easily terminable.  "De facto" exclusive dealing, a theory that has not been explicitly recognized by the Ninth Circuit (*see Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016)), has no applicability here.  A de facto exclusive dealing theory looks "past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement in the real world."  *Aerotec Int'l, Inc.*, 836 F.3d at 1182.  However, courts have rejected claims of de facto exclusive dealing where the "record includes no facts from which a jury could infer that the practical effects of the rebate agreements made it so payors 'were not free to walk away from the agreements and purchase products from the supplier of their choice.'"  *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 545 F. Supp. 3d 922, 1011 (D. Kan. 2021) (citation omitted); *see also Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 407–08 (3d Cir. 2016) (granting summary judgment for defendant on de facto exclusive dealing claim where "customers had the ability to switch to competing products"); *PNY Techs.*, 2014 WL 2987322, at *7 (dismissing exclusive dealing claim where complaint was "devoid of any indication that [defendant] engaged in anticompetitive conduct to preclude retailers from considering [plaintiff] or other manufacturers or to prevent [plaintiff] or other manufacturers from approaching retailers with better offers than [defendant]").

Here, the record evidence makes clear that retailers were free to purchase from other suppliers and that many retailers declined the exclusivity discount during one or more contract cycles.  For

example:

- ▓▓▓▓▓▓▓▓▓▓▓▓ have not taken the discount since Bayer initiated a direct relationship with them in mid-2017;
- ▓▓▓▓ has not taken the discount since it initiated a direct relationship with Bayer in February 2019;
- ▓▓▓▓▓▓ has not taken the discount since March 2017 after initially taking it;
- ▓▓ did not take the discount between February 2016 and January 2018;
- ▓▓▓ stopped taking the discount in March 2017 and started taking the discount again in February 2020; and
- ▓▓▓ stopped taking the discount in July 2017 and started taking the discount again in February 2018;

Trial Exhibit 92, Exhibit A (30(6)(6) Stipulation). Some retailers even stopped taking the discount during the middle of a contract cycle. Bayer witness Scott Bauer will testify, for example, that ▓▓▓ stopped taking the discount in mid-2017 to test generic products in its stores, and Bayer witness Craig Reinert will testify that ▓▓▓ stopped taking the discount mid-contract cycle in March 2017.

Tevra, unable to dispute these facts, instead points to other alleged monetary levers that Bayer used to convince retailers to exclusively carry Bayer's products, including allocation of marketing funds. Tevra suggests, for example, that Bayer applied pressure on ▓▓▓ to take the Imidacloprid Exclusivity Discount by threatening to withhold marketing funds. *See* Trial Exhibit 1057. Putting aside the fact that ▓▓▓ declined the discount after that email was sent, Bayer witnesses including Chris Diesel will testify that financial incentives such as marketing funds were not conditioned on the retailer exclusively carrying Bayer's products.

### D. Causation

Causation is "relevant in the first instance to proof of the fact of damages . . . Unless the amount sought to be recovered is shown to be 'definitely attributable' to defendant's wrongful conduct, there is no basis for [damages]." *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 863 (N.D. Cal. 1979), *aff'd sub nom. Murphy Tugboat Co. v. Crowley*, 658

1  F.2d 1256 (9th Cir. 1981)).

2  At trial, Tevra will not be able to demonstrate that its alleged lost sales were due to Bayer.
3  Rather, Tevra's lack of success was due to its own failings.

4  *First*, Tevra was not the first generic imidacloprid product on the market but was instead the
5  seventh.  PetIQ's PetLock II, a generic imidacloprid product, obtained its EPA registration in
6  November 2015 and launched in March 2016[2], well over a year before Tevra first launched its
7  imidacloprid topical products.  Several other imidacloprid topical products also launched before
8  Tevra made it to the market, including PetIQ's PetLock MAX and Advecta3, Perrigo Animal Health's
9  PetArmor Advanced 2, Adventure Plus, and PARADefense Advanced for Dogs.  *See, e.g.*, Wong
10 Report, Exhibit 3A.

11 PetIQ soon began selling its products at outlets including Petco, PetSmart, and Walmart.
12 Petco started carrying PetIQ's PetLock II product well before Tevra ever made it to the market, while
13 PetSmart chose to carry PetIQ's PetLock MAX product.  In May 2017, PetIQ announced that its
14 Advecta3 product would launch at Walmart stores nationwide.[3]  Tevra recognized that PetIQ was a
15 competitive threat, noting in April 2017 that ▮
16 ▮
17 ▮  Trial Exhibit 2010.  Tevra executive Robert Scharf later noted in
18 August 2018 that if ▮ Trial Exhibit 2154.  PetIQ rapidly
19 gained brand recognition, while Tevra did not.  Tevra noted in November 2018 that ▮ informed
20 Tevra that they ▮
21 ▮ Trial Exhibit 2121 at 3.

22 *Second*, Tevra had poor relationships with the retailers with whom it did manage to secure

---

[2] *See* PetLock® Launches New Line of Flea and Tick Treatment and Prevention Products, PetIQ, March 17, 2016, https://ir.petiq.com/news-releases/news-release-details/petlockr-launches-new-line-flea-and-tick-treatment-and.

[3] *See* Advecta™3 Flea and Tick Treatment Launches at Walmart Stores Nationwide, May 8, 2017, https://www.globenewswire.com/news-release/2017/05/08/980136/0/en/Advecta-3-Flea-and-Tick-Treatment-Launches-at-Walmart-Stores-Nationwide.html.

business. As one example, Tevra produced a private label product for Chewy called Onguard. However, in April 2018, ███████████████████████████████████████████████████████████████████████████████████████████████████ Trial Exhibit 126. In December 2019, ████████████████████████████████████████████████████████ Trial Exhibit 2082. *See also* Trial Exhibit 2122 at 3 (████████████████████████████████████████████████████████████████████████████████████████████████████████████). Tevra had a similarly strained relationship with ██████. Tevra executive Robert Scharf noted in December 2019 that he thought ████████████████████████████████████████████████████████████████████████████ Trial Exhibit 2166. *See also* Trial Exhibit 110 (████████████████████████████████████████████); Trial Exhibit 3005 (██████████████████████████████████████████).

*Third*, Tevra did not have the lowest pricing among its generic imidacloprid competitors. *See* Wong Report, Exhibit 3C. Consequently, retailers went with better-priced options. For example, ████████████ noted in March 2017 that ████████████████████████████████████████████████████████████████ Trial Exhibit 115. *See also* Trial Exhibit 2307 (Jim Corcuera noting that ████████████████████████████████████████████████).

*Fourth*, Bayer's damages expert Andy Richmond will show that Tevra was undercapitalized with negative equity and suffered significant net losses in its first years of operation. *See* Richmond Report ¶¶ 34–49. Because Tevra was unprofitable, Tevra funded its ongoing operations via a series of loans and contributions from partners and bank debt. *See id.* ¶ 53. Tevra would have needed to overcome these financial constraints to grow at the rates claimed by Tevra. Tevra's poor financial condition stands in contrast to other competitors in the topical imidacloprid market, such as PetIQ and Perrigo. *See id.* ¶¶ 50–52.

**E.     Damages**

Finally, Tevra has no admissible evidence of damages. Tevra's expert, Dr. Wong, previously

opined that Tevra would have sold 100% of the "excess units" that would have shifted from Bayer's name brand products to imidacloprid generics. However, the Court granted Bayer's motion to exclude that opinion, noting: "[T]he 100% figure used by Dr. Wong is undermined by every single predicate fact he considered. Tevra had several generic imidacloprid competitors, and several beat it to market. Its price was competitive, but it was never the cheapest. Other than one company's 'headwinds,' and a general statement about Tevra's potential to improve its efficiencies, Tevra is not appreciably distinguishable from its competitors." ECF No. 360 at 13 (Daubert Order).

Tevra now offers its executive, Robert Scharf, to opine on Tevra's damages. However, Scharf's opinions amount to nothing more than speculation and thus cannot serve as the basis for a damages opinion.[4] Antitrust damages claims resting on "speculation or guesswork" are to be excluded. *See Cave Consulting Grp., Inc. v. OptumInsight, Inc.*, No. 15-CV-03424-JCS, 2020 WL 127612, at *6 (N.D. Cal. Jan. 10, 2020); *see also Alpha GRP, Inc. v. Subaru of Am., Inc.*, No. CV 18-2133-MWF (MRWx), 2021 WL 6103548, at *5 (C.D. Cal. Nov. 17, 2021) (granting summary judgment on damages; executives' testimony did not "convert extremely optimistic internal projections into reasonably reliable evidence because the projections are plagued by several levels of assumptions"); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988) (holding that "[s]ome sort of study estimating the amount of damages was essential to appellants' case"; plaintiffs "must provide evidence such that the jury is not left to 'speculation or guesswork' in determining the amount of damages to award").

Mr. Scharf did not do *any* analysis of the market to determine what market share percentage Tevra could hope to capture and instead incorrectly testified that Tevra had a "first mover" advantage. *See* ECF No. 370 at 2–3 (Bayer's Motion in Limine No. 1). Nor can Scharf rely on Tevra's forecasts, which Bayer conclusively established in discovery were speculative and without foundation. *See id.* With no admissible lost sales estimate, Tevra cannot show injury or damages. *See City of Vernon v.*

---

[4] Mr. Scharf's testimony on July 12, 2024 reveals that Tevra has engaged in discovery abuse, that Tevra is failing to abide by the terms of two stipulations, and that Mr. Scharf's opinion is inadmissible under Rule 701. Bayer has asked the Court to entertain on shortened time a motion to exclude Mr. Scharf's testimony and enter judgment for Bayer.

*S. Cal. Edison Co.*, 955 F.2d 1361, 1373 (9th Cir. 1992) (holding "that the serious flaws in the only damage study which could be proffered to the jury placed [plaintiff] in the position of having no proper proof of damages at all"); *Cave Consulting*, 2020 WL 127612, at *9; *Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK, 2017 WL 635469, at *10 (N.D. Cal. Feb. 16, 2017), *aff'd*, 726 F. App'x 608 (9th Cir. 2018) (granting summary judgment where "Plaintiffs have conceded that they have no admissible evidence to prove damages").

## IV. CONCLUSION

Tevra's claims will fail at trial. It lacks proof of each of the key elements of its claims, such that the jury will reject its case or the Court will find as a matter of law that Bayer is entitled to judgment.

Dated: July 15, 2024.

Respectfully submitted,

**ARNOLD & PORTER KAYE SCHOLER LLP**

By:  /s/ *Daniel B. Asimow*
　　　DANIEL B. ASIMOW

DANIEL B. ASIMOW
MEREDITH B. OSBORN
SEAN M. CALLAGY
ANDREW S. HANNEMANN
JEE HEUN ("JEENIE") KAHNG
JESSICA GILLOTTE
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024

SONIA K. PFAFFENROTH
LAURA S. SHORES (appearance *pro hac vice*)
601 Massachusetts Ave, NW
Washington, D.C. 20001-3743

*Attorneys for Defendant*
BAYER HEALTHCARE LLC