COLBY B. SPRINGER (SBN 214868)
cspringer@polsinelli.com
IQRA IQBAL (SBN 353064)
iiqbal@polsinelli.com
MIYA YUSA (SBN 314563)
myusa@polsinelli.com
**POLSINELLI *LLP***
Three Embarcadero Center, Suite 2400
San Francisco, CA 94111
T:  415-248-2100

DANIEL D. OWEN (*Admitted PHV*)
dowen@polsinelli.com
**POLSINELLI *PC***
900 W. 48th Place, Ste. 900
Kansas City, MO 64112
T:  816-753-1000

EMILY C. MCNALLY (*Admitted PHV*)
emcnally@polsinelli.com
**POLSINELLI *PC***
1000 Second Avenue, Suite 3500
Seattle, WA 98104
T: 206-393-5400

Attorneys for Plaintiff
TEVRA BRANDS, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TEVRA BRANDS, LLC, | Case No. 5:19-cv-04312-BLF |
| Plaintiff, | **PLAINTIFF TEVRA BRANDS, LLC'S TRIAL BRIEF** |
| v. | |
| BAYER HEALTHCARE LLC, | Judge:  Hon. Beth Labson Freeman |
| Defendants. | |

1    **I.    INTRODUCTION**

2         Plaintiff Tevra Brands, LLC ("Tevra") competes with Defendant Bayer Healthcare LLC

3    ("Bayer") by producing generic alternatives to Bayer's flea and tick topical products.  As the result

4    of patents and EPA grants of exclusivity, Bayer was the sole manufacturer and seller of

5    imidacloprid topicals in the United States prior to 2016.  Bayer illicitly maintained that exclusivity

6    once its EPA and patent rights expired.  Bayer did so through a stated campaign of blocking generic

7    entry.  Tevra will show that Bayer: (a) had substantial market power in a properly defined relevant

8    antitrust market, (b) foreclosed competition in that market through long-term, not readily

9    terminable contracts and corresponding exclusionary conduct, and (c) damaged Tevra through said

10   contracts and conduct.

11   **II.    THE RELEVANT ANTITRUST MARKET AND BAYER'S SUBSTANTIAL POWER IN THE SAME**

12        "A relevant antitrust market is an area of effective competition, comprising both product

13   (or service) and geographic elements."  HORIZONTAL MERGER GUIDELINES, § 4.3 (2023).  The

14   relevant market is commonly defined through use of the hypothetical monopolist test ("HMT").

15   *Id.*  The HMT considers a small but significant and non-transitory increase in price, which asks:

16        whether a hypothetical profit-maximizing firm, not prevented by regulation from
     worsening terms, that was the only present and future seller of a group of products
17        ("hypothetical monopolist") likely would undertake at least a small but significant
     and non-transitory increase in price ("SSNIP") . . . for at least one product in the
18        group.
19

20   *Id.* § 4.3A.  Dr. Paul Wong used the hypothetical monopolist and corresponding SSNIP test to

21   identify the relevant antitrust market as "sales of imidacloprid spot-on flea and tick treatments by

22   manufacturers to wholesale customers in the United States."  WONG REPORT at ¶ 64.

23        Bayer's own history from 2010 to 2016 validates Dr. Wong's analysis.  From 2011 to 2016

24   Bayer increased the gross price of its imidacloprid spot-on treatments to wholesale customers from

25   ███ per dose to ███ per dose ███.  Accounting for discounts and rebates, Bayer

26   increased its net price to wholesale customers from ███ per dose to ███ per dose ███.

27

28

1  These increases are both above the 5% threshold that federal agencies use when defining a SSNIP

2  in the context of the HMT.



3

4

5

6

7

8

9

10

11      But at the same time—in 2011—generic fipronil entered the marketplace presenting a new

12  source of price competition.  If fipronil products were close substitutes for imidacloprid (as Bayer

13  would suggest), lower priced generic fipronil should have caused Bayer's offerings to appear as a

14  significant price increase to both wholesale and retail customers.[1]    Bayer nevertheless

15  implemented and sustained a significant increase in price.   Bayer's success shows that

16  imidacloprid topicals constitute a properly defined relevant market under the HMT.



17

18

19

20

21

22

23

24

25

_____

26  [1] Bayer did not sell directly to consumers, but to veterinarians, retailers, and other distributors

27  that then resold to consumers or other retailers.

28

Frontline (a brand name fipronil offering) declined over that same period.  This comparison both demonstrates the profitability of Bayer's illicit conduct and why fipronil products are appropriately excluded from the relevant market.  That Bayer was able to raise its price *and* maintain its sales are sufficient to show monopolization of a relevant market.

███████████████████████████████████████████████████████████

### III.   THE COMPLAINED OF CONDUCT TO MAINTAIN MONOPOLY POWER

What constitutes a short-term contract is fluid.  *See e.g. Omega Env't, Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1162 (9th Cir. 1997).  And "discounts and rebates" "may be understood as 'de facto' exclusive dealing contracts because they coerce buyers."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,* 836 F.3d 1171, 1182 (9th Cir. 2016).  Whether a contract creates an exclusive dealing arrangement depends on the contract's "practical effect" and its "practical application."  *Tampa Elec. Co. v. Nashville Coal Co.,* 365 US 320, 327 (1961).

Bayer's contracts are the explicit reason why many suppliers declined to carry Tevra's generic products.  The practical effect was to keep generics out of the market thus allowing Bayer to maintain market shares exceeding ████ despite the expiration of various exclusivity protections.  Bayer retailers has no incentive to terminate contracts.  Bayer used monetary levers (*i.e.,* practical application) to pressure distributors to exclusively carry Bayer's imidacloprid topicals.  *See e.g.* HOWELL DEP. TR. at 74:6–76:2 (███████████████████████████████████████████████████████████████████"); BAUER DEPO

1   EXHIBIT 1067 at 4619–24 (████████████████████████████████████████

2   ████████████████████████████████████████); DIESEL JULY 23, 2017 EMAIL (ECF

3   No. 277-32) ("████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████"); DIESEL DECEMBER 11,

6   2015 EMAIL (ECF No. 277-33) (████████████████████████).

7          Tevra will present adverse testimony from Jeremy Page evidencing Bayer's concern about

8   ████████████████████████████████████████████. *See e.g.*

9   EXHIBIT 1007.



17   Bayer—according to Mr. Page—experienced ████████████████████████

18   ████. ████████████████████████████. But despite the threat

19   of generic competition, Bayer did not reduce the price of its brand-name imidacloprid topicals.

20   Bayer instead maximized its profits through agreements with retailers and distributors to prevent

21   sale of competing imidacloprid generics.

22          Tevra will also present adverse testimony from Scott Bauer concerning the generic

23   imidacloprid competitive threat.  Mr. Bauer was personally involved in negotiating and executing

24   contracts with retailers to ████████████████.  Bayer's strategy was to implement a brand

25   block.  Mr. Bauer gave a 2016 presentation to distributors that asked those distributors to aid in

26   ████████████.  *See* EXHIBIT 1029.

27

28



Tevra will present testimony from Chris Diesel.  Mr. Diesel will testify that he presented arguments to retailers that by ██████████████████████████████. Mr. Diesel also led efforts to protect Bayer's shelf space and corresponding sales.  This included payments for ████████████████████.  Craig Reinert will testify as to presentations e██████████████████████ ███████.  Mr. Reinert will also testify as to the collection of data on ████████████████ █████████████████████████ risked a similar fate.

Denise Winslow will provide testimony concerning Bayer's contracts and retailer █████████████████████████████████████ ██████.  Thad Howell will testify as to the ████████████████████ ████████.  Mr. Howell's testimony includes the warning that a failure to adjust its strategy would be "█████████████████████."  Mr. Howell was involved in planning Bayer's distributor summit and aligning retailers on ██████████████y.  Mason Williams, in turn, will testify as to generics being a "████████."  *See* EXHIBIT 1126.

TEVRA BRANDS LLC's TRIAL BRIEF
CASE NO. 5:19-cv-04312-BLF

1   Tevra will also present affirmative testimony from its founders and employees.  Tevra's

2   co-founder and chairman of the board, Robert Scharf, will testify about the lucrative opportunity

3   for a generic imidacloprid topical.  He will likewise testify as to how those sales were impacted by

4   Bayer's anti-competitive conduct.

5   Tevra's co-founder and Senior Vice President of Sales, Jim Corcuera, will testify about his

6   experience in the pet products industry and Tevra's established network of relationships with

7   retailers and distributors.  Mr. Corcuera's testimony will address Tevra's efforts to sell its

8   imidacloprid topical products to distributors and retailers and how Bayer's exclusivity provisions

9   prohibited those sales.  Tevra co-founder Dr. Olaf Hansen, who is a co-inventor for the patents for

10  both Bayer's Advantix and Tevra's generic equivalent imidacloprid topical, will testify about the

11  efficacy and safety of Tevra's imidacloprid product.

12  **IV.    DAMAGE TESTIMONY BY TEVRA FACT WITNESSES**

13  Bayer's illegal maintenance of a monopoly and illegal exclusive dealings substantially

14  foreclosed competition thereby damaging Tevra.  Bayer's behavior—part of a documented and

15  stated goal to block generic entry—excluded Tevra from a substantial share of the relevant antitrust

16  market.  Robert Scharf's damages testimony is admissible under Federal Rule 701.  The Court

17  previously (and correctly) denied Bayer's Motion *in Limine* No. 3.  *See* ECF No. 409 at 9:21.  That

18  motion sought to exclude Tevra's projections and lay witness testimony by Mr. Scharf.  *See* ECF

19  No. 372 at 4-5.  *Lightning Lube, Inc. v. Witco Corp*., 4 F.3d 1153 (3d Cir. 1993) and the committee

20  notes to Rule 701 both explain the modern trend of allowing for admission of lay opinion testimony

21  grounded in personal knowledge.  ECF No. 409 at 9:11-12.

22  In *Lightning Lube,* the court deemed Rule 701 satisfied "given the owner's knowledge and

23  participation in the day-to-day affairs of his business [and] his reliance on [a] report [at issue] even

24  if prepared by an outsider."  *Lightning Lube*, 4 F.3d at 1175.  Mr. Scharf, like the owner in

25  *Lightning Lube*, has knowledge of the day-to-day affairs of Tevra as its founder, CEO, and

26  chairman of the board.  *See* SCHARF DEPO. I at 142:2-6.  Mr. Scharf can likewise explain how

27  internal corporate operations resulted in the generation of financial details.  *Id.* at 142:24-144:1.

28

Mr. Scharf has also explained his accountability for those numbers.  *See id.* at 142:15-17; 149:7-15; 155:5-18; 156:11-20; 156:21-157:3; 158:4-10.  That accountability and knowledge of company financials is readily explained as he is tasked to "determine if you have a company in the first place."  *Id.* at 144:7-12; *see Lightning Lube*, 4 F.3d 1153 at 1175 ("It is logical that in preparing a damages report the author may incorporate documents that were prepared by others, while still possessing the requisite personal knowledge or foundation to render his lay opinion admissible under [Rule] 701").

*BJB Elec. LP v. Bridgelux, Inc.* is also instructive.  2023 WL 4849764 (N.D. Cal. July 28, 2023).  *BJB* followed the guidance of *Lightning Lube* and allowed a company president to testify to damages finding "district courts within the Ninth Circuit have followed [this] trend").  *Id.,* at *5.  The plaintiff's president in *BJB* had sufficient knowledge of sales figures and financial information to opine on lost profits as a lay witness; his role involved cost and resource management and overseeing logistics, warehousing, and assembly operations.  *Id.*, at *6.  Lost profit calculations based on mathematical calculations and assumptions derived from personal experience working for the plaintiff and past work experience were found to be "well within the bounds of lay testimony."  *Id.*  Mr. Scharf's corporate responsibilities are similar; they involve cost and resource management, logistics, and operations.  Like the president in *BJB*, Mr. Scharf is equally well positioned to testify as to damages.

*Pet Food Exp. Ltd. v. Royal Canin USA, Inc.* is equally on point as to allowing for Mr. Scharf's testimony.  2011 WL 6140874 (N.D. Cal. Dec. 8, 2011).  The *Pet Food Express* court held that a co-CEO could testify to damages because his testimony was based on projections of future contract payments relative an estimate of competitors' sales.  *Id.*, at *11.  *Pet Food Express* cited *Lightning Lube* for the proposition that a business owner can testify to projected profits or losses due to their particularized knowledge and position in the business.  *Id.*  Testimony concerning the ***defendant's business*** despite being based on personal experience from running that business are nevertheless valid foundation.  *Id.*, at *12.  Mr. Scharf's testimony exhibits that foundation.

-7-

1    July 15, 2024                              Respectfully Submitted,

2                                                **POLSINELLI** *LLP*

3                                                /s/ COLBY B. SPRINGER
                                                 _____
4                                                 Colby B. Springer
                                                  Daniel D. Owen
5                                                 Emily C. McNally
                                                  Miya Yusa
6                                                 Iqra Iqbal

7                                                 Attorneys for
8                                                 TEVRA BRANDS LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TEVRA BRANDS LLC's TRIAL BRIEF
CASE NO. 5:19-cv-04312-BLF